1

The Honorable James L. Robart

ROBERT W. FERGUSON
2     WSBA #26004
      Attorney General
3     NOAH G. PURCELL
      WSBA #43492
4     Solicitor General
      COLLEEN M. MELODY
5     WSBA #42275
      Civil Rights Unit Chief
6     Office of the Attorney General
      800 Fifth Avenue, Suite 2000
7     Seattle, WA 98104
      206-464-7744
8

9

10              **UNITED STATES DISTRICT COURT**
              **WESTERN DISTRICT OF WASHINGTON**
11

12    STATE OF WASHINGTON and          CIVIL ACTION NO. 2:17-cv-00141-JLR
      STATE OF MINNESOTA,

13                    Plaintiffs,

14            v.                       FIRST AMENDED COMPLAINT
                                       FOR DECLARATORY AND
15    DONALD TRUMP, in his official    INJUNCTIVE RELIEF
      capacity as President of the United
16    States; U.S. DEPARTMENT OF
      HOMELAND SECURITY; JOHN F.
17    KELLY, in his official capacity as
      Secretary of the Department of
18    Homeland Security; TOM SHANNON,
      in his official capacity as Acting
19    Secretary of State; and the UNITED
      STATES OF AMERICA,
20
                      Defendants.
21

22                    **I.     INTRODUCTION**

23         1.     The States of Washington and Minnesota ("States") bring this action to protect

24    the States—including their residents, employers, and educational institutions—against illegal

25    actions of the President and the federal government. The President's Executive Order of

26    January 27, 2017 ("the Executive Order"), is separating families, harming thousands of the

States' residents, damaging the States' economies, hurting State-based companies, and undermining both States' sovereign interest in remaining a welcoming place for immigrants and refugees. The Court should invalidate the portions of the Executive Order challenged here.

## II.    JURISDICTION AND VENUE

2.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

3.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Washington is a resident of this judicial district and a substantial part of the events or omissions giving rise to this First Amended Complaint occurred within the Western District of Washington.

4.    The States bring this action to redress harms to their proprietary interests and their interests as parens patriae, as well as under their authority pursuant to 5 U.S.C. § 702 and 42 U.S.C. § 2000bb-1(a).

## III.    PARTIES

### PLAINTIFF STATE OF WASHINGTON

5.    The Governor is the chief executive officer of the State of Washington. The Governor is responsible for overseeing the operations of the State of Washington and ensuring that its laws are faithfully executed.

6.    The Attorney General is the chief legal adviser to the State of Washington. The Attorney General's powers and duties include acting in federal court on matters of public concern.

7.    Washington has declared that practices that discriminate against any of its inhabitants because of race, creed, color, or national origin are matters of public concern that threaten the rights and proper privileges of the State and harm the public welfare, health, and peace of the people. *See* Wash. Rev. Code 49.60.010.

8.     Washington's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, is a quasi-sovereign interest.

9.     Washington also has an interest in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

10.     Washington's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of Washington's residents, including individuals who suffer indirect injuries and members of the general public.

11.     According to the most current American Community Survey data from the U.S. Census Bureau, as of 2015, approximately 7,280 non-citizen immigrants from Iran, Iraq, Syria, Somalia, Sudan, Libya, and Yemen reside in Washington—1,409 Iranian immigrants, 2,275 Iraqi immigrants, 360 Libyan immigrants, 2,883 Somalian immigrants, 165 Sudanese immigrants, and 187 Syrian immigrants.

12.     Immigration is an important economic driver in Washington. Many workers in Washington's technology industry are immigrants, and many of those immigrant workers are from Muslim-majority countries. Immigrant and refugee-owned businesses employ 140,000 people in Washington. Many companies in Washington are dependent on foreign workers to operate and grow their businesses.

13.     The technology industry relies heavily on the H-1B visa program, through which highly skilled workers like software engineers are permitted to work in the United States. Washington ranks ninth in the U.S. by number of applications for high-tech visas. Microsoft, a corporation headquartered in Redmond, Washington, is the State's top employer of H-1B visa holders and employs nearly 5,000 people through the program. Other Washington-based companies, including Amazon, Expedia, and Starbucks, employ thousands of H-1B visa holders.

14.     The market for highly skilled workers and leaders in the technology industry is extremely competitive. Changes to U.S. immigration policy that restrict the flow of people may inhibit these companies' ability to adequately staff their research and development efforts and recruit talent from overseas. If recruiting efforts are less successful, these companies' abilities to develop and deliver successful products and services may be adversely affected.

15.     Microsoft's U.S. workforce is heavily dependent on immigrants and guest workers. At least 76 employees at Microsoft are citizens of Iran, Iraq, Syria, Somalia, Sudan, Libya, or Yemen and hold U.S. temporary work visas. There may be other employees with permanent-resident status or green cards. These employees may be banned from re-entering the U.S. if they travel overseas or to the company's offices in Vancouver, British Columbia.

16.     Seattle-based company Amazon also employs workers from every corner of the world. Amazon's employees, dependents of employees, and candidates for employment with Amazon have been impacted by the Executive Order that is the subject of this First Amended Complaint. Amazon has advised such employees currently in the United States to refrain from travel outside the United States.

17.     Bellevue-based company Expedia operates a domestic and foreign travel business. At the time of the filing of the Complaint, Expedia had approximately 1,000 customers with existing flight reservations in or out of the United States who hold passports from Iran, Iraq, Syria, Somalia, Sudan, Libya, or Yemen. The Executive Order will restrict business, increase business costs, and impact current employees and customers.

18.     Washington is also home to individuals and nonprofit religious organizations that, as part of their religious beliefs and/or mission, provide services to refugees and immigrants in Washington and throughout the world.

19.     Up to 13 individuals were detained at Seattle-Tacoma International Airport ("Sea-Tac Airport") one day after President Trump issued the Executive Order that is the subject of this First Amended Complaint.

1        20.      An unknown number of Washington residents from the affected countries may

2   have been prevented from, or may now be prevented from, traveling to Washington through

3   air, land, and sea ports of entry across the United States. It is unknown how many additional

4   Washington residents will reach United States ports across the country and be prevented from

5   returning to Washington while the Executive Order remains in effect.

6        21.      As a result of the Executive Order, Washington residents have been separated

7   from their families. One Somali refugee, who has lived in Seattle for 12 years, went to Sea-Tac

8   Airport to pick up her husband who was flying from Somalia through Vienna, but never saw

9   him before he was sent back on a flight to Vienna. Another individual who was detained is

10  related to a Sea-Tac Airport worker. A third detainee, the sister of a blind Iraqi man who lives

11  in Seattle, was prevented from seeing him after 15 years apart.

12       22.      Other Washington residents will be unable to travel to Canada to visit family.

13  An Iraqi-born software engineer, who works in Facebook's Seattle office and was in Canada

14  watching his little brother perform in a high school play, received a phone call from his

15  immigration attorney shortly before the Executive Order took effect, advising him to rush back

16  across the border.

17       23.      Still other Washington residents will be prevented from being reunited with

18  family members. One Syrian family who recently resettled in Seattle is waiting for an older

19  child still in a refugee camp who was set to arrive next week, but for the Executive Order.

20       24.      In addition to affecting Washington residents, families, and businesses, the

21  Executive Order harms Washington's proprietary interests.

22       25.      In 2015, travelers from the Middle East spent approximately $96 million in

23  Washington. This spending generated more than $6 million in State tax revenue and more than

24  $2 million in local tax revenue.

25       26.      Washington also has a proprietary interest in securing the best possible

26  employees. Washington agencies and institutions of higher education (including the University

of Washington and Washington State University) employ a number of people from the affected countries who are here on visas and will be affected by the Executive Order. These employees were hired because of their specialized skills and qualifications.

27.     Washington expends time and funds to sponsor H-1B employees. Washington wastes that time and money, and loses the value of employee labor, if employees are not able to fully work and travel due to the Executive Order.

28.     The University of Washington and Washington State University are the two largest public universities in the State. More than 95 students from Iran, Iraq, Syria, Somalia, Sudan, Libya, and Yemen attend the University of Washington, based in Seattle. More than 135 students from those countries attend Washington State University, based in Pullman. Affected students also attend Washington colleges, community colleges, and technical colleges.

29.     The Executive Order prohibits these students from traveling abroad for research or scholarship, and may cause some to leave the universities. Future students from these countries may be prevented from enrolling. These harms damage the educational mission of Washington's institutions of higher education.

## PLAINTIFF STATE OF MINNESOTA

30.     Lori Swanson is the chief legal officer of the State of Minnesota. Her powers and duties include filing lawsuits in federal court on behalf of the State of Minnesota.

31.     The Executive Order has had immediate and significant effects in Minnesota. According to the American Community Survey data from the U.S. Census Bureau, as of 2015, over 400,000 of Minnesota's approximately 5.4 million residents were born outside the United States, including more than 30,000 from Somalia, Sudan, Iran, Iraq, Syria, and Yemen. These Minnesotans now face considerable uncertainty about whether they may travel overseas or whether relatives may visit or move here.

32.     The Executive Order is also harming Minnesota's educational institutions. For example, at the University of Minnesota, the State's largest public research university, immigrants have been a vital part of the University's student body, faculty and staff, research, scholarship, and innovation. Currently, across the five campuses, there are approximately 120 students and international scholars from Iran, Iraq, Syria, Somalia, Sudan, Libya, or Yemen. These individuals are now restricted from traveling outside the United States for research and academic collaborations or other personal reasons, since they have no reasonable expectation of being able to return to continue their studies. Several of these individuals were anticipating the arrival of their families for various reasons this spring, among them the celebration of graduations, which may no longer be possible due to the Executive Order.

33.     The University of Minnesota student-body, faculty, and staff also includes refugees who have expressed concern about reunifying with family members. Others who immigrated to the United States years ago and still maintain close ties to families and friends in their home countries have also expressed concern.

34.     Likewise, at Macalester College, a nationally ranked liberal arts college in St. Paul, Minnesota, the executive order has negatively affected students from Syria and Libya, as well as domestic students from Somalia, who may be unable to visit family and friends or participate in study abroad programs.

35.     Minnesota's businesses and economy are also impacted. For example, the Mayo Clinic, an internationally-known healthcare institution that treats patients who travel to it for healthcare services from around the world, has publicly stated that approximately 80 staff, physicians, and scholars have ties to the affected countries.

36.     Many travel plans to and from Minnesota have been disrupted. For example, a 4-year-old Somali girl, who was separated from her mother and two sisters shortly after being born in a refugee camp in Uganda, was scheduled to arrive on January 30, 2017. Her mother had received visas for herself and her other two daughters, but she was pregnant when they

1   were approved, so her newborn was not covered. She was told that her whole family would

2   have to start the visa process over if she tried to get one for her youngest daughter or she could

3   move to the United States and apply for reunification which would take less than one year.

4   Four years later, the youngest daughter finally received a visa to come to the United States.

5   The young girl was at the airport in Uganda on January 30, 2017, ready to board the plane, but

6   she was not allowed due to the Executive Order.

7                                   **DEFENDANTS**

8        37.    Defendant Donald Trump is the President of the United States, and issued the

9   January 27, 2017, Executive Order on which Defendants rely for authority to detain, remove,

10   or refuse admission to non-citizen immigrants from Iran, Iraq, Syria, Somalia, Sudan, Libya,

11   and Yemen who are traveling or returning to the States via air, land, and sea ports across the

12   United States, including Sea-Tac Airport and Minneapolis-St. Paul International Airport. He is

13   sued in his official capacity.

14        38.    Defendant U.S. Department of Homeland Security ("DHS") is a federal cabinet

15   agency responsible for implementing and enforcing the Immigration and Nationality Act

16   ("INA"). DHS is a Department of the Executive Branch of the U.S. Government, and is an

17   agency within the meaning of 5 U.S.C. § 552(f). The U.S. Customs and Border Protection is an

18   Operational and Support Component agency within DHS. The U.S. Customs and Border

19   Protection is responsible for detaining and/or removing non-citizen immigrants from Iran, Iraq,

20   Syria, Somalia, Sudan, Libya, and Yemen arriving at air, land, and sea ports across the United

21   States, including Sea-Tac Airport and Minneapolis-St. Paul International Airport.

22        39.    Defendant John F. Kelly is the Secretary of the Department of Homeland

23   Security. He is responsible for implementing and enforcing the INA, and oversees the U.S.

24   Customs and Border Protection. He is sued in his official capacity.

25

26

40.     Defendant Tom Shannon is the Acting Secretary of State. The Secretary of State has authority to determine and implement certain visa procedures for non-citizens. He is sued in his official capacity.

41.     Defendant the United States of America includes all government agencies and departments responsible for the implementation of the INA and responsible for the admission, detention, removal of non-citizen immigrants from Iran, Iraq, Syria, Somalia, Sudan, Libya, and Yemen who are traveling to or returning to the States via air, land, and sea ports across the United States, including Sea-Tac Airport and Minneapolis-St. Paul International Airport.

## IV.   ALLEGATIONS

42.     Prior to his election, Donald Trump campaigned on the promise that he would ban Muslims from entering the United States.

43.     On December 7, 2015, candidate Trump issued a press release calling for "a total and complete shutdown of Muslims entering the United States." As of the date of this filing, the press release remains available on Trump's campaign website and is attached hereto as Exhibit 1.

44.     In defending his decision shortly thereafter, candidate Trump compared the Muslim ban to former President Franklin Roosevelt's decision to intern Japanese Americans during World War II, and stated, "This is a president highly respected by all, [Roosevelt] did the same thing." A media report of this interview is attached hereto as Exhibit 2.

45.     On June 14, 2016, candidate Trump reiterated his promise to ban all Muslims entering this country until "we as a nation are in a position to properly and perfectly screen those people coming into our country." A transcript of this speech is attached hereto as Exhibit 3.

46.     Asked during a July 24, 2016, interview about whether he was "backing off on his Muslim ban[]," candidate Trump stated, "I actually don't think it's a pull-back. In fact, you could say it's an expansion." A transcript of this interview is attached hereto as Exhibit 4.

47.     In a foreign policy speech delivered on August 15, 2016, candidate Trump noted that the United States could not "adequate[ly] screen[]" immigrants because it admits "about 100,000 permanent immigrants from the Middle East every year." Trump proposed creating an ideological screening test for immigration applicants, which would "screen out any who have hostile attitudes towards our country or its principles – or who believe that Sharia law should supplant American law." During the speech, he referred to his proposal as "extreme, extreme vetting." A copy of the prepared remarks is attached hereto as Exhibit 5. A video link to the delivered speech is available at: https://www.c-span.org/video/?413977-1/donald-trump-delivers-foreign-policy-address (quoted remarks at 50:46).

48.     On January 20, 2017, Donald Trump was inaugurated as the President of the United States. In his first television interview as President, he again referred to his plan for "extreme vetting." A transcript of this interview is attached hereto as Exhibit 6.

49.     On January 27, 2017, one week after being sworn in, President Trump signed an executive order entitled, "Protecting the Nation from Foreign Terrorist Entry into the United States." The Executive Order directs a series of changes to the manner in which non-citizens may seek and obtain entry to the United States. The Executive Order is attached hereto as Exhibit 7.

50.     Section 3(c) of the Executive Order proclaims that entry of immigrants and nonimmigrants from countries referred to in section 217(a)(12) of the Immigration and Nationality Act, 8 U.S.C. § 1187(a)(12), i.e., Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen, "would be detrimental to the interests of the United States." The Executive Order "suspend[s] entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order."

51.     Sections 5(a)–(b) of the Executive Order suspend the U.S. Refugee Admissions Program in its entirety for 120 days and then, upon its resumption, direct the Secretary of State

1  to prioritize refugees who claim religious-based persecution, "provided that the religion of the

2  individual is a minority religion in the individual's country of nationality."

3      52.    Section 5(c) of the Executive Order proclaims that entry of Syrian refugees is

4  "detrimental to the interests of the United States" and suspends their entry indefinitely.

5      53.    In a January 27, 2017, interview with the Christian Broadcasting Network,

6  President Trump confirmed his intent to prioritize Christians in the Middle East for admission

7  as refugees. A copy of the transcript of this interview is attached hereto as Exhibit 8.

8      54.    During a signing ceremony for the Executive Order on January 27, 2017,

9  President Trump stated that the purpose of the Executive Order was to "establish[] new vetting

10  measures to keep radical Islamic terrorists out of the United States of America." He continued,

11  "We don't want them here." A media report of these statements is attached hereto as Exhibit 9.

12      55.    That same day, a Deputy Assistant Secretary for Visa Services at the U.S.

13  Department of State, Edward J. Ramotowski, issued a letter which, subject to limited

14  exceptions, "provisionally revoke[d] all valid nonimmigrant and immigrant visas of nationals

15  of Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen." The letter is attached hereto as

16  Exhibit 10.

17      56.    Also that day, the U.S. Department of State and some U.S. embassies and

18  consulates abroad posted a notice online advising immigrant visa applicants that visa issuance

19  had been suspended and visa interviews cancelled. The online notice is attached hereto as

20  Exhibit 11. A copy of the notice posted in the U.S. embassy in Iraq is attached hereto as

21  Exhibit 12.

22      57.    On January 28, 2017, a spokeswoman for DHS stated that lawful permanent

23  residents, or green card holders, would be barred from entry pursuant to the Executive Order.

24  A media report of these statements is attached hereto as Exhibit 13.

25

26

1    58.    On January 29, 2017, DHS reversed its decision through a statement by

2    Secretary Kelly that purported to exempt lawful permanent residents from the Executive Order.

3    The statement is attached hereto as Exhibit 14.

4    59.    Two days later, however, on January 31, 2017, the U.S. Customs and Border

5    Protection, a DHS sub-agency, issued a statement entitled "Protecting the Nation from Foreign

6    Terrorist Entry into the United States." Although it repeated Secretary Kelly's earlier

7    statement, it also confirmed in its "Questions and Answers" section that the Executive Order

8    applies to lawful permanent residents and that their entry would depend on receipt of a

9    "national interest waiver[] consistent with the provisions of the Executive Order." The

10   statement is attached hereto as Exhibit 15.

11   60.    On January 29, 2017, President Trump issued a statement defending the

12   Executive Order, stating "[t]his is not a Muslim ban." The statement is attached hereto as

13   Exhibit 16.

14   61.    President Trump's statement conflicts with the statement made by his

15   cybersecurity advisor the day before. In an interview with Fox News on January 28, 2017,

16   Rudolph Giuliani confirmed that the Executive Order was crafted to be a "legal" ban on

17   Muslims. Specifically, Giuliani stated that Trump asked him for a "Muslim ban" and instructed

18   Giuliani to "put a commission together" to "show [Trump] the right way to do it legally." A

19   media report of Giuliani's statements is attached hereto as Exhibit 17.  A video of Giuliani's

20   statements is also available at: https://youtu.be/l9GKL6i38pI.

## V.    FIRST CAUSE OF ACTION
### (Fifth Amendment – Equal Protection)

22

23   62.    The States reallege and incorporate by reference the allegations set forth in each

24   of the preceding paragraphs of this First Amended Complaint.

25   63.    The Due Process Clause of the Fifth Amendment prohibits the federal

26   government from denying equal protection of the laws.

1    64.    Sections 3 and 5 of the Executive Order, together with statements made by Defendants concerning their intent and application, target individuals for discriminatory treatment based on their country of origin and/or religion, without lawful justification.

65.    The Executive Order was motivated by animus and a desire to harm a particular group.

66.    The discriminatory terms and application of the Executive Order are arbitrary and cannot be sufficiently justified by federal interests.

67.    Through their actions above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

68.    Defendants' violation causes ongoing harm to the States and their residents.

## VI.    SECOND CAUSE OF ACTION
### (First Amendment – Establishment Clause)

69.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

70.    The Establishment Clause of the First Amendment prohibits the federal government from officially preferring one religion over another.

71.    Sections 3 and 5 of the Executive Order, together with statements made by Defendants concerning their intent and application, are intended to disfavor Islam and favor Christianity.

72.    Through their actions above, Defendants have violated the Establishment Clause of the First Amendment.

73.    Defendants' violation causes ongoing harm to the States and their residents.

## VII.    THIRD CAUSE OF ACTION
### (Fifth Amendment – Procedural Due Process)

74.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

75.     The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their liberty interests without due process of law.

76.     Where Congress has granted statutory rights and authorized procedures applicable to arriving and present non-citizens, minimum due process rights attach to those statutory rights.

77.     Sections 3 and 5 of the Executive Order conflict with the statutory rights and procedures directed by Congress. In issuing and implementing the Executive Order, Defendants have violated the procedural due process guarantees of the Fifth Amendment.

78.     Defendants' violation causes ongoing harm to the States and their residents.

## VIII.     FOURTH CAUSE OF ACTION
### (Immigration and Nationality Act – Discriminatory Visa Procedures)

79.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

80.     The Immigration and Nationality Act, 8 U.S.C. § 1152(a)(1)(A), prohibits discrimination in the issuance of immigrant visas on the basis of race, nationality, place of birth, or place of residence.

81.     Sections 3 and 5 of the Executive Order, together with statements made by Defendants concerning their intent and application, discriminate on the basis of race, nationality, place of birth, and/or place of residence in the issuance of visas, in violation of the Immigration and Nationality Act.

82.     Defendants' violation causes ongoing harm to the States and their residents.

## IX.     FIFTH CAUSE OF ACTION
### (Immigration and Nationality Act – Denial of Asylum and Withholding of Removal)

83.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

84.     The Immigration and Nationality Act, 8 U.S.C. §§ 1158 and 1231(b)(3), entitles certain non-citizens arriving at the States' ports of entry to apply for asylum and withholding of removal.

85.     As implemented, the Executive Order suspends all immigrant and nonimmigrant entry into the States by individuals from seven countries and forecloses their ability to apply for asylum and withholding of removal.

86.     Defendants' violation causes ongoing harm to the States and their residents.

## X.     SIXTH CAUSE OF ACTION
**(Foreign Affairs Reform and Restructuring Act – Denial of Convention Against Torture Relief)**

87.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

88.     The Foreign Affairs Reform and Restructuring Act of 1998, 8 U.S.C. § 1231 note, implements the United Nations Convention Against Torture, which the United States ratified in 1994. Pub. L. 105-277, div. G, subdiv. B, title XXII, § 2242. Under the Convention Against Torture, the United States may not involuntarily return any person to a country where there are substantial grounds for believing the person would be in danger of being subjected to torture.

89.     As implemented, the Executive Order suspends all immigrant and nonimmigrant entry into the States by individuals from seven countries and forecloses their ability to apply for relief under the Convention Against Torture.

90.     Defendants' violation causes ongoing harm to the States and their residents.

## XI.     SEVENTH CAUSE OF ACTION
**(Religious Freedom Restoration Act)**

91.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

92.     The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(a), prohibits the federal government from substantially burdening the exercise of religion, even if the burden results from a rule of general applicability.

93.     Section 3 of the Executive Order, if implemented, will result in substantial burdens on the exercise of religion by non-citizen immigrants by, for example, preventing them from exercising their religion while in detention, returning to their religious communities in the States, and/or taking upcoming, planned religious travel abroad. Such burdens on religion violate the Religious Freedom Restoration Act.

94.     Sections 3 and 5 of the Executive Order also will result in substantial burdens on the exercise of religion by individuals and religious organizations in Washington that provide services to refugees and immigrants as part of their religious beliefs/mission.

95.     Defendants' violation causes ongoing harm to the States and their residents.

## XII.   EIGHTH CAUSE OF ACTION
### (Procedural Violation of the Administrative Procedure Act)

96.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

97.     The Administrative Procedure Act, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct formal rule making before engaging in action that impacts substantive rights.

98.     In implementing Sections 3 and 5 of the Executive Order, federal agencies have changed the substantive criteria by which individuals from affected countries may enter the United States. Federal agencies did not follow the procedures required by the Administrative Procedure Act before taking action impacting these substantive rights.

99.     Through their actions above, Defendants have violated the Administrative Procedure Act.

100.    Defendants' violation causes ongoing harm to the States and their residents.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

### XIII.   NINTH CAUSE OF ACTION
#### (Substantive Violation of the Administrative Procedure Act)

101.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

102.    The Administrative Procedure Act, 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary, unconstitutional, and contrary to statute.

103.    In implementing Sections 3 and 5 of the Executive Order, federal agencies have taken unconstitutional and unlawful action, as alleged herein, in violation of the Administrative Procedure Act.

104.    In implementing Sections 3 and 5 of the Executive Order, federal agencies have applied provisions arbitrarily, in violation of the Administrative Procedure Act.

105.    Defendants' violation causes ongoing harm to the States and their residents.

### XIV.   TENTH CAUSE OF ACTION
#### (Tenth Amendment)

106.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

107.    The Tenth Amendment reserves all powers not enumerated in the Constitution to the states and prohibits the federal government from commandeering state legislative processes.

108.    The Tenth Amendment prohibits the federal government from directly compelling states to enact and enforce federal law.

109.    Sections 3 and 5 of the Executive Order, together with statements made by Defendants concerning their intent and application, target individuals for discriminatory treatment based on their country of origin and/or religion, without lawful justification.

110.    The States and their employers, housing providers, and businesses have long been prohibited by their States' laws from discriminating against people based on national origin and religion in employment, housing, and in places of public accommodation.

111. The Executive Order effectively mandates that the States engage in discrimination based on national origin and/or religion, thereby rescinding the States' historic protection of civil rights and religious freedom.

112. Through their actions above, Defendants have violated the Tenth Amendment.

113. Defendants' violation causes ongoing harm to the States.

## XV.   PRAYER FOR RELIEF

114. Wherefore, the States pray that the Court:

    a.    Declare that Sections 3(c), 5(a)–(c), and 5(e) of the Executive Order are unauthorized by and contrary to the Constitution and laws of the United States;

    b.    Enjoin Defendants from implementing or enforcing Sections 3(c), 5(a)–(c), and 5(e) of the Executive Order, including at all United States borders, ports of entry, and in the issuance of visas, pending further orders from this Court;

    c.    Pursuant to Federal Rule of Civil Procedure 65(b)(2), set an expedited hearing within fourteen (14) days to determine whether the Temporary Restraining Order should be extended; and

    d.    Award such additional relief as the interests of justice may require.

1 | DATED this 1st day of February, 2017.

2

3                                                   Respectfully submitted,

4                                                   _____
                                                    Bob Ferguson, WSBA #26004

5                                                   Attorney General
                                                    Noah G. Purcell, WSBA #43492

6                                                   Solicitor General
                                                    Colleen M. Melody, WSBA #42275

7                                                   Civil Rights Unit Chief
                                                    Anne E. Egeler, WSBA #20258

8                                                   Deputy Solicitor
                                                    Marsha Chien, WSBA #47020

9                                                   Patricio A. Marquez, WSBA #47693
                                                    Assistant Attorneys General

10                                                  Office of the Attorney General
                                                    800 Fifth Avenue, Suite 2000

11                                                  Seattle, WA  98104
                                                    (206) 464-7744

12                                                  Noahp@atg.wa.gov

13
                                                    LORI SWANSON

14                                                  Attorney General
                                                    State of Minnesota

15

16

17

18

19

20

21

22

23

24

25

26