The Honorable James L. Robart

ROBERT W. FERGUSON
Attorney General
WSBA #26004
NOAH G. PURCELL
WSBA #43492
Solicitor General
COLLEEN M. MELODY
WSBA #42275
Civil Rights Unit Chief
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

STATE OF WASHINGTON,

                    Plaintiff,

          v.

DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of the Department of Homeland Security; TOM SHANNON, in his official capacity as Acting Secretary of State; and the UNITED STATES OF AMERICA,

                    Defendants.

CIVIL ACTION NO.  2:17-cv-00141-JLR

AMENDED MOTION FOR TEMPORARY RESTRAINING ORDER

Motion Noted: January 30, 2017

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................................1

II.  FACTUAL BACKGROUND ...........................................................................................2

III.  ARGUMENT ....................................................................................................................4

    A.  Standard for Granting Temporary Relief ...................................................................4

    B.  The State is Likely to Prevail on the Merits Because the Executive Order is
        Illegal in Many Respects ..............................................................................................4

        1.  The State is Likely to Prevail on the Merits of Its Claim that the
             Executive Order Violates the Equal Protection Clause .............................5

             a.  Standard of Review ....................................................................5

             b.  Strict scrutiny applies .................................................................6

             c.  The Executive Order fails strict scrutiny ...........................................8

             d.  Even Under rational basis review, the Executive Order fails .............9

        2.  The State is Likely to Prevail on the Merits of Its Claim that the
             Executive Order Violates the Establishment Clause ...............................11

        3.  The State is Likely to Prevail on the Merits of Its Claim that the
             Executive Order Violates Due Process ....................................................14

             a.  The denial of re-entry to and de facto travel ban on certain legal
                permanent residents and visaholders violates their
                due process rights ......................................................................14

             b.  The blanket ban on all refugees violates their due process right to the
                 fair administration of congressionally enacted policies and
                 procedures ..................................................................................17

        4.  The State is Likely to Prevail on the Merits of Its Claim that the
             Executive Order Violates the Immigration and Nationality Act ..............19

    C.  The State, its Residents, and its Businesses Are Suffering and Will Continue
        to Suffer Irreparable Harm Due to the Executive Order ................................20

    D.  The Balance of Equities and Public Interest Sharply Favor Preliminary
        Relief ......................................................................................................22

IV.  CONCLUSION ...............................................................................................................23

AMENDED MOTION FOR TEMPORARY ORDER          i          ATTORNEY GENERAL OF WASHINGTON
                                                                    800 Fifth Avenue, Suite 2000
                                                                     Seattle, WA 98104-3188
                                                                          (206) 464-7744

# I.    INTRODUCTION

Federal courts have no more sacred role than protecting marginalized groups against irrational, discriminatory conduct. Over the last 48 hours, federal courts across the country have exercised this role, ordering President Trump's administration to release individuals who were detained pursuant to the President's Executive Order on immigration and refugees issued late on Friday, January 27. Each of those courts found a significant likelihood that the Executive Order violates federal law. Today, the State of Washington asks this Court to make the same finding and to enter a nationwide temporary restraining order barring enforcement of portions of the order. This relief is necessary to protect the State, its residents, and its businesses from ongoing irreparable harm, and is overwhelmingly in the public interest.

President Trump's Executive Order bans all refugees from entering the country for 120 days, and bans all refugees from Syria indefinitely, whether they be infants, schoolchildren, or grandmothers. Washington families waiting to be reunited with their loved ones have had their dreams of reunification destroyed, as their refugee relatives around the world were taken off airplanes or told they are no longer welcome.

The Order also bans nationals from seven countries from entering the United States for 90 days. Though the administration's interpretation of the Order has changed repeatedly over the last 48 hours, it has applied the Order to block longtime legal permanent residents from returning to this country, and the Order's text purports to grant the administration authority to continue denying entry to such residents. This entry ban is harming legal permanent residents who live in Washington, Washington businesses that employ residents from the listed countries, and Washington families whose loved ones are trying to visit them.

In addition to suffering these irreparable harms, the State has a strong likelihood of success on its claims. The Executive Order has both the intent and effect of discriminating based on national origin and religion, in violation of the Constitution. Strict scrutiny applies, and the order fails utterly. Even if rational basis review applied, the Order would fail because it

is motivated by discriminatory animus and bears no relationship to its purported ends. While preventing terrorist attacks is an important goal, the order does nothing to further that purpose by denying admission to children fleeing Syria's civil war, to refugees who valiantly assisted the U.S. military in Iraq, or to law-abiding high-tech workers who have lived in Washington for years. The Order also violates the Immigration and Nationality Act.

In short, the Order is illegal, is causing and will continue to cause irreparable harm in Washington, and is contrary to the public interest. The Court should fulfill its constitutional role as a check on executive abuse and temporarily bar enforcement of the Order nationwide.

## II.     FACTUAL BACKGROUND

Donald Trump campaigned on the promise that he would ban Muslims from entering the United States. First Am. Compl. For Decl. & Inj. Relief ("FAC") ¶ 42, ECF No. 18. On December 7, 2015, he issued a press release calling for "a total and complete shutdown of Muslims entering the United States." FAC ¶ 43. Over the next several months, he defended and reiterated this promise. FAC ¶¶ 44-46. On August 15, 2016, Trump proposed an ideological screening test for immigration applicants, which he referred to as "extreme vetting." FAC ¶ 47.

Following his inauguration, President Trump reaffirmed his commitment to "extreme vetting." FAC ¶ 48. Within one week of taking office, President Trump signed an order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States". FAC ¶ 49. The Order directs a variety of changes to the manner and extent to which non-citizens may obtain admission to the United States. *Id.* Among other things, it imposes a 120-day moratorium on the refugee resettlement program as a whole; indefinitely suspends the entry of Syrian refugees; and suspends for 90 days entry of all immigrants and nonimmigrants from seven majority-Muslim countries: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. FAC ¶¶ 50-52. President Trump subsequently stated that the purpose of the Executive Order was to establish "new vetting measures to keep radical Islamic terrorists out of the United States."

FAC ¶ 54. He also confirmed his intent to prioritize Christians in the Middle East for admission as refugees. FAC ¶ 53.

The Executive Order has had immediate and significant effects in Washington. Most urgently, the Order is tearing Washington families apart. Husbands are separated from wives, brothers are separated from sisters, and parents are separated from their children. FAC ¶¶ 21-23. Some who have waited decades to see family members had that reunion taken without warning or reason. FAC ¶ 21. While the anecdotal stories are heartbreaking, Decl. of E. Chiang ¶¶ 11-13, the sheer number of people affected is also notable. Over 7,000 noncitizen immigrants from the affected countries reside in Washington. FAC ¶ 11; Decl. of N. Purcell ¶ 7, Ex. A. These Washingtonians now face considerable uncertainty about whether and when they may travel. FAC ¶ 22. Additionally, an unknown but large number of Washington residents are originally from these countries but are now U.S. citizens, who wish to be able to receive visits from overseas relatives or see them move here as refugees or otherwise.

Washington's businesses and economy are also impacted. Washington-based travel company Expedia is incurring costs to assist its customers who are now banned from travel to the United States. Decl. of R. Dzielak ¶¶ 12-14, 20. Washington companies Amazon, Expedia, and Microsoft depend on skilled immigrants to operate and grow their businesses. FAC ¶¶ 12-13, 15-17; Decl. of A. Blackwell-Hawkins ¶¶ 3-4; Decl. of R. Dzielak ¶¶ 7, 9. At least 76 Microsoft employees are originally from the affected countries and hold temporary work visas. FAC ¶ 15. As a result of the Executive Order, such employees may be banned from reentering the United States if they travel overseas. *Id*. The Executive Order will affect these companies' ability to recruit and retain talented workers, to the detriment of Washington's economy and tax base. FAC ¶ 14; Decl. of R. Dzielak ¶¶ 7, 21; *see also* Decl. of A. Blackwell-Hawkins ¶¶ 4, 11.

The Executive Order is also harming Washington's educational institutions. More than 95 immigrants from the affected countries attend the University of Washington. FAC ¶ 28;

1    Decl. of J. Riedinger ¶ 5. More than 130 attend Washington State University. Decl. of A.

2    Chaudhry ¶ 5. The Executive Order is already disrupting students' personal and professional

3    lives, preventing travel for research and scholarship, and harming the universities' missions.

4    Decl. of J. Riedinger ¶¶ 6-8; Decl. of A. Chaudhry ¶¶ 6-9.

5         As long as the Executive Order is in place, it will continue to have these serious,

6    pointless effects on Washington's families, businesses, and educational institutions.

7                              **III.    ARGUMENT**

8    A.    **Standard for Granting Temporary Relief**

9         To obtain a temporary restraining order, the State must establish 1) a likelihood of

10   success on the merits; 2) that irreparable harm is likely in the absence of preliminary relief; 3)

11   that the balance of equities tips in the State's favor; and 4) that an injunction is in the public

12   interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d

13   249 (2008); Fed. R. Civ. P. 65(b)(1); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240

14   F.3d 832, 839 n. 7 (9th Cir. 2001). And while the State can establish all of these factors,

15   "[h]ow strong a claim on the merits is enough depends on the balance of harms: the more net

16   harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still

17   supporting some preliminary relief." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133

18   (9th Cir. 2011) (quoting *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins.

19   Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). Thus, while the State's claims on the merits are

20   extremely strong, temporary relief would be appropriate even if they were less clearly

21   meritorious given how sharply the balance of harms tips in the State's favor.

22   B.    **The State is Likely to Prevail on the Merits Because the Executive Order is Illegal
         in Many Respects**

23        The Executive Order violates multiple provisions of the Constitution and federal

24   statutes. As demonstrated below, the State is highly likely to prevail on the merits.

25

26

1

### 1.   The State is Likely to Prevail on the Merits of Its Claim that the Executive Order Violates the Equal Protection Clause

2

#### a.   Standard of review

3

The Fifth Amendment has an "equal protection component," *Harris v. McRae*, 448 U.S. 297, 297 (1980), and noncitizens "com[e] within the ambit of the equal protection component of the Due Process Clause," *Kwai Fun Wong v. United States*, 373 F.3d 952, 974 (9th Cir. 2004). In equal protection analysis, the court first decides whether a challenged classification burdens a suspect or quasi-suspect class. *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001). "If the statute employs a suspect class (such as race, religion, or national origin) or burdens the exercise of a constitutional right, then courts must apply strict scrutiny, and ask whether the statute is narrowly tailored to serve a compelling governmental interest." *Id.* "[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (footnotes omitted); *see also City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (religion is an "inherently suspect distinction"). If no suspect classification is implicated, the court applies rational basis review, and determines whether the statute is rationally related to a legitimate governmental interest. *Ball*, 254 F.3d at 823.

While courts generally give more latitude to the political branches in the immigration context, *see, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001), this does not mean that the political branches can act with impunity. In protecting its borders, this country does not set aside its values or its Constitution. *Id.* (the political branches' "power is subject to important constitutional limitations"); *INS v. Chadha*, 462 U.S. 919, 941-42 (1983) (Congress must choose "a constitutionally permissible means of implementing" its power over immigration).

Here, the Executive Order cannot pass muster under any standard of review. Its blunderbuss approach—prompted by irrational fear and blind animus—is at odds with the fundamental American promise that all are entitled to equal protection under the law.

### b.     Strict scrutiny applies

The Court should apply strict scrutiny to the Executive Order. While courts often defer to the political branches' reasoned judgments on immigration policy, they do not give a blank check to ignore the law. Here, the State challenges not an act of Congress or a carefully formulated regulation, but an Executive Order that was written largely by the President's political advisers without consultation of legal experts or the National Security Council and that flatly discriminates on the basis of national origin and religion, in at least three ways.

First, the executive order discriminates based on national origin by singling out people from seven countries for an outright ban on admission to the United States. Notably, the Executive Order on its face applies to lawful permanent residents from the listed countries who live in the United States.[1] Lawful permanent residents are accorded the same constitutional protections as United States citizens. *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953); *see also Bridges v. Wixon*, 326 U.S. 135 (1945) ("[O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment."). The Order's blatant distinction between green-card holders currently residing in the United States on the basis of national origin demands strict scrutiny. "[C]lassifications . . . based on nationality . . . are inherently suspect and subject to close judicial scrutiny," *Graham*, 403 U.S at 372, and are "odious to a free people whose institutions are founded upon the doctrine of equality." *Oyama v. California*, 332 U.S. 633, 646 (1948) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

---

[1] Although administration officials have since suggested that, despite the plain language of the Executive Order, the ban might not be fully implemented against lawful permanent residents, the text of the Executive Order remains in effect regardless of the ever-changing instructions from Defendants.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Second, the executive order singles out refugees from Syria for differential treatment, indefinitely suspending their entry whether they be toddlers or grandmothers. Syrian-American families in Washington and across the country awaiting their refugee relatives are left with no idea when their relatives will be allowed to come, solely based on nationality.

Third and finally, as discussed in more detail in Part B.2, the Executive Order discriminates based on religion. On its face, the Executive Order requires immigration officials to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." Sec. 5(b). As detailed below, comments by President Trump and his advisers make clear that the intent of this provision is to give preference to Christian refugees while disadvantaging Muslim refugees.[2] FAC ¶ 53, Ex. 8.  Importantly, the State need not show that intent to discriminate against Muslims "was the sole purpose of the challenged action, but only that it was a 'motivating factor.'" *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). That standard is plainly met here based on the evidence presented.

There thus can be no dispute that the executive order uses suspect classifications. And it does so not in furtherance of a congressionally authorized purpose, but rather in direct violation of federal law (as discussed in Part B.4), which prohibits discrimination "in the issuance of an immigrant visa because of the person's . . . nationality." 8 U.S.C. § 1152(a)(1)(A). In short, this is an extraordinary case that falls well outside the run-of-the-mill immigration context in which deference to the political branches applies. The President's decision to adopt suspect classifications in violation of federal law deserves strict scrutiny.

---

[2] *See, e.g.*, https://twitter.com/realDonaldTrump/status/825721153142521858; http://www.cnn.com/2017/01/27/politics/trump-christian-refugees/index.html; FAC ¶ 53.

### c. The Executive Order fails strict scrutiny

The Executive Order cannot withstand strict scrutiny. Neither the temporary ban on admission of aliens from certain countries nor the barring of refugees is narrowly tailored to further a compelling government interest.

The order cites three rationales to support its temporary ban on admission of nationals of seven countries: "To temporarily reduce investigative burdens on relevant agencies . . . , to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals." Sec. 3(c). The first rationale—essentially a desire to conserve resources by discriminating—is not compelling,[3] and in any case the order is not narrowly tailored to achieve any of these goals.

To begin with, the Order is profoundly overbroad. Section 3(c) bans those from disfavored countries without any evidence that any individual poses a threat of terrorism. It sweeps within its ambit infant children, the disabled, long-time U.S. residents, those fleeing terrorism, those who assisted the United States in conflicts overseas, and many others who the government has no reason to suspect are terrorists. The government simply cannot establish any factual basis for *presuming* that all people from a given country pose such a great risk that an outright entry ban—rather than less extreme measures—is warranted.

At the same time, the order is also underinclusive to achieve its purported ends. By way of example, the Executive Order recites the tragic events of September 11, 2001, but imposes no entry restrictions on people from the countries whose nationals carried out those attacks (Egypt, Lebanon, Saudi Arabia, and the United Arab Emirates). Decl. N. Purcell ¶8, Ex. B. As to admission of refugees, the order claims that a temporary prohibition is necessary "to

---

[3] *Memorial Hospital v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974) ("a state may not protect the public fisc by drawing an invidious distinction between classes" of people); *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) (simply saving money is not a compelling interest).

determine what additional procedures should be taken to ensure that those approved for refugee admission do not pose a threat to the security and welfare of the United States." Sec. 5. Citing no evidence at all, the Order declares that "the entry of nationals of Syria as refugees is detrimental to the interests of the United States." Sec. 5(c). But assertion is not evidence, and there is no evidence that refugees pose any unique risk to the United States.[4]

"[S]trict scrutiny requires a direct rather than approximate fit of means to ends." *Hunter ex rel. Brandt v. Regents of Univ. of Cal.*, 190 F.3d 1061, 1077 (9th Cir. 1999) (internal quotation marks omitted). The Supreme Court has emphasized that equal protection guards against sweeping generalizations about categories of people based on traits such as national origin or religion.[5] Here, there is no "fit" between the rationales advanced to support the Executive Order and the means used to further those rationales.

### d.      Even under rational basis review, the Executive Order fails

The State is also likely to prevail on the merits of its equal protection claim should the Court employ rational basis review.

There are "two versions of the rational basis test—traditional rational basis review and a more rigorous rational basis standard." *United States v. Wilde*, 74 F. Supp. 3d 1092, 1096 (N.D. Cal. 2014). Where "a law neither burdens a fundamental right nor targets a suspect class," the classification must be upheld "so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). When a classification *does*, in fact, "adversely affect[ ] an unpopular group, courts apply a 'more searching' rational basis review."

---

[4] A recent and exhaustive study concluded that the chance of an American being killed by a refugee in a terrorist attack is 1 in 3.64 billion a year. Alex Nowrasteh, *Terrorism and Immigration: A Risk Analysis*, at 2, Cato Institute (Sept. 13, 2016) (Cato Institute).

[5] *See, e.g., Shaw v. Reno*, 509 U.S. 630, 647 (1993) (striking down racial gerrymander because "[i]t reinforces the perception that members of the same racial group . . . think alike, share the same political interests, and will prefer the same candidates at the polls"); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (strict scrutiny "ensures that the means chosen 'fit' [a purported] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate . . . prejudice or stereotype").

1 | *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 996 (N.D. Cal. 2012) (citing *Diaz*
2 | *v. Brewer*, 656 F.3d 1008, 1012 (9th Cir. 2011)).

3 | "The Constitution's guarantee of equality 'must at the very least mean that a bare
4 | [legislative] desire to harm a politically unpopular group cannot' justify disparate treatment of
5 | that group." *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (quoting *Dep't of
6 | Agriculture v. Moreno*, 413 U.S. 528, 534-35 (1973)). Thus, courts cast a more skeptical eye
7 | toward legislation that "has the peculiar property of imposing a broad and undifferentiated
8 | disability on a single named group." *Romer*, 517 U.S. at 632. Accordingly, when legislation
9 | "seems inexplicable by anything but animus toward the class it affects[,] it lacks a rational
10 | relationship to legitimate state interests." *Id.* Likewise, the government has no legitimate
11 | interest in catering to "mere negative attitudes, or fears" that some residents may have against a
12 | disfavored minority. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448
13 | (1985). Simply put, the government "may not avoid the strictures of [equal protection] by
14 | deferring to the wishes or objections of some fraction of the body politic." *Id.*

15 | There is little doubt that the Executive Order is prompted by animus to those of the
16 | Islamic faith, which was one of the pillars of President Trump's campaign. On December 7,
17 | 2015, President Trump's Campaign released a statement indicating that "Donald J. Trump is
18 | calling for a total and complete shutdown of Muslims entering the United States." *See* FAC ¶
19 | 43, Ex. 1. The Campaign's spokesperson thereafter defended President Trump against criticism
20 | as follows: "So what? They're Muslim." *See* Decl. of N. Purcell ¶ 9, Ex. C. In the face of
21 | significant criticism, President Trump announced that he would "expand" his proposed blanket
22 | ban to "any nation that has been compromised by terrorism" but use different words to
23 | describe it:

24 | > I actually don't think it's a rollback. In fact, you could say it's an
25 | > expansion. . . . I'm looking now at territory. People were so upset when I
26 | > used the word Muslim. Oh, you can't use the word Muslim. Remember

1         this. And I'm OK with that, because I'm talking territory instead of Muslim.

2 FAC ¶ 46, Ex. 4. Even after issuing the order, President Trump's statements confirm that it is

3 designed to disfavor Muslims. FAC ¶ 53, Ex. 8. The bottom line is that the Executive Order is

4 designed to "adversely affect[ ] an unpopular group," calling for the "court [ to] apply a 'more

5 searching' rational basis review." *Golinski*, 824 F. Supp. 2d at 996 (citing *Diaz*, 656 F.3d at

6 1012).

7         Even assuming the absence of animus and the application of ordinary rational basis

8 review, the Executive Order bears no "rational relationship to a legitimate governmental

9 purpose." *Romer*, 517 U.S. at 635. There is simply no basis to conclude that existing screening

10 procedures are uniquely failing as to individuals from the listed countries or as to refugees.

11 Instead, the Executive Order panders to irrational fears about Muslims and refugees, and bears

12 no *rational* relationship to any government interest.

13

14     **2.**     **The State is Likely to Prevail on the Merits of Its Claim that the Executive Order Violates the Establishment Clause**

15         The Executive Order violates the Establishment Clause of the First Amendment

16 because both its purpose and effect are to favor one religion over another. "The clearest

17 command of the Establishment Clause is that one religious denomination cannot be officially

18 preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Thus, where a law

19 "grant[s] a denominational preference, our precedents demand that we treat the law as suspect

20 and that we apply strict scrutiny in adjudging its constitutionality." *Id.* at 246. In *Larson*, the

21 law at issue did not mention any religious denomination by name, but drew a distinction

22 between religious groups based on the percentage of their revenue received from non-

23 members, which had the effect of harming certain religious groups. *Id.* at 231-32. Because the

24 law was focused on religious entities and had the effect of distinguishing between them in a

25 way that favored some, the Court applied strict scrutiny. *Id.* at 246-47.

26

The Court should apply the *Larson* approach here. The Executive Order's refugee provisions explicitly distinguish between members of religious faiths, granting priority to "refugee claims made by individuals on the basis of religious-based persecution" only if "the religion of the individual is a minority religion in the individual's country of nationality." Section 5(b). President Trump and his advisers have made clear that the very purpose of this order is to tilt the scales in favor of Christian refugees at the expense of Muslims. FAC ¶ 53, Ex. 8. This case thus involves just the sort of discrimination among denominations that failed strict scrutiny in *Larson*, and the Executive Order should likewise be invalidated.

Even if the Executive Order did not explicitly distinguish between denominations, the Court would still need to apply the three-part "*Lemon* test" to determine whether the government has violated the Establishment Clause. *Lemon v. Kurtzman*, 403 U.S. 602 (1971). "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" *Id*. at 612. While the government must satisfy all three prongs, here it can satisfy none.

First, the Executive Order's purpose is not "secular" because President Trump's purpose in issuing this Order—as confirmed by his own public statements—is to "endorse or disapprove of religion." *Wallace v. Jaffree*, 472 U.S. 38, 75-76 (1985). In analyzing government purpose, it is "the duty of the courts" to distinguish a "sincere" secular purpose from one that is either a "sham" or that is "secondary" to a "predominantly religious" purpose. *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 865 (2005) (internal quotation marks and citations omitted). This duty requires a Court to scrutinize all "probative evidence," to exercise "common sense," and to refuse "to turn a blind eye to the context in which [the] policy arose." *Id*. at 866 (alteration in original). In so doing, a court looks carefully at both the "historical context" of the government's action and "the specific sequence of events

leading to [its] passage." *Id.* (alteration in original). As the Supreme Court has explained, this inquiry into purpose at times requires invalidation of an action that otherwise would have been constitutional: "One consequence of taking account of the purpose underlying past actions is that the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage." *Id.* at 866 n.14. In short, given that President Trump's "actual purpose" in issuing this Order is to "endorse or disapprove of religion," *Wallace*, 472 U.S. at 75-76, the Order violates the first prong of the *Lemon* test.

The Order also violates *Lemon*'s second prong, which requires that the "principal or primary effect . . . be one that neither advances nor inhibits religion." Governmental action violates this prong "if it is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1256 (9th Cir. 2007) (internal quotation marks omitted). The court analyzes this prong "from the point of view of a reasonable observer who is informed . . . [and] familiar with the history of the government practice at issue." *See id.* (alteration in original) (internal quotation marks omitted). Thus, the question here is whether an informed, reasonable observer would perceive this Executive Order as an endorsement of one religion, as disapproval of another, or both? In light of the evidence cited above, there is little question that the answer to this question is in the affirmative.

As to the third prong, the Order "foster[s] 'an excessive governmental entanglement with religion" by favoring one religious group over another, which "engender[s] a risk of politicizing religion." Larson, 456 U.S. at 252-53. Selectively burdening those of the Muslim faith and favoring those of the Christian faith creates improper "entanglement with religion."

In short, because the Executive Order fails the *Larson* test and every prong of the *Lemon* test, it emphatically violates the Establishment Clause.

### 3. The State is Likely to Prevail on the Merits of Its Claim that the Executive Order Violates Due Process

The Executive Order violates the procedural due process rights of immigrants and non-immigrants from the seven impacted countries, including those who reside and work in Washington, are professors and students at Washington universities, and want to travel to Washington to visit their families. First, due process requires that the United States at a minimum provide notice and an opportunity to be heard before denying re-entry to legal permanent residents or visaholders with longer term residency rights such as under an H-1B visa (workers) and f visas (students). Moreover, the United States must provide due process before restricting their vital liberty interests in travelling across United States borders. Second, Congress's grant of a statutory right to seek asylum or protection under the Convention Against Torture requires that the United States administer those policies and procedures consistent with due process. The Order's blanket prohibition on all refugees for 120 days and on Syrian refugees indefinitely contravenes refugees' due process rights.

### a. The denial of re-entry to and de facto travel ban on certain legal permanent residents and visaholders violates their due process rights

Section 3(c) of the Executive Order denies entry to the United States to all persons from Iraq, Syria, Iran, Libya, Somalia, Sudan and Yemen, including visaholders and legal permanent residents with the legal right to leave and re-enter the United States.[6] Under that policy, legal permanent residents and visaholders travelling abroad will be deported if they attempt to re-enter the United States, and those who remain will be forced to refrain from international travel to avoid that devastating result. This draconian restriction violates the due process rights of those individuals.

---

[6] The Executive Order excludes from this restriction only "those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas." Executive Order Sec. 3(c). This group is limited essentially to diplomatic visas.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

The Fifth Amendment protects all persons who have entered the United States "from deprivation of life, liberty, or property without due process of law." *Mathews v. Diaz*, 426 U.S. 67, 69, 77 (1976) (internal citation omitted). This protection applies to all persons within our borders, regardless of immigration status. *Id.* (Due Process Clause of the Fifth Amendment extends even to those "whose presence in this country is unlawful, involuntary, or transitory"); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *United States v. Raya-Vaca*, 771 F.3d 1195, 1202 (9th Cir. 2014). There is "no exception" to this rule. *Id.*, 771 F.3d at 1203.

A "temporary absence from our shores" does not deprive visaholders and legal permanent residents of their right to due process. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 213 (1953) (citing *Kwong Hai Chew v. Colding*, 344 U.S. 590, 601 (1953) (holding that denial of re-entry to legal permanent resident must comport with due process where resident had spent four months abroad); *Ricketts v. Simonse*, No. 16 CIV. 6662 (LGS), 2016 WL 7335675, at *2–3 (S.D.N.Y. Dec. 16, 2016) (legal permanent resident who had spent a few weeks abroad and was caught with drugs upon re-entry entitled to due process).

Due process requires that legal permanent residents and visaholders not be denied re-entry to the United States without "at a minimum, notice and an opportunity to respond." *Raya-Vaca*, 771 F.3d at 1204. "Aliens who have entered the United States—whether legally or illegally—cannot be expelled without the government following established procedures consistent with the requirements of due process." *Lanza v. Ashcroft*, 389 F.3d 917, 927 (9th Cir. 2004) (citing *Mezei*, 345 U.S. at 212). Specifically, due process guarantees that individuals denied re-entry be provided a "full and fair hearing of his [or her] claims" and "a reasonable opportunity to present evidence on his [or her] behalf." *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000); *Gutierrez v. Holder*, 662 F.3d 1083, 1091 (9th Cir. 2011) (same). Although Congress has prescribed certain circumstances under which an individual may be denied re-entry to the United States, those procedures must comport with due process. *See, e.g., Pantoja-Gayton v. Holder*, 366 F. App'x 739, 741 (9th Cir. 2010) (legal permanent resident deemed

1    inadmissible upon re-entry for child smuggling, but entitled to a full hearing before an

2    immigration judge to contest that finding).

3         The denial of re-entry to all visaholders and legal permanent residents from the

4    impacted countries, without an opportunity to be heard, is a prima facie violation of those due

5    process principles. The Executive Order provides that all individuals from the impacted

6    countries be denied entry to the United States, irrespective of their immigration status. On its

7    face, the Order bars legal permanent residents from impacted countries from reentry into the

8    United States if they travel aboard. The Order also denies the rights of H-1B visa holders from

9    re-entry if they travel abroad. As noted, there are a significant number of workers at

10   Washington businesses and students at Washington universities impacted. Similarly, the Order

11   on its face denies the rights to students here on f visas to reenter if they leave the country at any

12   time during their studies. The denial of re-entry to legal permanent residents and such

13   visaholders absent an opportunity to be heard, much less "proceedings conforming to . . . due

14   process of law," is patently unconstitutional. *Shaughnessy*, 345 U.S. at 212.

15        The Order's impact on the right to travel also violates due process. In determining

16   whether a new policy such as the Order violates due process, "courts must consider the interest

17   at stake for the individual, the risk of an erroneous deprivation of the interest through the

18   procedures used as well as the probable value of additional or different procedural safeguards,

19   and the interest of the government in using the current procedures rather than additional or

20   different procedures." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (citing *Mathews v.*

21   *Eldridge*, 424 U.S. 319, 334-35 (1976)). Here, the Executive Order deprives noncitizens of the

22   right to travel, a constitutionally protected liberty interest. *Kent v. Dulles*, 357 U.S. 116, 125

23   (1958) (holding that Secretary of State could not deny passports to Communists on the basis

24   that right to travel abroad is a constitutionally protected liberty interest). The right to travel

25   "may be as close to the heart of the individual as the choice of what he eats, or wears, or

26   reads," and is "basic in our scheme of values." *Id*. at 126. And for many noncitizens residing in

Washington pursuant to H-1B visas, international travel is a central component of their work. *See id.* (noting that "[t]ravel abroad, like travel within the country, may be necessary for a livelihood"). For visaholders or legal permanent residents with family abroad, the de facto travel ban also denies the right to connect with their families, "a right that ranks high among the interests of the individual." *Id.* In contrast to these vital liberty interests, the denial of re-entry to noncitizens with lawful immigration status does nothing to advance the government's interest in the "efficient administration of the immigration laws at the border." *Landon*, 459 U.S. at 34. The denial of re-entry to all persons from the seven affected countries, irrespective of immigration status, and resulting travel ban violate the due process rights of legal permanent residents and visaholders.

> **b.     The blanket ban on all refugees violates their due process right to the fair administration of congressionally enacted policies and procedures**

Congress has created a statutory right whereby persons persecuted in their own country may petition for asylum in the United States.  U.S.C. § 1158(a)(1) ("[a]ny alien who is physically present in the United States or who arrives in the United States. . . irrespective of such alien's status, may apply for asylum in accordance with this section"). Federal law prohibits the return of a noncitizen to a country where he may face torture or persecution. *See* 8 U.S.C. § 1231(b); United Nations Convention Against Torture ("CAT"), implemented in the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231). Congress has established procedures to implement those statutory rights, which includes providing refugees the right to present evidence in support of a claim for asylum or CAT protection, to move for reconsideration of an adverse decision, and to seek judicial review of a final order denying their claims. *Lanza v. Ashcroft*, 389 F.3d 917, 927 (9th Cir. 2004).

In enacting these statutory rights, Congress "created, at a minimum, a constitutionally protected right to petition our government for political asylum." *Haitian Refugee Ctr. v. Smith*,

676 F.2d 1023, 1038 (5th Cir. 1982). The constitutionally protected right to petition for asylum "invoke[s] the guarantee of due process." *Id.* at 1039; *Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999); *see also Lanza*, 389 F.3d at 927 ("The due process afforded aliens stems from those statutory rights granted by Congress and the principle that minimum due process rights attach to statutory rights.") (internal marks and quotation omitted). Due process requires at a minimum that refugees seeking asylum receive a "full and fair hearing." *Zetino v. Holder*, 622 F.3d 1007, 1013 (9th Cir. 2010). It also requires that refugees have the opportunity to consult with an attorney.

The Executive Order violates the due process rights of refugees because it provides no avenue for refugees to have their asylum claims heard.  Instead, it explicitly states that the United States will not entertain asylum claims from certain groups for a specified period of time, regardless of the merits of individual asylum claims. This contravenes the due process requirement that refugees receive a "full and fair hearing" on their claims for relief.  *Zetino*, 622 F.3d at 1013. It also denies refugees their constitutionally protected right to the effective assistance of counsel. *Jie Lin v. Ashcroft*, 377 F.3d 1014, 1023 (9th Cir. 2004).

Moreover, the denial of refugees' constitutionally protected right to petition for asylum does nothing to advance the government's interest in the "efficient administration of the immigration laws at the border." *Landon*, 459 U.S. at 34. That interest is satisfied by the rigorous procedures already in place to vet requests for asylum. Refugees are subject to "the highest level of background and security checks of any category of traveler to the United States," in a process that often takes years to complete.[7]  Accordingly, the ban on refugees violates the due process rights of refugees seeking asylum within the United States.

---

[7] U.S. Dept. of Homeland Security, USCIS, Refugee Processing and Security Screening (2015), *available at* https://www.uscis.gov/refugeescreening; *see also* White House, President Barack Obama, Infographic: The Screening Process for Refugee Entry into the United States (Nov. 2015), *available at* https://obamawhitehouse.archives.gov/blog/2015/11/20/infographic-screening-process-refugee-entry-united-states (noting that "[r]efugees undergo more rigorous screening than anyone else we allow into the United States" and are "subject to the highest level of security checks of any category of traveler").

### 4.     The State is Likely to Prevail on the Merits of Its Claim that the Executive Order Violates the Immigration and Nationality Act

The State is also likely to establish that Sections 3(c) and 5(c) of the Executive Order violate the Immigration and Nationality Act (INA). Enacted in 1965, 8 U.S.C. § 1152(a)(1)(A) clearly states, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." By suspending entry of refugees from Syria indefinitely, and immigrants from Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen, for 90 days, the Executive Order squarely violates the INA. *See U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026 (1989) (holding the "plain meaning of legislation should be conclusive"). While the INA refers only to discrimination in the "issuance of an immigrant visa," the statute would be rendered meaningless if it did not equally prohibit attempts, like President Trump's, to deny an immigrant's entry into the country altogether. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State,*, 45 F.3d 469 (D.C. Cir. 1995) (holding that Congress, in enacting section 1152, "unambiguously directed that no nationality-based discrimination shall occur").

Defendants may argue the President has power to suspend the entry of any class of aliens when their entry is detrimental to the interests of the United States. *See* 8 U.S.C. § 1182(f). Such an argument, however, is unavailing. Congress enacted Section 1182 in 1952, well before it passed section 1152. Whatever section 1182 meant when it was adopted, the enactment of the INA amendments in 1965, including section 1152, marked a "profound change" in the law by abolishing the national origin quota system, establishing a uniform quota system, and prohibiting discrimination on the basis of race and national origin. *Olsen v. Albright*, 990 F. Supp. 31 (D.D.C. 1997) (citing Pub. L. No. 89-236). Passed alongside the Civil Rights Act of 1964 and the Voting Rights Act of 1965, the legislative history of the INA Amendments of 1965 "is replete with the bold anti-discriminatory principles of the Civil

Rights Era." *Olsen*, 990 F.Supp. at 37. It is inconceivable that, in enacting anti-discrimination provisions in 1965, Congress intended to leave the President with the ability to adopt the same sort of overtly discriminatory measures Congress was outlawing. Accepting the President's approach would take us back to a period in our history when distinctions based on national origin were accepted as the natural order of things, rather than outlawed as the pernicious discrimination that they are. *Cf. Chae Chan Ping v. U.S.*, 130 U.S. 581, 595, 606 (1889) (sustaining the Chinese Exclusion Act because the Chinese "remained strangers in the land," constituted a "great danger [to the country]" unless "prompt action was taken to restrict their immigration," and were "dangerous to [the country's] peace and security").

C.  **The State, its Residents, and its Businesses Are Suffering and Will Continue to Suffer Irreparable Harm Due to the Executive Order**

To obtain preliminary relief, the State must show that irreparable harm is likely before a decision on the merits can be issued. The State meets this test on several grounds.

First, because the State has shown a likelihood of success on its Establishment Clause claim, harm is presumed. *See, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) ("[W]here a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination."); *Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir. 1986) (applying same rule).

Second, even aside from the Establishment Clause claim, the State's complaint, motion, and supporting evidence demonstrate overwhelming irreparable harm. Irreparable harm is harm "for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The Ninth Circuit's decision in Arizona Dream Act provides a directly applicable example. Undocumented persons who qualified for the federal Deferred Action for Childhood Arrivals Program (DACA) sought a preliminary injunction against Arizona's policy of denying driver's licenses to DACA

recipients. *Id.* at 1057-58. The Ninth Circuit held that irreparable harm existed because the lack of a driver's license stopped immigrants from getting to work, thereby hurting their ability to pursue their chosen professions. *Id.* at 1068. The same harm is experienced by workers or students prevented from entering or returning to the United States. "[A] delay, even if only a few months, pending trial represents . . . productive time irretrievably lost." *Id.* (second alteration in original).

The injuries to Washington residents and families are not merely professional and financial, but also profound and irreparable psychological injuries. As detailed in the attached declarations, the Order is resulting in longtime Washington residents being separated from or kept apart from their families, often in heartbreaking situations. Decl. E. Chiang ¶¶ 5-7, 11-13.

Washington businesses are also suffering irreparable injuries. Immigrant and refugee-owned businesses employ 140,000 people in Washington. Washington's technology industry relies heavily on the H-1B visa program. Nationwide, Washington ranks ninth in the number of applications for high-tech visas. Microsoft, which is headquartered in Washington, employs nearly 5,000 people through the program. Other Washington companies, including Amazon, Expedia, and Starbucks, employ thousands of H-1B visa holders. Loss of highly skilled workers puts Washington companies at a competitive disadvantage with global competitors. "[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Center, Inc. v. Canyon Tel. Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

The Executive Order is also causing irreparable harm to Washington's college students and universities. At the University of Washington, more than ninety-five students are immigrants from Iran, Iraq, Syria, Somalia, Sudan, Libya, and Yemen. Decl. of J. Riedinger ¶ 5. The number at Washington State University is over 135. Decl. of A. Chaudhry ¶ 5. Because of the Executive Order, these students are missing out on research and educational opportunities, travel to visit their families, study abroad, and other irreplaceable activities that

cannot be compensated through money damages. Decl. J. Riedinger ¶¶ 6-8; Decl. of A. Chaudry ¶¶ 6-10. The universities also risk losing current and future students, a harm that cannot be remedied with monetary damages. *See Regents of Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 519-20 (9th Cir. 1984) (loss of ability to recruit athletes, loss of national ranking, and dissipation of alumni goodwill are irreparable harm).

D.    **The Balance of Equities and Public Interest Sharply Favor Preliminary Relief**

The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Since this case involves the government, the balance of equities factor merges with the fourth factor, public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2013).

The balance tips sharply in favor of the State. The balance of equities and public interest always favor "prevent[ing] the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted). In addition, the State has shown irreparable, concrete harm to Washington residents, businesses, students, and universities. Meanwhile, as detailed above, the overbreadth and underbreadth of the order mean that it does little if anything to further its alleged purpose of preventing terrorism. And the requested relief is narrowly tailored to affect only those parts of the Order causing the State harm. While the State seeks a nationwide injunction, that relief is appropriate for two reasons: (1) Congress and the courts have emphasized the importance of uniformity in applying immigration policies nationwide; and (2) nationwide relief is necessary to ensure that State residents and those traveling to meet them are not stopped at other ports of entry around the country or interfered with by officials in Washington, DC, on their way to Washington State. *See, e.g.*, *Texas v. United States*, 787 F.3d 733, 768-69 (5th Cir. 2015) (affirming nationwide injunction to ensure uniformity and provide full relief).

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# IV.    CONCLUSION

Sometimes federal courts are the only entities that can immediately halt abuses by the executive branch. This is such a case. The State asks this Court to play its constitutional role and grant a nationwide temporary restraining order until such time as the Court can further consider the merits.

DATED this 1st day of February, 2017.

Respectfully submitted,

  s/ Robert W. Ferguson
ROBERT W. FERGUSON
Attorney General
WSBA #26004
NOAH G. PURCELL
WSBA #43492
Solicitor General
COLLEEN M. MELODY
WSBA #42275
Civil Rights Unit Chief
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744
noahp@atg.wa.gov