HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON and STATE OF MINNESOTA,<br><br>           Plaintiffs,<br><br>     v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of the Department of Homeland Security; TOM SHANNON, in his official capacity as Acting Secretary of State; and the UNITED STATES OF AMERICA,<br><br>           Defendants. | NO.  2:17-cv-00141 JLR<br><br>BRIEF OF *AMICUS CURIAE* AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE IN SUPPORT OF STATE OF WASHINGTON'S AMENDED MOTION FOR TEMPORARY RESTRAINING ORDER |

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH
AND STATE- i
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

**TABLE OF CONTENTS**

Introduction ..................................................................................................................................1

Argument ....................................................................................................................................1

I.    The Executive Order violates the Establishment Clause. .......................................................2

    A.    The Executive Order fails the Establishment Clause's *Larson* Test. ...........................3

    B.    The Executive Order fails the Endorsement Test ...........................................................5

    C.    The Executive Order fails all three requirements of the *Lemon* Test. ..........................8

II.    The Executive Order violates the Religious Freedom Restoration Act. ...............................11

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE- 1
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

# INTRODUCTION

President Donald Trump has spent over a year promising to ban Muslims from entering the country. *See, e.g.*, First Am. Compl. ¶¶ 42–61. During that time, he has repeatedly disparaged and attacked an entire religion because he regards it as "hard to separate . . . who is who" between Muslims and terrorists. Transcripts, *Anderson Cooper 360 Degrees*, CNN (Mar. 9, 2016), http://cnn.it/2jJmaEC. He insisted, for example, that "hundreds of thousands of refugees from the Middle East" would attempt to "take over" and radicalize "our children." *Donald Trump Remarks in Manchester, New Hampshire*, C-SPAN 20:05 (June 13, 2016), http://cs.pn/2k7bHGq. He argued that Syrian refugees would "be a better, bigger, more horrible version than the legendary Trojan Horse." *Id.* And when he "talked about the Muslims," he explained his position clearly: "we have to have a ban . . . it's gotta be a ban." *Presidential Candidate Donald Trump Town Hall Meeting in Londonderry, New Hampshire*, C-SPAN 28:16 (Feb. 8, 2016), http://cs.pn/2kY4f1T.

Now, in the face of the clear constitutional and statutory prohibitions against official discrimination on the basis of religion, President Trump insists that Executive Order 13,769 is a security measure aimed merely at specific countries and *not* at a specific religion. But he telegraphed this very strategy as a candidate: When asked about the constitutionality of banning an entire religion, then-candidate Trump responded "[s]o you call it territories. OK? We're gonna do territories." 60 Minutes, *The Republican Ticket: Trump and Pence*, CBS NEWS (July 17, 2016), http://cbsn.ws/29NrLqj. But a Muslim ban by any other name is still a Muslim ban. And as such, it violates the fundamental constitutional guarantees of religious freedom. The gross deprivations, for even a day, would be unfair, unjust, un-American, and just plain cruel.

# ARGUMENT

"[T]he First Amendment mandates governmental neutrality" with respect to religion. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *accord, e.g.*, *McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005); *Larson v. Valente*, 456 U.S. 228, 246 (1982). This principle, contained in the First Amendment's Religion Clauses and reflected also in the Religious Freedom

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE- 1
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

Restoration Act, 42 U.S.C. § 2000bb-1, secures the right to religious freedom by straightforwardly forbidding official discrimination on the basis of religion. Ignoring the clear constitutional command, however, the government has singled out a religious group—Muslims—for official disfavor and maltreatment. By instituting a wide-ranging, punishing ban on immigrants, the government has run roughshod over core First Amendment protections.

Because the Executive Order violates fundamental First Amendment rights, the injuries that it inflicts are irreparable as a matter of law. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And because the harms are imminent and extraordinary, a temporary restraining order should issue.

**I.   The Executive Order violates the Establishment Clause.**

Three tests apply in determining whether governmental action like the challenged Executive Order violates the Establishment Clause. First, when the government confers a denominational preference (i.e., when it acts to favor or disfavor one faith or denomination over others), the official action is subject to strict scrutiny and presumptively does not stand. *Larson*, 456 U.S. at 246. Second, the action is reviewed to determine whether the government is endorsing religion or certain religious beliefs. *See, e.g.*, *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000). And third, the challenged conduct is evaluated under the disjunctive three-part test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to determine (i) whether the government acted with a religious purpose, (ii) whether the effect of the government's action is to favor or disfavor religion or a particular faith, and (iii) whether the government has entangled itself with religion. It is customary to apply all the tests pertinent to the particular facts. *See, e.g.*, *Modrovich. v. Allegheny County*, 385 F.3d 397, 400–01 (3d Cir. 2004); *see also Hernandez v. Comm'r*, 490 U.S. 680, 695 (1989) (courts should apply *Larson* when relevant before proceeding to *Lemon*). Failure to satisfy any one test—or any one part of the three-part *Lemon* test—invalidates the challenged action. The Executive Order fails all three.

Hence, the Executive Order should be enjoined. And to prevent imminent and extraordinary harm in the meantime, a temporary restraining order should issue immediately.

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE- 2
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

A. **The Executive Order fails the Establishment Clause's *Larson* Test.**

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244. Thus, when the government designates one denomination for different treatment, whether favorable or unfavorable, its action is subject to strict scrutiny and cannot stand. *Id.* at 246; *see, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1128 (10th Cir. 2012) (applying strict scrutiny to and invalidating state action that targeted Islam for disfavor). Simply put, "the government may not favor one religion over another, or religion over irreligion, religious choice being the prerogative of individuals." *McCreary*, 545 U.S. at 875.

The challenged Executive Order singles out Muslim-majority countries and subjects those who were born in or come from those countries (principally Muslims) to harsh legal disabilities and punishments, including exclusion, detention, and expulsion, based on their faith. Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017). At the same time, it affords exemptions and more favorable treatment to "religious minorit[ies]" in those countries—in other words, non-Muslims. *See id.* § 5(b), (e). Legal U.S. residents from the identified countries are thereby targeted and put at severe risk of detention and deportation because of their officially disfavored Muslim faith, while non-Muslims are free from threats of similar harm.

The Executive Order thereby acts in the most personal, palpable terms to disfavor Muslims in Washington and throughout the country. Many Muslims on legal visas for work or education are, at best, trapped in the United States: If they leave, they will not be allowed to return. So they cannot engage in the ordinary activities enjoyed by non-Muslims that may be essential to educational or professional success or to maintenance of family relationships. And even under the government's litigation-inspired change to its actions (*see* First Am. Compl. Ex. 14)—which apparently now exempts permanent residents from the prescribed discriminatory treatment, these individuals, as well as U.S. citizens, will still be deprived of family reunifications through immigration and visits from geographically distant relatives that similarly situated Americans from

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE- 3
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

non-Muslim countries enjoy as a matter of course. The Executive Order thus severely injures Muslims by depriving them of fundamental rights and freedoms, negatively interfering with their professional and personal lives, and quarantining them from the outside world.

Therefore, this Court should "treat the [Executive Order] as suspect and . . . apply strict scrutiny in adjudging its constitutionality": the discriminatory treatment of Muslims "must be invalidated unless it is justified by a compelling governmental interest and unless it is closely fitted to further that interest." *Larson*, 456 U.S. at 246–47 (citation omitted).

Here, the government's *asserted* interest is "stop[ping] attacks by foreign nationals . . . admitted to the United States." Exec. Order No. 13,769 § 1. Preventing attacks is a compelling interest; but merely incanting the mantra of "terrorism" or "national security" is not enough. The Executive Order must be "closely fitted to further the interest." *Larson*, 456 U.S. at 248. It isn't.

National security is not furthered by a policy of suddenly, flatly, and universally excluding Muslims *whose entry the government had already approved*. Much less is it closely fitted to that end. People from the seven identified countries—Iran, Iraq, Libya, Somalia, Syria, Sudan, and Yemen—have, collectively, killed *zero* people in terrorist attacks in the United States since 1975. Alex Nowrasteh, *Where Do Terrorists Come From? Not the Nations Named in Trump Ban*, NEWSWEEK (Jan. 31, 2017), http://bit.ly/2kWoddx.[1] The Executive Order does not address the greater terrorist threat posed by domestic extremists who are not Muslims. *See, e.g.*, Ellen Nakashima, *Domestic Extremists Have Killed More Americans than Jihadists Since 9/11. How the Government Is Responding*, WASH. POST (Oct. 15, 2015), http://wapo.st/1Qh8Kft (noting that since 2001, "white supremacists and people motivated by racial and religious hatred and anti-government views" have killed more Americans than have "international terrorists"). And even accepting the Trump administration's fixation on terrorist attacks by Muslims, sixty-nine percent of the individuals who have perpetrated such attacks were either natural-born or naturalized U.S. citizens. *Who Are the*

---

[1] The top five countries of origin for foreign-born perpetrators of terrorism in the United States have been Croatia, Cuba, Egypt, Pakistan, and Saudi Arabia—not one of which is covered by the Executive Order. *See id.*

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE- 4
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

*Terrorists?*, NEW AMERICA, http://bit.ly/2keSmUO (last visited Feb. 2, 2017). As a defense against terrorism, the Executive Order wildly misses the mark. The fit with the defendants' asserted interest is not merely loose; it is nonexistent. Strict scrutiny cannot be satisfied, and the Executive Order cannot stand. Hence, it should not be enforced, to the great harm of so many, while the government litigates to try to defend its constitutionally and morally indefensible policy.

### B.     The Executive Order fails the Endorsement Test.

Not only is government forbidden to "discriminate among persons on the basis of their religious beliefs and practices," but the Establishment Clause "prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *County of Allegheny v. ACLU*, 492 U.S. 573, 590, 594 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring)). "[T]he government may not favor one religion over another" by endorsing the one or condemning the other. *McCreary*, 545 U.S. at 875. Yet the Executive Order does exactly that.

The question under the Endorsement Test is "'whether an objective observer . . . would perceive" the government to have placed its stamp of approval or disapproval on religion or on a particular faith. *Santa Fe*, 530 U.S. at 308 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 76 (1985) (O'Connor, J., concurring)). The hypothetical objective observer is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show" (*McCreary*, 545 U.S. at 866), which means that the entire history of publicly available information about the genesis and evolution of the challenged policy here speaks directly to whether the Executive Order is an unconstitutional religious endorsement. What is more, even officially repudiated past acts are not "dead and buried" but remain in the reasonable observer's memory, affecting how the final—or in this case evolving—governmental action is viewed. *Id.* at 870. And the Establishment Clause is violated by "both perceived and actual endorsement of religion"

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH
AND STATE- 5
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

1  (*Santa Fe*, 530 U.S. at 305), meaning that if a reasonable observer, considering the full history and
2  context of the challenged policy, would perceive governmental endorsement, even if the
3  government did not intend it, the policy cannot stand.

4  Disapproval of Islam and approval of other faiths is apparent even from the bare text of the
5  Executive Order. It singles out for exclusion persons from seven *overwhelmingly* Muslim nations:
6  Iran (99.5% Muslim), Iraq (99.0% Muslim), Libya (96.6% Muslim), Somalia (99.8% Muslim),
7  Sudan (90.7% Muslim), Syria (92.8% Muslim), and Yemen (99.1% Muslim). Exec. Order No.
8  13,769 § 3(c); PEW RES. CTR., THE GLOBAL RELIGIOUS LANDSCAPE 45–50 (2012),
9  http://bit.ly/2k4Us8B.

10  The Executive Order also blocks entry of *all* refugees temporarily and of Syrian refugees
11  indefinitely (Exec. Order No. 13,769 § 5(a), (c)), again disproportionately affecting Muslims. As
12  noted, Syria is overwhelmingly Muslim; and Muslims made up a plurality of *all* refugees resettled
13  in the United States last year, the number of Muslim refugees to the U.S. having increased almost
14  every year over the past decade. Jens Manuel Krogstad & Jynnah Radford, *Key Facts About*
15  *Refugees to the U.S.*, PEW RES. CTR. (Jan. 30, 2017), http://pewrsr.ch/2kk7ro8. The disfavor of
16  Islam is, once again, compounded by the Executive Order's favoritism toward refugees who
17  belong to minority religions (*see* Exec. Order No. 13,769 § 5(b), (e)), as most refugees worldwide
18  today come from Muslim-majority countries (*Figures at a Glance*, UNHCR, http://bit.ly/2cmTBiF
19  (last visited Feb. 2, 2017)). The intention to target Muslims and only Muslims is pellucid.

20  Though these features of the Executive Order alone suffice to communicate official
21  preference for non-Muslims, the objective observer as a matter of law also knows much more.
22  First, the precursor to the Executive Order was then-candidate Trump's public and repeated
23  promise of a "total and complete shutdown of Muslims entering the United States." First Am.
24  Compl. Ex. 1. Second, candidate Trump renamed and repackaged his Muslim ban only after civil-
25  rights organizations and others decried its illegality, saying "I'm talking territory instead of

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH
AND STATE- 6
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

Muslim." First Am. Compl. Ex. 4, at 6. Moreover, he publicly described this change not as "a pull-back" but as "an *expansion*" of the ban. First Am. Compl. Ex. 4, at 1 (emphasis added). Third, after the election, President-elect Trump asked Rudy Giuliani (then under consideration for the post of Secretary of State) how the "Muslim ban" could be implemented "legally." First Am. Compl. Ex 17. Fourth, in an interview with the Christian Broadcasting Network on January 27, 2017, the very day he issued the Executive Order, President Trump declared that his administration would be acting to give priority (i.e., favoritism) to Christian refugees going forward. First Am. Compl. Ex. 8. And fifth, the government has exempted from the ban any person from one of those countries who also holds an Israeli passport (i.e., anyone likely to be Jewish). *See Message from U.S. Embassy Tel Aviv Consular Section*, U.S. EMBASSY IN ISRAEL, http://bit.ly/2l0KWB8 (last visited Feb. 2, 2017). The objective observer is aware of these public statements by President Trump and others who developed and imposed the Muslim ban and the resulting Executive Order, and is also aware of the broader "social context" in which the Executive Order and the policy that it embodies arose. *See, e.g.*, *Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707, 734 (M.D. Pa. 2005). And the magnitude of the government's disfavor toward Islam is made vivid to the objective observer by the government's initial attempt, through the Executive Order, to ban even lawful permanent residents—residents whom the government had *already vetted*—before its rushed disavowal of that position in the face of compelling legal challenges (First Am. Compl. Exs. 13, 14), and by the government's mass revocation of "*all* valid nonimmigrant and immigrant visas," with few exceptions, from the seven countries (First Am. Compl. Ex. 10 (emphasis added)).

Taking all of that into account, an objective observer could hardly help but perceive governmental condemnation of Islam, as well as governmental endorsement of Christianity—most notably through President Trump's express declaration that his administration would favor Christians over other refugees. The objective observer would thus receive the message that Muslims are "outsiders, not full members of the political community" and that Christians are

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH
AND STATE- 7
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

"insiders, favored members of the political community." *Santa Fe*, 530 U.S. at 309–10 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)). Simply put, the Executive Order communicates that Muslims of all different legal statuses are a disfavored caste. That is not a message that the government can or should convey: "When the government associates one set of religious beliefs with the state and identifies nonadherents as outsiders, it encroaches upon the individual's decision about whether and how to worship." *McCreary*, 545 U.S. at 883 (O'Connor, J., concurring). The violation of the Establishment Clause here is forthright and flagrant.

C. **The Executive Order fails all three requirements of the *Lemon* Test.**

The Executive Order also violates the *Lemon* Test, under which governmental action must (1) have a preeminently secular purpose (*McCreary*, 545 U.S. at 864), (2) have a "principal or primary effect . . . that neither advances nor inhibits religion" (*Lemon*, 403 U.S. at 612), and (3) "must not foster 'an excessive government entanglement with religion'" (*id.* at 613 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970))). Failure to satisfy any part constitutes an Establishment Clause violation. *See id.* at 612–13. The Executive Order fails all three.

1. The secular-purpose requirement is violated if the "government's actual purpose is to endorse or disapprove of religion." *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)). It is not enough merely to articulate a secular purpose; "the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864. As with the Endorsement Test, "[t]he eyes that look to purpose belong to an 'objective observer.'" *Id.* at 862 (internal quotation marks omitted) (quoting *Santa Fe*, 530 U.S. at 308). And because "reasonable observers have reasonable memories," the court must not "turn a blind eye to the context" but must "look to the record of evidence showing the progression leading up to" the challenged action. *Id.* at 866, 868.

As explained above, President Trump's clear, unambiguous statements of intent both before and after the election and inauguration, and the rest of the history leading up to the

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE- 8
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

Executive Order, all bespeak the purpose to disfavor Islam and favor Christianity. The President and his campaign surrogates and policy advisers promised a "complete and total shutdown of Muslims entering the United States" and favoritism toward Christian refugees. First Am. Compl. Exs. 1, 8. They have now acted to deliver on those promises. *See* Exec. Order No. 13,769 §§ 3, 5; *see also* First Am. Compl. Ex. 17. The invocation of terrorist threats simply does not explain the action actually taken. So it must be deemed either a "sham" or merely "secondary" to an impermissible religious purpose (*McCreary*, 545 U.S. at 864).

    2. The Executive Order also fails *Lemon*'s principal-effect requirement by inhibiting Islam and advancing Christianity. *See Lemon*, 403 U.S. at 612. Again, that is partly for the reasons already stated: the effect requirement is violated whenever "it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or disapproval of religion." *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1398 (9th Cir. 1994).

    The Executive Order also has the impermissible effect of inhibiting Islam by demonstrably targeting Muslims, singling them out for unfavorable treatment. Muslim refugees desperate to escape the charnel house of Syria and reunite with family members in the State are now forced to renounce or disguise their faith to qualify for the Executive Order's exception affording preferred status to "religious minorit[ies]." Exec. Order No. 13,769 § 5(e). When remaining in Syria may be tantamount to a death sentence, this scenario is hardly implausible. *Cf., e.g.*, *The Marranos*, JEWISHHISTORY.ORG, http://www.jewishhistory.org/the-marranos/ (last visited Feb. 2, 2017) (describing "[t]he forced conversion of a quarter-million Jews in Spain" during the Inquisition). It is difficult to imagine a policy that would more greatly inhibit the practice of one's faith than to make religious conversion a life-or-death matter.

    3. Finally, the Establishment Clause forbids "excessive government entanglement with religion." *Lemon*, 403 U.S. at 613 (quoting *Walz*, 397 U.S. at 674). It thus prohibits government from imposing or implementing religious tests or making determinations based on religious

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE- 9
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

doctrine. *See, e.g., Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969).

Among other suspect features, the Executive Order gives priority to certain refugee claims "provided that the religion of the individual is a minority religion in the individual's country of nationality." Exec. Order No. 13,769 § 5(b). Yet it does not define the term *minority religion*, forcing individual government agents—although it is yet unclear *which* agents—to make that determination themselves.

The Syrian example demonstrates how fraught judgments about religious-minority status would be. Because Syria is overwhelmingly Muslim, those who profess a faith other than Islam are undoubtedly religious minorities there. But that is just the beginning. Syria's Muslim population is predominantly Sunni. There is also a substantial minority Shiite population that includes significant numbers of Alawites and Ismailis. *The World Factbook: Syria*, CENT. INTELLIGENCE AGENCY, http://bit.ly/JZ2o63 (last updated Jan. 12, 2017). Although Alawites are a numerical minority, they hold disproportionate governmental power and count Syrian President Bashar al-Assad (himself a leading cause of refugees) among their number. *Guide: Syria's Diverse Minorities*, BBC NEWS (Dec. 9, 2011), http://bbc.in/2l0Zgd0. Given the demographics and politics, whether a Sunni, a non-Alawite Shiite, or an Alawite would be considered a religious minority when fleeing Sunni-majority but Alawite-controlled Syria is unclear. What *is* clear is that the Executive Order would require U.S. officials to make religious determinations, apparently on an *ad hoc*, case-by-case basis, about which branch of Islam each potential refugee is most closely associated with and whether that branch constitutes a religious minority—or else to make the theological determination that the distinct branches of Islam are insufficiently different and therefore that *no* Muslim refugee will be accepted as a religious minority.

If it is unconstitutional for government to decide, for example, how much of a school's expenditure is attributable to "religious activity" versus "secular education" (*Lemon*, 403 U.S. at

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH
AND STATE- 10
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

620) or whether student activity constitutes "religious speech" (*Widmar v. Vincent*, 454 U.S. 263, 272 n.11 (1981)), it is all the more improper for government to decide whose religion is what and how that relates to other denominations or sects.

**II.     The Executive Order violates the Religious Freedom Restoration Act.**

The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 (2015), provides that governmental action cannot substantially burden religious exercise unless it is the least restrictive means of furthering a compelling interest—that is, unless the action survives strict scrutiny. *See Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015). Here, the Executive Order cannot meet that "exceptionally demanding" test (*see id.* at 864).

In the first instance, Muslim residents of Washington (or other States) who hold visas and are legally present in the United States cannot make a pilgrimage to Mecca—one of the five pillars of Islam and a mandatory religious obligation to be fulfilled at least once in a practicing Muslim's lifetime (Diaa Hadid, *What Muslims Do on Hajj, and Why*, N.Y. TIMES (Sept. 8, 2016), http://nyti.ms/2kYGovS). For if they leave the United States and then try to come back, they will be detained and deported. Because coercion "to act contrary to [one's] religious beliefs by the threat of civil or criminal sanctions" is a substantial burden on religious exercise (*Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069-70 (9th Cir. 2008)), no one could seriously dispute that detention and subsequent deportation meet RFRA's threshold.

The Executive Order must therefore be "the least restrictive means of furthering [a] compelling governmental interest" (§ 2000bb-1(b)), which, as explained (*see supra* Section I.A), it is not. A blanket ban on all immigration and visitation from seven overwhelmingly Muslim nations with little to no history of sending terrorists to the United States, and the revocation of visas and the inevitable detention and deportation of people lawfully in the United States and accused of no crime, much less terrorism, are not only far more restrictive than necessary to fight terrorism, but they may not further the government's asserted interest at all. *See* David Morgan, *Former Intel*

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE- 11
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

1  *Official: Trump Immigration Ban Makes Americans Less Safe*, CBS NEWS (Jan. 30, 2017),
2  http://cbsn.ws/2jKLkpK. The Executive Order is thus unlawful under RFRA.
3      What is more, RFRA was enacted "to provide greater protection for religious exercise than
4  is available under the First Amendment." *Holt*, 135 S. Ct. at 859-60. Thus, whatever else RFRA
5  may cover, it certainly encompasses violations of the Free Exercise Clause's core mandate that the
6  government must not single out a particular group for punishment based on religious exercise.
7      Indeed, because "[t]he Free Exercise Clause protects against governmental hostility which
8  is masked, as well as overt," the singling out of a religious group for punishment is suspect even if
9  done artfully and by subterfuge without making direct, explicit reference to the group or its faith.
10 *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). Such a
11 "religious gerrymander" presumptively violates the Free Exercise Clause—and thus also RFRA
12 (*cf. Fernandez v. Mukasey*, 520 F.3d 965, 966 n.1 (9th Cir. 2008))—unless the government can
13 demonstrate that it is the least restrictive means to serve a compelling governmental interest.
14 *Lukumi*, 508 U.S at 534, 546. As already explained, it cannot.
15                 *   *   *
16     The Executive Order is exactly what President Trump promised all along—a "Muslim
17 ban." No amount of rebranding will change that. People from seven countries are refused entry to
18 the United States for no reason other than their deity and preferred holy book. Beyond failing
19 every applicable legal standard, the Executive Order is an insult to the fundamental principles of
20 our Constitution. It cannot stand. It should not stand even for a day. The temporary restraining
21 order should issue.
22     DATED this 2ND day of February, 2017.
23
24
25

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE- 12
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE

By: s/ Richard B. Katskee
    Richard B. Katskee, admitted *pro hac vice*
    Eric Rothschild, admitted *pro hac vice*[*]
    Andrew Nellis, admitted *pro hac vice*[†]
    Bradley Girard, admitted *pro hac vice*
    Kelly M. Percival, admitted *pro hac vice*[‡]
    1310 L Street NW, Suite 200
    Washington, DC 20005
    Phone: (202) 466-3234
    Email: katskee@au.org
    Email: rothschild@au.org
    Email: nellis@au.org
    Email: girard@au.org
    Email: percival@au.org

[*] Admitted only in Pennsylvania. Supervised by Richard B. Katskee, a member of the D.C. bar.

[†] Admitted only in New York. Supervised by Richard B. Katskee, a member of the D.C. bar.

[‡] Admitted only in California. Supervised by Richard B. Katskee, a member of the D.C. bar.

CALFO EAKES & OSTROVSKY PLLC

By: s/ Angelo J. Calfo
By: s/ Kristin W. Silverman
    Angelo J. Calfo, WSBA #27079
    Kristin W. Silverman, WSBA #49421
    1301 Second Avenue, Suite 2800
    Seattle, WA 98101-3808
    Phone: (206) 407-2200
    Fax: (206) 407-2224
    Email: angeloc@calfoeakes.com
    Email: kristins@calfoeakes.com

***Counsel for** Amicus Curiae **Americans United for Separation of Church and State***

BRIEF OF *AMICUS CURIAE* AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE- 13
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on February 2, 2017, the foregoing document was electronically filed

3  with the United States District Court CM/ECF system, which will send notification of such filing

4  to all attorneys of record.

Americans United for Separation of Church and State

By: *s/ Richard B. Katskee*
Richard B. Katskee, admitted *pro hac vice*
1310 L Street NW, Suite 200
Washington, DC 20005
Phone: (202) 466-3234
Email:  katskee@au.org

***Counsel for* Amicus Curiae *Americans United for Separation of Church and State***

---

BRIEF OF *AMICUS CURIAE*
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE- 1
(Case No. 2:17-cv-00141 JLR)

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224