1

2

3

4

5

6

7

8

The Honorable James L. Robart

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON

9

10

11

12

13

14

15

16

17

18

19

STATE OF WASHINGTON and
STATE OF MINNESOTA,

                              Plaintiffs,

                    v.

DONALD TRUMP, in his official capacity as
President of the United States; U.S.
DEPARTMENT OF HOMELAND
SECURITY; JOHN F. KELLY, in his official
capacity as Secretary of the Department of
Homeland Security; REX W. TILLERSON, in
his official capacity as Secretary of State;[1] and
the UNITED STATES OF AMERICA,

                              Defendants.

No. 2:17-cv-00141 (JLR)

**DEFENDANTS' OPPOSITION TO
PLAINTIFF STATE OF
WASHINGTON'S MOTION FOR
TEMPORARY RESTRAINING
ORDER**

Noted For Consideration:
February 3, 2017

20

21

22

23

24

25

26

27

28

---

[1] Rex W. Tillerson, Secretary of State, has been substituted for Tom Shannon pursuant to Federal Rule of Civil Procedure 25(d).

DEFENDANTS' OPPOSITION TO
PLAINTIFF STATE OF WASHINGTON'S MOTION FOR
TEMPORARY RESTRAINING ORDER
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

    I.     The Immigration and Nationality Act ............................................................ 3

    II.    Presidential Authority Over Foreign Affairs and National Security ......................... 5

    III.   The President's Executive Order of January 27, 2017 .............................................. 6

STANDARD OF REVIEW .................................................................................................. 8

ARGUMENT ....................................................................................................................... 9

    I.     The State Lacks Standing to Invoke the Court's Jurisdiction ................................. 9

        A.    The State Lacks Standing on Its Own Behalf ..................................... 9

        B.    The State Cannot Bring a *Parens Patriae* Action Here ...................................... 12

    II.    The State Does Not Demonstrate It Is Likely to Prevail on the Merits ................... 14

        A.    The Executive Order Is a Valid Exercise of Congress' Broad Delegation of Authority to the President, and His Own Constitutional Powers .................. 14

        B.    This Court Cannot, and Need Not, Review the President's National Security Determinations Underlying the Executive Order ................................ 19

        C.    The State's Facial Constitutional Challenges Fail .............................................. 23

    III.   The State Has Made No Showing of Irreparable Harm .......................................... 26

    IV.   The Balance of the Equities and the Public Interest Mandate Against a Temporary Restraining Order ................................................................................. 28

    V.    Any Relief Entered Must Be Limited in Scope to the Plaintiff State and to the Specific Harm Found .......................................................................................... 30

CONCLUSION .................................................................................................................. 30

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - i
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

**INTRODUCTION**

A provision of the Immigration and Nationality Act (INA) titled "Suspension of entry or imposition of restrictions by President," 8 U.S.C. § 1182(f), authorizes the President to "suspend the entry of . . . any class of aliens" whenever the President determines their entry "would be detrimental to the interests of the United States[.]"  Invoking that authority, on January 27, 2017, the President issued an Executive Order titled "Protecting the Nation from Foreign Terrorist Entry into the United States."  *See* ECF No. 1-7.  The Executive Order's purpose is "to protect the American people from terrorist attacks by foreign nationals admitted to the United States," *id.* pmbl., and as pertinent here it directs the following actions:

- a 90-day suspension of entry for individuals from certain countries, during which time the Secretary of Homeland Security and other officials must review whether the United States has adequate information to determine that an individual seeking an immigration benefit "is not a security or public-safety threat," *see id.* § 3(a), (c);

- a 120-day suspension of the U.S. Refugee Admissions Program ("USRAP" or "refugee program"), during which time the Secretary of State and other officials must "review the USRAP application and adjudication process to determine what additional procedures should be taken to ensure that those approved for refugee admission do not pose a threat to the security and welfare of the United States, and shall implement such additional procedures," *see id.* § 5(a); and

- a suspension of entry of Syrian nationals as refugees, until such time as the President determines "that sufficient changes have been made to the USRAP to ensure that admission of Syrian refugees is consistent with the national interest," *see id.* § 5(c).

The Executive Order also contains waiver provisions permitting exceptions from some of these actions.  *See, e.g.*, *id.* §§ 3(g), 5(e).

Despite this plain congressional authorization to the President to make determinations regarding national security and the admissibility of aliens, the State of Washington (hereafter, "the State") requests entry of a temporary restraining order prohibiting enforcement nationwide of the President's Executive Order.  *See* Proposed Order (ECF No. 3-1) at 3 ¶ 2.  The State does so despite the heavy burden it carries to justify such an "extraordinary remedy," particularly

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 1
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

where the remedy would interfere with Congress' determination that it is the President, not a court or a single state, that should make the relevant judgments over national security and foreign affairs.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22, 25-26 (2008).

At the outset, the State's motion for a temporary restraining order (ECF No. 3, hereafter "TRO Mot.") overlooks whether the State even has standing to pursue its claims.  It is well-established that a state cannot sue the Federal Government on a *parens patriae* theory.  And the State's attempts to manufacture standing in its own right—*i.e.*, through lost tax revenues, or reputational injury to its universities—are not concrete, particularized harms cognizable under Article III.   Many of the State's claimed harms, moreover, simply do not exist.   Most significantly, the State cannot rely on injuries to lawful permanent residents ("LPRs"), as it seeks to do, in light of guidance from the White House clarifying that the 90-day suspension of entry does not apply to those individuals.[1]

The State's claims likewise fails on the merits.  Congress has "plenary power" over the admission and exclusion of aliens, *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972), and here expressly has delegated to the President the broad power to suspend entry "of any class of aliens into the United States."  8 U.S.C. § 1182(f).  The President's exercise of his Section 1182(f) authority is committed to his discretion by law, and thus judicial review is precluded.  Moreover, that delegation, combined with the President's own Article II powers in this realm, placed the President at the apex of his authority when issuing the Executive Order.  *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).  The Order was well within the President's authority under Congress' delegation, particularly in an area, like immigration, in which the admission to the United States of foreign aliens is subject to plenary

---

[1] *See* Memorandum from Donald F. McGahn II, Counsel to the President (Feb. 1, 2017) (filed herewith as Exhibit A) (hereafter "Feb. 1, 2017 Memorandum").

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 2
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

control by the political branches.  *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.").  In light of these principles, the State's claims on the merits cannot succeed, for they would force this Court to override the plenary power of the political branches to determine which aliens should be admitted into this Nation's borders according to those branches' assessments of the foreign policy and national security interests of the United States.

Indeed, the State's likelihood of success faces a particularly insurmountable barrier because the State is bringing a facial challenge to the Executive Order.  To prevail on its facial challenge, the State must prove that the Executive Order is unconstitutional in all (or at least most) of its applications.  It cannot do so.  At a minimum, because there are unquestionably a significant number of lawful applications of the Executive Order—*e.g.*, to non-resident unadmitted aliens—the State's facial challenge necessarily must fail.

Nor can the State sustain its other burdens.  The State's claimed irreparable harm is vague and abstract, and certainly not occurring with the immediacy necessary to warrant a temporary restraining order (*i.e.*, within the coming days or weeks).  The balance of the equities and the public interest also decisively favor the United States, given that the State's requested relief would interfere with the President's exercise of plenary power delegated by Congress.  As these factors, like the merits, weigh squarely against judicial relief, the State's motion should be denied.

## **BACKGROUND**

### I.     THE IMMIGRATION AND NATIONALITY ACT

The Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. §§ 1101 *et seq.*, as amended, provides the legal framework under which Congress has exercised and delegated its

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 3
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

constitutional authority to determine who is permitted to enter the United States, who is permitted to remain in the United States, and for what reasons persons may be admitted to or removed from the United States.  Central to the Court's consideration of the issues before it is Section 212(f) of the INA, 8 U.S.C. § 1182(f), which provides broad authority to the President to suspend or impose restrictions on the entry of aliens into the United States:

**(f) Suspension of entry or imposition of restrictions by President**
Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. . . .

Every President over the last thirty years has invoked this authority to suspend or impose restrictions on the entry of certain aliens or classes of aliens,[2] in some instances including classifications based on nationality.  For example, in 1986, President Reagan (through Presidential Proclamation 5517) invoked section 212(f) to suspend entry of Cuban nationals as immigrants into the United States, subject to certain exceptions.  *See Suspension of Cuban Immigration*, 1986 WL 796773 (Aug. 22, 1986).  In 1996, President Clinton (through Presidential Proclamation 6958) invoked section 212(f) to suspend entry, subject to certain exceptions, of members of the Government of Sudan, officials of that Government, and members of the Sudanese armed forces as immigrants or nonimmigrants into the United States.  *See Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Are Members or Officials of the Sudanese Government or Armed Forces*, 1996 WL 33673860 (Nov. 22, 1996).

---

[2] *See, e.g.*, Presidential Proclamation 5517 (President Reagan); Exec. Order No. 12,324 (President Reagan); Exec. Order No. 12,807 (President George H.W. Bush); Presidential Proclamation 6958 (President Clinton); Presidential Proclamation 8342 (President George W. Bush); Presidential Proclamation 8693 (President Obama); Exec. Order No. 13,694 (President Obama); Exec. Order No. 13,726 (President Obama).  The Department of States maintains a list of Section 212(f) Presidential Proclamations that currently affect the issuance of United States visas at https://travel.state.gov/content/visas/en/fees/presidential-proclamations.html.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 4
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

Congress likewise has expressly drawn distinctions based on nationality.  For example, in 2015, Congress amended the INA to exclude certain individuals from a visa waiver program (*i.e.*, the ability to enter the United States as a nonimmigrant without a visa) on the basis of nationality.[3]  *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2990 (2015) (codified at 8 U.S.C. § 1187(a)(12)).  Congress expressly excluded nationals of Iraq and Syria from the program, *see* 8 U.S.C. § 1187(a)(12)(A)(ii), and created a process by which the Secretary of Homeland Security could designate additional "Countries or areas of concern," for exclusion of a country's nationals.  *See id.* § 1187(a)(12)(D).  As of February 2016, the exclusion applied to nationals of Iraq and Syria (pursuant to the statute's plain text), as well as nationals of Iran, Sudan, Libya, Somalia, and Yemen (pursuant to Executive Branch designations under the statutory scheme).  *See* Dep't of Homeland Sec., *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016).[4]  These seven countries excluded from the visa waiver program are the same seven countries that are covered by Section 3 of the President's January 27, 2017 Executive Order.  *See* Executive Order § 3(c) (incorporating by reference "countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12)").

## II.  PRESIDENTIAL AUTHORITY OVER FOREIGN AFFAIRS AND NATIONAL SECURITY

These delegations of authority to deny entry to certain classes of aliens, based on the President's findings regarding the national interest, fall in the heartland of (and are bolstered by)

---

[3] The INA sets out several terms of art.  An "alien" is any person who is neither a citizen nor a national of the United States.  *See* 8 U.S.C. § 1101(a)(3).  A "nonimmigrant" is an alien admitted to the United States on a temporary basis, with one of the visa categories established for particular purposes under 8 U.S.C. § 1101(a)(15).  On the other hand, an "immigrant" is an individual who is permitted to stay in the United States on a permanent basis.  Within the category of "immigrant," an individual may be admitted with the privilege of residing permanently in the United States, thereby acquiring LPR status.  *See* 8 U.S.C. § 1101(a)(20).  LPRs are authorized to work in the United States, as are some aliens temporarily admitted pursuant to certain nonimmigrant categories.  *See generally* 8 C.F.R. § 274a.12 (Classes of aliens authorized to accept employment).

[4] https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 5
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

the President's broad authority under Article II relating to foreign affairs and national security. *See* U.S. Const., art. II, § 2 ("Commander in Chief" power, and authority to "make treaties" and "appoint ambassadors"), § 3 (power to "receive ambassadors").   As the Supreme Court repeatedly has held, Article II confers upon the President expansive authority over foreign affairs, national security, and immigration.  *See Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty . . . inherent in the executive power to control the foreign affairs of the nation."); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (discussing "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress").

## III.   THE PRESIDENT'S EXECUTIVE ORDER OF JANUARY 27, 2017

Invoking these constitutional and statutory authorities, on January 27, 2017, the President issued an Executive Order titled: "Protecting the Nation from Foreign Terrorist Entry into the United States."  *See* ECF No. 1-7, *also available at* 2017 WL 394075.  The Executive Order is intended "to protect the American people from terrorist attacks by foreign nationals admitted to the United States."  Executive Order § 2.

To accomplish this purpose, the Executive Order directs a number of actions.  *See id.* §§ 2-11.  First, Section 3 of the Executive Order directs the Secretary of Homeland Security (in consultation with other Executive Branch officials) to immediately conduct a review to identify the "information needed from any country . . . to determine that [an] individual seeking [an immigration-related] benefit is who the individual claims to be and is not a security or public-safety threat."  *Id.* § 3(a).  The Secretary must, within 30 days of the Executive Order, "submit to the President a report on the results of the review," as well as "a list of countries that do not

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 6
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

provide adequate information[.]" *Id.* § 3(b).  During the next 60 days, the Executive Order directs a process for requesting necessary information from foreign governments that do not supply such information, and consequences for countries not providing the information.  *See id.* § 3(d)-(f).

While this review is ongoing, the Executive Order, pursuant to section 212(f) of the INA, suspends entry for 90 days of aliens from the seven countries covered by 8 U.S.C. § 1187(a)(12).  *Id.* § 3(c).  During this period, exceptions may be made (on a case-by-case basis) by the Secretaries of State or Homeland Security.  *Id.* § 3(g).  The suspension of entry in Section 3(c) does not apply to lawful permanent residents of the United States.  *See* Feb. 1, 2017 Memorandum (Exhibit A).

The Executive Order also suspends the U.S. Refugee Admissions Program for 120 days, while the Secretary of State (in conjunction with other Executive Branch officials) reviews "the USRAP application and adjudication process to determine what additional procedures should be taken to ensure that those approved for refugee admission do not pose a threat to the security and welfare of the United States," and then "implement[s] such additional procedures."  Executive Order § 5(a).  Upon resumption of the refugee program—*i.e.*, no sooner than 120 days after issuance of the Executive Order—the Order directs the Secretary of State to "make changes, to the extent permitted by law, to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality."  *Id.* § 5(b).  Again, during the 120-day suspension of the refugee program, the Executive Order allows the Secretaries of State and Homeland Security to permit entry of individual refugees on a case-by-case basis.  *Id.* § 5(e).

Finally, notwithstanding the general resumption of the refugee program after 120 days, the Executive Order directs, pursuant to Section 212(f), a suspension of entry of nationals of

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 7
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1    Syria as refugees based upon the President's finding that such entry "is detrimental to the interests

2    of the United States." *Id.* § 5(c).  Such suspension will continue until such time as the President

3    determines "that sufficient changes have been made to the USRAP to ensure that admission of

4    Syrian refugees is consistent with the national interest."  *Id.*

5                                    **STANDARD OF REVIEW**

6

7        A temporary restraining order is "an extraordinary and drastic remedy[.]"  *Munaf v.*

8    *Geren*, 553 U.S. 674, 689 (2008).  A party seeking such relief "must establish that [it] is likely

9    to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary

10   relief, that the balance of equities tips in [its] favor, and that [a temporary restraining order] is in

11   the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  Further, injunctive relief that would

12   "deeply intrude[] into the core concerns of the executive branch"—such as foreign affairs and

13   national security—may be awarded only where the plaintiff "make[s] an extraordinarily strong

14   showing" as to each element.  *Adams v. Vance*, 570 F.2d 950, 954-55 (D.C. Cir. 1978); *see*

15   *Winter*, 555 U.S. at 32-33.

16

17       The State raises only facial challenges to the Executive Order, which are "the most

18   difficult challenge[s] to mount successfully."  *United States v. Salerno,* 481 U.S. 739, 745 (1987).

19   To demonstrate that it is likely to prevail on the merits, the State must show more than that the

20   Executive Order "might operate unconstitutionally under some conceivable set of

21   circumstances."  *Id*.  Instead, the State bears the "heavy burden" of "establish[ing] that no set of

22   circumstances exist under which the [Executive Order] would be valid."  *Id*.; *see also Puente*

23   *Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016).

24

25

26

27

28

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 8
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

## ARGUMENT

I.   **THE STATE LACKS STANDING TO INVOKE THE COURT'S JURISDICTION**

The State of Washington pursues two theories of standing.  First, it purports to sue on its own behalf, alleging various injuries to its "proprietary interests."  Pl.'s Supp. Br. at 2-3 (ECF No. 17).  Second, it seeks to bring a *parens patriae* action on behalf of its residents.  *Id*. at 3-5.  Neither theory satisfies the State's burden to demonstrate standing.

### A.   The State Lacks Standing on Its Own Behalf

In some circumstances, a state may have standing to challenge federal action that threatens its own distinct interests.  As with any other party, however, the harm to the state's interests must be "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  A state suffers a cognizable injury when, for example, its physical territory such as its "coastal land" is harmed.  *See Massachusetts v. EPA*, 549 U.S. 497, 522-23 (2007).  A state likewise may challenge a measure commanding the state itself to act, *see New York v. United States*, 505 U.S. 144 (1992) (standing to challenge federal law requiring State to take title to nuclear waste or enact federally-approved regulations), or that prohibits it from acting, *see Oregon v. Mitchell*, 400 U.S. 112 (1970) (standing to challenge federal law barring literacy-test or durational-residency requirements in elections and requiring State to enfranchise 18-year-olds).

The State's allegations of harm here are insufficient to establish Article III standing.  Most fundamentally, the State's allegations of standing rely on downstream, incidental effects stemming from the Federal Government's regulation of immigration as to third-party aliens.  The State has no legally cognizable interest in ensuring that the Federal Government issue any

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 9
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

particular alien any particular visa or admit any particular alien into the United States.  The State's conception of standing miscomprehends the Nation's constitutional structure:  under our federal system of separate sovereigns, a State has no legally protected interest in avoiding indirect and incidental consequences (allegedly) flowing from the United States' regulation of individuals' conduct pursuant to the powers vested in the Federal Government by the Constitution.  And it would be especially inconsistent with the constitutional structure to allow such claims to proceed when they involve immigration, which is a subject uniquely committed to the Federal Government, and in which the State has no role.  *See Arizona v. United States*, 132 S. Ct. 2492, 2502 (2012) ("The federal power to determine immigration policy is well settled."). Thus, the State's incidental, indirect injuries from federal immigration policies simply cannot establish standing here.

Even so, the State's alleged harms are neither concrete nor particularized.  The State first asserts that it will "lose . . . tax revenue" from tourists who, absent the Executive Order, would visit the State and purchase goods and services there.  Pl.'s Supp. Br. at 2; Decl. of Kathy Oline, ECF No. 17-1.  But allegations of a reduction in a State's tax revenues (particularly where, as here, there is no "direct link between the state's status as a collector and recipient of revenues and the . . . action being challenged") is a "generalized grievance about the conduct of government," not the sort of particularized injury necessary to establish standing.  *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) (rejecting similar allegations by analogy to taxpayer standing cases); *see Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (rejecting standing despite Florida's allegation that challenged federal law would induce citizens to remove property from the state thereby diminishing the state's tax revenues); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (concluding state lacked standing despite claim that challenged

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 10
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1    action would "forc[e] unemployment up and state tax revenues down").  Were the Court to find

2    standing based on incidental impacts to the State's treasury without any direct link to the action

3    challenged, virtually any change in federal policy could prompt an Article III dispute, which is

4    an approach to standing the Supreme Court decisively has rejected.  *See DaimlerChrysler Corp.*

5    *v. Cuno*, 547 U.S. 332, 341 (2006); *Kleppe*, 533 F.2d at 672.[5]

6        The State next claims that the "mission" of various state universities and "their

7    attractiveness to international students" may be "damage[d]" because some students and faculty

8    members may be prevented from attending the universities or from travelling abroad for research.

9    Pl.'s Supp. Br. at 3.  This argument fails for two reasons.  First, most (if not all) of the students

10   and faculty members the State identifies are not actually prohibited from entering the United

11   States, and others' alleged difficulties are hypothetical or speculative.[6]  That is particularly true

12   given the waiver authority granted to the Secretaries of Homeland Security and State under the

13   Executive Order when entry of an alien would be in the national interest.  *See* Executive Order

14   §§ 3(g), 5(e).  And second, even if the State could piggyback on these individuals to establish an

15   injury to the State itself, the State's assertions of injury are too abstract.  *See Whitmore v.*

16   *Arkansas*, 495 U.S. 149, 155 (1990).  Vague allegations about the universities' reputations and

17   ability to attract students are not sufficiently concrete to show standing.  The State's reliance on

18   *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480 (9th Cir. 1995), *see* Pl.'s Supp. Br. at 3 n.3,

19   is inapposite.  The school's injury in that case was that it had been terminated from the

---

[5] *City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004), *see* Pl.'s Supp. Br. at 2, is not to the contrary.  In that case, there was a direct link between the challenged construction project and the alleged injury to the adjacent City's natural resources, aesthetic, and economy.  *See O'Neill*, 386 F.3d at 1199.

[6] *See, e.g.*, Second Riedinger Decl. ¶¶ 3-7, ECF No. 17-2 (allegations about lawful permanent residents, who are not impacted by the Executive Order); Boesenberg Decl. ¶ 6, ECF No. 17-3 (same); Second Riedinger Decl. ¶ 8 (asserting that certain countries may "ban . . . U.S. travelers" in response to the Executive Order); Second Chaudhry Decl. ¶ 8, ECF No. 17-4 (alleging one faculty member may not be able to return to the university at a future date).

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 11
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

defendant's loan guarantee program, *id.* at 1483, not that its reputation or attractiveness to students had been incidentally diminished by some action that did not directly affect the school.

Additionally, the State asserts that it "expects" the Executive Order will have effects on its agency recruitment efforts and its child welfare system. Pl.'s Supp. Br. at 3 n.4. But the State concedes that it cannot identify any State agency employees that are currently affected by the Executive Order, *see* Schumacher Decl. ¶ 7, ECF No. 17-5, nor any specific and actual impact on its child welfare system, *see* Strus Decl., ECF No. 17-6. Speculation about possible future events does not constitute an injury in fact. *Whitmore*, 495 U.S. at 158.

Finally, the State cites no case recognizing the standing of a state government to bring an Establishment Clause challenge, and it is not clear how a state can suffer "spiritual or psychological harm" or have "religious beliefs" that can be "stigmatized." *Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 624 F.3d 1043, 1051-52 (9th Cir. 2010).

### B.   The State Cannot Bring a *Parens Patriae* Action Here

The State cannot convert its political dispute with the Federal Government into a legal claim through the vehicle of a *parens patriae* suit brought on behalf of its residents. The Supreme Court made clear more than eighty years ago that a state cannot bring a *parens patriae* action against federal defendants. *See Massachusetts v. Mellon*, 262 U.S. at 485-86. In dismissing an action brought by Massachusetts to exempt its citizens from a federal statute designed to "protect the health of mothers and infants," the Court explained that the citizens of a state "are also citizens of the United States," and therefore "[i]t cannot be conceded that a state, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof." *Id.* at 479, 485. "[I]t is no part of [a state's] duty or power to enforce [its

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 12
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

citizens'] rights in respect of their relations with the federal government;" "it is the United States, and not the state, which represents [its citizens] as *parens patriae*." *Id*. at 485-86.[7]

Contrary to the State's assertion, the "special solicitude" for states referred to in *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), did not "eradicate[]" the bar on *parens patriae* actions against the Federal Government, Pl.'s Supp. Br. at 4 n.5. Indeed, *Massachusetts* recognized that *Mellon* "prohibits" allowing a state "'to protect her citizens from the operation of federal statutes.'" *Massachusetts*, 549 U.S. at 520 n.17; *see also Del. Dep't of Nat. Res. & Envtl. Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009) (*Massachusetts* "does not eliminate the state [plaintiff's] obligation to establish a concrete injury, as Justice Stevens' opinion amply indicates"). The special solicitude afforded in *Massachusetts* was based on the "unique circumstances" of that case, *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476 (D.C. Cir. 2009), wherein Massachusetts sought to assert its own rights to ensure the protection of the land and air within its "sovereign territory," which was protected by a special "procedural right." 549 U.S. at 519-20; *see id*. at 522-23 (explaining that Massachusetts "owns a substantial portion of the state's coastal property" that was harmed by EPA's inaction). Here, the State's interest in protecting its territorial sovereignty is not at issue, and the State has identified no other injury to any legally protected rights. Moreover, Congress has not created any protection for states against the incidental impacts asserted by the State here.[8] Because a

---

[7] The Supreme Court has repeatedly applied this principle since *Mellon* to dismiss actions brought by a state as *parens patriae* against federal defendants. *See Florida*, 273 U.S. at 18 (relying on *Mellon* to dismiss Florida's challenge to a federal inheritance tax based on alleged injury to its citizens); *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (concluding South Carolina lacked standing as *parens patriae* to invoke the Due Process Clause or the Bill of Attainder Clause against the Federal Government); *see also Snapp*, 458 U.S. at 610 n.16 ("A State does not have standing as *parens patriae* to bring an action against the Federal Government.").

[8] The generic cause of action under the Administrative Procedure Act, 5 U.S.C. § 702, is no substitute for the necessary conditions for standing in *Massachusetts*. *See* Pl.'s Supp. Br. at 4 n.5. It would have made little sense for the Supreme Court to attach "critical importance" to Congress's creation of a particular procedural right, *Massachusetts*, 549 U.S. at 516, if the APA already made that right available generally. The State's reliance on the

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 13
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

state cannot bring a *parens patriae* suit against federal defendants, the State lacks standing and thus the Court should deny the State's motion for lack of jurisdiction.

## II. THE STATE DOES NOT DEMONSTRATE IT IS LIKELY TO PREVAIL ON THE MERITS

The State falls far short of carrying its "heavy burden" to demonstrate that it is likely to prevail on the merits of its facial challenge by "establish[ing] that no set of circumstances exist under which the [Executive Order] would be valid." *Salerno*, 481 U.S. at 745. To the contrary, the Executive Order fits within the express delegation of authority in Section 212(f). The State's constitutional and statutory claims additionally fail pursuant to their individual elements.

### A. The Executive Order Is a Valid Exercise of Congress' Broad Delegation of Authority to the President, and His Own Constitutional Powers

The Executive Order was issued pursuant to Congress' broad delegation of authority to the President to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). The express delegation from Congress, coupled with the President's own Article II powers over foreign affairs and national security, mean that the President's "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.'" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015) (quoting *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring)).

Indeed, in the immigration context specifically, "[t]he Supreme Court has 'long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792

---

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, also is unavailing, as that statute only provides a cause of action for persons that exercise religion.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 14
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

(1977)).  "Congress has 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.'"  *Cardenas*, 826 F.3d at 1169 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972)).  "When Congress delegates this plenary power to the Executive, the Executive's decisions are likewise generally shielded from administrative or judicial review."  *Cardenas*, 826 F.3d at 1169.  And "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens."  *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976).[9]

Here, the President's Executive Order falls squarely within the express delegation of power granted him under Section 212(f) of the INA, codified at 8 U.S.C. § 1182(f).  "[T]hat statute specifically grants the President, where it is in the national interest to do so, the extreme power to prevent the entry of any alien or groups of aliens into this country as well as the lesser power to grant entry to such person or persons with any restriction on their entry as he may deem to be appropriate."  *Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980); *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1507 (11th Cir. 1992) ("8 U.S.C. § 1182(f) clearly grants the President broad discretionary authority to control the entry of aliens into the United States.").[10]

Presidents, moreover, repeatedly have exercised authority under Section 212(f) to suspend entry of certain aliens or classes of aliens, and at least twice have drawn distinctions

---

[9] As an example of the judicial deference in this area, under the long-established doctrine of consular non-reviewability, a non-resident alien outside the United States has no right to judicial review of a consular officer's denial of a visa.  *See Capistrano v. Dep't of State*, 267 F. App'x 593, 594 (9th Cir. 2008) ("The doctrine of consular nonreviewability predates the founding of our Republic" and "prevents [courts] from reviewing decisions reached by consular officials regarding the entry of visa applicants.").

[10] In several other statutory provisions, Congress delegated authority to the Secretaries of Homeland Security and State to, in their sole discretion, revoke visas or visa petitions.  *See* 8 U.S.C. §§ 1155, 1201(i); *see also Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, 814 F.3d 481, 484 (1st Cir. 2016) (describing the unreviewability of such revocations).

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 15
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

based on nationality.  *See* Background, Section II.A.  For example, in 1986, the President invoked

Section 212(f) to suspend entry of Cuban nationals as immigrants into the United States, and in

1996, the President did something similar for Sudanese government officials.  And with respect

to Executive Order 12,807—which, among other things, suspended entry of undocumented aliens

by sea—the Supreme Court found "[i]t is perfectly clear that 8 U.S.C. § 1182(f) . . . grants the

President ample power to establish a naval blockade that would simply deny *illegal Haitian

migrants* the ability to disembark on our shores."  *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S.

155, 164 n.13, 187 (1993) (emphasis added).  There can be little doubt, therefore, that 8 U.S.C.

§ 1182(f) authorizes the President to suspend the entry of classes of immigrants on the basis of

nationality where, as here, the President has determined that their entry would be "detrimental to

the interests of the United States."  And it is thus untenable for the State to contend that, for

countries that present a national-security risk to the United States—as judged by Congress, the

State Department, and DHS—the President lacks the authority to pause the entry of aliens from

those countries.

Indeed, courts repeatedly have confirmed that "[d]istinctions on the basis of nationality

may be drawn in the immigration field by the Congress or the Executive."  *Narenji v. Civiletti*,

617 F.2d 745, 747 (D.C. Cir. 1979).  "In view of the Supreme Court's repeated emphasis on the

concurrent nature of executive and legislative power in this area and the sweeping congressional

delegations of discretionary authority to the Executive under the INA, there is little question that

the Executive has the power to draw distinctions among aliens on the basis of nationality."  *Jean

v. Nelson*, 727 F.2d 957, 978 n.30 (11th Cir. 1984) (en banc), *aff'd*, 472 U.S. 846 (1985).

"[C]lassifications on the basis of nationality are frequently unavoidable in immigration matters,"

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 16
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

including because "the very concept of 'alien' is a nationality-based classification." *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008).

Despite this wealth of authority, the State asserts that the President's authority under Section 212(f) is limited by 8 U.S.C. § 1152(a)(1)(A), another provision of the INA stating that, with certain exceptions,[11] "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." *See* TRO Mot. at 19-21. The State is wrong. First, as an initial matter, this provision's reach is limited to only the "issuance of an immigrant visa"—meaning that it does not apply to nonimmigrant visas or to refugees (who generally do not enter the United States with a visa), and also expressly does not extend to procedures for processing visa applications. Indeed, § 1152(a)(1)(B) clarifies that subsection (A) is not to be "construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed." This clarification suggests that the Executive Order, in part or in whole, may not be covered by the restrictions of subsection (A) because the Executive Order governs the procedures for pausing then resuming visa applications. *See, e.g.*, Executive Order §§ 3(a), 5(a). Moreover, this provision does not purport to prohibit preference, priority, or discrimination on the basis of religion, so it would provide no benefit to the State here under one of the State's theories of the case. *See* TRO Mot. at 10 ("There is little doubt that the Executive Order is prompted by animus to those of the Islamic faith[.]"). By the statute's plain terms, then, the provision could have only limited application to the State's claims here.

---

[11] These exceptions include most family-based, employment-based, and special immigrant visa categories. 8 U.S.C. §§ 1101(a)(27), 1151(b)(2)(A)(i), 1152(b), 1153.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 17
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1     More fundamentally, however, the State misreads 8 U.S.C. § 1152(a)(1)(A) as

2    constraining the broad delegation of authority to the President in Section 212(f) of the Act.  "[I]t

3    is a well established axiom of statutory construction that, whenever possible, a court should

4    interpret two seemingly inconsistent statutes to avoid a potential conflict."  *California ex rel.*

5    *Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1012 (9th Cir. 2000).

6    Likewise, it is a "well established canon of statutory interpretation . . . that the specific governs

7    the general."  *RadLAX Gateway Hotel v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-71 (2012).

8         In light of these principles, Section 212(f) is easily reconciled with § 1152(a)(1)(A): the

9    latter sets forth the general default rule that applies in the absence of action by the President,

10   whereas Section 212(f) governs the specific instance in which the President proclaims that entry

11   of a "class of aliens" would be "detrimental to the interests of the United States."  Here, as the

12   challenged Executive Order involves "detrimental" findings, Section 212(f) controls.  That is

13   precisely why (as discussed above) prior Presidents have drawn nationality-based distinctions

14   when exercising their authority under Section 212(f).  And it is likewise why the 2015

15   Amendment to the INA, as implemented by the Executive Branch over the past year, has drawn

16   the exact same nationality-based distinctions as the Executive Order.  Indeed, under the State's

17   view, the United States could not suspend entry of nationals of a country with which the United

18   States is at war.  The INA plainly does not require that result.

19        The placement of the anti-discrimination rule within Section 1152 further indicates that

20   the rule is not intended to curb the President's authority under Section 212(f) to suspend or

21   impose restrictions upon entry.  Section 1152 generally establishes a uniform annual numerical

22   limit on immigrant visas for nationals of each foreign country.  Had Congress intended to enact

23   a general bar against nationality-based distinctions, it would have enacted such a bar as a general

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 18
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1   provision of the INA, rather than as a subpart of a subsection speaking to the implementation of

2   nationality-based numerical limitations for the issuance of immigrant visas.

3          Finally, the State mischaracterizes the Executive Order as "tak[ing] us back to a period

4   in our history when distinctions based on national origin were accepted . . . rather than outlawed."

5   TRO Mot. at 20.  As an initial matter, the State repeatedly characterizes the Executive Order as

6   discriminating on the basis of "national origin."  *See* TRO Mot. at 1, 6.  But the Executive Order

7   does not distinguish on the basis of national origin insofar as that term implicates ethnic heritage;

8   rather, discrimination on the basis of *nationality* implicates whether "a person ow[es] permanent

9   allegiance to a state."  8 U.S.C. § 1101(a)(21) (defining "national").

10         In any event, in 2015, Congress amended the INA to single out nationals of Iraq, Syria,

11  and other to-be-designated countries for exclusion from the Visa Waiver Program.  *See*

12  Background, Section II.B.  It is that same group of countries that is covered by Section 3(c) of

13  the Executive Order, which expressly cross-references 8 U.S.C. § 1187(a)(12).  And Section 5(c)

14  of the Executive Order applies to nationals of Syria, one of the countries Congress expressly

15  identified.  Accordingly, the President has joined with Congress in selecting the seven countries

16  whose nationals warrant different treatment on the basis of national security and foreign policy

17  concerns.

18  **B.     This Court Cannot, and Need Not, Review the President's National Security
            Determinations Underlying the Executive Order**

19         The State asks this Court to not only disregard case law, Congress' express delegation of

20  authority to the President, and the President's own Article II powers, but indeed, to substitute the

21  Court's own judgment regarding what is in the national security and foreign policy interests of

22  the United States.  *See, e.g.*, TRO Mot. at 8.  This Court should soundly reject that invitation, for

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 19
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1   as courts repeatedly have recognized, these areas are within the exclusive domain of the political

2   branches of our government.

3        As a statutory matter, Section 212(f), by its plain terms, vests complete discretion in the

4   President to determine whether "the entry of any aliens or of any class of aliens into the United

5   States would be detrimental to the interests of the United States," for the period "as he shall deem

6   necessary," and to impose such conditions of entry as "he may deem appropriate."  8 U.S.C. §

7   1182(f).  The statute does not require the President to state any basis for such a finding, nor does

8   it require ratification of such a finding by any other entity.  Instead, it reflects Congress'

9   considered judgment that these determinations should be vested exclusively in the President.

10        Critically, the State cites no instance where any court has reviewed presidential findings

11   under Section 212(f) regarding what is detrimental to the interests of the United States, nor does

12   the State explain how such an inquiry would be judicially manageable.  To the contrary, one

13   court analyzing a presidential exercise of authority under 8 U.S.C. § 1182(f) concluded that

14   "because exercise of this discretion is not limited to circumstances defined in the statute, but

15   rather is geared to Executive 'find[ings]' and what is 'deem[ed]' necessary or appropriate, the

16   statute provides no discernable standards by which this court can review the challenged actions

17   under the APA."  *Haitian Refugee Ctr., Inc. v. Baker*, 789 F. Supp. 1552, 1575-76 (S.D. Fla.

18   1991); *see also Webster v. Doe*, 486 U.S. 592, 594, 600-01 (1988) (holding that similar statutory

19   language vested the Director of Central Intelligence with complete discretion over employee

20   discharges, and thus judicial review was precluded).

21        The State here asks the Court to evaluate whether the President's Executive Order

22   achieves its stated purposes.  *See* TRO Mot. at 9 (arguing that the Executive Order is unlawful

23   because "there is no 'fit' between the rationales advanced to support the Executive Order and the

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 20
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

means used to further those rationales"). But that would require the Court inappropriately to second-guess the underlying finding that Congress has tasked the President with making, and which lies at the heartland of his constitutional authority regarding foreign affairs, national security, and immigration. *See Mandel*, 408 U.S. at 765 ("[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers[.]"); *see also, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."); *Knauff*, 338 U.S. at 542; *Mow Sun Wong*, 626 F.2d at 743. It is thus well-established that courts cannot evaluate the President's national security and foreign affairs judgments, especially in the immigration context. *See Knauff*, 338 U.S. at 543 ("[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien."); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'"); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988); *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007).

It is simply not possible for the Court here to evaluate the President's Executive Order without passing judgment on the President's national security and foreign affairs determinations. *See, e.g.*, TRO Mot. at 11 (arguing that the Executive Order is unlawful because there is "no basis to conclude that existing screening procedures are uniquely failing as to individuals from the listed countries or as to refugees"). The Constitution vests the President with the duty of

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 21
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

protecting our Nation's security, and Congress has specifically empowered the President to suspend the entry of categories of aliens if he finds that their entry would be detrimental to the national interest.  There is accordingly no basis for the Judiciary to second-guess the President's determinations in that regard.  *See Al Haramain Islamic Found., Inc. v. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012) (stating that the court "owe[s] unique deference to the executive branch's determination that we face 'an unusual and extraordinary threat to the national security' of the United States" (quoting an Executive Order)); *Harisiades*, 342 U.S. at 597 (Frankfurter, J., concurring) (noting that immigration policies have sometimes been "departures . . . from the best traditions of this country" and "may be deemed to offend American traditions," but "the place to resist unwise or cruel legislation touching aliens is the Congress, not this Court").

Finally, the State also argues that the President's stated rationale under Section 212(f) was pretextual and, instead, that the Executive Order was "prompted by animus to those of the Islamic faith."  TRO Mot. at 10.  But any such inquiry would be directly contrary to the Supreme Court's decision in *Kleindienst v. Mandel*, 408 US. 753 (1972), which held that "when the Executive exercises" its delegated plenary power over immigration "on the basis of a facially legitimate and bona fide reason, the courts will [not] look behind the exercise of that discretion[.]"  *Id.* at 770.  Here, the Executive Order undeniably states a facially legitimate and bona fide reason—protecting against terrorism—which is sufficient to end the matter.  *Cf. Kerry v. Din*, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring) (noting that *Mandel*'s "reasoning has particular force in the area of national security").  Accordingly, the State's references to statements outside the four corners of the Executive Order are not legally pertinent.  The State, moreover, creates a constitutional separation-of-powers problem—between the Judiciary and the President, and between a state and the Federal Government—to the extent that this Court is being

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 22
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

urged to allow the State to use Article III judicial process to attempt to divine the President's purported subjective motives in issuing the Executive Order.[12]  The State cites no precedent for such an inquiry by the Judiciary of the President.  *Cf. United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) (holding that an inquiry into the subjective motives of members of Congress is a "hazardous matter" and that courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive").

### C.     The State's Facial Constitutional Challenges Fail

Aside from its statutory argument under the INA, the State contends that the Executive Order is facially unconstitutional under the Fifth Amendment's equal protection and procedural due process doctrines, and under the First Amendment's Establishment Clause.  TRO Mot. at 5-19.  These claims fail for reasons in addition to those discussed above.

1.     An overarching and insurmountable hurdle for the State's claims of facial unconstitutionality is that the State has the burden to show there is no constitutionally valid application of the Executive Order.  *See Salerno*, 481 U.S. at 745; *United States v. Mujahid*, 799 F.3d 1228, 1233 (9th Cir. 2015).  That showing is improbable—indeed, impossible—because it is clear that valid applications exist, at an absolute minimum as to unadmitted and nonresident aliens.  *See Mandel*, 408 U.S. at 762 ("It is clear that Mandel personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise."); *Plasencia*, 459 U.S. at 32 ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative."); *United States*

---

[12] In addition, it is well-settled that courts have no jurisdiction "to enjoin the President in the performance of his official duties."  *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866).  Accordingly, the President cannot be the subject of any injunctive order.  *Id.*; *see Franklin v. Massachusetts*, 505 U.S. 788, 826 (1992) (Scalia, J., concurring in part and concurring in judgment).

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 23
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

*v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) ("[W]e have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States."). The State does not dispute that the Executive Order is constitutional as applied to this category of unadmitted and nonresident aliens who have no constitutional right to entry. Whatever claims may exist in hypothetical individual cases, therefore, are irrelevant because the State must—but cannot—demonstrate that all (or even most) applications of the Executive Order are unconstitutional.[13]

The State's arguments rest heavily on the Executive Order's purported application to lawful permanent residents. *See, e.g.*, TRO Mot. at 1 (contending that the Executive Order "block[s] longtime legal permanent residents from returning to this country"). But as is now clear, the Executive Order does not apply to such individuals. *See* Feb. 1, 2017 Memorandum (Exhibit A).

2. A further problem with the State's equal protection and procedural due process claims is that they both arise under the Fifth Amendment's Due Process Clause, but the State is ineligible to assert a Fifth Amendment claim. The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot . . . be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court." *Katzenbach*, 383 U.S. at 323-24; *see also Premo v. Martin*, 119 F.3d 764, 771 (9th Cir. 1997) ("Because the State is not a 'person' for the purposes of the Fifth Amendment, the State's reliance on the Due Process Clause was misplaced."). "Nor does a State have standing as the parent of its citizens to invoke these constitutional provisions against the Federal

---

[13]     With respect to hypothetical individual cases that may arise, the Executive Order contains an overarching direction that "[t]his order shall be implemented consistent with applicable law." Executive Order § 11(b).

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 24
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

Government, the ultimate *parens patriae* of every American citizen." *Katzenbach*, 383 U.S. at 324. This defect is also fatal to the State's equal protection and due process claims.

3. The State's claim under the Establishment Clause—which is limited to Section 5(b) of the Executive Order—is likewise meritless. *See* TRO Mot. at 12. The State argues that Section 5(b) discriminates based on religion, because it "give[s] preference to Christian refugees while disadvantaging Muslim refugees." TRO Mot. at 7. That is wrong. Notably, Section 5(b) does not take effect for at least 120 days (*i.e.*, "Upon the resumption of USRAP admissions"), and thus the State cannot yet know how it will be implemented. The State's Establishment Clause claim therefore is not ripe. *See Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th Cir. 2010) ("A question is fit for decision when it can be decided without considering 'contingent future events that may or may not occur as anticipated, or indeed may not occur at all.'").[14]

Even if the claim were ripe, moreover, Section 5(b) is lawful. That Section applies to *all* USRAP admissions—not just admissions for nationals of the seven countries of concern—so it does not exclusively "tilt the scales in favor of Christian refugees at the expense of Muslims." TRO Mot. at 12. Moreover, Section 5(b) merely provides an accommodation to minority religions within each country participating in the refugee program. That accommodation makes eminent sense, because members of minority religions are more likely to face persecution. Such accommodations do not violate the Establishment Clause. *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005) ("'[T]here is room for play in the joints between the Free Exercise and Establishment

---

[14] There is also an interim provision, Section 5(e), which authorizes the Secretaries of State and Homeland Security to admit refugees on a case-by-case basis, with one factor (of several) being religious persecution as a minority religion. The State does not mention this interim provision in its TRO motion, but its proposed order seeks to enjoin this section "to the extent Section 5(e) purports to prioritize only the refugee claims of certain religious minorities." ECF No. 3-1 at 3, ¶ 1(e). Obviously Section 5(e) does not prioritize *only* claims of religious minorities because that is only one of several factors expressly listed, and thus, the State does not appear to be meaningfully challenging this provision.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 25
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause.'")  Because Section 5(b) is both lawful and not yet subject to challenge, therefore, the State has failed to justify any relief—let alone emergency relief—with respect to this provision.

## III.   THE STATE HAS MADE NO SHOWING OF IRREPARABLE HARM

The State's motion for a temporary restraining order also should be denied because the State has not "demonstrate[d]" that it will be "immediate[ly]" and "irreparabl[y]" harmed by the Executive Order if this case proceeds in the normal course.  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  The State speculates that its residents might be harmed by the Executive Order, *see* Pl.'s TRO Mot. at 22, but to obtain a temporary restraining order, the State must demonstrate irreparable harm to itself, not merely to "third parties."  *Phany Poeng v. United States*, 167 F. Supp. 2d 1136, 1142 (S.D. Cal. 2001); *see, e.g.*, *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) ("[T]he preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm.").  Because the State has identified no injury to itself—much less a likely, immediate, and irreparable injury—it has not met its burden.

Even if the Court could consider purported harms to non-parties, moreover, the State does no more than speculate that amorphous harms may occur at some point in time to unspecified individuals.  The State claims that some "workers and students" may be harmed economically or psychologically because they will not be able to travel overseas for work or school, and that businesses' recruitment efforts may be hampered because they may not be able to hire certain aliens.  *See* TRO Mot. at 21.  This sort of generalized speculation is a far cry from the concrete evidence of likely immediate and irreparable harm that is necessary to obtain a temporary

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 26
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

restraining order.  *See Winter*, 555 U.S. at 22; *Caribbean Marine*, 844 F.2d at 674; *cf. Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 971 (9th Cir. 2009) (noting that the Supreme Court has disapproved of considering "'abstract questions of wide public significance'" amounting to "'generalized grievances'").

The State's arguments also fail to acknowledge the limited timeframe relevant to consideration of their request for a temporary restraining order.  To obtain such relief, the State must show that irreparable harm will occur *in the time prior to a hearing on the preliminary injunction motion*.  *Cf. Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974) ("Ex parte temporary restraining orders . . . should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.").  Here, even assuming the State's harms are both cognizable and irreparable (and they are not), those harms will be suffered over the long-term; there is no showing that harm is imminent within the next days or even weeks.

Finally, the restrictions on entry in Sections 3(c) and 5(a) of the Executive Order are both subject to exceptions to be applied by the Secretaries of State and Homeland Security on a case-by-case basis.  *See* Executive Order §§ 3(g), 5(e).  Therefore, none of the purported harms the State identifies will occur unless a particular individual falls within the terms of the Executive Order *and* cannot obtain an exception under these case-by-case provisions.  Because of the availability of this case-by-case review, any allegations of harm to third parties are not irreparable at this time.  *Cf. Leidseplein Presse, B.V. v. Does*, No. C16-5065 (BHS), 2016 WL 337267, at *1 (W.D. Wash. Jan. 28, 2016) (denying temporary restraining order based on lack of irreparable harm, because "Plaintiff has failed to show that other means of preventing the alleged [harm] are

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 27
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

either unavailable or unavailing" and "Plaintiff has failed to submit evidence describing efforts made to explore other available means of preventing" the alleged harm).

## IV.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST MANDATE AGAINST A TEMPORARY RESTRAINING ORDER

The State has not demonstrated that any harm to it (and there is none) outweighs the harm that a temporary restraining order would cause the Federal Government, or that "an injunction is in the public interest." *Winter*, 555 U.S. at 20.  These two factors merge where, as here, the Federal Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Courts have accorded "great weight" to considerations of foreign policy and national security when balancing the interests and equities of the parties. *Nat'l Res. Def. Council, Inc. v. Pena*, 972 F. Supp. 9, 20 (D.D.C. 1997); *see Winter*, 555 U.S. at 24; *Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 796, 798 (D.C. Cir. 1971) (Because of "assertions of potential harm to national security and foreign policy—assertions which [the court] obviously can not appraise— and given the meager state of the record before us, we are constrained to refuse an injunction."). Moreover, in assessing the public interest, a court must heed "the judgment of Congress, deliberately expressed in legislation," and "the balance that Congress has struck." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001).

These final elements weigh heavily in favor of the Federal Government.  The State asks the Court to enjoin an Executive Order that suspends the entry of certain aliens into the United States based on the President's determination that failing to do so would be detrimental to the interests of the United States, including its national security.  The State of Washington disagrees with the President's determination and believes the Executive Order will harm the interests of residents in that state.  The Constitution, however, commits "decision-making in the fields of

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 28
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

foreign policy and national security . . . to the political branches of government," *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005), not to the states.   And in 8 U.S.C. § 1182(f), Congress expressly authorized the President to do what he has done here based upon a finding, which the President has made here, that "the entry . . . of any class of aliens into the United States would be detrimental to the interests of the United States."   It undoubtedly would be contrary to the public interest for this Court to ignore Congress's judgment that the President should make such determinations, to second-guess the President's determination, or to override the President's determination based on purported interests of a single state.   *See, e.g.*, *Adams*, 570 F.2d at 954 (vacating preliminary injunction that directed action by the Secretary of State in foreign affairs, which "deeply intrude[d] into the core concerns of the executive branch").

Finally, even if the State satisfied the requirements for a temporary restraining order, this Court still would retain its equitable discretion—*i.e.*, the discretion to refrain from issuing relief that would interfere in the Executive Branch's foreign affairs and national security activities.   In an analogous situation, the D.C. Circuit held it would be an abuse of discretion for a court to enter equitable relief against one of the President's foreign affairs policies:  "At least where the authority for our interjection into so sensitive a foreign affairs matter as this are statutes no more specifically addressed to such concerns than the Alien Tort Statute and the APA, we think it would be an abuse of our discretion to provide discretionary relief."   *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985).   Similarly here, the Court should not intrude upon the President's efforts "to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism."  Executive Order § 1.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 29
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

## V.    ANY RELIEF ENTERED MUST BE LIMITED IN SCOPE TO THE PLAINTIFF STATE AND TO THE SPECIFIC HARM FOUND

Even if the Court were to conclude that the State has satisfied the requirements for a temporary restraining order with respect to some or all of its claims, the Court should not enter the "nationwide injunction" the State seeks.  TRO Mot. at 23; *see* Pl.'s Proposed TRO, ECF No. 3-1, at 3.  "[A]n injunction must be narrowly tailored 'to affect only those persons over which it has power, and to remedy only the specific harms shown by the plaintiffs, rather than' to enjoin all possible breaches of the law."  *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004). Thus, courts routinely deny requests for nationwide injunctive relief.  *See Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993) (staying nationwide injunction insofar as it "grants relief to persons other than" named plaintiff); *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012) (affirming district court's refusal to grant nationwide relief).

## CONCLUSION

For the reasons set forth above, the Court should deny the State of Washington's motion for a temporary restraining order.

DATED: February 2, 2017                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Director, Federal Programs Branch

*/s/ Michelle R. Bennett*
MICHELLE R. BENNETT
ERIC SOSKIN
DANIEL SCHWEI
ARJUN GARG

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 30
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
Tel: (202) 305-8902
Fax: (202) 616-8470
Email: michelle.bennett@usdoj.gov
          arjun.garg@usdoj.gov

*Attorneys for Defendants*

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - 31
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2017, I electronically filed the foregoing Opposition to Plaintiff's Motion for Temporary Restraining Order using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: February 2, 2017                                     */s/ Michelle R. Bennett*
                                                                        MICHELLE R. BENNETT

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**