**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF WASHINGTON; STATE OF
MINNESOTA,

    *Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, President of the
United States; U.S. DEPARTMENT OF
HOMELAND SECURITY; REX W.
TILLERSON, Secretary of State; JOHN
F. KELLY, Secretary of the
Department of Homeland Security;
UNITED STATES OF AMERICA,

    *Defendants-Appellants.*

No. 17-35105

D.C. No.
2:17-cv-00141

ORDER

Motion for Stay of an Order of the
United States District Court for the
Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted February 7, 2017

Filed February 9, 2017

Before:  William C. Canby, Richard R. Clifton, and
Michelle T. Friedland, Circuit Judges

Per Curiam Order

**COUNSEL**

August E. Flentje (argued), Special Counsel to the Assistant Attorney General; Douglas N. Letter, Sharon Swingle, H. Thomas Byron, Lowell V. Sturgill Jr., and Catherine Dorsey, Attorneys, Appellate Staff; Chad A. Readler, Acting Assistant Attorney General; Noel J. Francisco, Acting Solicitor General; Civil Division, United States Department of Justice, Washington, D.C., for Defendants-Appellants.

Noah G. Purcell (argued), Solicitor General; Marsha Chien and Patricio A. Marquez, Assistant Attorneys General; Colleen M. Melody, Civil Rights Unit Chief; Anne E. Egeler, Deputy Solicitor General; Robert W. Ferguson, Attorney General; Attorney General's Office, Seattle, Washington; for Plaintiff-Appellee State of Washington.

Jacob Campion, Assistant Attorney General; Alan I. Gilbert, Solicitor General; Lori Swanson, Attorney General; Office of the Attorney General, St. Paul, Minnesota; for Plaintiff-Appellee State of Minnesota.

**ORDER**

PER CURIAM:

At issue in this emergency proceeding is Executive Order 13769, "Protecting the Nation From Foreign Terrorist Entry Into the United States," which, among other changes to immigration policies and procedures, bans for 90 days the entry into the United States of individuals from seven countries. Two States challenged the Executive Order as unconstitutional and violative of federal law, and a federal district court preliminarily ruled in their favor and

temporarily enjoined enforcement of the Executive Order. The Government now moves for an emergency stay of the district court's temporary restraining order while its appeal of that order proceeds.

To rule on the Government's motion, we must consider several factors, including whether the Government has shown that it is likely to succeed on the merits of its appeal, the degree of hardship caused by a stay or its denial, and the public interest in granting or denying a stay. We assess those factors in light of the limited evidence put forward by both parties at this very preliminary stage and are mindful that our analysis of the hardships and public interest in this case involves particularly sensitive and weighty concerns on both sides. Nevertheless, we hold that the Government has not shown a likelihood of success on the merits of its appeal, nor has it shown that failure to enter a stay would cause irreparable injury, and we therefore deny its emergency motion for a stay.

## I. Background

On January 27, 2017, the President issued Executive Order 13769, "Protecting the Nation From Foreign Terrorist Entry Into the United States" (the "Executive Order"). 82 Fed. Reg. 8,977. Citing the terrorist attacks of September 11, 2001, and stating that "numerous foreign-born individuals have been convicted or implicated in terrorism-related crimes" since then, the Executive Order declares that "the United States must ensure that those admitted to this country do not bear hostile attitudes toward it and its founding principles." *Id.* It asserts, "Deteriorating conditions in certain countries due to war, strife, disaster, and civil unrest increase the likelihood that terrorists will use any means possible to enter the United States. The United

States must be vigilant during the visa-issuance process to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism." *Id.*

The Executive Order makes several changes to the policies and procedures by which non-citizens may enter the United States. Three are at issue here. First, section 3(c) of the Executive Order suspends for 90 days the entry of aliens from seven countries: Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen. 82 Fed. Reg. 8,977-78 (citing the Immigration and Nationality Act (INA) § 217(a)(12), codified at 8 U.S.C. § 1187(a)(12)). Second, section 5(a) of the Executive Order suspends for 120 days the United States Refugee Admissions Program. 82 Fed. Reg. 8,979. Upon resumption of the refugee program, section 5(b) of the Executive Order directs the Secretary of State to prioritize refugee claims based on religious persecution where a refugee's religion is the minority religion in the country of his or her nationality. *Id.* Third, section 5(c) of the Executive Order suspends indefinitely the entry of all Syrian refugees. *Id.* Sections 3(g) and 5(e) of the Executive Order allow the Secretaries of State and Homeland Security to make case-by-case exceptions to these provisions "when in the national interest." 82 Fed. Reg. 8,978-80. Section 5(e) states that situations that would be in the national interest include "when the person is a religious minority in his country of nationality facing religious persecution." 82 Fed. Reg. 8,979. The Executive Order requires the Secretaries of State and Homeland Security and the Director of National Intelligence to evaluate the United States' visa, admission, and refugee programs during the periods in which entry is suspended. 82 Fed. Reg. 8,977-80.

The impact of the Executive Order was immediate and widespread. It was reported that thousands of visas were

immediately canceled, hundreds of travelers with such visas were prevented from boarding airplanes bound for the United States or denied entry on arrival, and some travelers were detained. Three days later, on January 30, 2017, the State of Washington filed suit in the United States District Court for the Western District of Washington, challenging sections 3(c), 5(a)-(c), and 5(e) of the Executive Order, naming as defendants the President, the Secretary of the Department of Homeland Security, the Secretary of State, and the United States (collectively, "the Government"). Washington alleged that the Executive Order unconstitutionally and illegally stranded its residents abroad, split their families, restricted their travel, and damaged the State's economy and public universities in violation of the First and Fifth Amendments, the INA, the Foreign Affairs Reform and Restructuring Act, the Religious Freedom Restoration Act, and the Administrative Procedure Act. Washington also alleged that the Executive Order was not truly meant to protect against terror attacks by foreign nationals but rather was intended to enact a "Muslim ban" as the President had stated during his presidential campaign that he would do.

Washington asked the district court to declare that the challenged sections of the Executive Order are illegal and unconstitutional and to enjoin their enforcement nationwide. On the same day, Washington filed an emergency motion for a temporary restraining order (TRO) seeking to enjoin the enforcement of sections 3(c), 5(a)-(c), and 5(e) of the Executive Order. Two days later, Washington's Complaint was amended to add the State of Minnesota as a plaintiff and to add a claim under the Tenth Amendment. Washington and Minnesota (collectively, "the States") jointly filed an amended motion for a TRO. The Government opposed the

motion the next day, and the district court held a hearing the day after that.

That evening, the court entered a written order granting the TRO. *Washington v. Trump*, No. C17-0141-JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017). The district court preliminarily concluded that significant and ongoing harm was being inflicted on substantial numbers of people, to the detriment of the States, by means of an Executive Order that the States were likely to be able to prove was unlawful. *Id.* at *2. The district court enjoined and restrained the nationwide enforcement of sections 3(c) and 5(a)-(c) in their entirety. *Id.* It enjoined section 5(e) to the extent that section "purports to prioritize refugee claims of certain religious minorities," and prohibited the government from "proceeding with any action that prioritizes the refugee claims of certain religious minorities." The court also directed the parties to propose a briefing schedule for the States' request for a preliminary injunction and denied the Government's motion to stay the TRO pending an emergency appeal. *Id.* at *3.

The Government filed a notice of appeal the next day and sought an emergency stay in this court, including an immediate stay while its emergency stay motion was under consideration. We denied the request for an immediate stay and set deadlines for the filing of responsive and reply briefs on the emergency stay motion over the next two days.[1] *Washington v. Trump*, No. 17-35105, 2017 WL 469608 (9th Cir. Feb. 4, 2017). The motion was submitted after oral argument was conducted by telephone.

---

[1] We have also received many amicus curiae briefs in support of both the Government and the States.

## II. Appellate Jurisdiction

The States argue that we lack jurisdiction over the Government's stay motion because the Government's appeal is premature. A TRO is not ordinarily appealable. *See Bennett v. Medtronic, Inc.*, 285 F.3d 801, 804 (9th Cir. 2002). We may nonetheless review an order styled as a TRO if it "possesses the qualities of a preliminary injunction." *Serv. Emps. Int'l Union v. Nat'l Union of Healthcare Workers*, 598 F.3d 1061, 1067 (9th Cir. 2010). This rule has ordinarily required the would-be appellant to show that the TRO was strongly challenged in adversarial proceedings before the district court and that it has or will remain in force for longer than the fourteen-day period identified in Federal Rule of Civil Procedure 65(b). *See, e.g.*, *id.*

We are satisfied that in the extraordinary circumstances of this case, the district court's order possesses the qualities of an appealable preliminary injunction. The parties vigorously contested the legal basis for the TRO in written briefs and oral arguments before the district court. The district court's order has no expiration date, and no hearing has been scheduled. Although the district court has recently scheduled briefing on the States' motion for a preliminary injunction, it is apparent from the district court's scheduling order that the TRO will remain in effect for longer than fourteen days. In light of the unusual circumstances of this case, in which the Government has argued that emergency relief is necessary to support its efforts to prevent terrorism, we believe that this period is long enough that the TRO

should be considered to have the qualities of a reviewable preliminary injunction.[2]

### III. Standing

The Government argues that the district court lacked subject matter jurisdiction because the States have no standing to sue. We have an independent obligation to ascertain our jurisdiction, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006), and we consider the Government's argument de novo, *see, e.g.*, *Hajro v. U.S. Citizenship & Immigration Servs.*, 811 F.3d 1086, 1098 (9th Cir. 2016). We conclude that the States have made a sufficient showing to support standing, at least at this preliminary stage of the proceedings.

Article III, section 2 of the Constitution allows federal courts to consider only "Cases" and "Controversies." *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007). "Those two words confine 'the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.'" *Id.* (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)). "Standing is an essential and unchanging part of the case-or-controversy requirement" and is therefore a prerequisite to our jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "gist of the question of standing" is whether the plaintiff has a sufficiently "personal stake in the outcome of the controversy" to ensure that the parties will be truly adverse and their legal

---

[2] Our conclusion here does not preclude consideration of appellate jurisdiction at the merits stage of this appeal. *See Nat'l Indus., Inc. v. Republic Nat'l Life Ins. Co.*, 677 F.2d 1258, 1262 (9th Cir. 1982).

presentations sharpened. *Massachusetts*, 549 U.S. at 517 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

To establish Article III standing, a plaintiff must demonstrate "that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Id.* (citing *Lujan*, 504 U.S. at 560-61).

Because standing is "an indispensable part of the plaintiff's case," it "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At this very preliminary stage of the litigation, the States may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their TRO motion to meet their burden. *See id.* With these allegations and evidence, the States must make a "clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013).[3]

The States argue that the Executive Order causes a concrete and particularized injury to their public universities, which the parties do not dispute are branches of the States under state law. *See, e.g.*, *Hontz v. State*, 714 P.2d 1176, 1180 (Wash. 1986) (en banc); *Univ. of Minn. v. Raygor*, 620 N.W.2d 680, 683 (Minn. 2001).

---

[3] Our decision in *Townley* concerned a motion for a preliminary injunction, but the legal standards applicable to TROs and preliminary injunctions are "substantially identical." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

Specifically, the States allege that the teaching and research missions of their universities are harmed by the Executive Order's effect on their faculty and students who are nationals of the seven affected countries. These students and faculty cannot travel for research, academic collaboration, or for personal reasons, and their families abroad cannot visit. Some have been stranded outside the country, unable to return to the universities at all. The schools cannot consider attractive student candidates and cannot hire faculty from the seven affected countries, which they have done in the past.

According to declarations filed by the States, for example, two visiting scholars who had planned to spend time at Washington State University were not permitted to enter the United States; one was informed he would be unable to obtain a visa. Similarly, the University of Washington was in the process of sponsoring three prospective employees from countries covered by the Executive Order for visas; it had made plans for their arrival beginning in February 2017, but they have been unable to enter the United States. The University of Washington also sponsored two medicine and science interns who have been prevented by the Executive Order from coming to the University of Washington. The University of Washington has already incurred the costs of visa applications for those interns and will lose its investment if they are not admitted. Both schools have a mission of "global engagement" and rely on such visiting students, scholars, and faculty to advance their educational goals. Students and faculty at Minnesota's public universities were similarly restricted from traveling for academic and personal reasons.

Under the "third party standing" doctrine, these injuries to the state universities give the States standing to assert the

rights of the students, scholars, and faculty affected by the Executive Order. *See Singleton v. Wulff*, 428 U.S. 106, 114-16 (1976) (explaining that third-party standing is allowed when the third party's interests are "inextricably bound up with the activity the litigant wishes to pursue"; when the litigant is "fully, or very nearly, as effective a proponent of the right" as the third party; or when the third party is less able to assert her own rights). Vendors, for example, "have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig v. Boren*, 429 U.S. 190, 195 (1976). Likewise, doctors have been permitted to assert the rights of their patients. *See, e.g.*, *Griswold v. Connecticut*, 381 U.S. 479 (1965). And advocacy organizations such as the NAACP have been permitted to assert the constitutional rights of their members. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449 (1958).

Most relevant for our purposes, schools have been permitted to assert the rights of their students. *See, e.g.*, *Runyon v. McCrary*, 427 U.S. 160, 175 & n.13 (1976) ("It is clear that the schools have standing to assert these arguments [asserting free-association rights, privacy rights, and 'a parent's right to direct the education of his children'] on behalf of their patrons."); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925) (allowing a school to assert the "right of parents to choose schools where their children will receive appropriate mental and religious training [and] the right of the child to influence the parents' choice of a school"); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1487-88 (9th Cir. 1995) (citing *Pierce* and rejecting the argument that the plaintiff school had no standing to assert claims of discrimination against its minority students); *see also Ohio Ass'n of Indep. Sch. v. Goff*, 92 F.3d 419, 422 (6th Cir. 1996) (citing similar authorities). As in those cases, the interests

of the States' universities here are aligned with their students. The students' educational success is "inextricably bound up" in the universities' capacity to teach them. *Singleton*, 428 U.S. at 115. And the universities' reputations depend on the success of their professors' research. Thus, as the operators of state universities, the States may assert not only their own rights to the extent affected by the Executive Order but may also assert the rights of their students and faculty members.[4]

We therefore conclude that the States have alleged harms to their proprietary interests traceable to the Executive Order. The necessary connection can be drawn in at most two logical steps: (1) the Executive Order prevents nationals of seven countries from entering Washington and Minnesota; (2) as a result, some of these people will not enter state universities, some will not join those universities as faculty, some will be prevented from performing research, and some will not be permitted to return if they leave. And we have no difficulty concluding that the States' injuries would be redressed if they could obtain the relief they ask for: a declaration that the Executive Order violates the Constitution and an injunction barring its enforcement. The Government does not argue otherwise.

---

[4] The Government argues that the States may not bring Establishment Clause claims because they lack Establishment Clause rights. Even if we assume that States lack such rights, an issue we need not decide, that is irrelevant in this case because the States are asserting the rights of their students and professors. Male doctors do not have personal rights in abortion and yet any physician may assert those rights on behalf of his female patients. *See Singleton*, 428 U.S. at 118.

We therefore hold that the States have standing.[5]

## IV. Reviewability of the Executive Order

The Government contends that the district court lacked authority to enjoin enforcement of the Executive Order because the President has "unreviewable authority to suspend the admission of any class of aliens." The Government does not merely argue that courts owe substantial deference to the immigration and national security policy determinations of the political branches—an uncontroversial principle that is well-grounded in our jurisprudence. *See, e.g.*, *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016) (recognizing that "the power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control" (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977))); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010) (explaining that courts should defer to the political branches with respect to national security and foreign relations). Instead, the Government has taken the position that the President's decisions about immigration policy, particularly when motivated by national security concerns, are *unreviewable*, even if those actions potentially contravene constitutional rights and protections. The Government indeed asserts that it violates separation of powers for the

---

[5] The States have asserted other proprietary interests and also presented an alternative standing theory based on their ability to advance the interests of their citizens as *parens patriae*. Because we conclude that the States' proprietary interests as operators of their public universities are sufficient to support standing, we need not reach those arguments.

judiciary to entertain a constitutional challenge to executive actions such as this one.

There is no precedent to support this claimed unreviewability, which runs contrary to the fundamental structure of our constitutional democracy. *See Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (rejecting the idea that, even by congressional statute, Congress and the Executive could eliminate federal court habeas jurisdiction over enemy combatants, because the "political branches" lack "the power to switch the Constitution on or off at will"). Within our system, it is the role of the judiciary to interpret the law, a duty that will sometimes require the "[r]esolution of litigation challenging the constitutional authority of one of the three branches." *Zivotofsky* ex rel. *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)). We are called upon to perform that duty in this case.

Although our jurisprudence has long counseled deference to the political branches on matters of immigration and national security, neither the Supreme Court nor our court has ever held that courts lack the authority to review executive action in those arenas for compliance with the Constitution. To the contrary, the Supreme Court has repeatedly and explicitly rejected the notion that the political branches have unreviewable authority over immigration or are not subject to the Constitution when policymaking in that context. *See Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) (emphasizing that the power of the political branches over immigration "is subject to important constitutional limitations"); *Chadha*, 462 U.S. at 940-41 (rejecting the argument that Congress has "unreviewable authority over the regulation of aliens," and affirming that courts can review "whether Congress has chosen a constitutionally

permissible means of implementing that power").**6**   Our court has likewise made clear that "[a]lthough alienage classifications are closely connected to matters of foreign policy and national security," courts "can and do review foreign policy arguments that are offered to justify legislative or executive action when constitutional rights are at stake." *American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1056 (9th Cir. 1995).

*Kleindienst v. Mandel*, 408 U.S. 753 (1972), does not compel a different conclusion.   The Government cites *Mandel* for the proposition that "'when the Executive exercises' immigration authority 'on the basis of a facially legitimate and bona fide reason, the courts will [not] look behind the exercise of that discretion.'"   The Government omits portions of the quoted language to imply that this standard governs judicial review of *all* executive exercises of immigration authority.   In fact, the *Mandel* standard applies to lawsuits challenging an executive branch official's decision to issue or deny an individual visa based on the

---

**6** *See also, e.g.*, *Galvan v. Press*, 347 U.S. 522, 530 (1954) (reaffirming the broad power of Congress over immigration, but observing that "[i]n the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process"); *Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903) (reaffirming, in the context of adjudicating a constitutional challenge to an immigration policy, that "this court has never held, nor must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution"); *Chae Chan Ping v. United States*, 130 U.S. 581, 604 (1889) ("The powers to declare war, make treaties . . . and admit subjects of other nations to citizenship, are all sovereign powers, restricted in their exercise only by the constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations.").

application of a congressionally enumerated standard to the particular facts presented by that visa application. The present case, by contrast, is not about the application of a specifically enumerated congressional policy to the particular facts presented in an individual visa application. Rather, the States are challenging the President's *promulgation* of sweeping immigration policy. Such exercises of policymaking authority at the highest levels of the political branches are plainly not subject to the *Mandel* standard; as cases like *Zadvydas* and *Chadha* make clear, courts can and do review constitutional challenges to the substance and implementation of immigration policy. *See Zadvydas*, 533 U.S. at 695; *Chadha*, 462 U.S. at 940-41.

This is no less true when the challenged immigration action implicates national security concerns. *See Ex parte Quirin*, 317 U.S. 1, 19 (1942) (stating that courts have a duty, "in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty"); *Ex parte Milligan*, 71 U.S. 2, 120-21 (1866) ("The Constitution of the United States is a law for rulers and people, equally in war and in peace . . . under all circumstances."). We are mindful that deference to the political branches is particularly appropriate with respect to national security and foreign affairs, given the relative institutional capacity, informational access, and expertise of the courts. *See Humanitarian Law Project*, 561 U.S. at 33-34.

Nonetheless, "courts are not powerless to review the political branches' actions" with respect to matters of national security. *Alperin v. Vatican Bank*, 410 F.3d 532, 559 n.17 (9th Cir. 2005). To the contrary, while counseling deference to the national security determinations of the political branches, the Supreme Court has made clear that

the Government's "authority and expertise in [such] matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals," even in times of war. *Humanitarian Law Project*, 561 U.S. at 34 (quoting *id.* at 61 (Breyer, J., dissenting)); *see also United States v. Robel*, 389 U.S. 258, 264 (1967) ("'[N]ational defense' cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. . . . It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile."); *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("[S]imply because a statute deals with foreign relations [does not mean that] it can grant the Executive totally unrestricted freedom of choice.").

Indeed, federal courts routinely review the constitutionality of—and even invalidate—actions taken by the executive to promote national security, and have done so even in times of conflict. *See, e.g.*, *Boumediene*, 553 U.S. 723 (striking down a federal statute purporting to deprive federal courts of jurisdiction over habeas petitions filed by non-citizens being held as "enemy combatants" after being captured in Afghanistan or elsewhere and accused of authorizing, planning, committing, or aiding the terrorist attacks perpetrated on September 11, 2001); *Aptheker v. Sec'y of State*, 378 U.S. 500 (1964) (holding unconstitutional a statute denying passports to American members of the Communist Party despite national security concerns); *Ex parte Endo*, 323 U.S. 283 (1944) (holding unconstitutional the detention of a law-abiding and loyal American of Japanese ancestry during World War II and affirming federal court jurisdiction over habeas petitions by such individuals). As a plurality of the Supreme Court cautioned in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), "Whatever power the United

States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Id.* at 536 (plurality opinion).

In short, although courts owe considerable deference to the President's policy determinations with respect to immigration and national security, it is beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action.

## V.  Legal Standard

The Government moves to stay the district court's order pending this appeal. "A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). "It is instead 'an exercise of judicial discretion,' and 'the propriety of its issue is dependent upon the circumstances of the particular case.'" *Id.* (quoting *Virginian*, 272 U.S. at 672-73) (alterations omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id*. at 433-34.

Our decision is guided by four questions: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (quoting *Nken*, 556 U.S. at 434). "The first two factors . . . are the most critical," *Nken*, 556 U.S. at 434, and the last two steps are reached "[o]nce an applicant satisfies the first two

factors," *id.* at 435. We conclude that the Government has failed to clear each of the first two critical steps. We also conclude that the final two factors do not militate in favor of a stay. We emphasize, however, that our analysis is a preliminary one. We are tasked here with deciding only whether the Government has made a strong showing of its likely success in this appeal and whether the district court's TRO should be stayed in light of the relative hardships and the public interest.

The Government has not shown that it is likely to succeed on appeal on its arguments about, at least, the States' Due Process Clause claim, and we also note the serious nature of the allegations the States have raised with respect to their religious discrimination claims. We express no view as to any of the States' other claims.

## VI. Likelihood of Success—Due Process

The Fifth Amendment of the Constitution prohibits the Government from depriving individuals of their "life, liberty, or property, without due process of law." U.S. Const. amend. V. The Government may not deprive a person of one of these protected interests without providing "notice and an opportunity to respond," or, in other words, the opportunity to present reasons not to proceed with the deprivation and have them considered. *United States v. Raya-Vaca*, 771 F.3d 1195, 1204 (9th Cir. 2014); *accord Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1073 (9th Cir. 2015).

The Government has not shown that the Executive Order provides what due process requires, such as notice and a hearing prior to restricting an individual's ability to travel. Indeed, the Government does not contend that the Executive

Order provides for such process. Rather, in addition to the arguments addressed in other parts of this opinion, the Government argues that most or all of the individuals affected by the Executive Order have no rights under the Due Process Clause.

In the district court, the States argued that the Executive Order violates the procedural due process rights of various aliens in at least three independent ways. First, section 3(c) denies re-entry to certain lawful permanent residents and non-immigrant visaholders without constitutionally sufficient notice and an opportunity to respond. Second, section 3(c) prohibits certain lawful permanent residents and non-immigrant visaholders from exercising their separate and independent constitutionally protected liberty interests in travelling abroad and thereafter re-entering the United States. Third, section 5 contravenes the procedures provided by federal statute for refugees seeking asylum and related relief in the United States. The district court held generally in the TRO that the States were likely to prevail on the merits of their due process claims, without discussing or offering analysis as to any specific alleged violation.

At this stage of the proceedings, it is the Government's burden to make "a strong showing that [it] is likely to" prevail against the States' procedural due process claims. *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). We are not persuaded that the Government has carried its burden for a stay pending appeal.

The procedural protections provided by the Fifth Amendment's Due Process Clause are not limited to citizens. Rather, they "appl[y] to all 'persons' within the United States, including aliens," regardless of "whether their

presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). These rights also apply to certain aliens attempting to reenter the United States after travelling abroad. *Landon v. Plasencia*, 459 U.S. 21, 33-34 (1982). The Government has provided no affirmative argument showing that the States' procedural due process claims fail as to these categories of aliens. For example, the Government has failed to establish that lawful permanent residents have no due process rights when seeking to re-enter the United States. *See id.* ("[T]he returning resident alien is entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude him." (quoting *Rosenberg v. Fleuti*, 374 U.S. 449, 460 (1963))). Nor has the Government established that the Executive Order provides lawful permanent residents with constitutionally sufficient process to challenge their denial of re-entry. *See id.* at 35 ("[T]he courts must evaluate the particular circumstances and determine what procedures would satisfy the minimum requirements of due process on the re-entry of a permanent resident alien.").

The Government has argued that, even if lawful permanent residents have due process rights, the States' challenge to section 3(c) based on its application to lawful permanent residents is moot because several days after the Executive Order was issued, White House counsel Donald F. McGahn II issued "[a]uthoritative [g]uidance" stating that sections 3(c) and 3(e) of the Executive Order do not apply to lawful permanent residents. At this point, however, we cannot rely upon the Government's contention that the Executive Order no longer applies to lawful permanent residents. The Government has offered no authority establishing that the White House counsel is empowered to issue an amended order superseding the Executive Order

signed by the President and now challenged by the States, and that proposition seems unlikely.

Nor has the Government established that the White House counsel's interpretation of the Executive Order is binding on all executive branch officials responsible for enforcing the Executive Order. The White House counsel is not the President, and he is not known to be in the chain of command for any of the Executive Departments. Moreover, in light of the Government's shifting interpretations of the Executive Order, we cannot say that the current interpretation by White House counsel, even if authoritative and binding, will persist past the immediate stage of these proceedings. On this record, therefore, we cannot conclude that the Government has shown that it is "*absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.*" *Friends of the Earth, Inc., v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (emphasis added).

Even if the claims based on the due process rights of lawful permanent residents were no longer part of this case, the States would continue to have potential claims regarding possible due process rights of other persons who are in the United States, even if unlawfully, *see Zadvydas*, 533 U.S. 693; non-immigrant visaholders who have been in the United States but temporarily departed or wish to temporarily depart, *see Landon*, 459 U.S. 33-34; refugees, *see* 8 U.S.C. § 1231 note 8; and applicants who have a relationship with a U.S. resident or an institution that might have rights of its own to assert, *see Kerry v. Din*, 135 S. Ct. 2128, 2139 (2015) (Kennedy, J., concurring in judgment); *id.* at 2142 (Breyer, J., dissenting); *Kleindienst v. Mandel*, 408 U.S. 753, 762-65 (1972). Accordingly, the Government has not demonstrated that the States lack viable claims based

on the due process rights of persons who will suffer injuries to protected interests due to the Executive Order.  Indeed, the existence of such persons is obvious.

The Government argues that, even if the States have shown that they will likely succeed on some of their procedural due process claims, the district court nevertheless erred by issuing an "overbroad" TRO.  Specifically, the Government argues that the TRO is overbroad in two independent respects: (1) the TRO extends beyond lawful permanent residents, and covers aliens who cannot assert cognizable liberty interests in connection with travelling into and out of the United States, and (2) the TRO applies nationwide, and enjoins application of the Executive Order outside Washington and Minnesota.  We decline to modify the scope of the TRO in either respect.

First, we decline to limit the scope of the TRO to lawful permanent residents and the additional category more recently suggested by the Government, in its reply memorandum, "previously admitted aliens who are temporarily abroad now or who wish to travel and return to the United States in the future."  That limitation on its face omits aliens who are in the United States unlawfully, and those individuals have due process rights as well. *Zadvydas*, 533 U.S. at 693.  That would also omit claims by citizens who have an interest in specific non-citizens' ability to travel to the United States.  *See Din*, 135 S. Ct. at 2139 (Kennedy, J., concurring in judgment); *id.* at 2142 (Breyer, J., dissenting) (six Justices declining to adopt a rule that would categorically bar U.S. citizens from asserting cognizable liberty interests in the receipt of visas by alien spouses). There might be persons covered by the TRO who do not have viable due process claims, but the Government's proposed revision leaves out at least some who do.

Second, we decline to limit the geographic scope of the TRO. The Fifth Circuit has held that such a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy. *Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016). At this stage of the litigation, we do not need to and do not reach such a legal conclusion for ourselves, but we cannot say that the Government has established that a contrary view is likely to prevail. Moreover, even if limiting the geographic scope of the injunction would be desirable, the Government has not proposed a workable alternative form of the TRO that accounts for the nation's multiple ports of entry and interconnected transit system and that would protect the proprietary interests of the States at issue here while nevertheless applying only within the States' borders.

More generally, even if the TRO might be overbroad in some respects, it is not our role to try, in effect, to rewrite the Executive Order. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 (1995) (declining to rewrite a statute to eliminate constitutional defects); *cf. Aptheker v. Sec'y of State*, 378 U.S. 500, 516 (1964) (invalidating a restriction on freedom of travel despite the existence of constitutional applications). The political branches are far better equipped to make appropriate distinctions. For now, it is enough for us to conclude that the Government has failed to establish that it will likely succeed on its due process argument in this appeal.

## VII.    Likelihood of Success—Religious Discrimination

The First Amendment prohibits any "law respecting an establishment of religion." U.S. Const. amend. I. A law that has a religious, not secular, purpose violates that clause,

*Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), as does one that "officially prefer[s] [one religious denomination] over another," *Larson v. Valente*, 456 U.S. 228, 244 (1982). The Supreme Court has explained that this is because endorsement of a religion "sends the ancillary message to . . . nonadherents 'that they are outsiders, not full members of the political community.'" *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310 (2000) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)). The Equal Protection Clause likewise prohibits the Government from impermissibly discriminating among persons based on religion. *De La Cruz v. Tormey*, 582 F.2d 45, 50 (9th Cir. 1978).

The States argue that the Executive Order violates the Establishment and Equal Protection Clauses because it was intended to disfavor Muslims. In support of this argument, the States have offered evidence of numerous statements by the President about his intent to implement a "Muslim ban" as well as evidence they claim suggests that the Executive Order was intended to be that ban, including sections 5(b) and 5(e) of the Order. It is well established that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) ("The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. . . . Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality."); *Larson*, 456 U.S. at 254-55 (holding that a facially neutral statute violated the Establishment Clause in light of legislative history demonstrating an intent to apply regulations only to minority religions); *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-

68 (1977) (explaining that circumstantial evidence of intent, including the historical background of the decision and statements by decisionmakers, may be considered in evaluating whether a governmental action was motivated by a discriminatory purpose).

The States' claims raise serious allegations and present significant constitutional questions. In light of the sensitive interests involved, the pace of the current emergency proceedings, and our conclusion that the Government has not met its burden of showing likelihood of success on appeal on its arguments with respect to the due process claim, we reserve consideration of these claims until the merits of this appeal have been fully briefed.

## VIII. The Balance of Hardships and the Public Interest

The Government has not shown that a stay is necessary to avoid irreparable injury. *Nken*, 556 U.S. at 434. Although we agree that "the Government's interest in combating terrorism is an urgent objective of the highest order," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010), the Government has done little more than reiterate that fact. Despite the district court's and our own repeated invitations to explain the urgent need for the Executive Order to be placed immediately into effect, the Government submitted no evidence to rebut the States' argument that the district court's order merely returned the nation temporarily to the position it has occupied for many previous years.

The Government has pointed to no evidence that any alien from any of the countries named in the Order has

perpetrated a terrorist attack in the United States.[7]  Rather than present evidence to explain the need for the Executive Order, the Government has taken the position that we must not review its decision at all.[8]  We disagree, as explained above.

To the extent that the Government claims that it has suffered an institutional injury by erosion of the separation of powers, that injury is not "irreparable."  It may yet pursue and vindicate its interests in the full course of this litigation. *See, e.g.*, *Texas v. United States*, 787 F.3d 733, 767-68 (5th Cir. 2015) ("[I]t is the resolution of the case on the merits, not whether the injunction is stayed pending appeal, that will affect those principles.").

---

[7] Although the Government points to the fact that Congress and the Executive identified the seven countries named in the Executive Order as countries of concern in 2015 and 2016, the Government has not offered any evidence or even an explanation of how the national security concerns that justified those designations, which triggered visa requirements, can be extrapolated to justify an urgent need for the Executive Order to be immediately reinstated.

[8] In addition, the Government asserts that, "[u]nlike the President, courts do not have access to classified information about the threat posed by terrorist organizations operating in particular nations, the efforts of those organizations to infiltrate the United States, or gaps in the vetting process."  But the Government may provide a court with classified information.  Courts regularly receive classified information under seal and maintain its confidentiality.  Regulations and rules have long been in place for that.  28 C.F.R. § 17.17(c) (describing Department of Justice procedures to protect classified materials in civil cases); 28 C.F.R. § 17.46(c) ("Members of Congress, Justices of the United States Supreme Court, and Judges of the United States Courts of Appeal and District Courts do not require a determination of their eligibility for access to classified information . . . ."); W.D. Wash. Civ. L.R. 5(g) (providing procedures governing filings under seal).

By contrast, the States have offered ample evidence that if the Executive Order were reinstated even temporarily, it would substantially injure the States and multiple "other parties interested in the proceeding." *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). When the Executive Order was in effect, the States contend that the travel prohibitions harmed the States' university employees and students, separated families, and stranded the States' residents abroad. These are substantial injuries and even irreparable harms. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

The Government suggests that the Executive Order's discretionary waiver provisions are a sufficient safety valve for those who would suffer unnecessarily, but it has offered no explanation for how these provisions would function in practice: how would the "national interest" be determined, who would make that determination, and when? Moreover, as we have explained above, the Government has not otherwise explained how the Executive Order could realistically be administered only in parts such that the injuries listed above would be avoided.

Finally, in evaluating the need for a stay, we must consider the public interest generally. *See Nken*, 556 U.S. at 434. Aspects of the public interest favor both sides, as evidenced by the massive attention this case has garnered at even the most preliminary stages. On the one hand, the public has a powerful interest in national security and in the ability of an elected president to enact policies. And on the other, the public also has an interest in free flow of travel, in avoiding separation of families, and in freedom from

discrimination. We need not characterize the public interest more definitely than this; when considered alongside the hardships discussed above, these competing public interests do not justify a stay.

### IX. Conclusion

For the foregoing reasons, the emergency motion for a stay pending appeal is **DENIED.**