THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Civil Action No. 1:17-cv-0141-JLR

**MOTION FOR LEAVE TO FILE
BRIEF OF CHICAGO, LOS ANGELES,
NEW YORK, AND OTHER MAJOR
CITIES AND COUNTIES AS *AMICI
CURIAE* IN SUPPORT OF
PLAINTIFFS' EMERGENCY MOTION
TO ENFORCE PRELIMINARY
INJUNCTION**

NOTE ON MOTION CALENDAR:
APRIL 7, 2017

1

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

Chicago, Los Angeles, New York, and other major U.S. cities and counties respectfully submit this motion for leave to file a brief *amicus curiae* in support of Plaintiffs.

1. Amici include the largest cities in the United States. Along with other cities across the country, our physical and economic security is damaged by Executive Order 13780, issued on March 6, 2017, and entitled "Protecting the Nation from Foreign Terrorist Entry into the United States," as we describe in our brief.

2. The proposed *amicus* brief explains how the Order's discrimination on the basis of religion and national origin will significantly undermine the safety, economic well-being, and social cohesion in our communities and across the United States.

3. Plaintiffs have consented to this motion. Defendants take no position on our request to file an amicus brief.

CITIES' MOTION FOR LEAVE TO FILE *AMICUS* BRIEF
Civil Action No. 1:17-cv-0141-JLR

2

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LaSalle Street, Suite 800
CHICAGO, IL 60602
(312) 744-7764

　　　　　WHEREFORE, *amici* respectfully request that this Court grant them leave to

　file the *amicus* brief attached hereto.

　Dated:　March 14, 2017

　　　　　　　　　　　　　　　　　　　　Respectfully submitted,

　RYAN P. POSCABLO　　　　　　　　EDWARD N. SISKEL

　BRIAN NEFF　　　　　　　　　　　　Corporation Counsel
　ELIBERTY LOPEZ　　　　　　　　　　 of the City of Chicago

　Riley Safer Holmes & Cancila LLP　 BENNA RUTH SOLOMON
　1330 Avenue of the Americas, 6th Floor　Deputy Corporation Counsel

　New York, NY 10019　　　　　　　　30 N. LaSalle Street, Suite 800
　(212) 660-1030　　　　　　　　　　 Chicago, IL 60602

　rposcablo@rshc-law.com　　　　　　(312) 744-7764
　　　　　　　　　　　　　　　　　　benna.solomon@cityofchicago.org

　NICK KAHLON　　　　　　　　　　 *Attorneys for Amicus Curiae,*
　Riley Safer Holmes & Cancila LLP　 City of Chicago

　Three First National Plaza
　70 W. Madison Street, Suite 2900

　Chicago, IL 60602
　(312) 471-8700

　nkahlon@rshc-law.com

　*Attorneys for Amicus Curiae,*

　City of Chicago

CITIES' MOTION FOR LEAVE TO FILE *AMICUS* BRIEF　　　3
Civil Action No. 1:17-cv-0141-JLR

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, et al.,

        Plaintiffs,

        v.

DONALD J. TRUMP, et al.,

        Defendants.

Civil Action No. 1:17-cv-0141-JLR

---

BRIEF OF CHICAGO, LOS ANGELES, NEW YORK, AND OTHER MAJOR
CITIES AND COUNTIES AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION TO ENFORCE PRELIMINARY INJUNCTION

---

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO
ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LaSALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST OF AMICI CURIAE ........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 8

I.    THE EXECUTIVE ORDER VIOLATES THE ESTABLISHMENT
      CLAUSE. ................................................................................................................. 9

      A.    The Order's Avowed Purpose Is Discriminatory.................................. 10

      B.    The Order's Profound Effect Reveals Its Discriminatory Purpose....... 13

      C.    The Order Does Not Survive Strict Scrutiny. ..................................... 14

II.   THE EXECUTIVE ORDER UNLAWFULLY DISCRIMINATES
      BASED ON NATIONAL ORIGIN. ..................................................................... 18

CONCLUSION............................................................................................................. 22

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accord Yick Wo v. Hopkins,*
 118 U.S. 356 (1886) ........................................................................ 12

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
 501 U.S. 104 (1991) ......................................................................... 21

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
 508 U.S. 520 (1993) .......................................................................... 9

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
 473 U.S. 432 (1985) ......................................................................... 18

*City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation,*
 538 U.S. 188 (2003) ......................................................................... 10

*FDA v. Brown & Williamson Tobacco Corp.,*
 529 U.S. 120 (2000) ......................................................................... 20

*FTC v. Mandel Brothers, Inc.,*
 359 U.S. 385 (1959) ......................................................................... 21

*Gustafson v. Alloyd Co.,*
 513 U.S. 561 (1995) ......................................................................... 21

*Judulang v. Holder,*
 565 U.S. 42 (2011) ........................................................................... 22

*Larson v. Valente,*
 456 U.S. 228 (1982) ...................................................................... 9, 14

*McCreary County, Ky. v. American Civil Liberties Union of Ky.,*
 545 U.S. 844 (2005) ......................................................................... 10

*Olsen v. Albright,*
 990 F. Supp. 31 (D.D.C. 1997) ........................................................ 18

*Romer v. Evans,*
 517 U.S. 620 (1996) ......................................................................... 18

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO    ii
ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

*Santa Fe Indep. Sch. Dist. v. Doe*,
    530 U.S. 290 (2000) ............................................................... 10

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ............................................................... 10

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ............................................... 14

**Statutes and Ordinances**

8 U.S.C. § 1152(a)(1)(A) ............................................................ 19

8 U.S.C. § 1182(f) ..................................................................... 20

Municipal Code of Chicago, Ill. § 13-72-040 .............................. 19

Municipal Code of Chicago, Ill. § 9-115-180 .............................. 19

Municipal Code of Chicago, Ill. §§ 2-160-010 ............................ 19

Municipal Code of Los Angeles Admin. Code §§ 4.400.............. 19

Municipal Code of Los Angeles Charter §§ 104(i) ..................... 19

Municipal Code of Los Angeles Charter 1024 ........................... 19

New York City Charter, § 900 N.Y.C. Admins. Code § 6-108 .................. 19

New York City Charter, § 900 N.Y.C. Admins. Code §§ 4-116 .................. 19

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO   iii
ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

**EDWARD N. SISKEL**
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

## STATEMENT OF INTEREST OF AMICI CURIAE

_____

*Amici curiae* include some of the largest cities and counties in the United States.[1]  The population of Chicago, Los Angeles, and New York City alone is well over 15.1 million.[2]  These cities serve as major immigrant destinations and hubs for global economic activity, accounting for more than one-fifth of the country's gross domestic product.[3]

These cities, and others, are heavily dependent on the contributions of immigrants.[4]  Immigrant residents of Chicago, Los Angeles, and New York hail from more than 150 foreign countries, and at least five million residents of those cities are immigrants.  As of 2015, there were approximately 213,400 residents in Chicago, Los Angeles, and New York alone who were born in five of the six countries targeted by the Executive Order.[5]

Chicago, Los Angeles, and New York also rank as some of the largest employers in their jurisdictions, collectively employing approximately 365,000

[1] Additional counsel for amici curiae are listed in the appendix to this brief.

[2] The data in this statement of interest are limited to Chicago, Los Angeles, and New York City.  Support for the data is included in the appendix to this brief.

[3] Ted Hesson, *Why American Cities Are Fighting to Attract Immigrants*, The Atlantic (Jul. 21, 2015).

[4] *Immigrants & Competitive Cities*, Americas Society/Council of the Americas (available at http://www.as-coa.org/sites/default/files/ImmigrantsandCompetitiveCities.pdf).

[5] Alan Berube, *These communities have a lot at stake in Trump's executive order on immigration*, Brookings Institution (Jan. 30, 2017) (available at https://www.brookings.edu/blog/the-avenue/2017/01/30/these-communities-have-a-lot-at-stake-in-trumps-executive-order-on-immigration/).

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO
ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

1

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

people, many of them immigrants. In Los Angeles in particular, 22% of City employees are foreign-born. And in addition to public employees, in Chicago alone, at least 12,500 private employees are working on international visas. Similarly, 27% of all business owners in Chicago are immigrants; in New York City immigrants make up a majority of business owners, and that figure is 44% in Los Angeles.

Chicago and Los Angeles welcome and resettle some of the largest numbers of refugees in the United States. From October 2015 to September 2016, approximately 2100 refugees were resettled in the Chicago area and nearly 800 were from the targeted countries; 2800 were resettled in the Los Angeles area and 1900 were from Iran alone. Additionally, approximately 1300 refugees have been resettled in New York City in the past five years. Through municipal and private efforts, these new residents are woven into the social fabric of our cities, and they contribute daily to our collective benefit.

Chicago, Los Angeles, and New York City also operate and are served by airports with a large number of international flights. On any given day, more than 400 flights arrive at Chicago and Los Angeles airports from international destinations, bringing more than 60,000 passengers. Relatedly, the tourism sector of the local economies in Chicago, Los Angeles, and New York City accounts for at least $63 billion a year in local revenue. In 2016, our cities hosted more than 20 million foreign visitors, whose direct spending in Los Angeles County is estimated

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

2

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

at $6.3 billion dollars last year alone, and $1.88 billion annually in Chicago, including $1.25 million by tourists from the six targeted countries. New York City now predicts a 300,000-person drop in foreign visitors this year.[6]

Chicago, Los Angeles, and New York City are home to 131 four-year colleges and universities, including some of the country's most prestigious, which have approximately 80,000 international students. Chicago is also home to 44 major hospitals, which serve thousands of international patients a year. The Middle East region is the top source of patients who travel to the U.S. for medical care.[7]

*Amici* are profoundly opposed to the Executive Order, which is as misguided as it is unconstitutional. *Amici* are further opposed to actions by the federal government pursuant to the Executive Order. Our cities serve as the gateways for immigrants and refugees starting new lives in the United States. And when they have come, "[e]verywhere immigrants have enriched and strengthened the fabric of American life."[8] The Executive Order, and the anti-immigrant principles behind it, offends our cities' values and character; violates the principles girding our local

---

[6] Patrick McGeehan, *New York Expects Fewer Foreign Tourists, Saying Trump Is to Blame*, N.Y. Times (Feb. 28, 2017).

[7] Kristen Schorsch, *How Trump's Travel Ban Could Hit Medical Tourism Hard*, Crain's Chicago Business (Feb. 1, 2017), available at http://www.chicagobusiness.com/article/20170201/news03/170209996/how-trumps-travel-ban-could-hit-medical-tourism-hard.

[8] John F. Kennedy, A Nation of Immigrants 3 (Harper rev. ed 2008).

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

governments; and dilutes the effectiveness of our laws, including those prohibiting discrimination, on precisely the invidious grounds reflected in the Executive Order.

But beyond our ideals, the Executive Order subverts the very purposes it claims to serve. First, the unlawful discrimination based on religion and national origin undermines trust between our law enforcement agencies and our immigrant communities, which in turn hinders our ability to protect our residents. Chicago, Los Angeles, New York City, and the other *amici*, as financial, political, and cultural hubs in the United States, draw unique attention from individuals looking to cause harm in this country. Additionally, local law enforcement officers play an increasingly important role in efforts to detect and protect against national security threats. For these and other reasons, cities are a crucial part of the first-line of defense against terrorism.[9] To serve the mission of national security, our cities must be able to work in coordination with everyone in our communities, including our diverse ethnic populations. Even at the strictly local level, the safety and security of our residents and visitors, which is the foremost priority of any city in America, depends upon cooperation between the residents and our local police forces. The United States Department of Justice's own Office of Community

---

[9] *E.g.*, Mitch Silber and Adam Frey, *Detect, Disrupt, and Detain: Local Law Enforcement's Critical Roles in Combating Homegrown Terrorism and the Evolving Terrorist Threat*, 41 Fordham Urb. L.J. 127 (Nov. 2013); David Thacher, *The Local Role in Homeland Security*, 39 Law & Soc'y Rev. 635 (Sept. 2005); *DHS Announces Expansion of the Securing the Cities Program*, Dep't of Homeland Security (Sep. 14, 2015) (available at https://www.dhs.gov/news/2015/09/14/dhs-announces-expansion-securing-cities-program).

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

Oriented Policing Services has emphasized this fact time and again.[10]  With decades of experience policing neighborhoods that are home to immigrant populations, *amici* are keenly and uniquely aware that ostracized residents do not report crimes, against themselves or others, or behavior that should, in the interest of safety and national security, be reported as suspicious.  Thus, by targeting immigrants based on religion and national origin, the Executive Order makes *all* of our residents and visitors, and indeed everyone in the country, less safe.

Second, the Executive Order's message that citizens of majority-Muslim countries threaten national security conveys that members of those communities, and other immigrant communities, are to be distrusted and feared.  Thus, targeting Muslims makes these immigrant residents more vulnerable to victimization, and adds to the burden of local governments to provide protection.  At the extreme, this victimization amounts to hate crimes.  In the first 34 days following the 2016 election, there were 1,094 hate crimes and lesser hate incidents.[11]  Of these, 315 were categorized as anti-immigrant, and 112 as anti-Muslim.  The Southern Poverty Law Center figures also show a dramatic increase from 2015 to 2016 in the number of organizations identified as anti-Muslim hate groups, from 34 to 101.

[10] *E.g., Community Policing Defined*, Dep't of Justice, Office of Community Oriented Policing Services (rev. 2014) (available at https://ric-zai-inc.com/Publications/cops-p157-pub.pdf).

[11] *Update: 1,094 Bias-Related Incidents in the Month Following the Election*, Southern Poverty Law Center (Dec. 16, 2016 (available at https://www.splcenter.org/hatewatch/2016/12/16/update-1094-bias-related-incidents-month-following-election).

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

Chicago, Los Angeles, and New York City in particular all saw dramatic rises in hate crimes following the election. In the three months after the election, New York City reported twice the number of hate crime incidents compared to the same period a year prior; Chicago had twice as many arrests for hate crimes than in that three-month period the prior year. In the first five weeks of 2017, the number of hate crimes recorded in Chicago was more than triple the number for the same period in 2016. Additionally, hate crimes categorized as anti-Muslim or anti-Arab hit five-year highs in Chicago in 2016. And in Los Angeles, hate crime incidents doubled in the month following the presidential election, with 30 such reported incidents during that month.

Overt discrimination presents other dangers. Foreign residents of our cities who feel unwelcome are more likely to cut themselves off from public life and participation in public programs. They may refuse to participate in public health programs such as vaccinations or seek medical care for contagious diseases. They may keep their children out of school to avoid harassment and stay away from mosques because of the fear that they will be unsafe. Nor will these effects be limited to individuals from the six targeted countries. Thousands of other Muslim students, workers, refugees, and other residents living in the *amici* cities will rightly worry that the public will likewise see that the true meaning of the Executive Order is to demean all Muslims. The Order therefore places millions of

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LaSALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

people at risk of harm or being driven underground, which will only make those residents and our cities less safe.

Third, the Executive Order further deprives our communities and our residents of immigrants and students from the targeted six countries, and others who will simply decide not to travel to the United States, much less to live here.[12] These individuals enrich us with their customs and celebrations, their hard work and perseverance, and their unique skills and training. Our cities would be bereft without them. Foreign residents and students also make an immeasurable contribution to America's ability to participate in the global economy, among other reasons, because fewer than half of Americans have passports.[13] Thus, many Americans' exposure to other cultures comes only if visitors and students from other countries come here.

Our cities will always welcome immigrant residents, students, tourists, and refugees. Indeed, perhaps uniquely in the world, the very identity of American cities has been forged since the inception of our Nation from the toil of immigrant communities and their love for the American ideal. The discriminatory and unlawful Executive Order seriously harms *amici* by making us less safe,

[12] Shivani Vora, *After Travel Ban, Interest in Trips to U.S. Declines*, N.Y. Times (Feb. 20, 2017) ("Following President Trump's Jan. 27 executive order banning people from seven predominantly Muslim countries from entering the United States, the demand for travel to the United States took a nosedive, according to data from several travel companies and research firms.").

[13] Sally Herships, *Trump's travel ban worries international students*, Marketplace (Feb. 8, 2017) (available at http://www.marketplace.org/2017/02/08/world/overseas-students).

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

7

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

endangering the lives of our residents, disrupting our communities, and undermining our ability to continue to be welcoming communities for immigrants and refugees. It also harms our businesses, hospitals, and educational institutions, limits our labor pool, decreases our tax revenues, and dampens our tourism industry. For these reasons, *amici* have a vital interest in this case and file this brief in support of the States' emergency motion to enforce the preliminary injunction against the current Executive Order.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For months on the campaign trail, presidential candidate Donald J. Trump promised that, if elected, he would impose a ban on Muslim immigration. On January 27, 2017, President Trump issued an Executive Order that made good on his promise. In describing the ban, the President and his advisors publicly said that the Executive Order accomplishes exactly what the candidate Trump said he would do. Then, after the courts enjoined that Order precisely because of this unlawful discriminatory intent, President Trump replaced it with the Order under review in this case, while reiterating that he "keep[s] his promises." Like its predecessor, the revised Executive Order is unlawful. Accordingly, this Court should enforce the preliminary injunction against it.

*Amici* submit that Sections 2 and 6 of the Executive Order violate the Establishment Clause by classifying immigrants and refugees based on religion. Those provisions are also irrational, in violation of both the Due Process Clause and

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO
ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LaSALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

the Immigration and Nationality Act of 1965. Below, amici address the merits of these two issues and rely on the States' motion for its discussion of the remaining grounds to enforce the injunction.

## I. THE EXECUTIVE ORDER VIOLATES THE ESTABLISHMENT CLAUSE.

The Establishment Clause prohibits any "law respecting an establishment of religion." It enshrines, in the first words to the First Amendment to the U.S. Constitution, the special protection that the Framers intended for religion to have from governmental compulsion. As Madison wrote: "we hold it for a fundamental and undeniable truth, that Religion or the duty which we owe to our Creator and the manner of discharging it, can be directed only by reason and conviction, not by force or violence. The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate." James Madison, Memorial and Remonstrance Against Religious Assessments to the Honorable the General Assembly of the Commonwealth of Virginia P1, reprinted in 8 The Papers of James Madison 299 (Robert A. Rutland ed., 1973). Consistent with these principles, "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente,* 456 U.S. 228, 244 (1982). The Executive Order violates the Establishment Clause by disfavoring Muslim immigrants.

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

## A.    The Order's Avowed Purpose Is Discriminatory.

The Establishment Clause extends beyond facial discrimination and protects "against governmental hostility which is masked, as well as overt." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).  When determining whether governmental action was motivated by an invidious discriminatory purpose, courts often must look beyond the text, *id.,* and may examine "such circumstantial and direct evidence of intent as may be available," including "[t]he historical background of the decision" and "contemporary statements" by decisionmakers. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977).  Indeed, scrutinizing purpose requires that courts "not only can, but must" examine "the circumstances surrounding [the policy's] enactment," *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000), to ascertain whether, in the eyes of an "objective observer," a religious objective "emerges from readily discoverable fact[s]." *McCreary County, Ky. v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 862 (2005).  *Accord City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S. 188, 196-97 (2003) ("statements made by decisionmakers or referendum sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent in a challenge to an ultimately enacted initiative").

Here, although the Executive Order in terms bans only immigrants and refugees from six countries, it is an admitted guise for discriminating against

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LaSalle Street, Suite 800
Chicago, IL 60602
(312) 744-7764

Muslims. Numerous statements by President Trump, before and after his election, and indeed before and after the prior Executive Order was invalidated, confirm that the purpose of the Executive Order is to ban Muslims. The same day as the prior Executive Order was signed, President Trump avowed that its purpose was to favor Christian refugees over Muslims.[14] That purpose is likewise revealed by a litany of other public statements, including then-candidate Trump's repeated promises of a "total and complete shutdown of Muslims entering the United States." (SAC ¶ 142.) President-elect Trump also answered a question about his plans for a Muslim ban in the wake of a terrorist attack in Berlin by saying, "You know my plans. All along I've been proven right ...." (SAC ¶ 153.) Prior to taking office, Mr. Trump revealed that he intended to camouflage this discrimination by focusing on "territories," because "[p]eople were so upset when I used the word Muslim." (SAC ¶ 150.)[15] But even as he did so, he stressed that this was not backing off on his Muslim ban; rather it was "an expansion" of it. *Id.*[16]

---

[14] The President confirmed to the Christian Broadcasting Network that the Executive Order was intended to prioritize Christian refugees over Muslims. (*See* Dkt. 118-1 (Second Amended Complaint ("SAC")) ¶ 159.)

[15] Specifically, Mr. Trump said: "I actually don't think it's a pull-back. In fact, you could say it's an expansion. I'm looking now at territories. People were so upset when I used the word Muslim. Oh, you can't use the word Muslim. Remember this. And I'm okay with that, because I'm talking territory instead of Muslim." (*Id.*)

[16] The district court in Virginia, considering a challenge to the original Executive Order, refused to excise the President's pre-inauguration statements from consideration. *Aziz v. Trump*, 1:17–cv–116 (LMB/TCB), 2017 WL 580855, at *8 (E.D. Va. Feb. 13, 2017). It noted that another court had looked only to the text of the Order but had not explained why it had not considered other evidence. *Id.* at 7 n.8 (citing *Louhghalam v. Trump*, 2017 WL 479779, at *4-*5 (D. Mass. 2017)). We do not suggest that it will always be appropriate to

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

After taking office, President Trump carried out his promise of imposing a Muslim ban exactly as he said he would. According to the public comments of the President's advisor Rudy Giuliani, the President asked him to craft a "Muslim ban" with a veneer of legality, which was accomplished by banning citizens of the identified countries in lieu of explicitly saying "Muslims." (SAC ¶ 168.)

It is of no moment that the Executive Order was drafted to omit explicit reference to discriminatory intent, and no longer contains an explicit preference for religious minorities within Muslim-majority countries. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *City of Hialeah,* 508 U.S. at 534. *Accord Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (even facially neutral law cannot survive when "no reason for it exists except hostility to the race and nationality" of those adversely affected). For this reason, it is "the duty of the courts" to distinguish a "sincere" secular purpose from one that is a "sham," or that is

_____

look at campaign statements to determine intent. Where an elected official campaigns on a promise to do one thing and then does something that is plainly different, it will not be appropriate. But here, President Trump and others in his administration have confirmed the discriminatory intent of the ban since he took office – and it functions exactly as he promised when campaigning. Indeed, in announcing that he would replace the invalid Order, President Trump repeatedly stated "In each of these actions, I'm keeping my promises to the American people. These are campaign promises." *Full Transcript and Video: Trump News Conference*, N.Y. Times (Feb. 16, 2017) (available at https://www.nytimes.com/2017/02/16/us/politics/donald-trump-press-conference-transcript.html). Under these circumstances, "[j]ust as the world is not made brand new every morning," *McCreary*, 545 U.S. at 866, intent is not made brand new simply by taking the oath of office.

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

12

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

"secondary" to a "predominately religious" purpose. *McCreary,* 545 U.S. at 864. Here the sham purpose could not be more transparent: the Executive Order, by the administration's own prior and concurrent admissions, targets Muslims.

**B.     The Order's Profound Effect Reveals Its Discriminatory Purpose.**

Although the federal government asserts that the Executive Order is neutral with respect to religion that ignores the reality of the Order's intended effects. Most of the 38,901 Muslim refugees admitted to the United States in fiscal year 2016 came from the six countries targeted by the Executive Order.[17]   Indeed, given current global conditions of civil war, ethnic conflict, drought, famine, and radical Islamic elements, most refugees worldwide come from predominately Muslim countries.[18]   Under these circumstances, an Executive Order banning refugees is a Muslim ban.

The Executive Order remains discriminatory despite the federal government's insistence that the ban is temporary and affects only a partial list of countries with majority-Muslim populations – although, tellingly, these are the countries from which the majority of Muslim refugees come to the United States. Regardless, "temporary" and "partial" are not defenses to an Establishment Clause violation.   And in fact, whatever the temporal duration or the geographic scope of

[17] Phillip Connor, *U.S. admits record number of Muslim refugees in 2016,* Pew Research Center (Oct. 5, 2016) (available at http://www.pewresearch.org/fact-tank/2016/10/05/u-s-admits-record-number-of-muslim-refugees-in-2016/).

[18] *Figures at a Glance,* UNHCR (available at http://www.unhcr.org/en-us/figures-at-a-glance.html).

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

this Order, the federal government's defense of this Order would allow defendants to later extend the Order for a longer period of time and to more countries to reach the desired "total and complete shutdown."

### C.    The Order Does Not Survive Strict Scrutiny.

Where, as here, a law "grant[s] a denominational preference," the Supreme Court's cases "demand" that courts "treat the law as suspect" and "apply strict scrutiny in adjudging its constitutionality." *Larson,* 456 U.S. at 246. The law will be upheld only if the government shows a compelling governmental purpose, *id.* at 247, and the law is "closely fitted to further [that] interest," *id.* at 246. *Amici* accept, of course, that the principles of enhancing national security and preventing domestic terrorism are plainly compelling, but the Order is not narrowly tailored to achieve that purpose and therefore fails strict scrutiny.

As the Ninth Circuit correctly observed in denying the motion to stay the order enjoining enforcement of the original Executive Order, there is "no evidence that any alien from any of the countries named in the Order has perpetrated a terrorist attack in the United States." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017). Indeed, no Americans have been killed by foreign nationals from the targeted countries since 1975.[19] At the same time, while the original Executive

---

[19] Alex Nowrasteh, *Where Do Terrorists Come From? Not the Nations Named in Trump Ban*, Newsweek (Jan. 31, 2017).

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

Order cited the attacks of September 11, 2001 as an impetus, the countries whose citizens carried out those attacks were excluded from the ban.[20]

The revised Executive Order contains several factual assertions apparently designed to avoid these defects, but these do not withstand scrutiny. Tellingly, the Order omits reference to the September 11th attacks – underscoring that the Order would have done nothing to prevent that tragedy at all. Instead, the Order generally states that its restrictions are necessary to prevent "foreign nationals who may commit, aid, or support acts of terrorism" from entering the county. Order § 1(a). The federal government's own internal documents refute this. Following the Ninth Circuit's ruling, the administration asked the Department of Homeland Security ("DHS") to compile an intelligence report supporting a travel ban from the targeted countries. That report rejects the premise of the Executive Order, concluding that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity." (Dkt. 113-9 at 2.)

Other assertions in the Order likewise fail to support a finding that the Order is narrowly, or even rationally, drawn. For example, the Order states that Attorney General Sessions reported to the President that "more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism

---

[20] Mark Berman, *Trump and his aides keep justifying the entry ban by citing attacks it couldn't have prevented*, Wash. Post (Jan. 30, 2017).

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

investigations by the Federal Bureau of Investigation." Order § 1(h).[21]  Again, it is telling that the Order does not claim that any of these refugees came from the six countries affected by this ban.  Regardless, the Order appears to adopt a broad interpretation of what qualifies as a "counterterrorism investigation," and the number is misleading because only a small fraction of terrorism inquiries conducted by the F.B.I. ever lead to criminal charges.[22]  Moreover, with terrorism investigations so broadly defined, 300 investigations is insignificant.

Similarly, the Order asserts that "[s]ince 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States." Order § 1(h).  But the Executive Order does not restrict immigration of *all* foreign-born nationals, instead making this a problem of the six Muslim countries targeted. This data is also suspect because it includes individuals initially investigated as part of a "terror-related" investigation but who were convicted of charges that had no connection to terrorism.[23]

---

[21] The Attorney General himself advocated while a Senator for restricting the admission of Muslims to the United States.  *See* June 14, 2016 Letter from Sen. Jeff Sessions and Sen. Ted Cruz to President Barack Obama (available at https://web.archive.org/web/20161109030307/http://www.sessions.senate.gov/public/_cache/files/f9d1d9f4-6ee8-42ff-a5f2-29a2518fe2f7/06.14.16-sens.-sessions-cruz-to-president-obama-on-terrorism-immigration.pdf).

[22] Charlie Savage, *F.B.I. Casts Wide Net Under Relaxed Rules for Terror Inquiries, Data Shows*, N.Y. Times (Mar. 26, 2011) (citing Justice Department document indicating that from December 2008 to March 2009 the F.B.I. initiated 11,667 "assessments" of people and from that group opened 427 more intensive investigations).

[23] Shirin Sinnar, *More Misleading Claims on Immigrants and Terrorism*, Just Security (Mar. 4, 2017) (available at https://www.justsecurity.org/38341/misleading-claims-immigrants-terrorism/) (last visited March 8, 2017); *see also* Alex Nowrasteh, *42 Percent of*

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LaSalle Street, Suite 800
CHICAGO, IL 60602
(312) 744-7764

The national security claims advanced to support the Executive Order are not supported by the evidence and thus cannot mask the Order's discriminatory intent. Instead, the Order cuts an indiscriminate swath through the heart of immigration into this country. The Order fails strict scrutiny and violates the Establishment Clause.[24]

---

"*Terrorism-Related Convictions Aren't for Terrorism* (analysis of list compiled by Senator Sessions of terrorism convictions from 9/11 until the end of 2014 indicated that "[o]nly 40 were convicted of planning, attempting, or carrying out a terrorist attack on U.S. soil . . .") (available at https://www.cato.org/blog/42-percent-terrorism-related-convictions-arent-terrorism) (last visited Mar. 8, 2017).

[24] The federal government is also subject to the equal protection requirement of the Due Process Clause of the Fifth Amendment. *E.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Here, the Executive Order's blatant discrimination against Muslims also denies equal protection. Distinctions based on religion are inherently suspect. *Friedman v. Rogers*, 440 U.S. 1, 17 (1979); *see also City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (court will give heightened scrutiny to a classification that is based on religion). Invidious classifications "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985). Accordingly, such laws "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *Id.* As we explain, the Executive Order plainly was motivated by a desire to discriminate. Thus, it violates the Equal Protection Clause as well as the Establishment Clause. Finally, the Executive Order also violates the RFRA, 42 U.S.C. § 2000bb-1. RFRA prohibits action by the federal government that substantially burdens religious exercise unless it is the least restrictive means of furthering a compelling governmental interest. *See Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015). A desire to discriminate based on religion does not qualify as a compelling governmental interest.

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

17

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

## II. THE EXECUTIVE ORDER UNLAWFULLY DISCRIMINATES BASED ON NATIONAL ORIGIN.

The Executive Order uses national origin as a pretext for discrimination against Muslims. The federal government's defense that it is not a religious ban at all but one based on national origin does not save it.

The Order violates the equal protection component of the Fifth Amendment's Due Process Clause. By banning nationals of countries not shown to perpetrate terrorism in the United States and not banning nationals of countries that do, the Executive Order is so staggeringly underinclusive and overinclusive for the stated goal of national security and so profoundly arbitrary that it is unconstitutional for that reason alone. Utterly irrational classifications that do not serve the stated purpose violate equal protection. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."); *see also Romer v. Evans*, 517 U.S. 620, 635 (1996) (invalidating under the Equal Protection Clause "a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; . . . a classification of persons undertaken for its own sake").

Beyond that, the Order violates the Immigration and Nationality Act of 1965. "During most of its history, the United States openly discriminated against individuals on the basis of race and national origin in its immigration laws." *Olsen v. Albright*, 990 F. Supp. 31, 37 (D.D.C. 1997). Then, "[t]hroughout the latter half of

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

18

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

the Twentieth Century, Congress moved away from such discriminatory policies. The most profound change was the Immigration and Nationality Act Amendments of 1965," which "eliminated discrimination on the basis of race and national origin." *Id.*; *see also* 1965 U.S.C.C.A.N. 3328, 3328 (quoting S. Rep. No. 89-748) (principal purpose of the 1965 Act was "to repeal the national origin quota provisions of the Immigration and Nationality Act, and to substitute a new system for the selection of immigrants to the United States"). As President Kennedy noted, "the national origins quota system has strong overtones of an indefensible racial preference." John F. Kennedy, A Nation of Immigrants 45 (Harper rev. ed 2008). The 1965 Act could not be more clear: "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A). Moreover, "[t]he legislative history surrounding the 1965 Act is replete with the bold anti-discriminatory principles of the Civil Rights Era. Indeed, the 1965 Act was passed alongside the Civil Rights Act of 1964 and the Voting Rights Act of 1965." *Olsen*, 990 F. Supp. at 37. The Executive Order is in direct violation of section 1152(a).

Strong enforcement of the INA's antidiscrimination provision is profoundly important to *amici*, which have adopted similar laws prohibiting discrimination in their local communities in all aspects of life – housing, employment, public accommodation, transportation, schooling, government services, and public

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

19

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

employment. *E.g.*, Municipal Code of Chicago, Ill. §§ 2-160-010, 5-8-010, 9-115-180, 13-72-040; Los Angeles Charter §§ 104(i), 1024; Los Angeles Admin. Code §§ 4.400, 10.8, 10.13; New York City Charter, § 900 N.Y.C. Admins. Code §§ 4-116; 6-108. Such laws reflect *amici*'s strong commitment to equal opportunity and equal rights, just as section 1152(a) does. The Executive Order's blatant discrimination based on national origin turns the clock back on this important civil rights guarantee, and it should be set aside.

To be sure, the President has broad authority over the entry of aliens generally: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). But for two reasons in particular, section 1182(f) does not save the Executive Order.

First, section 1152(a)'s prohibition on discrimination was enacted after section 1182(f) and is properly understood as a limitation on the authority previously granted under section 1182(f) to suspend entry. "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Thus, although section 1182(f)

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

grants the President authority to suspend entry of a class of immigrants whose entry would be "would be detrimental to the interests of the United States,"—*i.e.,* entrants belonging to Foreign Terrorist Organizations—section 1152 declares Congress's determination that it is *not* in the national interest to discriminate based upon national origin. This reading also construes these provisions "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569 (1995), and "fit[s] all parts into an harmonious whole," *FTC v. Mandel Brothers, Inc.,* 359 U.S. 385, 389 (1959). By contrast, to read section 1182(f) as though section 1152(a) did not exist is inconsistent with settled rules of statutory construction and should be rejected. *E.g., Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) ("[W]e construe statutes, where possible, so as to avoid rendering superfluous any parts thereof.").

In addition, section 1182(f) should be read in light of the grounds for denial of admission for terrorist activity that are specifically set forth in section 1182(a)(3)(B). That provision mandates an individualized inquiry; it does not authorize blanket exclusion based solely on the applicant's nation of origin.

Even considering section 1182(f) in isolation, the Executive Order's exclusion of all immigrants and refugees from six countries, solely because of the accident of their place of birth, cannot stand. The plain language of section 1182(f) requires a determination that the entry of aliens or a class of aliens is "detrimental to the interests of the United States," and here it is simply not possible to say that every

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

single person, or even a majority of persons, born in the six targeted countries presents a security risk to the United States. Most obviously perhaps, this group includes people who left their place of birth as infants or children, and perhaps were born to parents who themselves were not citizens of the country where their children were born. These immigrants and refugees could have lived nearly their entire lives in countries that even the federal government does not think present any risk to the United States, and yet they are banned solely because of where they were born. Even on immigration matters, discretion must be exercised "in a reasoned manner." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). A classification based on national origin is not rational.[25]

## CONCLUSION

———

For these reasons, and the reasons set forth in Plaintiffs' motion, *amici* urge the court to grant the emergency motion to enforce the preliminary injunction.

Respectfully submitted,

RYAN P. POSCABLO                      EDWARD N. SISKEL
BRIAN NEFF                            Corporation Counsel
ELIBERTY LOPEZ                          of the City of Chicago
Riley Safer Holmes & Cancila LLP      BENNA RUTH SOLOMON
1330 Avenue of the Americas, 6th Floor  Deputy Corporation Counsel
New York, NY 10019                    30 N. LaSalle Street, Suite 800

---

[25] The Executive Order states the six targeted countries are unable to "share or validate" data about individuals seeking to enter the United States. Order § 1(d). But this assertion regarding vetting cannot be read as a blanket "determination" that all individuals from the six countries are "detrimental" to the United States in violation of section 1182(f).

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

(212) 660-1030
rposcablo@rshc-law.com

NICK KAHLON
Riley Safer Holmes & Cancila LLP
Three First National Plaza
70 W. Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700
nkahlon@rshc-law.com

*Attorneys for Amicus Curiae,*
City of Chicago

Chicago, IL 60602
(312) 744-7764
benna.solomon@cityofchicago.org
*Attorneys for Amicus Curiae,*
City of Chicago

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO       23
ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764

# CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Washington by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: March 14, 2017

Respectfully submitted,

RYAN P. POSCABLO
BRIAN NEFF
ELIBERTY LOPEZ
Riley Safer Holmes & Cancila LLP
1330 Avenue of the Americas, 6th Floor
New York, NY 10019
(212) 660-1030
rposcablo@rshc-law.com

NICK KAHLON
Riley Safer Holmes & Cancila LLP
Three First National Plaza
70 W. Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700
nkahlon@rshc-law.com
*Attorneys for Amicus Curiae,*
City of Chicago

EDWARD N. SISKEL
Corporation Counsel
  of the City of Chicago
BENNA RUTH SOLOMON
Deputy Corporation Counsel
30 N. LaSalle Street, Suite 800
Chicago, IL 60602
(312) 744-7764
benna.solomon@cityofchicago.org
*Attorneys for Amicus Curiae,*
City of Chicago

4852-6669-4213, v. 1

*AMICUS* BRIEF OF CITIES IN SUPPORT OF MOTION TO
ENFORCE PRELIMINARY INJUNCTION
Civil Action No. 1:17-cv-0141-JLR

24

EDWARD N. SISKEL
CORPORATION COUNSEL
OF THE CITY OF CHICAGO
30 N. LASALLE STREET, SUITE 800
CHICAGO, IL 60602
(312) 744-7764