THE HONORABLE JAMES L. ROBART

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

STATE OF WASHINGTON; STATE OF CALIFORNIA; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW YORK; and STATE OF OREGON,

Plaintiffs,

v.

DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of the Department of Homeland Security; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA,

Defendants.

CIVIL ACTION NO. 2:17-cv-00141-JLR

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.  INTRODUCTION

1.      The States of Washington, California, Maryland, Massachusetts, New York, and Oregon ("States") bring this action to protect the States—including their residents, employers, hospitals, and educational institutions—against illegal actions of the President and the federal government.

2.      On January 27, 2017, President Trump issued Executive Order 13769 ("First Executive Order"). This Court enjoined key provisions of the First Executive Order on February 3, 2017. President Trump responded on March 6, 2017, by issuing Executive Order 13780 ("the Second Executive Order").

3.      Like the First Executive Order, the Second Executive Order will cause severe and immediate harms to the States, including our residents, our colleges and universities, our healthcare providers, and our businesses. The Second Executive Order will prevent State residents—including United States citizens—from seeing their spouses, parents, or other family members, will cause our States' colleges and universities to lose talented students and highly qualified faculty and staff, will deny our States' hospitals the opportunity to compete for top medical residents and physicians, and will cost our States' businesses talented job applicants and substantial revenue. The Second Executive Order will also cause the States themselves to lose tax revenue and will undermine our sovereign interest in maintaining the separation between church and state, in upholding our non-discrimination policies, and in remaining a welcoming place for immigrants and refugees.

4.      The Court should invalidate the portions of the First Executive Order and the Second Executive Order challenged here.

## II.      JURISDICTION AND VENUE

5.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Washington is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Second Amended Complaint occurred within the Western District of Washington.

1       7.     The States bring this action to redress harms to their proprietary interests and their interests as *parens patriae*, as well as under their authority pursuant to 5 U.S.C. § 702 and 42 U.S.C. § 2000bb-1(a).

### III.    PARTIES

### PLAINTIFF STATE OF WASHINGTON

8.     The Governor is the chief executive officer of the State of Washington. The Governor is responsible for overseeing the operations of the State of Washington and ensuring that its laws are faithfully executed.

9.     The Attorney General is the chief legal adviser to the State of Washington. The Attorney General's powers and duties include acting in federal court on matters of public concern.

10.    Washington has declared that practices that discriminate against any of its inhabitants because of race, creed, color, or national origin are matters of public concern that threaten the rights and proper privileges of the State and harm the public welfare, health, and peace of the people. *See* Wash. Rev. Code 49.60.010.

11.    Washington's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, is a quasi-sovereign interest.

12.    Washington also has an interest in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

13.    Washington's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of Washington's residents, including individuals who suffer indirect injuries and members of the general public.

14.    As this Court recognized, the First Executive Order harmed Washington residents, educational institutions, and employers, and Washington itself. The Second

Executive Order will do the same. The Second Executive Order's six-country ban and refugee suspension provisions prevent our colleges and universities from welcoming talented students and staff from around the world, separate our residents from their families, thwart businesses that recruit or serve foreign nationals from the six-listed countries, interfere with religious organizations practicing their faith, and negatively impact state tax revenue.

15.     According to the most current American Community Survey data from the U.S. Census Bureau, as of 2015, approximately 7,280 non-citizen immigrants from Iran, Iraq, Syria, Somalia, Sudan, Libya, and Yemen reside in Washington—1,409 Iranian immigrants, 360 Libyan immigrants, 2,883 Somalian immigrants, 165 Sudanese immigrants, and 187 Syrian immigrants. In addition, 2,275 immigrants in Washington are from Iraq—which was included in the First Executive Order, but, for now, falls outside the Second Executive Order's six-country ban.

16.     The Second Executive Order will negatively impact Washington's economy. Immigration is an important economic driver in Washington. Many workers in Washington's technology industry are immigrants, and many of those immigrant workers are from Muslim-majority countries. Immigrant and refugee-owned businesses employ 140,000 people in Washington. Many companies in Washington are dependent on foreign workers to operate and grow their businesses.

17.     The technology industry relies heavily on the H-1B visa program, through which highly skilled workers like software engineers are permitted to work in the United States. Microsoft, a corporation headquartered in Redmond, Washington, is the State's top employer of H-1B visa-holders and employs nearly 5,000 people through the program. Other Washington-based companies, including Amazon, Expedia, and Starbucks, employ thousands of H-1B visa-holders.

18.     The market for highly skilled workers and leaders in the technology industry is extremely competitive. Changes to U.S. immigration policy that restrict the flow of people may

1    inhibit these companies' ability to adequately staff their research and development efforts and

2    recruit talent from overseas. If recruiting efforts are less successful, these companies' abilities

3    to develop and deliver successful products and services may be adversely affected.

4         19.    Microsoft's U.S. workforce is heavily dependent on immigrants and guest

5    workers. At least 76 employees at Microsoft are citizens of Iran, Iraq, Syria, Somalia, Sudan,

6    Libya, or Yemen and hold U.S. temporary work visas (and many more are lawful permanent

7    residents or green card holders who were the subjects of the First Executive Order). These

8    employees may no longer be able to renew their visas, travel overseas, or attend meetings at

9    the company's offices in Vancouver, British Columbia.

10        20.    Seattle-based company Amazon also employs workers from every corner of the

11   world. Amazon's employees, dependents of employees, and candidates for employment with

12   Amazon will be impacted by the Second Executive Order.

13        21.    Bellevue-based company Expedia operates a domestic and foreign travel

14   business. At the time of the First Executive Order, Expedia had approximately 1,000 customers

15   with existing flight reservations in or out of the United States who held passports from the

16   seven originally banned countries. The Second Executive Order will again restrict business,

17   increase business costs, and impact current employees and customers.

18        22.    Like the First Executive Order, the Second Executive Order will separate our

19   residents' families. Under the First Executive Order, at least three Washington residents from

20   the seven originally affected countries were prevented from traveling to Washington or

21   detained at air, land, and sea ports of entry across the United States. One Somali refugee, who

22   had lived in Seattle for 12 years, went to Sea-Tac airport to pick up her Somali husband who

23   was flying from Vienna, but never saw him before he was sent back on a flight to Vienna.

24   Another detainee was prevented from seeing her Iraqi brother who lives in Seattle, after 15

25   years apart. Still other Washington residents were prevented from being reunited with family

26

1   members. One Syrian family who recently resettled in Seattle was left waiting for an older

2   child arriving from a refugee camp because of the First Executive Order.

3          23.     Once implemented, the Second Executive Order will again prevent residents

4   from receiving visits from or reunifying with family members from the six-targeted countries.

5   For example, the fiancée of one WSU student lives in Iran. Though his fiancée long ago

6   applied for a green card and is scheduled for an interview in May 2017, her interview will

7   likely be cancelled under the Second Executive Order. Another long-time Washington resident,

8   an aerospace engineer, is suffering the same plight. His Iranian wife, though scheduled for an

9   interview, will likely be unable to enter due to the Second Executive Order.

10          24.     Similarly, Washington residents will be unable to receive visits from their

11   families abroad. For example, a U.S. citizen originally from Iran applied for a green card for

12   her parents on November 9, 2016. One of her parents is sick and requires 24-hour care. Under

13   the Second Executive Order, neither of her parents—nor her Iranian sister who was recently

14   accepted to seven different Ph.D. programs in the U.S.—will be allowed to enter the United

15   States for at least 90 days, if not longer. Another Iranian-American resident, a doctor

16   specializing in diagnostic radiology, recently applied for green cards for her parents, whom she

17   has not seen in three years. Although her mother arrived in the United States on March 11,

18   2017, after the First Executive Order was enjoined, her father's application is still being

19   processed. The Second Executive Order will likely preclude him from entering the United

20   States.

21          25.     Even more, Washington residents will be torn apart from their family members

22   in the United States who are on temporary visas. One Washington green card holder, for

23   example, will be separated from her Iranian sister and her two-year old daughter. The daughter

24   suffers from a rare and deadly disease called Niemann-Pick Disease Type C. Although her

25   sister and niece were able to obtain visas from Iran to enroll the niece in a clinical trial at

26   Oakland Children's Hospital in California, those visas are set to expire on March 24, 2017.

1   Since it is unclear whether they will be extended under the Second Executive Order, sister and

2   niece are required to return to Iran having not finished the clinical trial.

3       26.    The Second Executive Order will also impact physicians in Washington and our

4   health care system as a whole. The Washington State Medical Quality Assurance Commission

5   regulates 27,001 physicians whose licenses are in active status. At least 105 of these physicians

6   were born in one of the seven countries named in the First Executive Order, with seven

7   additional licenses pending approval. In addition, 45 active licensees received all or part of

8   their medical education in one of the affected countries. The Medical Commission has also

9   issued several limited licenses to residents, fellows and physicians serving as teaching-research

10  members from the affected countries.

11      27.    Washington currently has many Health Professional Shortage Areas

12  ("HPSAs"), which are areas in which there are shortages in the number of primary care, dental

13  health, or mental health physicians needed to treat patients. In many situations, a county is

14  triply designated as having shortages in primary care, dental, and mental health clinicians.

15  Washington also has a number of Medically Underserved Areas/Populations, which are areas

16  in which there are too few primary care providers, high infant mortality rates, high poverty, or

17  high elderly populations. Washington has undertaken a number of initiatives to recruit

18  physicians to treat these underserved populations and communities. Despite these initiatives,

19  however, Washington continues to have shortages in the number of physicians and dentists

20  available. These shortages are expected to increase in the coming years. Recruitment of

21  foreign-born physicians is one of the ways that Washington has attempted to address these

22  shortages. The First Executive Order significantly harmed these recruitment efforts and harmed

23  Washington's efforts to ensure that residents in rural and underserved areas receive health care.

24  The Second Executive Order will do the same. When a position goes unfilled, patients may

25  have to wait months for appointments, travel long distances to receive care, or simply do

26

SECOND AMENDED COMPLAINT                    7                    ATTORNEY GENERAL OF WASHINGTON
                                                                800 Fifth Avenue, Suite 2000
                                                                Seattle, WA 98104-3188
                                                                (206) 464-7744

without the care. The inability to hire foreign-born physicians reduces patient access to healthcare in Washington.

28.     In fact, Washington healthcare employers have already lost needed physician candidates due to uncertainty created by the First Executive Order. For example, one health center was ready to sign a contract with a family medicine physician from Libya but after the First Executive Order was issued, the physician decided that it was too risky to change employers. Another large healthcare system in Washington with multiple hospitals and clinics lost a physician candidate who decided to pursue a position in Canada given the uncertainty of the First Executive Order. The same healthcare system also has several physicians who are in process to receive their permanent resident status who are considering leaving the U.S. for opportunities in Canada. Physicians are central revenue generators for Washington hospitals and clinics. The shortage of physicians reduces the revenue of these hospitals and clinics and reduces the taxes the State is able to collect.

29.     In addition to affecting Washington residents, families, and its businesses, and health care system, the Second Executive Order will harm Washington's proprietary interests.

30.     According to data from several travel companies and research firms, there appears to have been a "chilling effect" on tourism to the United States. Since January 27, 2017, the demand for travel to the United States has taken a "nosedive." (*See* Shivani Vora, *After Travel Ban, Interest in Trips to U.S. Declines,* N.Y.Times (Feb. 20, 2017), *available at* https://www.nytimes.com/2017/02/20/travel/after-travel-ban-declining-interest-trips-to-united-states.html, attached hereto as Exhibit 1).

31.     Tourism is Washington's fourth largest economic sector. It is estimated to generate nearly $21 billion annually, and it is estimated that each international route to Sea-Tac airport generates about $89 million in economic revenue to our region. In 2015, travelers from the Middle East spent approximately $96 million in Washington. This spending generated more than $6 million in state tax revenue and more than $2 million in local tax revenue. In

2016, more than 6,000 passengers travelled between Sea-Tac airport and the six countries targeted in the Second Executive Order.

32.     The Second Executive Order will negatively impact Washington's tourism industry. After the First Executive Order, for example, one Washington tour company that operated trips to Iran for thirty years had to cancel four trips scheduled for Iran. Customers—some U.S. citizens—told the tour company's CEO that they cancelled because they were afraid to travel in light of the First Executive Order. Another tour company was similarly forced to cancel a pilgrimage to Iraq. This fear will only continue under the Second Executive Order and Washington's tourism industry will suffer.

33.     Similarly, the Second Executive Order will depress Washington's real estate businesses. For example, Redfin, a Seattle-based real estate brokerage company, is aware of at least five potential Redfin customers who decided not to purchase a home due to concerns about the future following President Trump's Executive Orders. Each time a customer ends their home-buying search before buying a home, Redfin loses potential revenue and the State loses taxable revenue.

34.     The Second Executive Order will also harm countless students and faculty at the States' public colleges and universities, as well as harm the institutions themselves.

35.     The University of Washington ("UW") and Washington State University ("WSU") are the two largest public universities in the State. At least 95 students from Iran, Syria, Somalia, Sudan, Libya, and Yemen attend the University of Washington, based in Seattle. Fourteen of these scholars are nonimmigrant visa-holders from the six countries specified in the Second Executive Order. Two of these fourteen scholars are not currently in the United States. More than 135 students from the seven original countries targeted by the First Executive Order attend Washington State University, based in Pullman. At least 188 students from the seven countries attend Washington's public community and technical

1  colleges. In addition, Washington's public universities and colleges have faculty members and

2  visiting scholars from the seven countries.

3       36.     The Second Executive Order will restrict these students, scholars, and faculty

4  members, who rely on their ability to renew their visas, from traveling abroad for research or

5  scholarship. The First Executive Order, for example, prevented one graduate student from

6  participating in critical research in Greenland, prevented visiting scholars from traveling to the

7  United States for research, and prevented faculty members and students from participating in

8  international conferences. These cancellations resulted in financial losses to the universities

9  and will continue under the Second Executive Order.

10       37.     By restricting travel, the Second Executive Order will hinder students'

11  educational experience as well as limit students' ability to fully participate in their programs of

12  study and will prevent faculty members from fulfilling university responsibilities. UW's

13  Global Health program, for example, has worked with Sudan's Ministry of Health since 2001,

14  hosting approximately 25 Sudanese professionals as scholars for as much as one academic

15  quarter. The presence of Sudanese students at UW's Global Health program strengthens the

16  educational experience of all the students, but will likely be discontinued under the Second

17  Executive Order.

18       38.     In addition, numerous graduate students from the six-targeted countries are

19  studying here on single-entry visas. The Second Executive Order will impact their ability to

20  attend academic conferences, visit their families abroad, or have their families visit them.  It

21  may cause some students or faculty to leave the universities, which damages research projects,

22  academic programs, and the educational missions of Washington's institutions of higher

23  education.

24       39.     Like the First Executive Order, the Second Executive Order will also harm the

25  universities' ability to recruit, employ, and retain, scholars from the affected countries.

26  Washington has a proprietary interest in securing the best possible employees. Washington

agencies and institutions of higher education (including UW and WSU) often recruit people, based on their specialized skills and qualifications, from the countries affected by the Second Executive Order.

40.     For example, UW started the process of sponsoring three prospective employees to work in the fields of medicine and engineering. Two of these scholars were expected to start in February 2017, but the First Executive Order prevented them from entering the U.S. UW also sponsored two interns to work with faculty in medicine and science who were scheduled to start their internships during the 90-day ban imposed by the First Executive Order. One of these interns would not have been able to enter the U.S. if the temporary restraining order had not issued. The second intern cancelled his internship because of the First Executive Order.

41.     UW incurs costs for processing each application, including visa-related fees and the costs of the human resources required to assist the international scholars. If a person whom UW has sponsored cannot enter the country or carry out their work because of the Second Executive Order, UW will lose the benefit of its investment. UW may also lose associated registration fees and program expenses. For example, UW will lose the quarterly registration fee for each of the academic quarters that the intern who cancelled was to be engaged in his internship.

42.     Likewise, Washington's educational institutions will have difficulty in retaining its faculty members. UW, for example, has one faculty member who regularly visits family members in Iran. If she can no longer do so, she may have to leave and her loss would be a very significant loss to UW.

43.     The Second Executive Order will also prevent individuals from the listed countries from enrolling in Washington's public universities or colleges. This could result in lost tuition revenue or other fees. As of March 12, 2017, UW's Graduate School has received 374 applications from prospective students from the six-targeted countries—and has already extended offers to twenty-eight of them. If these students are unable to attend UW, the quality

and number of graduate students enrolling in UW graduate programs will decrease. Further, UW will likely forgo revenue it would otherwise have obtained from these international students' revenue. Regular full-time tuition is currently $10,404 for Fall, Winter, and Spring Quarters, and $10,074 for Summer Quarter.

44.     Similarly, the UW Continuum College's International English Language Program routinely enrolls students from several of the affected countries. The students pay a program fee of $3,680 per quarter. Five students from the targeted countries had been accepted for either the Spring quarter, which will begin on March 22, 2017, or the Summer quarter, which will begin in June 2017, but none has yet received a valid visa. The students will not be able to travel to the U.S. under the Second Executive Order, and Continuum College will lose the associated program fees.

45.     A number of applicants from the countries targeted by the First and Second Executive Orders have been contacting the Graduate School at UW with concerns about the Executive Orders. Some have requested refunds of the $85 application fee. To date, the Graduate School has provided application fee refunds to two affected applicants.

46.     Likewise, the Second Executive Order will depress the number of applications universities receive from international students in the first place. Since the First Executive Order was issued, UW Continuum College has not received any applications from any of the six countries named in the Second Executive Order. WSU's Special Education program, likewise, had been receiving more and more applications from international students until this year. The program received over 60 applications last year, before the First Executive Order issued. This year, WSU's program processed only 10 applications.

47.     The Second Executive Order will harm members of Washington's diverse faith communities and non-profit religious organizations that provide services to refugees and immigrants as part of their religious beliefs and/or mission. By barring the arrival of refugees

1    to whom these individuals and organizations would have otherwise provided services, the

2    Second Executive Order will have a negative financial impact on their revenue.

3        48.    This impact will be immediate. Lutheran Community Services Northwest

4    ("Lutheran Services"), for example, was directly prevented from providing services to at least

5    eight refugees after the First Executive Order was implemented for just one week. If the

6    Second Executive Order's refugee ban is implemented, Lutheran Services will be prevented

7    from providing services to an additional 100 to 200 refugees and 15 of its 35 refugee

8    resettlement staff will be laid off. The Jewish Family Service of Seattle, which views its

9    service to refugees to be a part of Jewish religious and cultural commands to "welcome the

10    stranger," will suffer similar harms.

11        49.    Finally, the Second Executive Order renders the State unable to honor its own

12    sovereign laws, policies, and commitments. Specifically, Washington and its employers,

13    housing providers, and businesses have long been prohibited from discriminating against

14    people based on national origin and/or religion in employment, housing, and in places of public

15    accommodation. If the Second Executive Order is implemented, Washington will suffer the

16    indignity of the federal government expressing a religious and nationality preference in a way

17    that violates Washington's prerogatives.

18                    **PLAINTIFF STATE OF CALIFORNIA**

19        50.    The State of California, represented by and through its Attorney General, is a

20    sovereign State of the United States. California is home to more than 10 million immigrants,

21    welcomed almost 8,000 refugees last year, and hosts the greatest number of international

22    students—almost 150,000—of any state.

23        51.    California joins this litigation as a Plaintiff following the issuance of the Second

24    Executive Order. California suffered harm as a result of the First Executive Order and will

25    continue to suffer injuries from the Second Executive Order.

26

52.     California has an interest in protecting the well-being of its populace and in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the United States Constitution and federal law. California also has an interest, as evidenced by its Constitution and state law, in prohibiting discrimination on the basis of religion or national origin. The Constitution of the State of California provides that "[f]ree exercise and enjoyment of religion without discrimination or preferences are guaranteed," and that the "Legislature shall make no law respecting an establishment of religion." Cal. Const. art. I, § 4.  California's Constitution also prohibits any discrimination on the basis of national origin. *Id.* §§ 7-8, 31. California state law also prohibits discrimination on the basis of religion or national origin. *See, e,g.*, Cal. Gov't Code §§ 11135-11137, 12900 et seq; Cal. Civ. Code § 51, subd. (b).

53.     According to a 2015 study, 27 percent of California's population was foreign born, about twice that of the nation as a whole. Foreign-born residents represented more than 30 percent of the population in eight California counties (Santa Clara, San Mateo, Los Angeles, San Francisco, Alameda, Imperial, Orange, and Monterey). According to the 2015 American Community Survey, 213,689 California residents were born in Iran; 25,903 in Syria; 7,859 in Yemen; 5,505 in Somalia; and 1,761 in Sudan. The foreign-born population, including those individuals from the six countries affected by the Second Executive Order, contributes significantly to the State's economy and workforce.

54.     California, as the sixth largest economy in the world, houses many small businesses, large corporations, non-profit organizations, public and private hospitals, and colleges and universities that will be adversely affected by the Second Executive Order. These institutions employ and enroll individuals from the affected countries and rely on their expertise, skill, and labor. The Second Executive Order will harm California by reducing investment and industry in California and decreasing travel by students, scholars, and tourists. These outcomes will harm California's economy as a whole and will decrease state tax and

1   other revenues. The Second Executive Order is also fundamentally inconsistent with and

2   undermines California's commitment to diversity and nondiscrimination.

3       55.    California's state colleges and universities will be adversely affected by the

4   Second Executive Order. These institutions enroll many students from the affected countries

5   and the Second Executive Order substantially interferes with the continued matriculation of

6   these students to California's universities and colleges. The University of California ("UC"),

7   which has ten campuses, has numerous undergraduate students, graduate students, and medical

8   residents who are nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen. There are 436

9   students on student visas from these countries at UC's six largest campuses (Los Angeles,

10  Berkeley, San Diego, Irvine, Davis, Santa Barbara). The California State University System

11  has approximately 250 students on visas from these countries. The University of Southern

12  California ("U.S.C.") typically has 150-200 graduate students and post-doctoral scholars from

13  the six affected countries. In the 2015-2016 academic year, U.S.C. had enrolled approximately

14  157 students from these countries—153 students from Iran, three from Libya, and one from

15  Yemen. Because of the Second Executive Order, students admitted to California universities

16  and colleges who are unable to obtain a visa by March 15, 2017, will likely be unable to

17  matriculate for the 2017-2018 academic year. Some international students already have

18  withdrawn applications due to uncertainty caused by the First and Second Executive Orders.

19      56.    The Second Executive Order also disrupts the ability of California's universities

20  and colleges to meet staffing needs. As a result of the Second Executive Order, California

21  colleges and universities may be unable to hire the best faculty, lecturers, research assistants,

22  and visiting scholars from the affected countries. Without these faculty, graduate students, and

23  post-doctoral scholars, it will be far more difficult for these institutions to conduct important

24  research, instruction, and administration. Many of these individuals have specialized expertise

25  that cannot easily be replaced or duplicated. The Second Executive Order will interfere with

26

1    the ability of those who seek to study, train, research, and teach at California colleges and

2    universities, to the detriment of these communities.

3         57.    The Second Executive Order hinders the mission and purpose of California's

4    colleges and universities. As the UC President stated, the Second Executive Order's

5    restrictions on travel are an "anathema to advancing knowledge and international cooperation"

6    and infringe on "the free flow of students, faculty, scholars and researchers that are at the core

7    of the universit[ies'] education, research and public service missions." (*See* UC Statement and

8    preliminary guidance on revised executive order, UC Office of the President (Mar. 6, 2017)

9    *available at* http://nhlrc.ucla.edu/institute/article/172916, attached hereto as Exhibit 2).

10   Universities throughout the State have had to expend money and resources on providing

11   support to impacted students and faculty in their communities. The universities have also had

12   to instruct their international students, faculty, scholars, and employees to consult with

13   immigration lawyers, register with their campus office of International Affairs, and generally,

14   show caution before traveling out of the country. Further, the atmosphere of fear and

15   uncertainty created by the Second Executive Order is antithetical to the diversity of

16   perspectives and the freedom of thought and expression that are essential to (higher) education.

17        58.    The Second Executive Order will also deprive California colleges and

18   universities, and California, of significant revenue. The estimated expenditure in 2016 by

19   foreign students in California was $5,215,216,463.  The University of Southern California

20   takes in, and now faces the potential loss of, millions of dollars in tuition and costs from

21   international students.

22        59.    The Second Executive Order, like the First Executive Order, will disrupt

23   medical residency staffing. The University of California, for example, has five teaching

24   hospitals that participate in the "match" program for purposes of placing residents in various

25   university hospital programs. These medical residents perform crucial services, including, in

26   many cases, providing medical care for underserved state residents. Decisions on ranking these

1   future residents were due on February 22, and the computerized "match" is scheduled to occur

2   on March 17, one day after the Second Executive Order goes into effect. Matched residents are

3   expected to begin work on July 1. On information and belief, UC hospitals historically have

4   taken residents from the six affected countries and planned to do so this year. However, a

5   potential resident who is unable to obtain a visa by March 15, 2017, will not be able to

6   participate in UC residency programs. Particularly for smaller programs, some of which may

7   have only five residents, this will create a significant gap in staffing.

8       60.     The Second Executive Order will also harm California residents' access to

9   health care. California, like many other states, relies on doctors who are foreign nationals,

10  especially in underserved rural areas. According to one survey, of the non-U.S.-citizen doctors

11  in California's physician workforce, 191 are from the six countries affected by the Second

12  Executive Order.

13      61.     Like all other states, California is allotted 30 J-1 Visa Waiver recommendations

14  and administers this program through the State Department of Health Care Services. Because

15  of a critical need for primary care physicians in underserved communities, California gives

16  priority to those willing to serve in these communities. The Second Executive Order, by

17  limiting the pool of applicants who may be selected for its 30 slots, will impede California's

18  future ability to effectively use this program to benefit its citizens, especially those in rural and

19  other underserved areas.

20      62.     The Second Executive Order may also have a negative impact on staffing in the

21  California State Hospital System, which provides mental health services to patients in secure

22  correctional medical facilities, and could make serving this patient population more difficult.

23      63.     The Second Executive Order, like the First Executive Order, will cause

24  California to lose significant revenue from tourism. In 2015, there were approximately 286,000

25  visitors from the Middle East, which includes Iran, Syria, and Yemen, to California.

26

SECOND AMENDED COMPLAINT                17                ATTORNEY GENERAL OF WASHINGTON
                                                          800 Fifth Avenue, Suite 2000
                                                          Seattle, WA 98104-3188
                                                          (206) 464-7744

1   Collectively, visitors from the Middle East spent approximately $681,000,000 in California in

2   2015.

3       64.     The $681,000,000 spent by visitors from the Middle East is subject to state and

4   local taxes in California. As a result of this spending, it is estimated that the state sales tax, at a

5   rate of 6.0 percent, generated $40,860,000 in tax revenue for the State in 2015. In addition to

6   the state sales tax, California imposes a mandatory local tax rate of 1.25 percent, bringing the

7   total sales and use tax base to 7.25 percent. In some municipalities, additional local taxes can

8   raise the sales and use tax rate as high as 9.75 percent. At the minimum 1.25 percent local tax

9   rate, travelers from the Middle East are estimated to have generated $8,512,500 million in local

10  tax revenue in 2015. Altogether, 2015 spending by Middle East travelers is conservatively

11  estimated to have generated a total of $49,372,500 in state and local tax revenue.

12      65.     Using the estimated total of $49,372,500 in state and local tax revenue

13  generated annually by visitors from the Middle East, during a 90-day period, Middle East

14  travelers generate $12,174,041 in state and local tax revenue. Due to the Second Executive

15  Order, California will be deprived of a significant portion of this revenue. In addition, because

16  tourism supports employers in California, the Second Executive Order may cause the

17  elimination of tourism-related jobs.

18      66.     For example, on information and belief, the Los Angeles Tourism and

19  Convention Board estimated that it might see 300,000 fewer international visitors in 2017, a

20  three to four percent decrease from expectations, at least in part as a result of the Executive

21  Orders. This decrease would amount to an estimated loss of $220 million, which jeopardizes

22  the employment of the hundreds of thousands of Los Angeles residents whose jobs rely on

23  tourism. Tourism is particularly critical to the economy of Los Angeles, supporting more than

24  500,000 jobs in the city's leisure and hospitality sector. In 2016, Los Angeles attracted 47.3

25  million visitors. In 2015, Los Angeles's approximately 45.5 million visitors spent a total of

26  $20.6 billion. In 2016, the Los Angeles Tourism and Convention Board announced a marketing

1  campaign to increase tourism from the Middle East. In 2014 alone, 128,000 Middle Eastern

2  travelers visited Los Angeles, accounting for approximately $410 million in direct spending.

3       67.    The Second Executive Order also negatively impacts California's Refugee

4  Resettlement Bureau ("RRB"), which administers the state's Refugee Resettlement Program

5  ("RRP"). RRB works with county and local refugee service providers to aid the displaced in

6  achieving successful resettlement and self-sufficiency in California. The RRB is responsible

7  for managing and coordinating the delivery of benefits and services to the State's refugee

8  population in coordination with county and local refugee service providers. Among the

9  benefits administered by RRB are those for low-income refugees such as Refugee Cash

10  Assistance, California Work Opportunity and Responsibility to Kids ("CalWORKs") aid for

11  children, and Refugee Medical Assistance.

12       68.    According to data collected by the RRB, from 1995-2015, California accepted

13  179,016 refugees—37,953 from Iran, 6,916 from Somalia, 1,269 from Sudan, and 256 from

14  Syria. Between 2012 and 2015, California accepted 23,393 refugees including 5,668 from Iran,

15  225 from Syria, and 119 from Sudan. Between July 1, 2015 and June 30, 2016, California re-

16  settled 1,454 Syrian refugees, more than any other State. The Second Executive Order's

17  restrictions on travel from countries such as Syria and Iran, and the four-month suspension of

18  the United States Refugee Admissions Program ("USRAP"), means that the family members

19  of the State's large refugee population will be unable to travel to the United States to provide

20  financial and other support, placing additional strain on RRB.

21                    **PLAINTIFF STATE OF MARYLAND**

22       69.    This suit is brought on behalf of the State of Maryland ("Maryland") by its chief

23  legal advisor and representative, Brian E. Frosh, the Attorney General of Maryland. Md. Code

24  Ann., State Government § 6-106. Under the Constitution of Maryland, and as directed by the

25  Maryland General Assembly, the Attorney General has the authority to file suit to challenge

26  action by the federal government that threatens the public interest and welfare of Maryland

1   residents, including this suit, which seeks to protect Maryland residents against illegal and

2   unconstitutional federal immigration and travel restrictions. Md. Const. Art. V, § 3(a)(2); 2017

3   Md. Laws, Joint Resolution 1.

4        70.    Maryland joins this litigation as a Plaintiff following issuance of the Second

5   Executive Order. Maryland suffered harm as a result of the First Executive Order and will

6   continue to suffer injuries from the Second Executive Order.

7        71.    Maryland has a quasi-sovereign interest in protecting the welfare and safety of

8   its residents and ensuring that its residents are not excluded from the benefits that flow from

9   participation in the federal system, including the rights and privileges provided by the U.S.

10  Constitution and federal laws.

11       72.    Immigrants have always been vital to Maryland's economy and its very identity,

12  and in recent years the relative importance of immigrants' contribution has increased

13  substantially. According to the U.S. Census Bureau, the percentage of Maryland residents who

14  are foreign-born grew from 6.6% in 1990 to 9.8% in 2000, and then rose to 14.5% of the

15  population in the period 2011-15. Immigrants comprise nearly one-third of the residents in

16  Maryland's most populous county, Montgomery County.

17       73.    Maryland's foreign-born population contributes disproportionately to its

18  economy.

19       74.    According to the Census Bureau, in 2013 the 14.5% of Maryland's population

20  that was foreign-born provided 18.2% of Maryland's total workforce. In 2014 alone,

21  immigrants working in Maryland earned $33.7 billion and paid $3.1 billion in state and local

22  taxes; of these amounts, $1.5 billion in earnings and $134.8 million in state and local taxes

23  were attributable to immigrants from the Middle East and North Africa. Approximately 26% of

24  all entrepreneurs in Maryland are foreign-born. An Urban Institute study examining 2006 data

25  found that foreign-born residents accounted for 27% of Maryland's scientists, 21% of health

26  care practitioners, 19% of mathematicians and computer specialists; a quarter of construction

1  and agricultural workers; a third of all building and grounds maintenance workers; and almost

2  a quarter of food preparation and healthcare support workers.

3       75.      According to the Census Bureau's most current American Community Survey

4  data, as of 2015, approximately 2,829 non-citizen immigrants residing in Maryland are from

5  countries subject to the ban set forth in Section 2(c) of the Second Executive Order. The non-

6  citizen immigrants who are Maryland residents include 1,930 persons from Iran, 93 from

7  Libya, 152 from Somalia, 344 from Sudan, and 310 from Syria.

8       76.      The Maryland Office for Refugees and Asylees ("MORA"), a state agency

9  operating pursuant to a cooperative agreement with the U.S. Department of State, has helped

10  more than 40,000 refugees make Maryland their home. MORA works through a network of

11  public and private service providers to plan, administer, and coordinate transitional services

12  aimed at helping refugees become self-sufficient contributors to the national and local

13  economy as quickly as possible. According to MORA's records, during the five-year period

14  ending September 30, 2016, 1,121 refugees from the countries designated in Section 2(c) of

15  Second Executive Order were resettled in Maryland, including 404 refugees from Syria.

16       77.      Maryland is home to non-profit organizations that provide services to refugees

17  and immigrants in Maryland and throughout the world. The Second Executive Order directly

18  impacts the ability of those organizations to fulfill their mission. For example, the International

19  Rescue Committee, located in Baltimore, Maryland since 1990, contracts with the federal

20  government to assist with refugee resettlements. Among those persons the Committee has

21  helped with resettlement are at least 10,000 refugees in Baltimore and 4,000 in Silver Spring,

22  Maryland. The Committee's clients have included 400 Syrian refugees. The Committee

23  currently has 70 recipients of its services waiting for asylum, and it is anticipated that the

24  Executive Order will cause delays in processing applications.  Some as yet unknown portion of

25  the Committee's 70 Maryland employees may be facing unemployment as a result of the

26  Second Executive Order.

Also directly impacted by the Second Executive Order is World Relief, a Baltimore-based non-profit organization that helps resettle refugees. It announced on February 16, 2017 that it will lay off more than 140 staff as a result of the provision in the First Executive Order allowing fewer refugees to enter the United States. The Second Executive Order contains the same provision. World Relief will close five offices across the country, including one in Glen Burnie, Maryland. The organization employed 741 people in 2014, according to its latest tax filing.

78.     The Second Executive Order will also adversely impact economic investment in Maryland by foreign investors. For example, the First Executive Order already has hindered the planned construction of a data center in Hagerstown, Maryland, developed by a permanent resident from Iran, with funding to be supplied by $50 million raised from 20 Iranian citizens. Though the necessary real property has been acquired and design of the improvements has begun, the First Executive Order prompted the Iranian investors to withdraw their informal commitments.

79.     In addition to its quasi-sovereign interest, Maryland has an interest in the subject matter of this suit both as the proprietor of various facilities, institutions, and entities that will be adversely impacted by the Second Executive Order and as a taxing entity that stands to lose revenue from persons denied admission or dissuaded from travelling due to the Second Executive Order and from businesses that serve such persons. Among the most significant of these interests is the State of Maryland's proprietary interest in securing the best possible employees. Maryland agencies and institutions of higher education, including the University System of Maryland, employ a number of people from the countries subject to the ban set forth in Section 2(c) of the Second Executive Order.

80.     The Second Executive Order will have a direct and substantial impact on the State of Maryland's 14 state universities and colleges and their faculty, staff and students who are foreign-born.

81.    Maryland's flagship state university, the University of Maryland College Park ("UMCP"), currently enrolls more than 6,100 international students and employs approximately 1,500 international faculty from 137 countries. Each year, UMCP sends more than 2,000 students abroad to more than 60 countries. It currently has 273 active international agreements with more than 213 partners in 53 countries. According to the 2016 NAFSA Association of International Educators report, international students contribute $150 million annually to UMCP in payments for tuition, housing, and academic materials.

82.    The implementation of the Second Executive Order directly impairs UMCP's ability to carry out its mission of teaching, research, and support for the State's economic development. It will prevent some students and faculty from traveling for academic activities and will impede some students' academic progress and the progress of scholarly research. It will also prevent students from seeing family members, including visits for graduation and other significant events. It is already causing anxiety, depression, and alienation among international members of the campus community.

83.    UMCP students from the designated six countries whose visas have expired or will soon expire will not be eligible to apply for new visas until the 90-day ban has elapsed, thus delaying any travel abroad for academic or personal reasons. The Second Executive Order likely will delay the return to UMCP of a student who has already applied for renewal of his expired student visa. That process typically requires a 90-day waiting period. If this student's visa is not issued prior to the effective date of the Second Executive Order, the 90-day ban will increase his wait time to return to the United States to 180 days, thus impeding his academic progress and the University research in which he is engaged.

84.    The Second Executive Order also poses a significant chilling effect on other out-of-country faculty and students who fear traveling abroad due to the possibility that they will be denied reentry. Even UMCP students with valid visas have expressed hesitancy to travel abroad for fear that they will be subjected to heightened scrutiny upon their return to the

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

United States, or that there may be additional executive orders forthcoming that will affect their immigration status.

85.    Due to the anxiety generated by the Second Executive Order, UMCP has mobilized a team of professionals to provide special counseling services and has engaged legal counsel specializing in immigration.

86.    The Second Executive Order also threatens enrollment at UMCP.  Nearly 400 individuals from the six countries subject to the Second Executive Order's ban have submitted applications for Fall 2017 admission. More than 90% are from Iran. If just half of these students are admitted and accepted but choose not to attend UMCP because of the Second Executive Order's chilling effect, UMCP will incur a revenue loss of approximately $1.6 million for academic year 2017-18.

87.    The Second Executive Order also will adversely impact other publicly funded institutions of higher education and the people they serve. For example, Baltimore City Community College ("BCCC"), a State-sponsored community college, maintains a Refugee Youth Project that currently serves 92 students from the six countries affected by the Second Executive Order. Of those students, 54 are from Syria, 36 are from Sudan and two are from Somalia. A relative of a member of the BCCC community, a woman from Syria, was separated from her husband during their transition, and he remains stranded in Jordan. She filed an application with the United States Citizenship and Immigration Service ("USCIS") for him to be reunited with her in the U.S. but because he is a Syrian national, it is unclear if the couple's application will be processed at this time.

88.    Students at private universities in Maryland also are impacted by the Second Executive Order. As one example, the Johns Hopkins University is a private, not-for-profit institution of higher education located primarily in Baltimore, Maryland.  Johns Hopkins has over 5,000 international students from more than 125 different countries, and over 1,350 international scholars from more than 85 different countries. Johns Hopkins has more than 70

1   students and scholars from the six countries that are the subject of the Second Executive

2   Order.

3                      **COMMONWEALTH OF MASSACHUSSETTS**

4        89.     The Commonwealth of Massachusetts, represented by and through its Attorney

5   General, is a sovereign State of the United States.

6        90.     Massachusetts joins this litigation as a Plaintiff following issuance of the

7   Second Executive Order. Massachusetts suffered harm as a result of the First Executive Order

8   and will continue to suffer injuries from the Second Executive Order.

9        91.     Massachusetts is home to more than one million immigrants, hosts tens of

10   thousands of international students, and welcomes approximately two thousand refugees each

11   year. According to the 2015 American Community Survey: 5,371 Massachusetts residents

12   were born in Iran; 2,202 in Syria; 743 in Sudan; 33 in Yemen; and 2,353 in Somalia.  In 2015

13   alone, the Commonwealth accepted hundreds of new refugees and asylees from the affected

14   countries.  It is the policy of Massachusetts "to promote the full participation of refugees and

15   immigrants as self-sufficient individuals and families in the economic, social, and civic life of

16   the commonwealth."  Mass. Gen. Laws ch. 6, § 205.

17        92.     Massachusetts has a significant interest in treating its residents equally, as

18   required by its constitution and laws, and in ensuring that its residents are not excluded from

19   the benefits that flow from participation in the federal system, including the rights and

20   privileges secured by the U.S. Constitution and federal law.  Massachusetts also has a

21   sovereign interest in protecting the health, safety, and well-being of all its residents, including

22   against the special harms caused by discrimination based on race, religion, and national origin.

23        93.     Massachusetts is also home to hundreds, if not thousands, of small businesses,

24   large corporations, non-profit organizations, public and private hospitals, and colleges and

25   universities that will be affected by the Executive Orders. These institutions employ and enroll

26   individuals from the affected countries and rely on their expertise, skill, labor, and other

contributions to the State's civic society and economy. These institutions also engage in a constant exchange of information, personnel, and ideas with international partners and collaborators. Such exchanges with institutions, organizations, businesses, and persons in the six affected countries will be hampered or precluded altogether by the Executive Order.

94.     The Second Executive Order will thus affect these organizations' operations and productivity, in turn adversely affecting Massachusetts' overall competitiveness, including vis-à-vis international competitors who will become more attractive locations for investment, conferences, meetings, and other engines of economic growth. In turn, these harms will reduce Massachusetts' tax and other revenues.

95.     The Second Executive Order will also harm Massachusetts by decreasing travel to the State by students, scholars, tourists, and business travelers. Every person who forgoes a trip to Massachusetts means hotel bookings cancelled, meals not purchased, retail purchases not made, and related taxes not collected. These outcomes will harm Massachusetts' economy as a whole and will immediately decrease state tax and other revenues.

96.     In higher education and the health care industry in particular, Massachusetts depends upon the unique specialized knowledge and experience of foreign nationals, including from the affected countries, such as doctors, scholars, teachers, and other contributors to these institutions.

97.     Massachusetts supports an extensive system of twenty-nine public colleges and universities, including the University of Massachusetts ("UMass"). One in ten households in Massachusetts has a direct connection to UMass, given its 360,000 students, alumni, or employees residing in the state. UMass graduates 17,000 students per year, with 30 percent in Science, technology, engineering and mathematics ("STEM") fields, and spends $632 million annually on research.

98.     UMass currently has approximately 130 employees from the six affected countries who are neither lawful permanent residents nor U.S. citizens, including professors,

1    researchers, and postdoctoral fellows across a wide variety of academic departments. To the

2    extent these employees hold expired or single-entry visas, they now face unprecedented delays

3    in the renewal of their visas, precluding them from international travel—whether for personal

4    reasons or to fulfill professional obligations—during the implementation of the entry ban.

5        99.    The Second Executive Order's 90-day entry ban also coincides with the peak

6    period of the hiring season, during which UMass is interviewing top candidates and extending

7    offers to faculty for the 2017-2018 year. Because of the Second Executive Order, UMass may

8    be unable to hire top-ranked potential faculty, lecturers, or visiting scholars from the affected

9    countries, because the Second Executive Order may preclude them from reaching the United

10   States to fulfill their teaching obligations.

11       100.   UMass has approximately 155 graduate and undergraduate students who are

12   nationals of the affected countries and who are neither legal permanent residents nor U.S.

13   citizens. Approximately 100 of these students are among the University's 130 visa-holding

14   employees, including, for example, graduate teaching and research assistants. The Second

15   Executive Order jeopardizes the continued enrollment of these current students, who may face

16   unprecedented delays in the renewal of visas due to the implementation of the Second

17   Executive Order. These students may also be effectively precluded from traveling outside the

18   United States, because the entry ban threatens their ability to return.

19       101.   UMass also regularly receives applications from prospective students who are

20   nationals of the affected countries. Indeed, although the admissions process is on-going,

21   UMass has already extended at least 40 offers of admission for the 2017-2018 academic year

22   to prospective undergraduate and graduate students who are nationals of these countries.

23   Admitted students in the affected countries who are unable to obtain a visa on or before March

24   15, 2017, will likely be unable to matriculate at UMass, or at any other college or university in

25   the United States, for the 2017-2018 academic year.

26                          **PLAINTIFF STATE OF NEW YORK**

SECOND AMENDED COMPLAINT                27                ATTORNEY GENERAL OF WASHINGTON
                                                                    800 Fifth Avenue, Suite 2000
                                                                       Seattle, WA 98104-3188
                                                                          (206) 464-7744

102. The State of New York, represented by and through its Attorney General, is a sovereign state of the United States.

103. According to the most recent American Community Survey, New York has more than 4.4 million foreign-born residents, more than 13,000 of whom were born in one of the six countries named in the Second Executive Order. Approximately two percent of New Yorkers (just under 400,000) identify as Muslim.

104. New York joins this litigation as a Plaintiff following issuance of the Second Executive Order. New York suffered harm as a result of the First Executive Order and will continue to suffer injuries from the Second Executive Order.

105. The Second Executive Order hampers the ability of colleges and universities in New York State—including the City University of New York ("CUNY"), State University of New York ("SUNY"), and Rochester Institute of Technology ("RIT")—to recruit, accept, and retain top international students and scholars from anywhere in the world, and to promote the exchange of ideas across international boundaries. CUNY currently enrolls more than 8,000 international students from over 100 countries, including more than 850 students born in the affected countries. SUNY enrolls more than 22,000 international students from 160 different countries, including approximately 232 students from the six designated countries. As a result of the Second Executive Order, many scholars and students from Muslim-majority countries now have reservations about relocating to the United States. CUNY's Graduate School, for example, expects the yield on its outstanding offers to applicants to decline as a result of the uncertainty that just-admitted students from the affected countries face over their ability to travel to the United States.

106. The Second Executive Order also interferes with the ability of New York-based scholars and students to travel for research and to participate in international programs. CUNY students from Muslim-majority countries are afraid to travel abroad, including for study-abroad programs, because they fear being unable to return to the United States. CUNY's Spitzer

School of Architecture at City College already has suspended a partnership with institutions in Mexico City because the School cannot risk sending its students outside the United States when some may not be able to return. The uncertainty created by the Second Executive Order means that study-abroad programs dependent on minimum levels of enrollment will find it more difficult to meet critical targets, which will cause program cancellations and deny irreplaceable educational experiences to New York-based students.

107.    The international students and faculty who are directly affected by the Second Executive Order substantially contribute to New York State's economy. Based on information from Open Doors and the U.S. Department of Commerce, the Institute of International Education estimates that in 2015, international students from the six designated countries who were enrolled in New York State institutions contributed $28.8 million to New York State's economy, which includes direct payments for tuition and fees and living expenses, and excludes indirect economic benefits such as contributions of international students and scholars to innovation in academic and medical research.

108.    The Second Executive Order also harms health care institutions in the State, which rely on foreign nationals—including those from the six designated countries—to provide health care to New Yorkers, and to train and teach the next generation of medical professionals in New York. According to the Immigrant Doctors Project, about 550 doctors who trained in the six designated countries provide 1.1 million medical appointments each year in New York State. The Greater New York Hospital Association ("GNYHA") reports that 80 member hospitals in the State employ 72 physician trainees and 38 other health care workers who have nonimmigrant visas from the six designated countries.

109.    The uncertainty created by the Second Executive Order—and its January 27, 2017, predecessor—is already having a negative effect on New York hospitals participating in this year's National Residency Matching Program ("the Match"). Some hospitals are reluctant to highly rank some of their best candidates, who are from foreign countries (including the six

designated countries), because it will be very difficult to fill a vacant residency position after the Match. Hospitals that take the risk of highly ranking foreign nationals from the affected countries may successfully match with foreign nationals who will not be allowed to begin training and serving patients in New York on July 1, 2017. If the matching foreign nationals cannot obtain visas, the hospitals will be forced to identify other, potentially less-qualified, candidates from the remaining applicants who have not been matched.

110.    New York's "safety-net" hospitals—i.e., those in one of 97 medically underserved communities in New York with high-need populations—rely particularly heavily on foreign national resident physicians. For example, of the 91 resident physicians in the Department of Internal Medicine at Interfaith Medical Center, a safety-net hospital in Brooklyn, 43 are on H-1B visas, 12 are on J-l visas, and 20 are legal permanent residents. Interfaith's medical staff includes four Sudanese residents who are concerned about leaving the country for fear of not being allowed to return, and whose family members may not be able to visit them here because of the Second Executive Order.

111.    The Committee of Interns and Residents ("CIR") reports that CIR members who are foreign nationals of non-designated nations with large Muslim populations have inundated CIR's counsel with calls, expressing concern that the Executive Orders will be expanded to include their countries of origin. As CIR's experience shows, the Second Executive Order has made foreign nationals fearful about coming to New York to train and work. This has significant public health implications for New York as even the shortage of one physician can have a significant impact on safety-net hospitals and the patients they treat.

112.    The Second Executive Order also endangers critical research being conducted by New York-based foreign nationals from the designated countries, including research into techniques to diagnose kidney cancer at early stages, drug candidates for diabetes, and treatments for leukemia. The ban is forcing these New York-based scientists to choose between continuing their life-saving research and being able to see their family members who are still in

the designated countries. A postdoctoral research fellow studying leukemia also is fearful that she will not be able to renew her visa when it expires next year. And a scientist working on diabetes drugs cannot leave the United States on her single-entry F1 student visa because she would risk being unable to return to her research and her fiancé if she left.

113.    The Second Executive Order also hurts New York State's tourism industry, which is the fourth largest employer in the State. In 2015, the tourism industry sustained 764,072 jobs, provided workers with a total income of $33.1 billion, and generated $8 billion in state and local taxes—saving each household an average of $1,100 in taxes; overseas travelers accounted for 30 percent ($19 billion) of the tourism spending supporting those economic benefits. In New York City alone, the tourism industry supported more than 362,000 waged and salaried employees in 2015.

114.    The Second Executive Order already is chilling foreign nationals from visiting New York State, and could cost the State and its residents hundreds of millions of dollars in lost revenue. For the first time in seven years, New York City officials are expecting a drop in the number of foreign visitors. New York City now expects to draw 300,000 fewer foreigners this year than in 2016, a decline that will cost New York City businesses at least $600 million in sales. Smaller cities such as Ithaca also anticipate a decline in tourism revenues as would-be foreign tourists have contacted the Chamber of Commerce to inform the Chamber that President Trump's Executive Orders have caused them to cancel plans to attend and visit Ithaca-regional events and attractions.

115.    The Second Executive Order harms New York companies by—among other things—interfering with business travel and undermining the ability of New York companies to recruit top talent from countries with significant Muslim populations, putting those companies at a disadvantage in the competitive international hiring market. For example, Kickstarter—the world's largest funding platform for creative projects—is concerned that the Second Executive Order will impede travel to Kickstarter-hosted events for creators around the

world, including the approximately 50 current creators who live in a Muslim-majority country. Meetup, one of the largest networks of local community groups in the world, has among its employees 12 visa-holders who are now worried about their future status in this country. MongoDB, a database software company, employs 700 individuals in 27 offices across 13 countries; the Second Executive Order hinders MongoDB's efforts to serve customers and users around the world and to recruit internationally. The non-citizen employees of Casper Sleep Inc., an e-commerce seller of mattresses and other sleep-related products, worry about what is coming next, making it difficult for them to focus on their work.

116.    Etsy, a global creative commerce platform, currently employs more than 175 employees outside the United States, some of whom may be prevented from traveling to and from Etsy's U.S.-based offices as a result of the Second Executive Order. Moreover, the Second Executive Order has caused Etsy employees of the Muslim faith to feel ostracized. The same issue has surfaced at ATM World Corp., which operates 4,500 Automated Teller Machines ("ATMs"), and services approximately 2,000 Yemeni-owned businesses across the five boroughs of New York City. Many of the company's employees are uncomfortable traveling throughout the city to service customers because the anti-immigrant and anti-Muslim rhetoric surrounding the Second Executive Order and its predecessor makes them fearful about being targeted based on their background and religion.

117.    The Second Executive Order separates New York residents from their family members in the designated countries. Rabyaah Althaibani, a Yemeni-American community organizer with U.S. citizenship, knows many New York City residents who now face uncertainty as to their ability to travel outside the United States and to be re-united with family members abroad. Ms. Althaibani's own husband, a Yemeni national and journalist, is currently stranded in Kuala Lumpur, Malaysia. Another Yemeni-American U.S. citizen and New York resident, Abdo Elfgeeh, fears that he will not be reunited with his wife and four children, who are in Sana'a, Yemen. Both Ms. Althaibani and Mr. Elfgeeh have filed an I-130 Petition for

Alien Relative on behalf of their family members, and have already had interviews with USCIS; Ms. Athaibani was even told her husband's petition was approved. But the Executive Order's 90-day ban on Yemeni nationals entering the United States has put their applications in limbo.

118.   The Second Executive Order's suspension of the USRAP directly harms refugees residing in New York. As of the Second Executive Order's issuance, the United States had already vetted 60,000 individuals for resettlement in the country. These refugees are now stranded in crisis zones, even though they have established to the satisfaction of consular officers that their lives are in danger and they pose no threat to the United States.

119.   In 2016, New York received 5,830 refugees, of whom 44 were refugees from Iran, one was a refugee from Libya, 989 were refugees from Somalia, 141 were refugees from Sudan, seven were refugees from Yemen, and 803 were refugees from Syria. Some refugee families have been separated because their members obtained refugee status at different times.

120.   In addition, the suspension of the USRAP interferes with the ability of refugee resettlement organizations in New York State to fulfill their mission. Such agencies include the International Rescue Committee ("IRC") in New York; the Rochester-based Catholic Family Center; Catholic Charities Tompkins/Tioga Immigrant Services Program; and the International Institute of Buffalo. For example, the IRC in New York has 25 cases (56 people) in its pipeline waiting for resettlement in New York, from countries such as Iraq, Afghanistan, Syria, El Salvador and Cuba. However, as a result of the Second Executive Order's limits on USRAP, these people may not be resettled. Similarly, arrangements for the arrival in Ithaca of at least three refugee families were impeded by the First Executive Order, and the Second Executive Order has further delayed the arrival of these families by at least four months.

121.   The Second Executive Order's reduction in the number of refugee arrivals this fiscal year (ending September 30, 2017) from 110,000 to 50,000 translates into funding cuts and staff layoffs for refugee resettlement organizations. This will, in turn, jeopardize the

capacity of these organizations to provide essential services—such as English-language instruction and job skills training—to refugees who are already in the State. A decrease in the number of arriving refugees also may negatively affect employers, such as in Rochester where Kraft, Wegmans Food Markets, and the University of Rochester have a practice of hiring refugees. The reduction also will hurt local economies as landlords will rent out fewer apartments and retailers will make fewer sales.

122.    Finally, the Second Executive Order causes fear and uncertainty for refugees about their legal status, rights, and future in the United States, and thus reintroduces the type of persecutory and government-instilled fear that caused these refugees to flee their countries of origin in the first place.

## PLAINTIFF STATE OF OREGON

123.    The State of Oregon joins this action to protect its residents, its employers, its agencies, its educational institutions, and its state constitution and laws against both the First and Second Executive Orders, which harm the State, its economy, its institutions, its families, its laws, and its sovereign interest in serving as a welcoming home to people from all over the world. The Governor is the State's chief executive officer and is responsible for overseeing the State's operations and ensuring that its laws are faithfully executed. The Attorney General is the State's chief legal adviser whose powers and duties include acting in federal court on matters of public concern.

124.    According to the American Community Survey data from the U.S. Census Bureau, as of 2015, thousands of Oregon residents were born in Iran, Libya, Somalia, Sudan, Syria, and Yemen. Oregon's companies employ immigrants, refugees, and others who would be affected by the ban in more indirect ways (spouses of immigrants, for example). Threats to Oregon's companies will result in serious risks to Oregon's financial investments, its credit rating, its companies, and its tax revenue from those companies and their employees.

125.   Portland International Airport, located in Portland, Oregon, served over 670,000 international travelers in 2016. It has been estimated that international travelers from just one major airline contribute over $172 million in business revenue to Oregon. The Second Executive Order will cause significant economic injury to Oregon by interfering with international travel and deterring international travelers from coming to Oregon.

126.   Since 2010, more than 8,500 refugees have arrived in Oregon; two of the six most common refugee groups come from Iran and Somalia. After a refugee is granted legal status and permission to enter the U.S., state agencies and community organizations handle the "resettlement and acculturation process." The Federal Office of Refugee Resettlement provides up to eight months of cash and medical assistance. Those federal funds are administered through the Oregon Department of Human Services.

127.   A number of organizations—including Ecumenical Ministries of Oregon, Catholic Charities of Oregon, and the Immigrant and Refugee Community Organization— assist hundreds of refugees with resettlement in Oregon every year.  If refugees are no longer permitted to enter the United States for 120 days or longer, these organizations may lose federal funding and may have to lay off some or all of their staff. For example, even if the ban lasts just 120 days, Catholic Charities stands to lose between $200,000 and $350,000 in funding and is already considering reducing its workforce by almost half. The State of Oregon will accordingly lose the income taxes that were paid as a result of those jobs existing in Oregon.

128.   The University of Oregon ("UO") is a public research university with more than 3,000 students from countries other than the United States, including the countries affected by the First and Second Executive Orders. International students typically pay substantially more than in-state students; those students pay more than $100 million in tuition each year, in total. This tuition allows UO to subsidize Oregon students, who pay about three times less than international students. Even students from outside the immediately affected countries have

1  expressed a loss of enthusiasm for the prospect of studying in the United States. UO's

2  Admissions Department has already seen a 15 percent decrease in applications from

3  international students. UO is also facing the likely loss of participants in two international

4  conferences already scheduled for UO campuses, because attendees and international schools

5  are hesitant to schedule travel to the United States.

6       129.    Portland State University (PSU) is a public research university with nearly

7  2,000 students from countries other than the United States, including the countries affected by

8  the First and Second Executive Orders. Approximately $33 million of PSU's tuition and fee

9  revenue in academic year 2015-16 was derived from international students. The First

10 Executive Order already had an adverse impact on, among others, a visiting researcher who

11 traveled to Finland over the winter break and was prevented from returning and continuing his

12 research, and a recent graduate who was unable to return to PSU to present his research at PSU

13 with his graduate advisor. The presentation will likely occur outside the country now, which

14 requires PSU to bear the cost of having the research presented in another country.

15      130.    Oregon State University (OSU) has 3,529 international students enrolled,

16 comprising more than 11 percent of its student body and including students who are citizens of

17 the countries affected by the First and Second Executive Orders. As with other students from

18 outside Oregon, those students typically pay full non-resident rates; OSU's international

19 students represent approximately $85 million in annual gross tuition revenue to OSU. OSU's

20 efforts to address the effects of the First Executive Order and, now, the Second Executive

21 Order on its students and faculty are draining away time and resources that otherwise would be

22 spent on other community needs.

23      131.    Other public and private schools face similar harms. For example, Lewis &

24 Clark College, a private institution in Portland, has more than 200 international students.  Like

25 the First Executive Order, the Second Executive Order will harm the college's ability to attract

26 and retain students from the countries subject to the immigration ban, and are likely to have a

chilling effect on Lewis & Clark's ability to recruit international students, causing both fiscal harm (loss of tuition) and harm to the college's ability to foster a diverse and global student body.

132.    Oregon Health & Sciences University ("OHSU"), a public academic medical center, had at least 15 individuals at its campus from the seven countries affected by the First Executive Order: six students, two post-doctoral fellows, one professor, and six medical residents. Many of these individuals remain affected by the Second Executive Order. The school is expecting two more post-doctoral fellows from Iran. The medical residents are performing critically needed medical care in the fields of surgery, pathology, and cardiology; if they left the country due to the effects of the First or Second Executive Orders, OHSU likely would not be able to replace them.

133.    The Second Executive Order will also harm Oregon's ability to recruit doctors, particular in rural and underserved areas. Oregon depends on international medical graduates who have been given a J-1 visa to complete a medical residency or fellowship in the United States. A stipulation of the J-1 visa is that, upon completion of training, the physicians must return to their home country for two years, but this requirement may be "waived" for a physician willing to work in a shortage area. Since 2002, approximately 320 J-1 visa physicians have practiced in Oregon, including 15 physicians from the countries affected by the First Executive Order. As required by the visa, these physicians serve regions such as rural areas of southern and eastern Oregon that have difficulty recruiting physicians domestically, particularly physicians who are willing to accept the Oregon Health Plan or Medicare payment. Currently, a physician from Iran is practicing in underserved areas. Without J-1 visa physicians, Oregon patients will have to either delay treatment or travel farther to obtain it, resulting in additional Oregon Health Plan and Medicare costs to the State.

134.    There is a great deal of competition to obtain physicians willing to work on the J-1 program. In the past, Oregon has been unable to fill all of its 30 available slots, and the

Second Executive Order will make this even more difficult. Already, one physician from a country affected by the First Executive Order who had been willing to work in Florence, Oregon, an area affected by a physician shortage, has indicated through his counsel that because of the First Executive Order, he was unlikely to obtain a visa. Oregon has not received any information that this situation has changed.

135.    The uncertainty created by the First and Second Executive Orders are causing additional workload, costs, and delay for the Oregon Health Authority in ensuring successful placement and employment of J-1 visa physicians. Even with a waiver of the requirement to return home, a J-1 visa physician must obtain an H-1B visa to remain in the United States. USCIS recently announced that it would end "premium processing" of these H-1B requests, so it will now take four to eight months—rather than just a couple of weeks—to process such a request. The Oregon Health Authority is proactively reaching out to employers and prospective employers to update them about the new difficulties in recruiting J-1 waiver physicians.

**DEFENDANTS**

136.    Defendant Donald Trump is the President of the United States, and issued the First and Second Executive Orders. He is sued in his official capacity.

137.    Defendant U.S. Department of Homeland Security ("DHS") is a federal cabinet agency responsible for implementing and enforcing the Immigration and Nationality Act ("INA"). DHS is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 552(f). The U.S. Customs and Border Protection is an Operational and Support Component agency within DHS. The U.S. Customs and Border Protection is responsible for detaining and/or removing non-citizens arriving at air, land, and sea ports across the United States.

138.    Defendant John F. Kelly is the Secretary of the Department of Homeland Security. He is responsible for implementing and enforcing the INA, and oversees the U.S. Customs and Border Protection. He is sued in his official capacity.

139.    Defendant Rex Tillerson is the Secretary of State. The Secretary of State has authority to determine and implement certain visa procedures for non-citizens. He is sued in his official capacity.

140.    Defendant the United States of America includes all government agencies and departments responsible for the implementation of the INA and responsible for the admission, detention, removal of non-citizens who are traveling to or returning to the States via air, land, and sea ports across the United States.

## IV.    ALLEGATIONS

**President Trump's Campaign Promise: "[A] Total and Complete Shutdown of Muslims entering the United States"**

141.    Prior to his election, Donald Trump campaigned on the promise that he would ban Muslims from entering the United States. On July 11, 2015, candidate Trump stated in a speech in Las Vegas that, "If you're from Syria and you're a Christian, you cannot come into this country, and they're the ones that are being decimated. If you are Islamic … it's hard to believe, you can come so easily." (*See* Louis Jacobson, *Donald Trump says if you're from Syria and a Christian, you can't come to the U.S. as a refugee*, Politifact (July 20, 2015) *available at* http://www.politifact.com/truth-o-meter/statements/2015/jul/20/donald-trump/donald-trump-says-if-youre-syria-and-christianyou-/ , attached hereto as Exhibit 3).

142.    On December 7, 2015, candidate Trump issued a press release calling for "a total and complete shutdown of Muslims entering the United States."  As of the date of this filing, the press release remains available on Trump's campaign website. (*See* Donald J. Trump Campaign, *Donald J. Trump Statement on Preventing Muslim Immigration* (Dec. 7, 2015) *available at* www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration , attached hereto as Exhibit 4).

143.    In defending his decision shortly thereafter, candidate Trump compared the Muslim ban to former President Franklin Roosevelt's decision to intern Japanese Americans

1   during World War II, and stated, "This is a president highly respected by all, [Roosevelt] did

2   the same thing." (*See* Jenna Johnson, *Donald Trump says he is not bothered by comparisons to*

3   *Hitler*, The Washington Post (Dec. 8, 2015) *available at* https://www.washingtonpost.com/new

4   s/post-politics/wp/2015/12/08/donald-trump-says-he-is-not-bothered-by-comparisons-to-

5   hitler/?utm_term=.8182339a69c3 , attached hereto as Exhibit 5).

6        144.    When a news reporter further asked candidate Trump what the customs process

7   would look like for a Muslim non-citizen attempting to enter the United States, candidate

8   Trump stated, "[T]hey would say, 'are you Muslim?'" And, if they said they were Muslim,

9   candidate Trump confirmed they would not be allowed into the country. (*See* Nick Gass,

10   *Trump not bothered by comparisons to Hitler*, Politico (Dec. 8, 2015) *available at*

11   http://www.politico.com/trump-muslims-shutdown-hitler-comparison , attached hereto as

12   Exhibit 6).

13        145.    When asked during the Republican primary debate on January 14, 2016,

14   whether he wanted to rethink his position regarding Muslims entering the country, candidate

15   Trump said, "No." (*See* The American Presidency Project, *Presidential Candidates Debates:*

16   *Republican Debate in North Charleston, South Carolina* at 16 (Jan. 14, 2016) *available at*

17   http://www.presidency.ucsb.edu/ws/index.php?pid=111395 , attached hereto as Exhibit 7).

18        146.    In February 2016, candidate Trump asked Lieutenant General Michael Flynn to

19   advise him on a range of issues, including national security and foreign policy. That same

20   month, Lt. Gen. Flynn posted the following message ("tweet") on his Twitter account: "Fear of

21   Muslims is RATIONAL: please forward this to others: the truth fears no questions…" and

22   linked to a YouTube video that argues Islamophobia is an oxymoron. Lt. Gen. Flynn would

23   later become Trump's National Security Advisor. The February 2016 tweet is available at the

24   following link: https://mobile.twitter.com/genflynn/status/703387702998278144?lang=en,

25   attached hereto as Exhibit 8).

26

147.    On March 9, 2016, candidate Trump stated during an interview with Anderson Cooper that he "think[s] Islam hates us." *See Anderson Cooper 360 Degrees: Exclusive Interview with Donald Trump* at 17 (CNN television broadcast, Mar. 9, 2016) *available at* http://www.cnn.com/TRANSCRIPTS/1603/09/acd.01.html , attached hereto as Exhibit 9).

148.    On June 13, 2016, candidate Trump reiterated his promise to ban all Muslims entering this country until we "as a nation . . . are in a position to properly and perfectly screen those people coming into our country." (*See Read Donald Trump's Speech on the Orlando Shooting*, Time, at 2 (Jun 13, 2016) *available at* http://time.com/4367120/orlando-shooting-donald-trump-transcript/, attached hereto as Exhibit 10).

149.    On July 17, 2016, candidate Trump and Vice Presidential candidate Mike Pence appeared on *60 Minutes* and were interviewed by Lesley Stahl. After Ms. Stahl referenced Mike Pence's December 2015 tweet stating a Muslim ban would be offensive and unconstitutional, candidate Trump stated: "So you call it territories. OK? We're gonna do territories. We're not gonna let people come in from Syria that nobody knows who they are." When Ms. Stahl asked candidate Trump if he was changing his position on the Muslim ban, candidate Trump stated, "—No, I—call it whatever you want. We'll call it territories, OK?" When Ms. Stahl further asked whether he no longer included Muslims, candidate Trump stated, "You know—the Constitution, there's nothing like it. But it doesn't necessarily give us the right to commit suicide, as a country, OK? And I'll tell you this. Call it whatever you want, change territories [sic], but there are territories and terror states and terror nations that we're not gonna allow the people to come into our country." (*See 60 Minutes,* CBS News at 10 (July 17, 2016) *available at* http://www.cbsnews.com/news/60-minutes-trump-pence-republican-ticket/, attached hereto as Exhibit 11).

150.    Asked again during a July 24, 2016, interview about whether he was "backing off on his Muslim ban[]," candidate Trump stated, "I actually don't think it's a pull-back. In fact, you could say it's an expansion." He further stated, "I'm looking now at territories.

41

1  People were so upset when I used the word Muslim. Oh you can't use the word Muslim.

2  Remember this. And I'm okay with that, because I'm talking territory instead of Muslim." (*See*

3  *Meet the Press – July 24, 2016*, NBC News at 1 (July 24, 2016) *available at*

4  http://www.nbcnews.com/meet-the-press/meet-press-july-24-2016-n615706 , attached hereto

5  as Exhibit 12).

6      151.   In a foreign policy speech delivered on August 15, 2016, candidate Trump

7  noted that the United States could not "adequate[ly] screen[]" immigrants because it admits

8  "about 100,000 permanent immigrants from the Middle East every year." Candidate Trump

9  proposed creating an ideological screening test for immigration applicants, which would

10  "screen out any who have hostile attitudes towards our country or its principles – or who

11  believe that Sharia law should supplant American law." During the speech, he referred to his

12  proposal as "extreme, extreme vetting." (*See Donald Trump Foreign Policy Speech in*

13  *Youngstown*, C-SPAN (Aug. 15, 2016) *available at* https://www.c-span.org/video/?413977-

14  1/donald-trump-delivers-foreign-policy-address ) (quoted remarks at 50:46).

15      152.   On October 9, 2016, candidate Trump was asked during the St. Louis

16  presidential debate to explain whether or not his proposed Muslim ban still applied. Candidate

17  Trump replied: "It's called extreme vetting." (*See* The American Presidency Project,

18  *Presidential Debates: Presidential Debate at Washington University in St. Louis, Missouri* at 9

19  (October 9, 2016) *available at* http://www.presidency.ucsb.edu/ws/index.php?pid=119038 ,

20  attached hereto as Exhibit 13).

21      153.   On December 21, 2016, President-Elect Trump was asked whether he had

22  decided to "rethink or re-evaluate [his] plans to create a Muslim registry or ban Muslim

23  immigration to the United States." President-Elect Trump responded by stating, "You know

24  my plans. All along, I've been proven to be right." (*See President-Elect Trump Remarks in*

25  *Palm Beach, Florida*, C-SPAN (Dec. 21, 2016) *available at* https://www.c-

26

1   span.org/video/?420583-101/presidentelect-trump-speaks-reporters-palm-beach-florida ,

2   attached hereto as Exhibit 14).

**President Trump Issues the First Executive Order**

3

4   154.   On January 20, 2017, Donald Trump was inaugurated as the President of the

5   United States. In his first television interview as President, on January 25, 2017, he again

6   referred to his commitment to "extreme vetting." (*See ABC News Anchor David Muir*

7   *Interviews President Trump*, ABC News at 13 (Jan. 25, 2017) *available at*

8   http://abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-interviews-

9   president/story?id=45047602 , attached hereto as Exhibit 15).

10   155.   On January 27, 2017, one week after being sworn in, President Trump signed

11   Executive Order 13769 entitled, "Protecting the Nation from Foreign Terrorist Entry into the

12   United States" ("First Executive Order"). The First Executive Order directed a series of

13   changes to the manner in which non-citizens may seek and obtain entry to the United States.

14   156.   Section 3(c) of the First Executive Order proclaimed that entry of immigrants

15   and nonimmigrants from countries referred to in section 217(a)(12) of the Immigration and

16   Nationality Act, 8 U.S.C. § 1187(a)(12), i.e., Iran, Iraq, Libya, Somalia, Sudan, Syria, and

17   Yemen, "would be detrimental to the interests of the United States." The First Executive Order

18   "suspend[ed] entry into the United States, as immigrants and nonimmigrants, of such persons

19   for 90 days from the date of this order"—and provided for the possibility that the suspension

20   could be extended. The majority of the population in each of these seven countries is Muslim.

21   157.   Sections 5(a)–(b) of the First Executive Order suspended the USRAP in its

22   entirety for 120 days and then, upon its resumption, directed the Secretary of State to prioritize

23   refugees who claim religious-based persecution, "provided that the religion of the individual is

24   a minority religion in the individual's country of nationality."

25

26

1   158.   Section 5(c) of the First Executive Order proclaimed that entry of Syrian

2   refugees is "detrimental to the interests of the United States" and suspended their entry

3   indefinitely.

4   159.   In a January 27, 2017, interview with the Christian Broadcasting Network,

5   President Trump confirmed his intent to prioritize Christians in the Middle East for admission

6   as refugees. President Trump stated, "Do you know if you were a Christian in Syria it was

7   impossible, at least very tough to get into the United States? If you were a Muslim you could

8   come in, but if you were a Christian, it was almost impossible and the reason that was so

9   unfair, everybody was persecuted in all fairness, but they were chopping off the heads of

10  everybody but more so the Christians. And I thought it was very, very unfair. So we are going

11  to help them." (*See Brody File Exclusive: President Trump Says Persecuted Christians Will Be*

12  *Given Priority As Refugees*, Christian Broadcasting Network at 8 (Jan. 27, 2017) *available at*

13  http://www1.cbn.com/thebrodyfile/archive/2017/01/27/brody-file-exclusive-president-trump-

14  says-persecuted-christians-will-be-given-priority-as-refugees , attached hereto as Exhibit 16).

15  160.   During a signing ceremony for the First Executive Order on January 27, 2017,

16  President Trump read its title and stated, "We all know what that means." (*See Trump Signs*

17  *Executive   Orders   at   Pentagon*,   ABC   News   (Jan.   27,   2017),   *available   at*

18  http://abcnews.go.com/Politics/video/trump-signs-executive-orders-pentagon-45099173

19  (quoted remarks at 0:45)). President Trump stated that the purpose of the First Executive Order

20  was to "establish[] new vetting measures to keep radical Islamic terrorists out of the United

21  States of America." (*See* Sarah Pulliam Bailey, *Trump Signs order limiting refugee entry, says*

22  *he will prioritize Christian refugees*, The Washington Post (Jan. 27, 2017) *available at*

23  https://www.washingtonpost.com/news/acts-of-faith/wp/2017/01/27/we-dont-want-them-there-

24  trump-signs-order-limiting-refugee-entry/?utm_term=.db861d9642ea,   attached   hereto   as

25  Exhibit 17).

26

161.    That same day, a Deputy Assistant Secretary for Visa Services at the U.S. Department of State, Edward J. Ramotowski, issued a letter which, subject to limited exceptions, "provisionally revoke[d] all valid nonimmigrant and immigrant visas of nationals of Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen." The letter is attached hereto as Exhibit 18.

162.    Also that day, the U.S. Department of State and some U.S. embassies and consulates abroad posted a notice online advising immigrant visa applicants that visa issuance had been suspended and visa interviews cancelled. The online notice is attached hereto as Exhibit 19. A copy of the notice posted in the U.S. embassy in Iraq is attached hereto as Exhibit 20.

163.    On January 28, 2017, a spokeswoman for DHS stated that lawful permanent residents, or green card holders, would be barred from entry pursuant to the Executive Order. (*See Green card holders will need additional screening: White House*, Reuters (Jan. 29, 2017) *available at* http://www.reuters.com/article/us-usa-trump-immigration-greencard-idUSKBN15C0KX , attached hereto as Exhibit 21).

164.    On January 29, 2017, DHS apparently reversed its decision through a statement by Secretary Kelly that suggested, while the First Executive Order did apply to lawful permanent residents, DHS had determined lawful permanent residents should be admitted through an exception because their admission was in the public interest. (*See* U.S. Dep't of Homeland Security, *Statement by Secretary John Kelly on the Entry of Lawful Permanent Residents into the United States* (Jan. 29, 2017) *available at* https://www.dhs.gov/news/2017/01/29/statement-secretary-john-kelly-entry-lawful-permanent-residents-united-states, attached hereto as Exhibit 22).

165.    Two days later, on January 31, 2017, the U.S. Customs and Border Protection, a DHS sub-agency, issued a statement that repeated Secretary Kelly's earlier statement. (*See* U.S. Customs and Border Protection, *Protecting the Nation from Foreign Terrorist Entry into*

*the United States* (Jan. 31, 2017) *available at* https://www.cbp.gov/border-security/protecting-nation-foreign-terrorist-entry-united-states, attached hereto as Exhibit 23) However, it also confirmed in its "Questions and Answers" section that the First Executive Order applies to lawful permanent residents and that their entry would depend on receipt of a "national interest waiver[] consistent with the provisions of the [First] Executive Order." (*See* U.S. Customs and Border Protection, *Q&A for Executive Order: Protecting the Nation from Foreign Terrorist Entry into the United States* (Feb. 2, 2017), attached hereto as Exhibit 24).

166.    On February 1, 2017, White House Counsel Donald McGahn issued a Memorandum purporting to offer "Authoritative Guidance" that lawful permanent residents were never covered by Sections 3 and 5 of the First Executive Order. *See* ECF No. 50-1.

167.    On January 29, 2017, President Trump issued a statement defending the First Executive Order, stating "[t]his is not a Muslim ban." (*See President Donald J. Trump Statement Regarding Recent Executive Order Concerning Extreme Vetting* (Jan. 29, 2017) *available at* https://www.whitehouse.gov/the-press-office/2017/01/29/president-donald-j-trump-statement-regarding-recent-executive-order, attached hereto as Exhibit 25).

168.    President Trump's statement conflicted with the statement made by his cybersecurity advisor the day before. In an interview with Fox News on January 28, 2017, Rudolph Giuliani confirmed that the First Executive Order was crafted to be a "legal" ban on Muslims. Specifically, Giuliani stated that President Trump asked him for a "Muslim ban" and instructed Giuliani to "put a commission together" to "show [Trump] the right way to do it legally." (*See* Amy B. Wang, *Trump asked for a 'Muslim Ban,' Giuliani says – and ordered a commission to do it 'legally'*, The Washington Post (Jan. 29, 2017) *available at* https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-ban-giuliani-says-and-ordered-a-commission-to-do-it-legally/?utm_term=.6ce151a30f4c, attached hereto as Exhibit 26). A video of Giuliani's statements is also available at: https://youtu.be/l9GKL6i38pI.

169.   On January 30, 2017, President Trump defended the timing of the First Executive Order. President Trump tweeted, "If the ban were announced with a one week notice, the 'bad' would rush into our country during that week." *See* Donald J. Trump (@realDonaldTrump), Twitter (Jan. 30, 2017, 5:31am ET), *available at* https://twitter.com/realDonaldTrump/status/826060143825666051, attached hereto as Exhibit 27).

170.   Several reports released by the federal government demonstrate that it did not further its stated purpose. For example, a draft report prepared at the request of the DHS Acting Under Secretary for Intelligence and Analysis concluded that citizenship was "unlikely to be an indicator" of terrorism threats against the United States. Released on February 25, 2017, the draft report found that citizens of the seven countries targeted in President Trump's First Executive Order were "rarely implicated" in U.S.-based terrorism. Specifically, the DHS report determined that at least 82 people were inspired by a foreign terrorist group to carry out or attempt to carry out an attack in the United States since March 2011. Of those 82 people, more than half were native-born U.S. citizens, and the remaining persons were from 26 countries—with the most individuals originating from Pakistan. Of the seven countries included in the First Executive Order, only Somalia and Iraq were on the list of "top" origin countries. (*See* Vivian Salama & Alicia A. Caldwell, *AP Exclusive: DHS report disputes threat from banned nations*, Associated Press (Feb. 24, 2017), *available at* http://bigstory.ap.org/article/39f1f8e4ceed4a30a4570f693291c866/dhs-intel-report-disputes-threat-posed-travel-ban-nations, attached hereto as Exhibit 28 (including a hyperlink to the draft report, which is also attached hereto as Exhibit 29); *see also* U.S. Department of Homeland Security, *Intelligence Assessment: Most Foreign-born, US-based Violent Extremists Radicalized after Entering Homeland; Opportunities for Tailored CVE Programs Exist* (March 1, 2017), *available at* http://i2.cdn.turner.com/cnn/2017/images/03/03/dhs.intell.assessment.pdf, attached hereto as Exhibit 30).

171.    According to one report, not a single fatal terrorist attack has been perpetrated in the United States by a national of one of these seven countries since at least 1975. (*See* Alex Nowrasteh, *Little National Security Benefit to Trump's Executive Order on Immigration*, Cato Institute Blog (Jan. 25, 2017, 3:31pm ET) *available at* https://www.cato.org/blog/little-national-security-benefit-trumps-executive-order-immigration, attached hereto as Exhibit 31). Other countries whose nationals have perpetrated fatal terrorist attacks in the United States were not part of the First Exectuive Order. (*See* Scott Schane, *Immigration Ban Is Unlikely to Reduce Terrorist Threat, Experts Say*, N.Y.Times (Jan. 28, 2017) *available at* https://www.nytimes.com/2017/01/28/us/politics/a-sweeping-order-unlikely-to-reduce-terrorist-threat.html , attached hereto as Exhibit 32).

172.    On February 3, 2017, this Court issued a temporary restraining order ("TRO") precluding Defendants from implementing Sections 3(a), 5(a)-(c), and 5(e) of the First Executive Order. Defendants appealed this Court's TRO to the U.S. Court of Appeals for the Ninth Circuit, which construed the TRO as a preliminary injunction.

173.    On February 6, 2017, ten former national security, foreign policy, and intelligence officials including Madeline Albright, Avril D. Haines, Michael Hayden, John Kerry, John McLaughlin, Lisa O. Monaco, Michael J. Morell, Janet A. Napolitano, Leon E. Panetta, and Susan Rice, submitted a declaration before the Ninth Circuit, stating: "We all are…unaware of any specific threat that would justify the travel ban established by the [First] Executive Order." Further, the former officials stated "there is no national security purpose for a total bar on entry for aliens" and warned that the First Executive Order "could do long-term damage to our national security." (*See Washington v. Trump*, Case No. 17-35105, ECF No. 28-2 at 3 (9th Cir., Feb. 6, 2017)).

174.    On February 9, 2017, the Ninth Circuit issued a *per curiam* opinion denying Defendants' emergency motion for a stay of this Court's order.  On February 14, 2017, this Court agreed that the Ninth Circuit had construed the TRO as a preliminary injunction.

175.    During the week that the First Executive Order was in full effect, Defendants detained or removed at least 100 people entering the United States pursuant to the First Executive Order, including lawful permanent residents, U.S.-based residents returning from visits abroad, and others with valid visas to visit family in the United States. In addition, pursuant to the First Executive Order, the State Department revoked approximately 60,000 visas. (*See* Adam Kelsey et al., *60,000 Visas Revoked Since Immigration Executive Order Signed: State Department*, ABC News (Feb. 3, 2017, 6:32 PM ET), *available at* http://abcnews.go.com/Politics/60000-visas-revoked-immigration-executive-order-signed-state/story?id=45254827, attached hereto as Exhibit 33).

**Second Executive Order**

176.    On February 16, 2017, Defendants filed a brief in the Ninth Circuit advising the court that "the President intends in the near future to rescind the [First Executive] Order and replace it with a new, substantially revised Executive Order." (*See* Appellants' Supplemental Brief on *En Banc* consideration at 4, *Washington v. Trump*, No. 17-35105 (Feb. 16, 2017), ECF No. 154.)

177.    That same day, President Trump held a press conference. At the press conference, President Trump stated that his executive actions simply fulfilled his campaign promises and indicated a new "comprehensive" executive order would issue shortly. Specifically, President Trump stated: " [Politicians] lie[] to the American people in order to get elected. Some of the things I'm doing probably aren't popular but they're necessary for security and for other reasons. . . . I'm here following through on what I pledged to do. That's all I'm doing." (*See* Aaron Blake, *Donald Trump's combative, grievance-filled news conference, annotated*, The Washington Post at 4, 6-7, (Feb. 16, 2017) *available at* https://www.washingtonpost.com/news/the-fix/wp/2017/02/16/donald-trumps-grievance-filled-press-conference-annotated/?utm_term=.c3b469f082bb, attached hereto as Exhibit 34).

178.     At the same press conference, President Trump stated: "We have taken decisive action to keep radical Islamic terrorists out of our country. No parts [that] are necessary and constitutional actions were blocked by judges, in my opinion, incorrect, and unsafe ruling. Our administration is working night and day to keep you safe, including reporters safe. And is vigorously defending this lawful order. I will not back down from defending our country. I got elected on defense of our country. I keep my campaign promises, and our citizens will be very happy when they see the result. They already are, I can tell you that. Extreme vetting will be put in place, and it already is in place in many places."

179.     On February 21, 2017, President Trump's senior policy advisor, Stephen Miller, confirmed the new executive order would have "mostly minor technical differences." Mr. Miller further indicated the intent behind the new executive order would not change. Specifically, Mr. Miller stated, "you're still going to have the same basic policy outcome for the country, but you're going to be responsive to a lot of very technical issues that were brought up by the court and those will be addressed." *See Miller: New order will be responsive to judicial ruling; Rep. Don DeSantis: Congress has gotten off to a slow start* at 2 (Feb. 21, 2017) *available at* http://www.foxnews.com/transcript/2017/02/21/miller-new-order-will-be-responsive-to-judicial-ruling-rep-ron-desantis/ , attached hereto as Exhibit 35).

180.     On February 27, 2017, the White House Press Secretary, Sean Spicer, was asked why the President continued to defend the First Executive Order instead of rescinding it. Mr. Spicer answered: "[T]he manner in which [the First Executive Order] was done in the first place was what we believe and continue to believe was the right way to address this problem. And while the second executive order attempts to address the court's concerns that they made, the goal is obviously to maintain the way that we did it the first time . . .". (*See Press Briefing by Press Secretary Sean Spicer, 2/27/2017, #17,* The White House at 26-27 (Feb. 27, 2017) *available at* https://www.whitehouse.gov/the-press-office/2017/02/27/press-briefing-press-secretary-sean-spicer-2272017-17 , attached hereto as Exhibit 36).

181. On March 6, 2017, the White House revoked its January 27, 2017 Executive Order and issued Executive Order 13780 ("Second Executive Order"). This Second Executive Order is again titled "Protecting the Nation from Foreign Terrorist Entry into the United States" and has an effective date of March 16, 2017. (*See* ECF No. 108-1).

182. Section 2(c) of the Second Executive Order suspends the "entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen"—six of the seven countries targeted in the First Executive Order—for a period of 90 days. Like the First Executive Order, the Second Executive Order provides for possible expansion of the ban beyond 90 days and to nationals from additional countries.

183. Under Section 3, the suspension of entry pursuant to Section 2 applies only to foreign nationals of the designated countries who: (i) are outside the United States on the effective date of this order, (ii) did not have a valid visa at 5:00 p.m. EST on the date of the First Executive Order, and (iii) do not have a valid visa on the effective date of this order.

184. Section 3 also provides for various "exceptions" and potential "waivers" to Section 2's suspension. It confers discretion on certain federal officials to decide on a "case-by-case basis" to allow entry to certain foreign nationals otherwise barred by Section 2. There are no instructions, forms, or other process available by which to obtain a waiver under Section 3. Section 3 excepts lawful permanent residents, visa-holders, dual nationals traveling on passports issued by a non-designated country or on diplomatic visas, and foreign nationals who have been granted asylum as well as refugees who have been admitted to the United States.

185. Section 6(a) of the Second Executive Order suspends the "travel" of all refugees to the United States and all decisions by DHS on applications for refugee status for a period of 120 days. Again, the Second Executive Order provides for an expansion of the ban beyond 120 days where it is determined that countries have failed to implement the "additional procedures" identified by Defendants as necessary "to ensure the security and welfare of the United States."

186.    Section 6(b) of the Second Executive Order suspends the entry of more than 50,000 refugees for fiscal year 2017. In September 2016, after consultation with the Congress, President Obama determined that up to 110,000 refugees would be admitted during fiscal year 2017.

187.    Also on March 6, 2017, DHS published a "Q&A" document with answers to questions about the Second Executive Order. (*See* Department of Homeland Security, Q&A: Protecting the Nation from Foreign Terrorist Entry to the United States (Mar. 6, 2017, 11:30 AM ET) *available at* https://www.dhs.gov/news/2017/03/06/qa-protecting-nation-foreign-terrorist-entry-united-states , attached hereto as Exhibit 37).

188.    In that "Q&A," DHS states that nationals from one of the six targeted countries currently present in the United States on a single-entry visa will have to obtain a new valid visa in order to leave and return to the United States. Likewise, DHS states that students and exchange visitors from the six designated countries who are currently present in the United States—and their related U.S.-based dependents—will have to obtain a new valid visa in order to leave and return to the United States, if their visas expire while the Second Executive Order is in place. (*See id.* at 4, 13).

189.    Also, on March 6, 2017, President Trump issued a memorandum titled "Implementing Immediate Heightened Screening and Vetting of Applications for Visas and Other Immigration Benefits." In the memorandum, President Trump ordered the State Department, DHS, and the Attorney General to "implement protocols and procedures as soon as practicable that in their judgment will enhance the screening and vetting of applications for visas and all other immigration benefits" while the Second Executive Order is implemented. (*See* The White House, *Memorandum for the Secretary of State, the Attorney General, the Secretary of Homeland Security,* (Mar. 6, 2017) *available at* https://www.whitehouse.gov/the-press-office/2017/03/06/memorandum-secretary-state-attorney-general-secretary-homeland-security , attached hereto as Exhibit 38).

190.   The same day President Trump issued the Second Executive Order, his campaign issued a fundraising e-mail. In it, President Trump requested support for the Second Executive Order and the fight against "radical Islamic terrorism," and stated, "I will NEVER stop fighting until we implement the policies you—and millions of Americans like you—voted for." (*See* Matt Zapotosky, et. at*., Revised executive order bans travelers from six Muslim-majority countries from getting visas*, The Wash. Post (Mar. 6, 2017) *available at* https://www.washingtonpost.com/world/national-security/new-executive-order-bans-travelers-from-six-muslim-majority-countries-applying-for-visas/2017/03/06/3012a42a-0277-11e7-ad5b-d22680e18d10_story.html?utm_term=.fddd4559a269 , attached hereto as Exhibit 39).

191.   On March 7, 2017, White House Press Secretary Sean Spicer confirmed the purpose of the Second Executive Order was for President Trump to fulfill his campaign promise. Mr. Spicer stated: "President Trump yesterday continue [sic] to deliver . . . his . . . campaign promise[]: protecting the country against radical Islamic terrorism." (*See Press Briefing by Press Secretary Sean Spicer, 3/7/2017, #18,* The White House at 2 (Mar. 7, 2017) *available at* https://www.whitehouse.gov/the-press-office/2017/03/07/press-briefing-press-secretary-sean-spicer-372017-18, attached hereto as Exhibit 40).

192.   On March 10, 2017, more than 130 foreign policy experts addressed President Trump in an open letter, concluding that the Second Executive Order is just as "damaging" to the United States' interests as the First Executive Order. Representing foreign policy experts under both Republican and Democratic administrations, they observed that, even though Iraq was left off the Second Executive Order's six-country ban, Iraqis will remain in harm's way due to the 120-day suspension of refugees. (*See Letter from Foreign Policy Experts on Travel Ban*, N.Y. Times (Mar. 10, 2017) *available at* https://www.nytimes.com/interactive/2017/03/11/us/politics/document-letter-foreign-policy-trump.html?_r=0 , attached hereto as Exhibit 41).

193.   In filing notice to this Court about the Second Executive Order's issuance, Defendants declared: "This Court's injunctive order does not limit the Government's ability to

immediately begin enforcing the [Second] Executive Order." Further, Defendants stated: "[T]he Government intends to begin enforcing the [Second] Executive Order on its effective date of March 16, 2017." *See* ECF No. 108 at 13.

## V.     FIRST CAUSE OF ACTION
### (Fifth Amendment – Equal Protection)

194.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Complaint.

195.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

196.    Sections 3 and 5 of the First Executive Order, as well as Sections 2 and 6 of the Second Executive Order, together with statements made by Defendants concerning their intent and application, target individuals for discriminatory treatment based on their country of origin and/or religion, without lawful justification.

197.    Both the First Executive Order and the Second Executive Order were motivated by animus and a desire to harm a particular group.

198.    The discriminatory terms and application of the First Executive Order and the Second Executive Order are arbitrary and cannot be sufficiently justified by federal interests.

199.    Through their actions above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

200.    Defendants' violation causes ongoing harm to the States and their residents.

## VI.     SECOND CAUSE OF ACTION
### (First Amendment – Establishment Clause)

201.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Complaint.

202.    The Establishment Clause of the First Amendment prohibits the federal government from officially preferring one religion over another.

203.    Sections 3 and 5 of the First Executive Order, as well as Sections 2 and 6 of the Second Executive Order, together with statements made by Defendants concerning their intent and application, are intended to disfavor Islam and favor Christianity.

204.    Through their actions above, Defendants have violated the Establishment Clause of the First Amendment.

205.    Defendants' violation causes ongoing harm to the States and their residents.

## VII.    THIRD CAUSE OF ACTION
### (Fifth Amendment – Procedural Due Process)

206.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Complaint.

207.    The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their liberty interests without due process of law.

208.    Where Congress has granted statutory rights and authorized procedures applicable to arriving and present non-citizens, minimum due process rights attach to those statutory rights.

209.    Sections 3 and 5 of the First Executive Order, as well as Sections 2 and 6 of the Second Executive Order, conflict with the statutory rights and procedures directed by Congress. In issuing and implementing the First Executive Order and the Second Executive Order, Defendants have violated the procedural due process guarantees of the Fifth Amendment.

210.    Defendants' violation causes ongoing harm to the States and their residents.

## VIII.   FOURTH CAUSE OF ACTION
### (Immigration and Nationality Act)

211.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Complaint.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

212.   Section 8 of Article I of the U.S. constitution bestows Congress with exclusive authority over our immigration laws. Congress has laid down the country's immigration laws in the Immigration and Nationality Act ("INA"), as codified under Title 8 of the United States Code

213.   The INA is a multi-faceted and complex immigration structure. It sets forth specific prohibitions, as well as explicit requirements and detailed processes, related to the country's issuance of visas and refugee programs.

214.   For example, 8 U.S.C. § 1152(a)(1)(A), prohibits discrimination in the issuance of immigrant visas on the basis of race, nationality, place of birth, or place of residence.

215.   8 U.S.C. § 1101(a)(15)(U) creates a category of visas for noncitizens who are victims of specified crimes and assist U.S. law enforcement in the prosecution of criminal cases   ("U-visa"). The same provision also creates a category of visas for the noncitizen victim's family members, even if the family member is living abroad ("U-visa derivative"). 8 C.F.R. 214.14(f)(6)(ii) sets forth the process for petitioning for a U-visa derivative for a family member outside the United States.

216.   8 U.S.C. § 1101(a)(15)(T) creates a category of visas for noncitizens who are victims of severe forms of human trafficking and their family members ("T-visa"). The same provision also creates a category of visas for the noncitizen victim's family members, even if the family member is living abroad ("T-visa derivative"). 8 C.F.R. 214.11(k)(9)(ii) sets forth the process for petitioning for a T-visa derivative for a family member outside the United States.

217.   8 U.S.C. § 1157 sets forth the admission procedures for refugees, specifically. Section 1157(a) requires the numerical limitation on refugees be set by the President only after "appropriate consultation" with Congress.

218.     Sections 3 and 5 of the First Executive Order, as well as Sections 2 and 6 of the Second Executive Order, together with statements made by Defendants concerning their intent and application, violate the INA.

219.     Together, the provisions discriminate on the basis of race, nationality, place of birth, and/or place of residence in the issuance of visas, suspend the refugee program without appropriate consultation with Congress, and otherwise contravene the INA's complex immigration structure.

220.     Defendants' violation causes ongoing harm to the States and their residents.

### IX.     FIFTH CAUSE OF ACTION
### (Religious Freedom Restoration Act)

221.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Complaint.

222.     The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(a), prohibits the federal government from substantially burdening the exercise of religion, even if the burden results from a rule of general applicability.

223.     Section 3 of the First Executive Order, as well as Section 2 of the Second Executive Order, if implemented, will result in substantial burdens on the exercise of religion by non-citizen immigrants by, for example, preventing them from exercising their religion while in detention, returning to their religious communities in the States, and/or taking upcoming, planned religious travel abroad. Such burdens on religion violate the Religious Freedom Restoration Act.

224.     Sections 3 and 5 of the First Executive Order, as well as Sections 2 and 6 of the Second Executive Order, also will result in substantial burdens on the exercise of religion by individuals and religious organizations that provide services to refugees and immigrants as part of their religious beliefs/mission.

225.     Defendants' violation causes ongoing harm to the States and their residents.

## X.   SIXTH CAUSE OF ACTION
### (Procedural Violation of the Administrative Procedure Act)

226.   The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Complaint.

227.   The Administrative Procedure Act, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct formal rule making before engaging in action that impacts substantive rights.

228.   In implementing Sections 3 and 5 of the First Executive Order, as well as Sections 2 and 6 of the Second Executive Order, federal agencies changed the substantive criteria by which individuals from affected countries may enter the United States. Federal agencies did not follow the procedures required by the Administrative Procedure Act before taking action impacting these substantive rights.

229.   Through their actions above, Defendants have violated the Administrative Procedure Act.

230.   Defendants' violation causes ongoing harm to the States and their residents.

## XI.   SEVENTH CAUSE OF ACTION
### (Substantive Violation of the Administrative Procedure Act)

231.   The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Complaint.

232.   The Administrative Procedure Act, 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary, unconstitutional, and contrary to statute.

233.   Neither the First Executive Order nor the Second Executive Order is authorized by the INA. As alleged herein, both the First Executive Order and the Second Executive Order discriminates on the basis of race, nationality, place of birth, and/or place of residence in the issuance of visas, suspends the refugee program without appropriate consultation with Congress, and otherwise contravenes the INA's complex immigration structure.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

234.     In implementing Sections 3 and 5 of the First Executive Order, as well as Sections 2 and 6 of the Second Executive Order, federal agencies have taken or will take unconstitutional and unlawful action, as alleged herein, in violation of the Administrative Procedure Act.

235.     In implementing Sections 3 and 5 of the First Executive Order, as well as Sections 2 and 6 of the Second Executive Order, federal agencies have applied or will apply provisions arbitrarily, in violation of the Administrative Procedure Act.

236.     Defendants' violation causes ongoing harm to the States and their residents.

## XII.     EIGHTH CAUSE OF ACTION
### (Tenth Amendment)

237.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

238.     The Tenth Amendment reserves all powers not enumerated in the Constitution to the states and prohibits the federal government from commandeering state legislative processes.

239.     The Tenth Amendment prohibits the federal government from directly compelling states to enact and enforce federal law.

240.     Sections 3 and 5 of the First Executive Order, as well as Sections 2 and 6 of the Second Executive Order, together with statements made by Defendants concerning their intent and application, target individuals for discriminatory treatment based on their country of origin and/or religion, without lawful justification.

241.     The States and their employers, housing providers, and businesses have long been prohibited by their States' laws from discriminating against people based on national origin and religion in employment, housing, and in places of public accommodation.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

242. The First Executive Order and the Second Executive Order effectively mandate that the States engage in discrimination based on national origin and/or religion, thereby rescinding the States' historic protection of civil rights and religious freedom.

243. Through their actions above, Defendants have violated the Tenth Amendment.

244. Defendants' violation causes ongoing harm to the States.

## XIII.   PRAYER FOR RELIEF

Wherefore, the States pray that the Court:

a.   Declare that Sections 3(c), 5(a)–(c), and 5(e) of the First Executive Order are unauthorized by and contrary to the Constitution and laws of the United States;

b.   Enjoin Defendants from implementing or enforcing Sections 3(c), 5(a)–(c), and 5(e) of the First Executive Order, including at all United States borders, ports of entry, and in the issuance of visas, pending further orders from this Court;

c.   Declare that Sections 2(c) and 6(a) of the Second Executive Order are unauthorized by and contrary to the Constitution and laws of the United States;

d.   Enjoin Defendants from implementing or enforcing Sections 2(c) and 6(a) of the Second Executive Order, including at all United States borders, ports of entry, and in the issuance of visas, pending further orders from this Court;

e.   Enjoin Defendants from implementing or enforcing Section 5(d) of the First Executive Order;

f.   Enjoin Defendants from implementing or enforcing Section 6(b) of the Second Executive Order; and

g.   Award such additional relief as the interests of justice may require.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    DATED this 13th day of March, 2017.

2                                    Respectfully submitted,

3                                    BOB FERGUSON, WSBA #26004
4                                    Attorney General of Washington

5                                    /s/ Noah G. Purcell_____
                                     NOAH G. PURCELL, WSBA #43492
6                                    Solicitor General
7                                    COLLEEN M. MELODY, WSBA #42275
                                     Civil Rights Unit Chief
8                                    ANNE E. EGELER, WSBA #20258
                                     Deputy Solicitor General
9                                    MARSHA CHIEN, WSBA #47020
                                     PATRICIO A. MARQUEZ, WSBA #47693
10                                   Assistant Attorneys General
11                                   Office of the Attorney General
                                     800 Fifth Avenue, Suite 2000
12                                   Seattle, WA  98104
                                     (206) 464-7744
13                                   Noahp@atg.wa.gov

14                                   XAVIER BECERRA
                                     Attorney General of California
15                                   Angela Sierra
                                     Senior Assistant Attorney General
16                                   Douglas J. Woods
                                     Senior Assistant Attorney General
17                                   Tamar Pachter
                                     Supervising Deputy Attorney General
18
                                     /s/ Alexandra Robert Gordon_____
19                                   Alexandra Robert Gordon
                                     Deputy Attorney General
20                                   Office of the Attorney General
                                     455 Golden Gate Avenue, Suite 11000
21                                   San Francisco, CA  94102-7004
                                     Telephone: (415) 703-5509
22                                   E-mail:  Alexandra.RobertGordon@doj.ca.gov
                                     BRIAN E. FROSH
23                                   Attorney General of Maryland

24                                   /s/ Steven M. Sullivan_____
25                                   STEVEN M. SULLIVAN
                                     Solicitor General
26

SECOND AMENDED COMPLAINT              61          ATTORNEY GENERAL OF WASHINGTON
                                                         800 Fifth Avenue, Suite 2000
                                                          Seattle, WA 98104-3188
                                                              (206) 464-7744

Federal Bar No. 24930
ROBERT A. SCOTT
Assistant Attorney General
Federal Bar No. 24613
MEGHAN K. CASEY
Assistant Attorney General
Federal Bar No. 28958
Office of the Attorney General of Maryland
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 576-6325
Fax: (410) 576-6955
ssullivan@oag.state.md.us
rscott@oag.state.md.us
mcasey@oag.state.md.us

MAURA HEALEY
Attorney General of Massachusetts

*/s/ Elizabeth N. Dewar*
ELIZABETH N. DEWAR
State Solicitor
One Ashburton Place
Boston, MA 02108
617-963-2204
Bessie.Dewar@state.ma.us

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

*/s/ Lourdes M. Rosado*
LOURDES M. ROSADO
Bureau Chief, Civil Rights Bureau
ANISHA DASGUPTA
Deputy Solicitor General
Office of the New York State Attorney General
120 Broadway
New York, New York 10271
(212) 416-8252
lourdes.rosado@ag.ny.gov

ELLEN F. ROSENBLUM
Attorney General of Oregon

*/s/ Scott J. Kaplan*
SCOTT J. KAPLAN, WSBA #49377

SECOND AMENDED COMPLAINT

62

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Senior Assistant Attorney General
Oregon Department of Justice
100 Market Street
Portland, OR  97201
971-673-1880
scott.kaplan@doj.state.or.us