THE HONORABLE JAMES L. ROBART

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF CALIFORNIA; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW YORK; and STATE OF OREGON,<br><br>               Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA,<br><br>               Defendants. | CIVIL ACTION NO. 2:17-cv-00141-JLR<br><br><br>THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## I.   INTRODUCTION

1.      The States of Washington, California, Maryland, Massachusetts, New York, and Oregon ("States") bring this action to protect the States—including their residents, employers, hospitals, and educational institutions—against unlawful actions of the President and the federal government.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

2.      On January 27, 2017, President Trump issued Executive Order 13769 ("EO1"), which banned the entry of all immigrants and non-immigrants from seven Muslim-majority countries for 90 days. This Court enjoined key provisions of EO1 on February 3, 2017. President Trump responded on March 6, 2017, by issuing Executive Order 13780 ("EO2"), which barred entry by nationals from six Muslim-majority countries for 90 days. President Trump repeatedly referred to EO2 as a "watered-down" version of the earlier order. *See* Ex. A.

3.      On March 15 and 16, 2017, two federal district courts enjoined key provisions of EO2. *See Hawai'i v. Trump*, 241 F. Supp. 3d 1119 (D. Haw. 2017); *Int'l Refugee Assistance Project v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017). After the Fourth and Ninth Circuits largely upheld the district courts' injunctions, the Supreme Court declined to stay the injunctions except as to foreign nationals who lacked any credible claim to a bona fide relationship with a person or entity in the United States. *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017).

4.      On September 24, 2017, the President issued a Presidential Proclamation titled, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats," 82 Fed. Reg. 45,161 (Sept. 27, 2017) ("EO3").[1] *See* Ex. B. Like the first two Executive Orders, EO3 will suspend the entry of immigrants and non-immigrants based on national origin. However, unlike the first two Executive Orders, the newest Executive Order will operate indefinitely.

5.      EO3 blocks well over 150 million people from entering the United States and will cause severe and immediate harms to the States, including our residents, our colleges and universities, our healthcare providers, and our businesses. *See* Ex. 1 (Joint Declaration of 49

---

[1] Although the September 24, 2017, declaration is styled as a "proclamation" rather than an "executive order," the difference between executive orders and proclamations is one of form, not substance. *See* John Contrubis, Executive Orders and Proclamations, Congressional Research Service: American Law Division 1 (Mar. 9, 1999), *available at* https://fas.org/sgp/crs/misc/95-772.pdf.

Former National Security Officials) ¶ 3. The order will prevent State residents—including United States citizens and lawful permanent residents—from seeing their spouses, parents, or other family members, will cause our States' colleges and universities to lose talented students, tuition revenue, and specially-trained faculty and staff, will cause our States to lose tourism revenue, will deny our States' hospitals the opportunity to compete for top medical residents and physicians, and will cost our States' businesses talented job applicants and substantial revenue. EO3 will also cause the States themselves to lose tax revenue and will undermine our sovereign interest in maintaining the separation between church and state, in upholding our non-discrimination policies, and in remaining a welcoming place for immigrants.

6.      The Court should invalidate the portions of EO1, EO2, and EO3 challenged here.

## II.      JURISDICTION AND VENUE

7.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Washington is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Third Amended Complaint occurred within the Western District of Washington.

9.      The States bring this action to redress harms to their proprietary interests and their interests as *parens patriae*, as well as under their authority pursuant to 5 U.S.C. § 702 and 42 U.S.C. § 2000bb-1(a).

## III.      PARTIES

### PLAINTIFF STATE OF WASHINGTON

10.      The Governor is the chief executive officer of the State of Washington. The Governor is responsible for overseeing the operations of the State of Washington and ensuring that its laws are faithfully executed.

11.     The Attorney General is the chief legal adviser to the State of Washington. The Attorney General's powers and duties include acting in federal court on matters of public concern.

12.     Washington has declared that practices that discriminate against any of its inhabitants because of race, creed, color, or national origin are matters of public concern that threaten the rights and proper privileges of the State and harm the public welfare, health, and peace of the people. *See* Wash. Rev. Code § 49.60.010.

13.     Washington's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, is a quasi-sovereign interest.

14.     Washington also has an interest in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

15.     Washington's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of Washington's residents, including individuals who suffer indirect injuries and members of the general public.

16.     As this Court recognized, EO1 harmed Washington residents, educational institutions, employers, and Washington itself. EO3 will do the same. The new order's immigration ban[2] prevents our colleges and universities from welcoming talented students and staff from around the world, separates our residents from their families, thwarts businesses that recruit or serve foreign nationals from the banned countries, and negatively impacts state tax revenue.

---

[2] Although EO3 restricts entry from eight countries (Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela and Yemen), the Venezuela ban only applies to that country's government officials and the North Korea ban affects a vanishingly small number of individuals, as very few people travel to the United States from North Korea. *See infra* ¶ 204.

17.     According to the most current American Community Survey data from the U.S. Census Bureau, as of 2015, approximately 9,330 residents in Washington are naturalized U.S. citizens from the nine countries impacted by EO3: 3,904 citizens from Iran; 145 citizens from Libya; 220 citizens from Syria; 111 citizens from Yemen, 3,952 citizens from Somalia, and 1,054 citizens from Iraq. In addition, more than 7,100 non-citizen immigrants from the impacted countries reside in Washington—1,409 Iranian immigrants; 360 Libyan immigrants; 2,883 Somalian immigrants; and 187 Syrian immigrants, 2,275 Iraqi immigrants.[3] *See* Ex. C (Chart of Impacted Immigrants in Washington).While Iraqi immigration is not entirely suspended under EO3, Iraqis may be subject to "additional scrutiny" before they may enter the United States.

18.     Like the first two Executive Orders, EO3 will negatively impact Washington's economy. Immigration is an important economic driver in Washington. Many workers in Washington are naturalized citizens, immigrants, and non-immigrants from the banned countries. *See, e.g.,* Ex. 2 (2d Decl. Parsian) ¶¶ 2-5 (Seattle Care Alliance radiologist); Ex. 3 (Decl. Nouri) ¶¶ 1-4 (coastal engineer); Ex. 4 (Decl. Fotouhiyehpour) ¶¶ 2-5 (medical device quality manager); Ex. 5 (Decl. Beygi) ¶¶ 2-5 (Boeing data scientist); Ex. 6 (Decl. Vaezi) ¶¶ 2-4 (pilot); Ex. 7 (Decl. Esmali) ¶¶ 2-6 (architect). Many companies in Washington are dependent on foreign workers to operate and grow their businesses.

19.     The technology industry, in particular, relies heavily on naturalized citizens, immigrants, and non-immigrants from the currently-banned countries to work as software engineers, data scientists, and other highly skilled positions. *See, e.g.,* Ex. 8 (Decl. Soroush) ¶¶ 1-6 (Apple software engineer); Ex. 9 (Decl. Heravi) ¶¶ 2-3 (MemSql software engineer); Ex.

---

[3] Although the ACS does not contain statistics of immigrants living in Washington who are originally from Chad or Yemen, DHS reports 175 Chadians and 3,194 Yemenis became legal permanent residents in 2015 nationally. *See* Ex. K (U.S. Dep't of Homeland Security, *Table 3: Persons Obtaining Lawful Permanent Resident Status By Region and Country of Birth: Fiscal Years 2013 to 2015* (last published Dec. 15, 2016), *available at* https://www.dhs.gov/immigration-statistics/yearbook/2015/table3).

10 (Decl. Jazayeri) ¶ 2-6 (Facebook software engineer); Ex. 6 (Decl. Vaezi) (Microsoft data scientist) ¶¶ 2-6. Microsoft, a corporation headquartered in Redmond, Washington, is the State's top employer of H-1B visa-holders and employs nearly 5,000 people through the program. Other large Washington-based companies, including Amazon, Expedia, and Starbucks, employ many more. *See* ECF 6 (Decl. Blackwell-Hawkins) ¶ 7 (Amazon); ECF 7 (Decl Dzielak) ¶¶ 4, 16, 18 (Expedia).

20.     The market for highly skilled workers and leaders in the technology industry is extremely competitive. Changes to U.S. immigration policy that restrict the flow of people may inhibit these companies' ability to adequately staff their research and development efforts and recruit talent from overseas. *See* ECF 7 (Decl. Dzielak) ¶ 7, 21 (Expedia). It will be difficult to recruit new employees if the new employee is required to leave his or her family behind indefinitely. *Id.* In fact, many current employees are contemplating returning to their home country or moving to other countries so that their families in the banned countries can join them. *See, e.g.,* Ex. 8 (Decl. Soroush) ¶ 11); Ex. 10 (Decl. Jazayeri) ¶ 10; Ex. 11 (Decl. Tabrizi) ¶ 12; Ex. 18 (Decl. Devenport) ¶¶ 11-12. If recruitment and retention efforts are less successful, these companies' abilities to develop and deliver successful products and services may be adversely affected.

21.     Microsoft's U.S. workforce is heavily dependent on immigrants and guest workers from Iran, Iraq, Syria, Somalia, Libya, or Yemen. *See e.g.,* Ex. 12 (Decl. Khadem); ¶ 4; Ex. 11 (Decl. Tabrizi) ¶ 2; Ex. 13 (Decl. Hajiaghayi) ¶ 3. These employees may no longer be able to renew their visas, travel overseas, or attend meetings at the company's offices in Vancouver, British Columbia.

22.     Seattle-based company Amazon also employs workers from every corner of the world. *See* ECF 6 (Decl. Blackwell-Hawkins) ¶ 3. Amazon's employees, dependents of employees, and candidates for employment with Amazon will be impacted by EO3.

23.     Bellevue-based company Expedia operates a domestic and foreign travel business. *See* ECF 7 (Decl. Dzielak) ¶¶ 2-3. At the time of EO1, Expedia had approximately 1,000 customers with existing flight reservations in or out of the United States who held passports from the seven originally banned countries. EO3 will again restrict business, increase business costs, and impact current employees and customers.

24.     Like the first two Executive Orders, EO3 will separate our residents' families. Under the first two Executive Orders, at least three Washington residents from the seven originally affected countries were prevented from traveling to Washington or detained at air, land, and sea ports of entry across the United States. One Somali refugee, who had lived in Seattle for 12 years, went to Sea-Tac airport to pick up her Somali husband who was flying from Vienna, but never saw him before he was sent back on a flight to Vienna. *See* Ex. D (*The Latest: Protest at Seattle-Tacoma airport continues*, Associated Press (Jan. 29, 2017), *available at* http://www.washingtontimes.com/news/2017/jan/29/the-latest-protest-at-seattle-tacoma-airport-conti/). Still other Washington residents were prevented from being reunited with family members as the first two Executive Orders derailed the green card applications of our residents' fiancés, wives, and other family members. *See, e.g.,* ECF 118-13 (Decl. Parsian) ¶ 9.

25.     If implemented, EO3 will again prevent residents from receiving visits from or reunifying with family members from the banned countries. *See, e.g.,* Ex. 14 (Decl. Moghaddam) ¶¶ 5-7; Ex. 15 (Decl. Asheghabadi) ¶ 5; Ex. 13 (Decl. Hajiaghayi) ¶¶ 4-5; Ex. 53 (Decl. Parsimoghadam) ¶ 5; Ex. 51 (Decl. Ayoubi) ¶ 10. For example, many U.S. citizens and legal permanent residents in Washington have applied for green cards for their family so that grandparents may meet their new grandchildren, parents may live with their adult children, adult children may take care of their ailing parents, and families may otherwise share their new lives in the United States. *See, e.g.,* Ex. 13 (Decl. Hajishirzi) ¶ 6; Ex. 8 (Decl. Soroush) ¶ 7; Ex. 6 (Decl. Vaezi) ¶¶ 6-7; Ex. 16 (Decl. Ala) ¶ 5; ECF 118-6 (Decl. Callaghan) ¶¶ 3-4; ECF 118-9

1   (Decl. Fallah) ¶ 11; ECF 118-15 (Decl. Shayegan) ¶¶ 7-10; Ex. 17 (Decl. Shojaie) ¶ 5; Ex. 11

2   (Decl. Tabrizi) ¶ 10; Ex. 18 (Decl. Devenport) ¶ 8. Under EO3, however, all of these

3   applications will be suspended indefinitely. This presents a particularly harsh reality for those

4   U.S. citizens and residents who are unable to travel to their home countries because they are

5   here on single-entry visas, they have life-threatening illnesses, or they are barred from doing so

6   because of their refusal to fulfill their home country's compulsory military service

7   requirement. *See, e.g.,* Ex. 19 (Decl. Fayazi) ¶ 7 (single-entry); Ex. 11 (Decl. Tabrizi) ¶¶ 4-5

8   (single-entry); Ex. 20 (Decl. Abolhasani) ¶ 5 (single-entry); Ex. 21 (Decl. H. Farhadi) ¶ 3

9   (single-entry); Ex. 22 (Decl. Bina) ¶¶ 4-5 (cancer); Ex. 23 (Decl. Khadem) ¶ 5 (military

10  service).

11          26.     EO3 will also impact physicians in Washington and our health care system as a

12  whole. *See, e.g.,* Ex. 24 (Decl. Zangeneh) ¶ 3 (Fred Hutchinson Research Center statistician);

13  Ex. 2 (2d Decl. Parsian) ¶ 5 (Seattle Cancer Care Alliance radiologist). The Washington State

14  Medical Quality Assurance Commission regulates 27,001 physicians whose licenses are in

15  active status. *See* ECF 118-44 (Decl. De Leon) ¶ 4. At least 136 of these physicians were born

16  in one of the countries named in EO3, with ten additional licenses pending approval. *See* Ex.

17  25 (2d Decl. de Leon) ¶ 5. In addition, 137 active licensees received all or part of their medical

18  education in one of the affected countries. *Id.* at ¶ 7. The Medical Commission has also issued

19  several limited licenses to residents, fellows and physicians serving as teaching-research

20  members from the affected countries. *Id.* at ¶ 6.

21          27.     Washington   currently   has   many   Health   Professional   Shortage   Areas

22  ("HPSAs"), which are areas in which there are shortages in the number of primary care, dental

23  health, or mental health physicians needed to treat patients. *See* ECF 118-32 (Decl. Fullerton) ¶

24  5. In many situations, a county is triply designated as having shortages in primary care, dental,

25  and mental health clinicians. *Id.* Washington also has a number of Medically Underserved

26  Areas/Populations, which are areas in which there are too few primary care providers, high

infant mortality rates, high poverty, or high elderly populations. *Id.* at ¶ 9. Washington has undertaken a number of initiatives to recruit physicians to treat these underserved populations and communities. *Id. at ¶* 11. Despite these initiatives, however, Washington continues to have shortages in the number of physicians and dentists available. *Id.* at ¶ 12. These shortages are expected to increase in the coming years. *Id.* at ¶ 13. Recruitment of foreign-born physicians is one of the ways that Washington has attempted to address these shortages. *Id.* at ¶ 14. The first two Executive Orders significantly harmed these recruitment efforts and harmed Washington's efforts to ensure that residents in rural and underserved areas receive health care. The third Executive Order will do the same. *See, e.g.,* Ex. 2 (2d Decl. Parsian) ¶ 15. When a position goes unfilled, patients may have to wait months for appointments, travel long distances to receive care, or simply do without the care. The inability to hire foreign-born physicians reduces patient access to healthcare in Washington.

28.     In fact, Washington healthcare employers have already lost needed physician candidates due to uncertainty created by the first two Executive Orders. For example, one health center was ready to sign a contract with a family medicine physician from Libya but after EO1 issued, the physician decided that it was too risky to change employers. *See* ECF 118-32 (Decl. de Leon) ¶ 17. Another large healthcare system in Washington with multiple hospitals and clinics lost a physician candidate who decided to pursue a position in Canada following the issuance of EO1. *Id.* The same healthcare system also has several physicians who are in process to receive their permanent resident status who are considering leaving the U.S. for opportunities in Canada. *Id.* Physicians are central revenue generators for Washington hospitals and clinics. The shortage of physicians reduces the revenue of these hospitals and clinics and reduces the taxes the State is able to collect. *Id.* at ¶ 22.

29.     In addition to affecting Washington residents, families, and its businesses, and health care system, EO3 will harm Washington's proprietary interests.

30.     According to data from several travel companies and research firms, there appears to have been a "chilling effect" on tourism to the United States. Since January 27, 2017, the demand for travel to the United States has taken a "nosedive." *See* ECF 118-2 at 2 (Shivani Vora, *After Travel Ban, Interest in Trips to U.S. Declines,* N.Y. Times (Feb. 20, 2017)).

31.     Tourism is Washington's fourth largest economic sector. It is estimated to generate nearly $21 billion annually, and it is estimated that each international route to Sea-Tac airport generates about $89 million in economic revenue to our region. *See* Ex. 26 (2d Decl. Oline) ¶ 10; ECF 118-39 (Decl. Soike) ¶ 9. In 2016, travelers from the eight banned countries spent approximately $20 million in Washington. Ex. 26 (2d Decl. Oline) ¶ 10. This spending generated more than $1.2 million in state tax revenue and close to $500,000 in local tax revenue.[4] *Id.* In 2016, more than 6,000 passengers travelled between Sea-Tac airport and the six countries targeted in EO2. *See* ECF 118-39 (Decl. Soike) ¶ 11. Even more passengers travelled between Sea-Tac airport and the eight countries now targeted in EO3. Ex. 27 (2d Decl. Soike) ¶ 11.

32.     The first two Executive Orders negatively impacted Washington's tourism industry. After the EO1, for example, one Washington tour company that operated trips to Iran for thirty years had to cancel four scheduled trips. *See* ECF 118-42 (Decl. Zawaideh) ¶ 3. Customers—some U.S. citizens—told the tour company's CEO that they cancelled because they were afraid to travel in light of EO1. *Id.* Another tour company was similarly forced to cancel a pilgrimage to Iraq. *See* ECF 118-40 (Decl. Topiwala) ¶¶ 5-7. Under EO3, tourist visas are suspended indefinitely for millions of people, which will further depress Washington's tourism industry. *See* Ex. 28 (2d Decl. Zawaideh) ¶¶ 5, 8.

---

[4] These estimates do not include additional taxes such as convention center tax, hotel tax, promotion area tax, or rental car taxes, which generated approximately $145 million in revenue from international and domestic tourists, as well as local residents. Ex. 26 (Decl. 2d Oline) ¶ 14.

33.     Similarly, EO3 will depress Washington's real estate businesses. For example, Redfin, a Seattle-based real estate brokerage company, is aware of at least five potential Redfin customers who decided not to purchase a home due to concerns about the future following President Trump's first two Executive Orders. *See* ECF 118-37 (Decl. Saunders) ¶¶ 8-13. This fear will only continue under EO3. Each time a customer ends their home-buying search before buying a home, Redfin loses potential revenue and the State loses taxable revenue.

34.     EO3 will also harm countless students and faculty at the States' public colleges, universities, and research institutes, as well as harm the institutions themselves.

35.     The University of Washington ("UW") and Washington State University ("WSU") are the two largest public universities in the State.[5] At least 105 students from the countries targeted in EO3 are enrolled at the University of Washington, based in Seattle. *See* Ex. 29 (2d Decl. Eaton) ¶ 4; Ex. 30 (3d Decl. Branon) ¶ 4; Ex. 31 (Decl. Mokhalalati) ¶ 3. At least 140 students from the countries targeted by EO3 attend Washington State University, based in Pullman. *See* Ex. 32 (5th Decl. Chaudhry) ¶ 5. These students are undergraduates, graduate school students, as well as Ph.D. students, often studying science, engineering and other related fields. *See, e.g.,* Ex. 33 (Decl. Ehsani) ¶ 4 (Ph.D. candidate in computer science ); Ex. 34 (Decl. Nofallah) ¶ 4 (Ph.D. candidate in electrical engineering); Ex. 35 (Decl. Dadkhahan) ¶ 4 (college student); Ex. 19 (Decl. Fayazi) ¶ 5 (Ph.D. in rehabilitative medicine); Ex. 20 (Decl. Abolhasani) ¶ 3 (Ph.D. candidate in industrial engineering); Ex. 21 (Decl. H. Farhadi) (Ph.D. candidate in physical therapy); Ex. 15 (Decl. Asheghabadi) ¶ 4 (Ph.D. candidate in environmental sciences); Ex. 31 (Decl. Mokhalalati) ¶ 3 (college student with aerospace research position); Ex. 36 (Decl. Ghaedi) ¶ 1 (Ph.D. student and instructor at WSU).

---

[5] In addition, as of February 1, 2017, at least 188 students from the seven original countries included in EO1 attended Washington's public community and technical colleges. *See* ECF 17-3 (Decl. Boesenberg) ¶ 4.

36.     In addition, Washington's public universities and colleges have faculty members and visiting scholars from the banned countries. WSU currently has nine faculty, staff and visiting scholars from the countries banned in EO3. See Ex. 32 (5th Decl. Chaudhry) ¶ 5. Faculty and visiting scholars teach electrical engineering, business, public health, computer science, as well as other technical fields. *See, e.g.,* Ex. 37 (4th Decl. Riedinger) ¶ 3; Ex. 38 (Decl. Hajishirzi) ¶ 3 (electrical engineering professor); Ex. 39 (Decl. A. Farhadi) ¶ 4 (computer science professor); Ex. 40 (Decl. Alaghi) ¶ 4 (UW computer science researcher); Ex. 17 (Decl. Shojaie) ¶ 6 (biomedical data science professor); Ex. 41 (Decl. Yoganarasimhan) (business professor). Through their collective research, these faculty members and visiting scholars have brought in millions of dollars in research grants to our state universities. *See ,e.g.,* Ex. 38 (Decl. Hajishirzi) ¶¶ 3-5; Ex. 42 (Decl. Hosseinzadeh) ¶ 4; Ex. 39 (Decl. A. Farhadi) ¶ 4.

37.     Like the first two Executive Orders, EO3 will restrict students, scholars, and faculty members who rely on their ability to travel abroad for research or scholarship. *See* Ex. 32 (5th Decl. Chaudhry) ¶¶ 6-9; Ex. 33 (Decl. Ehsani) ¶ 4 (single-entry visa); Ex. 43 (Decl. Shakerifard) ¶ 4 (dual Canadian/Iranian citizen). The first two Executive Orders, for example, prevented one graduate student from participating in critical research in Greenland, prevented visiting scholars from traveling to the United States for research, and prevented faculty members and students from participating in international conferences. *See* ECF 17-4 (2d Decl. Chaudhry) ¶¶ 3-4. Under EO3, these cancellations will continue, as will the resultant financial losses to the universities *See* Ex. 30 (3d Decl. Branon) ¶ 4 (21.6% decrease in international applications to UW's Continuum College since EO1); Ex. 37 (4th Decl. Riedinger) ¶¶ 3-4; Ex. 32 (5th Decl. Chaudhry) ¶¶ 6-14.

38.     In addition, numerous students from the banned countries are studying here on single-entry visas. *See, e.g.,* Ex. 19 (Decl. Fayazi) ¶ 7; Ex. 15 (Decl. Asheghabadi) ¶¶ 3-5. EO3 will impact their ability to attend academic conferences, visit their families abroad, or have

their families visit them. Many students, researchers, and faculty members have already started contemplating leaving Washington's universities for opportunities in more welcoming countries. *See, e.g.,* Ex. 38 (Decl. Hajishirzi) ¶ 9; Ex. 19 (Decl. A. Farhadi) ¶ 7. If this occurs, this will damage the research projects, academic programs, and the educational missions of Washington's institutions of higher education. *See* Ex. 44 (Decl. Greenbaum) ¶¶ 5-6; Ex. 43 (Decl. Shakerifard) ¶ 4.

39.     Like the first two Executive Orders, EO3 will also harm the universities' ability to recruit, employ, and retain, scholars from the affected countries. *See, e.g.*, Ex. 41 (Decl. Yoganarasimhan) ¶ 7. Washington has a proprietary interest in securing the best possible employees. Washington agencies and institutions of higher education (including UW and WSU) often recruit people based on their specialized skills and qualifications, from the countries affected by EO3.

40.     For example, several business Ph.D. applicants decided to attend universities in Canada or England. *See* Ex. 41 (Decl. Yoganarasimhan) ¶ 7. In addition, UW started the process of sponsoring three prospective employees to work in the fields of medicine and engineering. *See* ECF 17-2 (2d Decl. Riedinger) ¶ 10. Two of these scholars were expected to start in February 2017, but the EO1 prevented them from entering the U.S. *Id.* UW also sponsored two interns to work with faculty in medicine and science who were scheduled to start their internships during the 90-day ban imposed by EO1. *Id.* One of these interns would not have been able to enter the U.S. if the temporary restraining order had not issued. The second intern cancelled his internship because of EO1. *Id.*

41.     UW incurs costs for processing each application, including visa-related fees and the costs of the human resources required to assist the international scholars. *See, e.g.*, ECF 118-29 (Decl. Wood) ¶¶ 7-8. If a person whom UW has sponsored cannot enter the country or carry out their work because of EO3, UW will lose the benefit of its investment. UW may also lose associated registration fees and program expenses. *Id.* For example, UW will lose the

1   quarterly registration fee for each of the academic quarters that the intern who cancelled was to
2   be engaged in his internship.

3       42.     Likewise, Washington's educational institutions will have difficulty retaining
4   their faculty members and researchers. *See* Ex. 42 (Decl. Hosseinzadeh) ¶ 8; Ex. 45 (Decl.
5   Detwiler) ¶ 5. Several UW faculty members and researchers, for example, have considered
6   leaving for opportunities in Canada or elsewhere if their family will be indefinitely barred from
7   joining them in the United States. *See, e.g.,* Ex. 38 (Decl. Hajishirzi) ¶ 10. Given that they
8   teach electrical engineering, and other technical subjects, and have brought in significant
9   research grants to the university, their departure would be a very significant loss to UW. *Id.*

10      43.     EO3 will also prevent individuals from at least two of the listed countries, and
11  likely four students, from enrolling in Washington's public universities or colleges.[6] *See* Ex. 29
12  (2d Decl. Eaton) ¶ 5; Ex. 32 (5th Decl. Chaudhry) ¶¶ 11-13. This could result in lost tuition
13  revenue or other fees. As of March 12, 2017, UW's Graduate School had received 374
14  applications from prospective students from four of the banned countries—and had already
15  extended offers to twenty-eight of them. ECF 118-19 (Decl. Eaton) ¶ 3. The quality and
16  number of graduate students enrolling in UW graduate programs decreases without these
17  prospective students, as does UW's revenue that would otherwise be obtained from these
18  international students' tuition. Regular full-time tuition is currently $10,404 for Fall, Winter,
19  and Spring Quarters, and $10,074 for Summer Quarter. ECF 118-19 (Decl. Eaton) ¶ 4.

20      44.     Similarly, the UW Continuum College's International English Language
21  Program routinely enrolls students from several of the banned countries. As of March 12,
22  2017, the program fee paid by each student was $3,680 per quarter. ECF 118-17 (2d Decl.
23  Branon) ¶ 6. Five students from the targeted countries were accepted for either the Spring

24      ────────────────────

25  [6] Although the Third Executive Order only explicitly suspends student visas from Syria
    and North Korea, it also subjects Iranian and Somalian student visa applicants to enhanced
    screening and vetting procedures, which will likely slow or prevent students from enrolling in
26  our universities.

1  quarter, which began on March 22, 2017, or the Summer quarter, which began in June 2017.

2  ECF 118-17 (2d Decl. Branon) ¶¶ 9-10. However, as of October 10, 2017, there are only two

3  students enrolled. Ex. 30 (3d Decl. Branon) ¶ 4. If any future students are not able to travel to

4  the U.S. under EO3, UW's Continuum College will lose the associated program fees.

5      45.    A number of applicants from the countries targeted by the first two Executive

6  Orders contacted the Graduate School at UW with concerns about the Executive Orders. *See*

7  ECF 118-19 (Decl. Eaton) ¶ 5. Some requested refunds of the $85 application fee. *Id*. To date,

8  the Graduate School has provided application fee refunds to two affected applicants. *Id.*

9      46.    Likewise, EO3 will depress the number of applications universities receive from

10  international students in the first place. Since January 27, 2017, when EO1 issued, UW

11  Continuum College received five applications from the countries named in EO3 for Spring

12  2017, Summer 2017 and Autumn 2017 quarters combined, and only one of those applicants

13  has enrolled as opposed to the four students who enrolled in Autumn 2016 and Winter 2017

14  before EO1 issued. *See* Ex. 30 (3d Decl. Branon) ¶ 5. Further, UW Continuum College

15  experienced a drop of 21.6% in new student applications for Autumn quarter 2017 as

16  compared to Autumn quarter 2016. *Id*. ¶ 4. Likewise, WSU has suffered a significant decline in

17  applications from international students since EO1 issued. *See* Ex. 32 (5th Decl. Chaudhry) ¶

18  11. The program to train special education teachers, which had been seeing increased

19  application numbers from international students, processed only 10 applications this year

20  compared to last year's more than 60 applications. *See* ECF 118-18 (4th Decl. Chaudhry) ¶ 9.

21  At WSU, each international student pays a minimum of $42,216 per academic year in tuition

22  and fees to WSU. Ex. 32 (5th Decl. Chaudhry) ¶ 14.

23      47.    Finally, EO3 renders the State unable to honor its own sovereign laws, policies,

24  and commitments. Specifically, Washington and its employers, housing providers, and

25  businesses have long been prohibited from discriminating against people based on national

26  origin and/or religion in employment, housing, and in places of public accommodation. If EO3

1   is implemented, Washington will suffer the indignity of the federal government expressing a
2   religious and nationality preference in a way that violates Washington's prerogatives.

3                          **PLAINTIFF STATE OF CALIFORNIA**

4        48.     The State of California, represented by and through its Attorney General, is a
5   sovereign State of the United States. California is home to more than 10 million immigrants,
6   welcomed almost 8,000 refugees last year, and hosts the greatest number of international
7   students—almost 150,000—of any state.

8        49.     California joined this litigation as a Plaintiff following the issuance of EO2.
9   California suffered harm as a result of EO1 and EO2 and will continue to suffer injuries from
10  EO3.

11       50.     California has an interest in protecting the well-being of its populace and in
12  ensuring that its residents are not excluded from the benefits that flow from participation in the
13  federal system, including the rights and privileges provided by the United States Constitution
14  and federal law. California also has an interest, as evidenced by its Constitution and state law,
15  in prohibiting discrimination on the basis of religion or national origin. The Constitution of the
16  State of California provides that "[f]ree exercise and enjoyment of religion without
17  discrimination or preferences are guaranteed," and that the "Legislature shall make no law
18  respecting an establishment of religion." Cal. Const. art. I, § 4. California's Constitution also
19  prohibits any discrimination on the basis of national origin. *Id*. §§ 7-8, 31. California state law
20  also prohibits discrimination on the basis of religion or national origin. *See, e.g.*, Cal. Gov't
21  Code §§ 11135-11137, 12900 et seq; Cal. Civ. Code § 51, subd. (b).

22       51.     According to a 2015 study, 27 percent of California's population was foreign
23  born, about twice that of the nation as a whole. Foreign-born residents represented more than
24  30 percent of the population in eight California counties (Santa Clara, San Mateo, Los
25  Angeles, San Francisco, Alameda, Imperial, Orange, and Monterey). According to the 2015
26  American Community Survey, 213,689 California residents were born in Iran; 25,903 in Syria;

7,859 in Yemen; and 5,505 in Somalia. The foreign-born population, including those individuals from the countries affected by EO3, contributes significantly to the State's economy and workforce.

52.     California, as the sixth largest economy in the world, houses many small businesses, large corporations, non-profit organizations, public and private hospitals, and colleges and universities that will be adversely affected by EO3. These institutions employ and enroll individuals from the affected countries and rely on their expertise, skill, and labor. EO3 will harm California by reducing investment and industry in California and decreasing travel by students, scholars, and tourists. These outcomes will harm California's economy as a whole and will decrease state tax and other revenues. EO3 is also fundamentally inconsistent with and undermines California's commitment to diversity and nondiscrimination.

53.     California's state colleges and universities will be adversely affected by EO3. These institutions enroll many students from the affected countries and EO3 interferes with the continued matriculation of these students to California's universities and colleges. The University of California ("UC"), which has ten campuses, has numerous undergraduate students, graduate students, and medical residents who are nationals of Iran, Libya, Somalia, Syria, Chad, and Yemen. There are approximately 529 students on student visas from these countries across the UC system, and approximately 436 students at UC's six largest campuses (Los Angeles, Berkeley, San Diego, Irvine, Davis, Santa Barbara). The California State University System has approximately 250 students on visas from these countries and North Korea. Some international students already have withdrawn applications due to uncertainty caused by the First and Second Executive Orders. It is expected that EO3 will cause this trend to continue.

54.     EO3, like EO1 and EO2, prevents students from the affected countries who are currently in the United States on a single-entry visa, from traveling outside of the United States to academic conferences or to conduct research, due to the risk that they will be unable to

1    obtain a new valid visa to return to the United States. This inability to travel impacts the

2    studies, work, and future careers of these students. Finally, EO3 also interferes with family

3    visits, deterring students here from visiting their families abroad, and preventing family

4    members from coming to the United States to visit these students. As a result, some students

5    from the affected countries may choose to return home and permanently leave California

6    colleges and universities.

7           55.    Like the first two Executive Orders, EO3 also disrupts the ability of California's

8    universities and colleges to meet staffing needs. As a result of EO3, California colleges and

9    universities may be unable to hire the best faculty, lecturers, research assistants, and visiting

10   scholars from the affected countries. Without these faculty, graduate students, and post-

11   doctoral scholars, it will be far more difficult for these institutions to conduct important

12   research, instruction, and administration. Many of these individuals have specialized expertise

13   that cannot easily be replaced or duplicated. EO3 will interfere with the ability of those who

14   seek to study, train, research, and teach at California colleges and universities, to the detriment

15   of these communities.

16          56.    EO3 hinders the mission and purpose of California's colleges and universities.

17   In response to all three executive orders, universities throughout the State have had to expend

18   money and resources on providing support to impacted students and faculty in their

19   communities. The universities have also had to instruct their international students, faculty,

20   scholars, and employees to consult with immigration lawyers, register with their campus office

21   of International Affairs, and generally, show caution before traveling out of the country. In

22   addition, the executive orders have caused some Muslim students to fear participating in

23   educational, social, work, and community activities. The atmosphere of fear and uncertainty

24   created by EO1, EO2, and EO3 is antithetical to the diversity of perspectives and the freedom

25   of thought and expression that are essential to higher education.

26

57.     EO3 will also deprive California colleges and universities, and California, of significant revenue. The estimated expenditure in 2016 by foreign students in California was $5,215,216,463.

58.     EO3 will also impair California residents' access to health care. California, like many other states, relies on doctors who are foreign nationals, including those from the affected countries, especially in underserved rural areas. According to one survey, of the non-U.S.-citizen doctors in California's physician workforce, approximately 191 are from the countries affected by EO3. Researchers at Harvard University confirmed that California, and specifically Los Angeles, has one of the highest rates of physicians who are citizens and nationals from the affected countries in the United States. These physicians are responsible for the lives and care of hundreds of thousands of California residents.

59.     Like all other states, California is allotted 30 J-1 Visa Waiver recommendations and administers this program through the State Department of Health Care Services. Because of a critical need for primary care physicians in underserved communities, California gives priority to those willing to serve in these communities. EO3, by limiting the pool of applicants who may be selected for its 30 slots, will impede California's future ability to effectively use this program to benefit its citizens, especially those in rural and other underserved areas. California patients in underserved areas who are in need of health care may be forced to either delay treatment or travel farther to obtain it. This could lead to dire consequences for those California residents, and could also result in additional costs to the State of California for various reasons, including the cost of providing transportation for Medi-Cal beneficiaries to the nearest available provider. The shortage of even one physician can have serious implications for "safety-net" hospitals in underserved areas.

60.     In response to the executive orders, California medical residents and interns from the affected areas, as well as those from predominantly Muslim countries, have expressed

1   concern and a desire to seek alternate training and work in other countries such as Canada or

2   the United Kingdom. This will result in fewer physicians in California and the United States.

3        61.     EO3, like EO1 and EO2, will cause California to lose significant revenue from

4   tourism. In 2015, there were approximately 286,000 visitors from the Middle East, which

5   includes Iran, Syria, and Yemen, to California. Collectively, visitors from the Middle East

6   spent approximately $681,000,000 in California in 2015.

7        62.     The $681,000,000 spent by visitors from the Middle East is subject to state and

8   local taxes in California. As a result of this spending, it is estimated that the state sales tax, at a

9   rate of 6.0 percent, generated $40,860,000 in tax revenue for the State in 2015. In addition to

10  the state sales tax, California imposes a mandatory local tax rate of 1.25 percent, bringing the

11  total sales and use tax base to 7.25 percent. In some municipalities, additional local taxes can

12  raise the sales and use tax rate as high as 9.75 percent. At the minimum 1.25 percent local tax

13  rate, travelers from the Middle East are estimated to have generated $8,512,500 million in local

14  tax revenue in 2015. Altogether, 2015 spending by Middle East travelers is conservatively

15  estimated to have generated a total of $49,372,500 in state and local tax revenue.

16       63.     Using the estimated total of $49,372,500 in state and local tax revenue

17  generated annually by visitors from the Middle East, during a 90-day period, Middle East

18  travelers generate $12,174,041 in state and local tax revenue. Due to EO3, California will be

19  deprived of a significant portion of this revenue. In addition, because tourism supports

20  employers in California, EO3 may cause the elimination of tourism-related jobs.

21       64.     For example, on information and belief, the Los Angeles Tourism and

22  Convention Board estimated that it might see 300,000 fewer international visitors in 2017, a

23  three to four percent decrease from expectations, at least in part as a result of the Executive

24  Orders. This decrease would amount to an estimated loss of $220 million, which jeopardizes

25  the employment of the hundreds of thousands of Los Angeles residents whose jobs rely on

26  tourism. Tourism is particularly critical to the economy of Los Angeles, supporting more than

500,000 jobs in the city's leisure and hospitality sector. In 2016, Los Angeles attracted 47.3 million visitors. In 2015, Los Angeles's approximately 45.5 million visitors spent a total of $20.6 billion. In 2016, the Los Angeles Tourism and Convention Board announced a marketing campaign to increase tourism from the Middle East. In 2014 alone, 128,000 Middle Eastern travelers visited Los Angeles, accounting for approximately $410 million in direct spending.

## PLAINTIFF STATE OF MARYLAND

65.     This suit is brought on behalf of the State of Maryland ("Maryland") by its chief legal advisor and representative, Brian E. Frosh, the Attorney General of Maryland. Md. Code Ann., State Government § 6-106. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents, including this suit, which seeks to protect Maryland residents against illegal and unconstitutional federal immigration and travel restrictions. Md. Const. Art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

66.     Maryland joined this litigation as a Plaintiff following issuance of EO2. Maryland suffered harm as a result of EO1 and EO2 and will continue to suffer injuries from EO3.

67.     Maryland has a quasi-sovereign interest in protecting the welfare and safety of its residents and ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal laws.

68.     Immigrants have always been vital to Maryland's economy and its very identity, and in recent years the relative importance of immigrants' contribution has increased substantially. According to the U.S. Census Bureau, the percentage of Maryland residents who are foreign-born grew from 6.6% in 1990 to 9.8% in 2000, and then rose to 14.5% of the

1  population in the period 2011-15. Immigrants comprise nearly one-third of the residents in

2  Maryland's most populous county, Montgomery County.

3       69.    Maryland's foreign-born population contributes disproportionately to its

4  economy.

5       70.    According to the Census Bureau, in 2013 the 14.5% of Maryland's population

6  that was foreign-born provided 18.2% of Maryland's total workforce. In 2014 alone,

7  immigrants working in Maryland earned $33.7 billion and paid $3.1 billion in state and local

8  taxes; of these amounts, $1.5 billion in earnings and $134.8 million in state and local taxes

9  were attributable to immigrants from the Middle East and North Africa. Approximately 26% of

10  all entrepreneurs in Maryland are foreign-born. An Urban Institute study examining 2006 data

11  found that foreign-born residents accounted for 27% of Maryland's scientists, 21% of health

12  care practitioners, 19% of mathematicians and computer specialists; a quarter of construction

13  and agricultural workers; a third of all building and grounds maintenance workers; and almost

14  a quarter of food preparation and healthcare support workers.

15       71.    According to the Census Bureau's most current American Community Survey

16  data, as of 2015, approximately 2,829 non-citizen immigrants residing in Maryland are from

17  countries subject to the ban of EO3. The non-citizen immigrants who are Maryland residents

18  include 1,930 persons from Iran, 93 from Libya, 152 from Somalia, 344 from Sudan, and 310

19  from Syria.

20       72.    The Maryland Office for Refugees and Asylees ("MORA"), a state agency

21  operating pursuant to a cooperative agreement with the U.S. Department of State, has helped

22  more than 40,000 refugees make Maryland their home. MORA works through a network of

23  public and private service providers to plan, administer, and coordinate transitional services

24  aimed at helping refugees become self-sufficient contributors to the national and local

25  economy as quickly as possible. According to MORA's records, during the five-year period

26

ending September 30, 2016, 1,121 refugees from the countries designated in EO2 were resettled in Maryland, including 404 refugees from Syria.

73.     Maryland is home to non-profit organizations that provide services to refugees and immigrants in Maryland and throughout the world. EO3 directly impacts the ability of those organizations to fulfill their mission. For example, the International Rescue Committee, located in Baltimore, Maryland since 1990, contracts with the federal government to assist with refugee resettlements. Among those persons the Committee has helped with resettlement are at least 10,000 refugees in Baltimore and 4,000 in Silver Spring, Maryland. The Committee's clients have included 400 Syrian refugees.

74.     EO3 will also adversely impact economic investment in Maryland by foreign investors. For example, EO1 and EO2 already hindered the planned construction of a data center in Hagerstown, Maryland, developed by a permanent resident from Iran, with funding to be supplied by $50 million raised from 20 Iranian citizens. Though the necessary real property has been acquired and design of the improvements has begun, EO1 prompted the Iranian investors to withdraw their informal commitments.

75.     In addition to its quasi-sovereign interest, Maryland has an interest in the subject matter of this suit both as the proprietor of various facilities, institutions, and entities that will be adversely impacted by EO3 and as a taxing entity that stands to lose revenue from persons denied admission or dissuaded from travelling due to EO3 and from businesses that serve such persons. Among the most significant of these interests is the State of Maryland's proprietary interest in securing the best possible employees. Maryland agencies and institutions of higher education, including the University System of Maryland, employ a number of people from the countries subject to the restrictions set forth in EO3.

76.     EO3 will have a direct and substantial impact on the State of Maryland's 14 state universities and colleges and their faculty, staff and students who are foreign-born.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

77.     Maryland's flagship state university, the University of Maryland College Park ("UMCP"), currently enrolls more than 5,059 international students and employs approximately 1,130 international faculty from 130 countries. Last academic year, UMCP sent 1,841 students abroad to more than 60 countries. It currently has 273 active international agreements with more than 213 partners in 53 countries. According to the 2016 NAFSA Association of International Educators report, international students contribute $150 million annually to UMCP in payments for tuition, housing, and academic materials.

78.     The indefinite suspension of immigrant and visitor visas, resulting in the inability of family members to visit or immigrate, makes UMCP a less active choice in comparison to institutions in other English speaking countries. It will also prevent students from seeing family members, including visits for graduation and other significant events. It is already causing anxiety, depression, and alienation among international members of the campus community.

79.     EO3 also poses a significant chilling effect on other out-of-country faculty and students who fear traveling abroad due to the possibility that they will be denied reentry. Even UMCP students with valid visas have expressed hesitancy to travel abroad for fear that they will be subjected to heightened scrutiny upon their return to the United States, or that there may be additional executive orders forthcoming that will affect their immigration status.

80.     Due to the anxiety generated by EO1 and EO2, UMCP mobilized a team of professionals to provide special counseling services and has engaged legal counsel specializing in immigration. Similar steps may be required as a result of EO3.

81.     Students at private universities in Maryland also are impacted by EO3. As one example, the Johns Hopkins University is a private, not-for-profit institution of higher education located primarily in Baltimore, Maryland. Johns Hopkins has over 5,000 international students from more than 125 different countries, and over 1,350 international scholars from more than 85 different countries.

## COMMONWEALTH OF MASSACHUSSETTS

82.     The Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign State of the United States.

83.     Massachusetts joined this litigation as a Plaintiff following the issuance of EO2. Massachusetts suffered harm as a result of EO1 and EO2, and will continue to suffer injuries from EO3.

84.     Massachusetts is home to more than one million immigrants, hosts tens of thousands of international students, and welcomes approximately two thousand refugees each year. According to the 2016 American Community Survey: 7,149 Massachusetts residents were born in Iran; 5,136 in Venezuela; 3,852 in Somalia; 2,543 in Syria; and 11 in Yemen. In 2015 alone, the Commonwealth accepted hundreds of new refugees and asylees from several of the affected countries. It is the policy of Massachusetts "to promote the full participation of refugees and immigrants as self-sufficient individuals and families in the economic, social, and civic life of the commonwealth." Mass. Gen. Laws ch. 6, § 205.

85.     Massachusetts has a significant interest in treating its residents equally, as required by its constitution and laws, and in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges secured by the U.S. Constitution and federal law. Massachusetts also has a sovereign interest in protecting the health, safety, and well-being of all its residents, including against the special harms caused by discrimination based on race, religion, and national origin.

86.     Massachusetts is also home to hundreds, if not thousands, of small businesses, large corporations, non-profit organizations, public and private hospitals, and colleges and universities that will be affected by EO3. These institutions employ and enroll individuals from the affected countries and rely on their expertise, skill, labor, and other contributions to the State's civic society and economy. These institutions also engage in a constant exchange of information, personnel, and ideas with international partners and collaborators. Such

exchanges with institutions, organizations, businesses, and persons in the affected countries will be hampered or precluded altogether by EO3, just as they were by EO1 and EO2. *See, e.g.,* Pltf-Intervenor's Memorandum in Support of Extending Temporary Restraining Order, *Louhghalam v. Trump,* Case No. 17-cv-10154 (D. Mass. Feb. 2, 2017), ECF 52-1 through 52-7, (Decls. Jeffrey N. Catalano, Esq. (Massachusetts Bar Association), Michael F. Collins, M.D. (University of Massachusetts Medical School), Seth Kalvert (TripAdvisor LLC), Eric S. Lander (The Broad Institute, Inc.), Glen S. Leroy (The Boston Architectural College), City of Boston, and Carol A. Starkey (Boston Bar Association)).

87.     EO3 will thus affect these organizations' operations and productivity, in turn adversely affecting Massachusetts' overall competitiveness, including vis-à-vis international competitors who will become more attractive locations for investment, conferences, meetings, and other engines of economic growth. In turn, these harms will reduce Massachusetts' tax and other revenues.

88.     EO3 will also harm Massachusetts by decreasing travel to the State by students, scholars, tourists, and business travelers. Every person who forgoes a trip to Massachusetts means hotel bookings cancelled, meals not purchased, retail purchases not made, and related taxes not collected. These outcomes will harm Massachusetts' economy as a whole and will immediately decrease state tax and other revenues.

89.     In higher education and the health care industry in particular, Massachusetts depends upon the unique specialized knowledge and experience of foreign nationals, including from the affected countries, such as doctors, scholars, teachers, and other contributors to these institutions.

90.     Massachusetts supports an extensive system of twenty-nine public colleges and universities, including the University of Massachusetts ("UMass"). One in ten households in Massachusetts has a direct connection to UMass, given its 360,000 students, alumni, or employees residing in the state. UMass graduates 17,000 students per year, with 30 percent in

1  science, technology, engineering and mathematics ("STEM") fields, and spends $632 million

2  annually on research.

3         91.    UMass currently has approximately 25 employees from the affected countries

4  who are neither lawful permanent residents nor U.S. citizens, including medical residents,

5  researchers, lecturers, and post-doctoral fellows. *See* Ex. 46 (2d Decl. Heatwole) ¶¶ 3-21

6  (describing the effect of EO3 on UMass). To the extent these employees hold expired or

7  single-entry visas, it is now unclear whether these employees will be able to travel abroad for

8  personal or professional reasons with any confidence that they will be permitted to return to the

9  United States. At a minimum, these employees now face unprecedented delays in the renewal

10 of their visas, effectively precluding many of them from international travel.

11        92.    Each of these approximately 25 current employees from the affected countries

12 was, at one time, a national of an affected country applying at a consulate abroad for a visa for the

13 first time. Many of these individuals would not be employed by UMass today had EO3 been in

14 effect at the time that they first sought entry to the United States.

15        93.    Each year, UMass hires approximately 12 new employees from the affected

16 countries to fill academic and research positions. *See* Ex. 46 (2d Decl. Heatwole) ¶ 6. While

17 some of these employees obtain work authorization while already in the United States, some

18 do not. In recent years, UMass has hired a number of nationals of the affected countries who

19 were living abroad and who came to the United States on an H-1B or O-1 visa issued at a

20 consulate abroad. *Id*. ¶ 6. EO3 will severely interfere with the University's ability to hire such

21 individuals in the future. Because of EO3, UMass may be permanently unable to hire top-

22 ranked potential faculty, lecturers, or visiting scholars from the affected countries, because

23 EO3 may preclude them from reaching the United States to fulfill their teaching obligations.

24 *Id*. ¶¶ 6-9.

25        94.    UMass has approximately 180 graduate and undergraduate students who are

26 nationals of the affected countries and who are neither legal permanent residents nor U.S.

citizens. Six of these students are Syrian nationals. *See* Ex. 46 (2d Decl. Heatwole) ¶ 10. EO3 jeopardizes the continued enrollment of these current students, who may face unprecedented delays in the renewal of visas. These students may also be effectively precluded from traveling outside the United States, because EO3 threatens their ability to return.

95.     Each of these students, too, was at one time a national of an affected country, applying at a consulate abroad for an F-1 or other visa for the first time. EO3 will severely interfere with the University's ability to attract such students in the future. In the case of Syria, UMass may never again be able to enroll a Syrian student living abroad on an F-1 visa, absent a discretionary "waiver," which appears unlikely to be granted for an individual without prior contacts in the United States. In the case of Iran, it is unclear to what extent the undefined "enhanced screening and vetting requirements" referenced in EO3 will limit students' ability to obtain visas.

## PLAINTIFF STATE OF NEW YORK

96.     The State of New York, represented by and through its Attorney General, is a sovereign state of the United States.

97.     New York has declared that practices that discriminate against any of its inhabitants because of race, creed, color, or national origin are matters of public concern that threaten the rights and proper privileges of the State and harm the public welfare, health, and peace of the people. See N.Y. Const. art. I, § 11; N.Y. Exec. Law § 290.

98.     New York's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, is a quasi-sovereign interest.

99.     New York also has an interest in ensuring that its residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

100.     New York's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of New York's residents, including individuals who suffer indirect injuries and members of the general public.

101.     According to the most current American Community Survey data from the U.S. Census Bureau, as of 2015, approximately 11,376 residents in New York are naturalized U.S. citizens from the six of the countries most severely impacted by EO3: 2,544 citizens of Iranian origin, 3,473 citizens of Syrian origin, 4,460 citizens of Yemeni origin, and 899 citizens of Somali origin. In addition, more than 9575 non-citizen immigrants from these countries reside in New York— 2,990 Yemeni immigrants; 4,280 Iranian immigrants; 1,140 Somali immigrants; and 1,165 Syrian immigrants. And approximately 1,520 immigrants in New York are Iraqis. While Iraqi immigration is not entirely suspended under EO3, Iraqis may be subject to "additional scrutiny" before they may enter the United States.

102.     Like the first two Executive Orders, EO3 will separate our residents' families. Under the first two Executive Orders, numerous New York residents from the seven originally affected countries would have been prevented from being reunited with family members. *See, e.g.,* Ex. 47 (Decl. Eskandari) ¶ 7; ECF 118-5 (Decl. Amin) ¶¶ 5-9; ECF 118-8 (Decl. Elfgeeh) ¶¶ 4-10; Ex. 48 (2d Decl. Althaibani) ¶¶ 4-14; ECF 118-21 (Decl. Hemmati) ¶¶ 7-8. One Iranian national who had lived and worked in New York since 2009 described the emotional weight of being indefinitely separated from his parents, who still lived in Iran and would be ineligible for travel to the United States. ECF 118-45 (Decl. Eskandari) ¶ 2, 7. Another New Yorker who emigrated from Yemen in 1985 and became a U.S. citizen recounted the impact on her marriage to a Yemeni national. Ex. 48 (2d Decl. Althaibani) ¶¶ 8-14. Her husband, a journalist and researcher in Yemen, was forced to flee the country. *Id.* The couple began the visa application in November 2016, but the first two Executive Orders derailed that process. *Id.*

103.     If implemented, EO3 will again prevent New York residents from receiving visits from or reunifying with family members from the banned countries. Many U.S. citizens

29

1   and legal permanent residents in New York have applied for green cards for their family so that

2   non-U.S. citizen spouses may join their partners and families already residing here, children

3   abroad may be reunited with their New York-resident parent, parents living abroad may visit

4   their adult children, and families may otherwise share their new lives in the United States. As

5   was the case for many of these individuals under the first two Executive Orders, upon

6   implementation of EO3, these applications will be suspended indefinitely. *See, e.g.,* ECF 118-

7   45 (Decl. Eskandari) ¶ 7 (parents are Iranian nationals without authorization to enter the U.S.

8   and are subject to EO3's ban on "entry into the United States … as immigrants and as

9   nonimmigrants" (EO3, at Sec. 2(b)(ii))); Ex. 48 (2d Decl. Althaibani) ¶¶ 7-11 (Yemeni national

10  husband is subject to EO3's ban on "entry into the United States of nationals of Yemen as

11  immigrants" (EO3, at Sec. 2(h)(ii)) because he falls among covered individuals, per Sec. (a) & (b)).

12      104.    This presents a particularly harsh reality for those New York residents whose

13  visa status restricts travel to their home countries because they can only see family members if

14  their family members are permitted to visit the United States. *See, e.g.,* Ex. 118-5 (Decl. Amin)

15  ¶¶ 4-5 (single entry F-1 visa preventing doctoral student and researcher from visiting family in

16  Iran).

17      105.    Like the first two Executive Orders, EO3 will also harm New York universities'

18  ability to recruit, employ, and retain faculty and students from the affected countries. *See, e.g.,*

19  ECF 118-30 (Decl. Zimpher) ¶¶ 12-14 (stating that the State University of New York (SUNY)

20  system "actively" recruits international students and concern that travel ban will dissuade

21  students from applying to or accepting offers from SUNY institutions); ECF 118-24 (Decl.

22  Rabinowitz) ¶¶ 2-4, 5, 11-13, 19-21 (discussing the City University of New York's plans to

23  recruit and need to retain international students and faculty, and concerns of current faculty of

24  travel ban impact). This impacts the universities' academic standing among institutions of

25  higher education, and the educational opportunities afforded to New York residents. New York

26

1    has a proprietary interest in securing the best possible employees and providing a relevant and

2    quality education to residents.

3          106.    EO3, like EO1 and EO2, directly undermines the educational mission of the

4    City University of New York ("CUNY") and its plans for institutional development. In its

5    2016-2020 Master Plan, CUNY's Board of Trustees acknowledged the increasing importance

6    of providing "global perspectives" through a diverse faculty and diverse student body. *See* ECF

7    118-24 (Decl. Rabinowitz) ¶ 4. The Master Plan specifically emphasizes CUNY's goal to

8    further faculty diversity and, in particular, geographic diversity of its student body by

9    recruiting more international students to enroll in and transfer to CUNY. *Id.*

10         107.    Executive Vice Chancellor and University Provost of CUNY, Vita Rabinowitz,

11   previously explained that, as a practical matter, the first two Executive Orders were "impeding

12   the ability of current students to leave the United States for personal reasons and to take part in

13   'study abroad' programs; chilling CUNY's ability to recruit and enroll foreign students;

14   interfering with the ability of CUNY faculty, postdoctoral researchers and graduate students,

15   and their collaborators abroad, to travel for research purposes; and limiting CUNY's ability to

16   hire and retain foreign faculty and to host foreign scholars in the United States." *See* ECF 118-

17   24 (Decl. Rabinowitz) ¶¶ 5, *passim*. EO3's blanket restrictions on granting nonimmigrant visas

18   to individuals from the designated countries will continue to have this impact on CUNY and

19   the education it provides. Other academic and research institutions in New York faced similar

20   harm under the first two Executive Orders and expect the negative impact to continue under

21   EO3.

22         108.    In addition, these institutions have experienced a new need for support services

23   for international students and researchers facing professional and personal uncertainty as a

24   result of all three EOs. CUNY currently enrolls more than 8,000 international students from

25   over 100 countries. *See* ECF 118-24 (Decl. Rabinowitz) ¶¶ 11. SUNY enrolls more than

26

1   22,000 international students from 160 different countries, including approximately 297

2   students from the countries designated by EO3. *See* ECF 118-30(Decl. Zimpher) ¶ 4.

3       109.    Like the first two Executive Orders, EO3 will restrict students, scholars, and

4   faculty members who rely on their ability to renew their visas from traveling abroad for

5   research or scholarship. For example, numerous graduate students from the banned countries

6   are studying here on limited-entry visas. EO3, like its predecessors, constrains these students'

7   ability to attend academic conferences, visit their families abroad, or have their families visit

8   them because of its ban on nonimmigrant visas to these individuals and uncertainty about

9   receiving a waiver.

10      110.    For example, after issuance of the first two Executive Orders, the Committee on

11  Interns & Residents – a union representing 5,900 medical interns, residents and fellows in New

12  York – advised members who were nationals of the impacted countries not to travel outside the

13  United States and members on visas to travel only after considering the risks of being refused

14  reentry. *See* Ex. 118-47 (Decl. Scherzer) ¶ 6. The risk of not being permitted reentry persist

15  under EO3 and, for some, now has no sunset date.

16      111.    Professionals, scholars, and students have already started contemplating leaving

17  New York's universities for opportunities in more welcoming countries. For example, one

18  Iranian national and postdoctoral fellow in New York, has been conducting cancer research for

19  over 10 years. *See* Ex. 118-21 (Decl. Hemmati) ¶¶ 2, 5. However, her H1-B employment visa

20  will expire on April 2018 and, under the first two Executive Orders, she was unsure whether

21  her visa would be renewed. *Id.* ¶ 4. As a result, she was considering relocating to Europe,

22  where she could continue her research without interruption. *Id.* ¶¶ 7-8. Under the terms of

23  EO3, her circumstances remain unchanged since nationals of Iran may not be admitted as

24  nonimmigrants and her current visa does not exempt her from the entry ban on Iranian

25  nationals.

26

112.   As EO3 pushes individuals into greater uncertainty about their future in the United States, the continued loss of talent will damage the research projects, academic programs, and the educational missions of New York's institutions of higher education. Under both EO2 and EO3, New York-based scientists and researchers working on techniques to diagnose kidney cancer at early stages, drug candidates for diabetes, and treatments for leukemia have been forced to choose between continuing their life-saving research and being able to see their family members who are still in the designated countries. A postdoctoral research fellow studying leukemia in New York is fearful that she will not be able to renew her visa when it expires next year. And a scientist working on diabetes drugs cannot leave the United States on her single-entry F1 student visa because she would risk being unable to return to her research and her fiancé if she left.

113.   As under EO2, EO3 harms New York companies by, among other things, interfering with business travel and undermining the ability of New York businesses to retain or recruit from countries with significant Muslim populations, putting them at a disadvantage in the competitive international hiring market.

114.   EO3 also continues to harm health care institutions in New York State, which rely on foreign nationals—including those from the banned countries—to provide health care to New Yorkers, and to train and teach the next generation of medical professionals in New York. According to the Immigrant Doctors Project, about 500 doctors who trained in the EO3-designated countries, including 200 from Syria alone, provide 1.1 million medical appointments each year in New York State. *See* Ex. 49 (2d Decl. Akhtar) ¶ 18. The Greater New York Hospital Association ("GNYHA") reported that 80 member hospitals in the State employ 72 physician trainees and 38 other health care workers with non-immigrant visas from the six of the EO3-designated countries. *See* ECF 118-46 (Decl. Johnson) ¶¶ 11-12.

115.   Additionally, EO3 has done nothing to eliminate the uncertainty and obstacles created by the first two Executive Orders with respect to New York hospitals' participation in

1   the National Residency Matching Program. Hospitals may be reluctant to consider, let alone

2   interview or highly rank, some of their best candidates, who are from foreign countries

3   (including the EO3 designated countries) because of the travel ban. At the present time,

4   hospitals are in the process of interviewing residency candidates for the next academic year.

5   However, because EO3 either prohibits or highly restricts nationals of the designated countries

6   from entering the United States on nonimmigrant visas, international applicants may not be

7   able to participate in the mandatory in-person interview process and take the mandatory exams

8   since they would no longer have access to non-immigrant visas to enter the United States for

9   those specific purposes. Even if applicants receive waivers to interview and take the residency

10   exam, they are not guaranteed a visa upon receipt of an offer from a hospital. Given these

11   strictures, hospitals may be reluctant to consider candidates from the banned countries

12   regardless of their qualifications because they have no guarantee that the candidates will be

13   able to begin – or finish – their residency.

14       116.   EO3, like the first two Executive Orders, also threatens the operations of New

15   York's "safety-net" hospitals which employ a significant number of foreign national resident

16   physicians to provide care to high needs populations in 97 medically underserved communities

17   in New York State. For example, of the 91 resident physicians in the Department of Internal

18   Medicine at Interfaith Medical Center, a safety-net hospital in Brooklyn, 43 are on H-1B visas,

19   12 are on J-l visas, and 20 are legal permanent residents. Nationals of the banned countries

20   with H-1B visas are not eligible for automatic reconsideration or renewal of their visa once it

21   expires, placing both New York's safety-net hospitals and the State's most vulnerable residents

22   at risk.

23       117.   Like EO2, the international students and faculty subject to travel restrictions

24   under EO3 substantially contribute to New York State's economy. Based on information from

25   Open Doors and the U.S. Department of Commerce, the Institute of International Education

26   estimates that in 2015-2016, New York educational institutions served 5.7% of all

1   international students from the eight travel-restricted countries identified by EO3. During the

2   same period, these students and Iraqi students who, going forward, will be subject to additional

3   vetting, contributed $30.4 million to New York State's economy, which includes direct

4   payments for tuition and fees and living expenses, and excludes indirect economic benefits

5   such as contributions of international students and scholars to innovation in academic and

6   medical research.

7   118.    EO3's travel restrictions also have the ability to harm cities and towns in upstate

8   and Western New York, where the influx of immigrants – including those from EO3-

9   designated countries - in recent years has helped maintain and boost local economies and

10  businesses.

11  **PLAINTIFF STATE OF OREGON**

12  119.    The State of Oregon joins this action to protect its residents, its employers, its

13  agencies, its educational institutions, and its state constitution and laws against both the First,

14  Second and Third Executive Orders, which harm the State, its economy, its institutions, its

15  families, its laws, and its sovereign interest in serving as a welcoming home to people from all

16  over the world. The Governor is the State's chief executive officer and is responsible for

17  overseeing the State's operations and ensuring that its laws are faithfully executed. The

18  Attorney General is the State's chief legal adviser whose powers and duties include acting in

19  federal court on matters of public concern.

20  120.    According to the American Community Survey data from the U.S. Census

21  Bureau, as of 2015, thousands of Oregon residents were born in Iran, Libya, Somalia, Chad,

22  Syria, and Yemen. Oregon's companies employ immigrants, refugees, and others who would

23  be affected by the ban in more indirect ways (spouses of immigrants, for example). Threats to

24  Oregon's companies will result in serious risks to Oregon's financial investments, its credit

25  rating, its companies, and its tax revenue from those companies and their employees.

26

121.     Portland International Airport, located in Portland, Oregon, served over 670,000 international travelers in 2016. It has been estimated that international travelers from just one major airline contribute over $172 million in business revenue to Oregon. EO3 will cause significant economic injury to Oregon by interfering with international travel and deterring international travelers from coming to Oregon.

122.     The University of Oregon ("UO") is a public research university with more than 2,700 students from countries other than the United States, including the countries affected by the First, Second and Third Executive Orders. International students typically pay substantially more than in-state students; those students pay more than $100 million in tuition each year, in total. This tuition allows UO to subsidize Oregon students, who pay about three times less than international students. Even students from outside the immediately affected countries have expressed a loss of enthusiasm for the prospect of studying in the United States. UO's Admissions Department had already seen a 20 percent decrease in applications from international students in 2017 as a result of the chilling effect of the executive orders Representatives from universities in China, Japan, Korea, Singapore, Hong Kong, Canada, Australia, and New Zealand have been open about their plans to actively recruit top students who would have otherwise come to the U.S. and to UO. Graduate admissions at UO are most immediately impacted by EO3. UO is making admissions offers to top graduate (doctoral and masters), candidates, some of whom are from the countries affected by the ban. Persons from the affected countries will not be able to accept UO's if they cannot come into the United States. Closing the door to the world's best and brightest students hinders UOs ability to accelerate the flow of innovation from lab/think tank to market and workplace. Ex. 52 (2d Decl. Galvan) at 4.

123.     UO's administration is using limited resources to field inquiries about the impact EO3 will have, and already is having, on faculty, staff, and student travel. UO also hosted two international conferences in the fall of 2017. The international conference on

sustainable cities and land use, held in Portland, was to be attended by 45 partner members of the Association of Pacific Rim Universities, of which the University of Oregon is the only Oregon member institution. Approximately half the conference's international attendees declined to attend as a result of, among other things, the Executive Orders. The same is true for a second conference, also hosted at UO in fall 2017, by the UO School of Architecture and Allied Arts on design innovation and urban futures. Hoped-for attendees to this conference signaled their unwillingness to travel to the US. Loss of participation in these conference resulted in decreased revenue for the UO and the state of Oregon, and will hinder the important work of the UO with its member universities.

124.    Portland State University (PSU) is a public research university with nearly 2,000 students from countries other than the United States, including the countries affected by the First, Second and Third Executive Orders. Approximately $33 million of PSU's tuition and fee revenue in academic year 2015-16 was derived from international students. PSU has 61 students from counties covered by EO3, four of whom are new this quarter and one of whom has not yet arrived. PSU also has one J-1 visa scholar and one H-1B faculty member from an affected country.

125.    Oregon State University (OSU) had 3,529 international students enrolled as of February 2017, comprising more than 11 percent of its student body and including students who are citizens of the countries affected by the First, Second and Third Executive Orders. As with other students from outside Oregon, those students typically pay full non-resident rates; OSU's international students represent approximately $85 million in annual gross tuition revenue to OSU. OSU's efforts to address the effects of the Executive Orderson its students and faculty are draining away time and resources that otherwise would be spent on other community needs. ECF 103 (Decl. Adams).

126.    Other public and private schools face similar harms. For example, Lewis & Clark College, a private institution in Portland, has more than 200 international students. Like

1   EO1and EO2, EO3 will harm the college's ability to attract and retain students from the

2   countries subject to the immigration ban, and are likely to have a chilling effect on Lewis &

3   Clark's ability to recruit international students, causing both fiscal harm (loss of tuition) and

4   harm to the college's ability to foster a diverse and global student body.

5       127.    Oregon Health & Sciences University ("OHSU"), a public academic medical

6   center, had at least 11 individuals at its campus from seven countries affected by EO3: This

7   includes nine individuals who are either nationals of or born in Iran, four on H-1B visa status,

8   four students and one faculty member. OHSU also has one Syrian medical resident and one J-1

9   physician that is schedule to arrive in November 2017.

10      128.    EO3 will also harm Oregon's ability to recruit doctors, particular in rural and

11  underserved areas. Oregon depends on international medical graduates who have been given a

12  J-1 visa to complete a medical residency or fellowship in the United States. A stipulation of the

13  J-1 visa is that, upon completion of training, the physicians must return to their home country

14  for two years, but this requirement may be "waived" for a physician willing to work in a

15  shortage area. Since 2002, approximately 350 J-1 visa physicians have practiced in Oregon,

16  including 10 physicians from the countries affected by EO3. Ex. 50 (2d Decl. Overbeck ) ¶ 5.

17  As required by the visa, these physicians serve regions such as rural areas of southern and

18  eastern Oregon that have difficulty recruiting physicians domestically, particularly physicians

19  who are willing to accept the Oregon Health Plan or Medicare payment. Currently, a physician

20  from Iran is practicing in underserved areas. *Id.* ¶¶ 5, 6. Without J-1 visa physicians, Oregon

21  patients will have to either delay treatment or travel farther to obtain it, resulting in additional

22  Oregon Health Plan and Medicare costs to the State. *Id.* ¶ 6.

23      129.    There is a great deal of competition to obtain physicians willing to work on the

24  J-1 program. In the past, Oregon has been unable to fill all of its 30 available slots, and EO3

25  will make this even more difficult. In particular, candidates for J-1 visas need to be able to

26  travel to Oregon to interview for positions, most often either on a tourist or business visa.

1    However, under EO3, candidates who are nationals of the five Muslim-majority countries

2    subject to the EO3--Chad, Iran, Libya, Syria, and Somalia--are unable to do so. Additionally,

3    the physician's families and friends would be unable to visit them in the United States and they

4    would face the risk of not being to return if they left. All of these factors will make recruiting

5    J-1 visa physicians very difficult. *Id.* ¶ 3-4.

6                                **DEFENDANTS**

7        130.    Defendant Donald Trump is the President of the United States, and issued EO1,

8    EO2, and EO3. He is sued in his official capacity.

9        131.    Defendant U.S. Department of Homeland Security ("DHS") is a federal cabinet

10   agency responsible for implementing and enforcing the Immigration and Nationality Act

11   ("INA"). DHS is a Department of the Executive Branch of the U.S. Government, and is an

12   agency within the meaning of 5 U.S.C. § 552(f). The U.S. Customs and Border Protection is an

13   Operational and Support Component agency within DHS. The U.S. Customs and Border

14   Protection is responsible for detaining and/or removing non-citizens arriving at air, land, and

15   sea ports across the United States.

16       132.    Defendant Elaine C. Duke is the Acting Secretary of the Department of

17   Homeland Security. She is responsible for implementing and enforcing the INA, and oversees

18   the U.S. Customs and Border Protection. She is sued in her official capacity.

19       133.    Defendant Rex Tillerson is the Secretary of State. The Secretary of State has

20   authority to determine and implement certain visa procedures for non-citizens. He is sued in

21   his official capacity.

22       134.    Defendant the United States of America includes all government agencies and

23   departments responsible for the implementation of the INA and responsible for the admission,

24   detention, removal of non-citizens who are traveling to or returning to the States via air, land,

25   and sea ports across the United States.

26

1

## IV.    ALLEGATIONS

2

**President Trump's Campaign Promise: "[A] Total and Complete Shutdown of Muslims entering the United States"**

3

4

135.    Prior to his election, Donald Trump campaigned on the promise that he would

5

ban Muslims from entering the United States. On July 11, 2015, candidate Trump stated in a

6

speech in Las Vegas that, "If you're from Syria and you're a Christian, you cannot come into

7

this country, and they're the ones that are being decimated. If you are Islamic … it's hard to

8

believe, you can come so easily." *See* ECF 118-2 at 12-13 (Louis Jacobson, *Donald Trump*

9

*says if you're from Syria and a Christian, you can't come to the U.S. as a refugee*, Politifact

10

(July 20, 2015)).

11

136.    On December 7, 2015, candidate Trump issued a press release calling for "a

12

total and complete shutdown of Muslims entering the United States." *See* ECF 118-2 at 18

13

(Donald J. Trump Campaign, *Donald J. Trump Statement on Preventing Muslim Immigration*

14

(Dec. 7, 2015).[7]

15

137.    In defending his decision shortly thereafter, candidate Trump compared the

16

Muslim ban to former President Franklin Roosevelt's decision to intern Japanese Americans

17

during World War II, and stated, "This is a president highly respected by all, [Roosevelt] did

18

the same thing." *See* ECF 118-2 at 21 (Jenna Johnson, *Donald Trump says he is not bothered*

19

*by comparisons to Hitler*, The Washington Post (Dec. 8, 2015)).

20

138.    When a news reporter further asked candidate Trump what the customs process

21

would look like for a Muslim non-citizen attempting to enter the United States, candidate

22

Trump stated, "[T]hey would say, 'are you Muslim?'" And, if they said they were Muslim,

23

24

---

[7] The December 7, 2015, press release was not removed from the President's campaign website until May 8, 2017, more than three months after this litigation was first filed and immediately prior to appellate arguments regarding the constitutionality of EO2. *See* Ex. N (Jessica Estepa, *'Preventing Muslim Immigration' Statement Disappears from Trump's Campaign Site*, USA Today (May 8, 2017)).

25

26

1 | candidate Trump confirmed they would not be allowed into the country. *See* ECF 118-2 at 28

2 | (Nick Gass, *Trump not bothered by comparisons to Hitler*, Politico (Dec. 8, 2015)).

3 |   139. When asked during the Republican primary debate on January 14, 2016,

4 | whether he wanted to rethink his position regarding Muslims entering the country, candidate

5 | Trump said, "No." *See* ECF 118-2 at 48 (The American Presidency Project, *Presidential*

6 | *Candidates Debates: Republican Debate in North Charleston, South Carolina* at 16 (Jan. 14,

7 | 2016)).

8 |   140. In February 2016, candidate Trump asked Lieutenant General Michael Flynn to

9 | advise him on a range of issues, including national security and foreign policy. That same

10 | month, Lt. Gen. Flynn posted the following message ("tweet") on his Twitter account: "Fear of

11 | Muslims is RATIONAL: please forward this to others: the truth fears no questions…" and

12 | linked to a YouTube video that argues Islamophobia is an oxymoron. *See* ECF 118-2 at 65. Lt.

13 | Gen. Flynn would later become Trump's National Security Advisor.

14 |   141. On March 9, 2016, candidate Trump stated during an interview with Anderson

15 | Cooper that he "think[s] Islam hates us." *See* ECF 118-2 at 84 (*Anderson Cooper 360 Degrees:*

16 | *Exclusive Interview with Donald Trump* at 17 (CNN television broadcast, Mar. 9, 2016)).

17 |   142. On June 13, 2016, candidate Trump reiterated his promise to ban all Muslims

18 | entering this country until we "as a nation . . . are in a position to properly and perfectly screen

19 | those people coming into our country." *See* ECF 118-2 at 104 (*Read Donald Trump's Speech*

20 | *on the Orlando Shooting*, Time (Jun 13, 2016)).

21 |   143. On July 17, 2016, candidate Trump and Vice Presidential candidate Mike Pence

22 | appeared on *60 Minutes* and were interviewed by Lesley Stahl. After Ms. Stahl referenced

23 | Mike Pence's December 2015 tweet stating a Muslim ban would be offensive and

24 | unconstitutional, candidate Trump stated: "So you call it territories. OK? We're gonna do

25 | territories. We're not gonna let people come in from Syria that nobody knows who they are."

26 | When Ms. Stahl asked candidate Trump if he was changing his position on the Muslim ban,

candidate Trump stated, "—No, I—call it whatever you want. We'll call it territories, OK?" When Ms. Stahl further asked whether he no longer included Muslims, candidate Trump stated, "You know—the Constitution, there's nothing like it. But it doesn't necessarily give us the right to commit suicide, as a country, OK? And I'll tell you this. Call it whatever you want, change territories [sic], but there are territories and terror states and terror nations that we're not gonna allow the people to come into our country." *See* ECF 118-2 at 121-22 (*60 Minutes,* CBS News at 10 (July 17, 2016)).

144.    Asked again during a July 24, 2016, interview about whether he was "backing off on his Muslim ban[]," candidate Trump stated, "I actually don't think it's a pull-back. In fact, you could say it's an expansion." He further stated, "I'm looking now at territories. People were so upset when I used the word Muslim. Oh you can't use the word Muslim. Remember this. And I'm okay with that, because I'm talking territory instead of Muslim." *See* ECF 118-2 at 130, 135 (*Meet the Press – July 24, 2016*, NBC News at 1 (July 24, 2016)).

145.    In a foreign policy speech delivered on August 15, 2016, candidate Trump noted that the United States could not "adequate[ly] screen[]" immigrants because it admits "about 100,000 permanent immigrants from the Middle East every year." Candidate Trump proposed creating an ideological screening test for immigration applicants, which would "screen out any who have hostile attitudes towards our country or its principles – or who believe that Sharia law should supplant American law." During the speech, he referred to his proposal as "extreme, extreme vetting." *See Donald Trump Foreign Policy Speech in Youngstown*, C-SPAN (Aug. 15, 2016), *available at* https://www.c-span.org/video/?413977-1/donald-trump-delivers-foreign-policy-address (quoted remarks at 50:46).

146.    On October 9, 2016, candidate Trump was asked during the St. Louis presidential debate to explain whether or not his proposed Muslim ban still applied. Candidate Trump replied: "It's called extreme vetting." *See* ECF 118-2 at 168 (The American Presidency

1   Project, *Presidential Debates: Presidential Debate at Washington University in St. Louis,*
2   *Missouri* at 9 (October 9, 2016)).

3        147.    On December 21, 2016, President-Elect Trump was asked whether he had
4   decided to "rethink or re-evaulate [his] plans to create a Muslim registry or ban Muslim
5   immigration to the United States." President-Elect Trump responded by stating, "You know
6   my plans. All along, I've been proven to be right." *See* Ex. E (Abby Phillip and Abigail
7   Hauslohner, *Trump on the Future of Proposed Muslim ban, registry; 'You know my plans,'*
8   The      Washington      Post      (Dec.      22,      2016),      *available      at*
9   https://www.washingtonpost.com/news/post-politics/wp/2016/12/21/trump-on-the-future-of-
10  proposed-muslim-ban-registry-you-know-my-plans/?utm_term=.b19232c2b763).

**President Trump Issues EO1**

11

12       148.    On January 20, 2017, Donald Trump was inaugurated as the President of the
13  United States. In his first television interview as President, on January 25, 2017, he again
14  referred to his commitment to "extreme vetting." *See* ECF 118-2 at 196 (*ABC News Anchor*
15  *David Muir Interviews President Trump*, ABC News at 13 (Jan. 25, 2017)).

16       149.    On January 27, 2017, one week after being sworn in, President Trump signed
17  EO1 titled, "Protecting the Nation from Foreign Terrorist Entry into the United States." EO1
18  directed a series of changes to the manner in which non-citizens may seek and obtain entry to
19  the United States.

20       150.    Section 3(c) of EO1 proclaimed that entry of immigrants and non-immigrants
21  from countries referred to in section 217(a)(12) of the Immigration and Nationality Act, 8
22  U.S.C. § 1187(a)(12), i.e., Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen, "would be
23  detrimental to the interests of the United States." EO1 "suspend[ed] entry into the United
24  States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this
25  order"—and provided for the possibility that the suspension could be extended. The majority
26  of the population in each of these seven countries is Muslim.

151.    Sections 5(a)–(b) of EO1 suspended the U.S. Refugee Admissions Program ("USRAP") in its entirety for 120 days and then, upon its resumption, directed the Secretary of State to prioritize refugees who claim religious-based persecution, "provided that the religion of the individual is a minority religion in the individual's country of nationality."

152.    Section 5(c) of EO1 proclaimed that entry of Syrian refugees is "detrimental to the interests of the United States" and suspended their entry indefinitely.

153.    In a January 27, 2017, interview with the Christian Broadcasting Network, President Trump confirmed his intent to prioritize Christians in the Middle East for admission as refugees. President Trump stated, "Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them." *See* ECF 118-2 at 201, (*Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority As Refugees*, Christian Broadcasting Network at 8 (Jan. 27, 2017)).

154.    During a signing ceremony for EO1 on January 27, 2017, President Trump read its title and stated, "We all know what that means." *See Trump Signs Executive Orders at Pentagon*, ABC News (Jan. 27, 2017), *available at* http://abcnews.go.com/Politics/video/trump-signs-executive-orders-pentagon-45099173 (quoted remarks at 0:45). President Trump stated that the purpose of EO1 was to "establish[] new vetting measures to keep radical Islamic terrorists out of the United States of America." *See* ECF 118-2 at 204 (Sarah Pulliam Bailey, *Trump Signs order limiting refugee entry, says he will prioritize Christian refugees*, The Washington Post (Jan. 27, 2017)).

155.    That same day, a Deputy Assistant Secretary for Visa Services at the U.S. Department of State, Edward J. Ramotowski, issued a letter which, subject to limited

1    exceptions, "provisionally revoke[d] all valid nonimmigrant and immigrant visas of nationals

2    of Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen." *See* ECF 118-2 at 209.

3          156.    Also that day, the U.S. Department of State and some U.S. embassies and

4    consulates abroad posted a notice online advising immigrant visa applicants that visa issuance

5    had been suspended and visa interviews cancelled. *See* ECF 118-2 at 211 (online notice); ECF

6    118-2 at 213 (Iraq embassy notice).

7          157.    On January 28, 2017, a spokeswoman for DHS stated that lawful permanent

8    residents, or green card holders, would be barred from entry pursuant to the Executive Order.

9    *See* ECF 118-2 at 216 (*Green card holders will need additional screening: White House*,

10    Reuters (Jan. 29, 2017)).

11          158.    On January 29, 2017, DHS apparently reversed its decision through a statement

12    by Secretary Kelly that suggested, while the EO1 did apply to lawful permanent residents,

13    DHS had determined lawful permanent residents should be admitted through an exception

14    because their admission was in the public interest. *See* ECF 118-2 at 221 (U.S. Dep't of

15    Homeland Security, *Statement by Secretary John Kelly on the Entry of Lawful Permanent*

16    *Residents into the United States* (Jan. 29, 2017)).

17          159.    Two days later, on January 31, 2017, the U.S. Customs and Border Protection, a

18    DHS sub-agency, issued a statement that repeated Secretary Kelly's earlier statement. *See* ECF

19    118-2 at 223 (U.S. Customs and Border Protection, *Protecting the Nation from Foreign*

20    *Terrorist Entry into the United States* (Jan. 31, 2017)). However, it also confirmed in its

21    "Questions and Answers" section that the EO1 applies to lawful permanent residents and that

22    their entry would depend on receipt of a "national interest waiver[] consistent with the

23    provisions of the [first] Executive Order." *See* ECF 118-2 at 226 (U.S. Customs and Border

24    Protection, *Q&A for Executive Order: Protecting the Nation from Foreign Terrorist Entry into*

25    *the United States* (Feb. 2, 2017)).

26

160.    On February 1, 2017, White House Counsel Donald McGahn issued a Memorandum purporting to offer "Authoritative Guidance" that lawful permanent residents were never covered by Sections 3 and 5 of EO1. *See* ECF 50-1.

161.    On January 29, 2017, President Trump issued a statement defending EO1, stating "[t]his is not a Muslim ban." *See* ECF 118-2 at 230 (*President Donald J. Trump Statement Regarding Recent Executive Order Concerning Extreme Vetting* (Jan. 29, 2017)).

162.    President Trump's statement conflicted with the statement made by his cybersecurity advisor the day before. In an interview with Fox News on January 28, 2017, Rudolph Giuliani confirmed that the EO1 was crafted to be a "legal" ban on Muslims. Specifically, Giuliani stated that President Trump asked him for a "Muslim ban" and instructed Giuliani to "put a commission together" to "show [Trump] the right way to do it legally." *See* ECF 118-2 at 233 (Amy B. Wang, *Trump asked for a 'Muslim Ban,' Giuliani says – and ordered a commission to do it 'legally'*, The Washington Post (Jan. 29, 2017)). A video of Giuliani's statements is available at: https://www.youtube.com/watch?v=aGOwEOTYfuE.

163.    On January 30, 2017, President Trump defended the timing of EO1. President Trump tweeted, "If the ban were announced with a one week notice, the 'bad' would rush into our country during that week." *See* ECF 118-2 at 239 (Donald J. Trump (@realDonaldTrump), Twitter (Jan. 30, 2017, 5:31am ET)).

164.    Several reports released by the federal government demonstrate that it did not further its stated purpose. For example, a draft report prepared at the request of the DHS Acting Under Secretary for Intelligence and Analysis concluded that citizenship was "unlikely to be an indicator" of terrorism threats against the United States. Released on February 25, 2017, the draft report found that citizens of the seven countries banned through EO1 were "rarely implicated" in U.S.-based terrorism. Specifically, the DHS report determined that at least 82 people were inspired by a foreign terrorist group to carry out or attempt to carry out an attack in the United States since March 2011. Of those 82 people, more than half were native-

1    born U.S. citizens, and the remaining persons were from 26 countries—with the most

2    individuals originating from Pakistan. Of the seven countries included in EO1, only Somalia

3    and Iraq were on the list of "top" origin countries. *See* ECF 118-2 at 242 (Vivian Salama &

4    Alicia A. Caldwell, *AP Exclusive: DHS report disputes threat from banned nations*, Associated

5    Press (Feb. 24, 2017) (including a hyperlink to the draft report)); ECF 118-2 at 241-257 (copy

6    of draft report); *see also* ECF 118-2 at 259-267 (U.S. Department of Homeland Security,

7    *Intelligence Assessment: Most Foreign-born, US-based Violent Extremists Radicalized after*

8    *Entering Homeland; Opportunities for Tailored CVE Programs Exist* (March 1, 2017)).

9        165.    According to one report, not a single fatal terrorist attack has been perpetrated

10   in the United States by a national of one of these seven countries since at least 1975. *See* ECF

11   118-2 at 269 (Alex Nowrasteh, *Little National Security Benefit to Trump's Executive Order on*

12   *Immigration*, Cato Institute Blog (Jan. 25, 2017, 3:31pm ET)). Other countries whose nationals

13   have perpetrated fatal terrorist attacks in the United States were not part of EO1. *See* ECF 118-

14   2 at 273 (Scott Schane, *Immigration Ban Is Unlikely to Reduce Terrorist Threat, Experts Say*,

15   N.Y.Times (Jan. 28, 2017)).

16       166.    On February 3, 2017, this Court issued a temporary restraining order ("TRO")

17   precluding Defendants from implementing Sections 3(a), 5(a)-(c), and 5(e) of EO1. Defendants

18   appealed this Court's TRO to the U.S. Court of Appeals for the Ninth Circuit, which construed

19   the TRO as a preliminary injunction.

20       167.    On February 6, 2017, ten former national security, foreign policy, and

21   intelligence officials including Madeline Albright, Avril D. Haines, Michael Hayden, John

22   Kerry, John McLaughlin, Lisa O. Monaco, Michael J. Morell, Janet A. Napolitano, Leon E.

23   Panetta, and Susan Rice, submitted a declaration before the Ninth Circuit, stating: "We all

24   are…unaware of any specific threat that would justify the travel ban established by the

25   Executive Order." Further, the former officials stated "there is no national security purpose for

26   a total bar on entry for aliens" and warned that EO1 "could do long-term damage to our

1  national security." *See Washington v. Trump*, Case No. 17-35105, ECF 28-2 at 3 (9th Cir. Feb.

2  6, 2017).

3         168.    On February 9, 2017, the Ninth Circuit issued a *per curiam* opinion denying

4  Defendants' emergency motion for a stay of this Court's order. On February 14, 2017, this

5  Court concluded that the Ninth Circuit had construed the TRO as a preliminary injunction.

6         169.    During the week that EO1 was in full effect, Defendants detained or removed at

7  least 100 people entering the United States pursuant to the order, including lawful permanent

8  residents, U.S.-based residents returning from visits abroad, and others with valid visas to visit

9  family in the United States. In addition, pursuant to EO1, the State Department revoked

10  approximately 60,000 visas. *See* ECF 118-2 at 280 (Adam Kelsey et al., *60,000 Visas Revoked*

11  *Since Immigration Executive Order Signed: State Department*, ABC News (Feb. 3, 2017, 6:32

12  PM ET)).

13  **President Trump Issues EO2**

14         170.    On February 16, 2017, Defendants filed a brief in the Ninth Circuit advising the

15  court that "the President intends in the near future to rescind the [first Executive] Order and

16  replace it with a new, substantially revised Executive Order." Appellants' Supplemental Brief

17  on *En Banc* Consideration at 4, *Washington v. Trump*, No. 17-35105 (9th Cir. Feb. 16, 2017),

18  9th Cir. ECF 154 at 16.

19         171.    The same day, President Trump held a press conference and stated that his

20  executive actions simply fulfilled his campaign promises and indicated a new "comprehensive"

21  executive order would issue shortly. Specifically, President Trump stated: "[Politicians] lie[] to

22  the American people in order to get elected. Some of the things I'm doing probably aren't

23  popular but they're necessary for security and for other reasons. . . . I'm here following through

24  on what I pledged to do. That's all I'm doing." *See* ECF 118-2 at 286-87 (Aaron Blake, *Donald*

25  *Trump's combative, grievance-filled news conference, annotated*, The Washington Post at 4, 6-

26  7, (Feb. 16, 2017)).

172.     At the same press conference, President Trump stated: "We have taken decisive action to keep radical Islamic terrorists out of our country. No parts [that] are necessary and constitutional actions were blocked by judges, in my opinion, incorrect, and unsafe ruling. Our administration is working night and day to keep you safe, including reporters safe. And is vigorously defending this lawful order. I will not back down from defending our country. I got elected on defense of our country. I keep my campaign promises, and our citizens will be very happy when they see the result. They already are, I can tell you that. Extreme vetting will be put in place, and it already is in place in many places."

173.     On February 21, 2017, President Trump's senior policy advisor, Stephen Miller, confirmed the new executive order would have "mostly minor technical differences." Mr. Miller further indicated the intent behind the new executive order would not change. Specifically, Mr. Miller stated, "you're still going to have the same basic policy outcome for the country, but you're going to be responsive to a lot of very technical issues that were brought up by the court and those will be addressed." *See* ECF 118-2 at 325 (*Miller: New order will be responsive to judicial ruling; Rep. Don DeSantis: Congress has gotten off to a slow start* at 2 (Feb. 21, 2017)).

174.     On February 27, 2017, then-White House Press Secretary Sean Spicer, was asked why the President continued to defend EO1 instead of rescinding it. Mr. Spicer answered: "[T]he manner in which [EO1] was done in the first place was what we believe and continue to believe was the right way to address this problem. And while EO2 attempts to address the court's concerns that they made, the goal is obviously to maintain the way that we did it the first time . . ." *See* ECF 118-2 at 366-67 (*Press Briefing by Press Secretary Sean Spicer, 2/27/2017, #17,* The White House at 26-27 (Feb. 27, 2017)).

175.     On March 6, 2017, the White House revoked EO1 and issued EO2. EO2 was again titled "Protecting the Nation from Foreign Terrorist Entry into the United States" and has an effective date of March 16, 2017. *See* ECF 108-1.

1    176.    Section 2(c) of EO2 suspended the "entry into the United States of nationals of

2  Iran, Libya, Somalia, Sudan, Syria, and Yemen"—six of the seven countries targeted in EO1—

3  for a period of 90 days. Like EO1, EO2 provided for possible expansion of the ban beyond 90

4  days and to nationals from additional countries.

5    177.    Under Section 3, the suspension of entry pursuant to Section 2 applied only to

6  foreign nationals of the designated countries who: (i) were outside the United States on the

7  effective date of EO2, (ii) did not have a valid visa at 5:00 p.m. EST on the date of EO1, and

8  (iii) did not have a valid visa on the effective date of EO2.

9    178.    Section 3 also provided for various "exceptions" and potential "waivers" to

10  Section 2's suspension. It conferred discretion on certain federal officials to decide on a "case-

11  by-case basis" to allow entry to certain foreign nationals otherwise barred by Section 2. There

12  were no instructions, forms, or other process available by which to obtain a waiver under

13  Section 3. Section 3 excepted lawful permanent residents, visa-holders, dual nationals traveling

14  on passports issued by a non-designated country or on diplomatic visas, and foreign nationals

15  who had been granted asylum as well as refugees who had been admitted to the United States.

16    179.    Section 6(a) of EO2 suspended the "travel" of all refugees to the United States

17  and all decisions by DHS on applications for refugee status for a period of 120 days. Again,

18  EO2 provided for an expansion of the ban beyond 120 days if it was determined that countries

19  failed to implement the "additional procedures" identified by Defendants as necessary "to

20  ensure the security and welfare of the United States."

21    180.    Section 6(b) of EO2 suspended the entry of more than 50,000 refugees for fiscal

22  year 2017. In September 2016, after consultation with the Congress, President Obama

23  determined that up to 110,000 refugees would be admitted during fiscal year 2017.

24    181.    Also on March 6, 2017, DHS published a "Q&A" document with answers to

25  questions about EO2. *See* ECF 118-2 at 376-95 (Department of Homeland Security, Q&A:

26

THIRD AMENDED COMPLAINT                              50                    ATTORNEY GENERAL OF WASHINGTON
                                                                                   800 Fifth Avenue, Suite 2000
                                                                                     Seattle, WA 98104-3188
                                                                                          (206) 464-7744

1    Protecting the Nation from Foreign Terrorist Entry to the United States (Mar. 6, 2017, 11:30

2    AM ET)).

3          182.   In that "Q&A," DHS stated that nationals from one of the six targeted countries

4    currently present in the United States on a single-entry visa will have to obtain a new valid visa

5    in order to leave and return to the United States. Likewise, DHS stated that students and

6    exchange visitors from the six designated countries who are currently present in the United

7    States—and their related U.S.-based dependents—will have to obtain a new valid visa in order

8    to leave and return to the United States, if their visas expire while EO2 was in place. *See id.* at

9    4, 13.

10         183.   Also, on March 6, 2017, President Trump issued a memorandum titled

11   "Implementing Immediate Heightened Screening and Vetting of Applications for Visas and

12   Other Immigration Benefits." In the memorandum, President Trump ordered the State

13   Department, DHS, and the Attorney General to "implement protocols and procedures as soon

14   as practicable that in their judgment will enhance the screening and vetting of applications for

15   visas and all other immigration benefits" while EO2 was implemented. *See* ECF 118-2 at 399

16   (The White House, *Memorandum for the Secretary of State, the Attorney General, the*

17   *Secretary of Homeland Security,* (Mar. 6, 2017)).

18         184.   The same day President Trump issued EO2, his campaign issued a fundraising

19   e-mail. In it, President Trump requested support for EO2 and the fight against "radical Islamic

20   terrorism," and stated, "I will NEVER stop fighting until we implement the policies you—and

21   millions of Americans like you—voted for." *See* ECF 118-2 at 404 (Matt Zapotosky, et. at.,

22   *Revised executive order bans travelers from six Muslim-majority countries from getting visas*,

23   The Wash. Post (Mar. 6, 2017)).

24         185.   On March 7, 2017, then-White House Press Secretary Sean Spicer confirmed

25   the purpose of EO2 was for President Trump to fulfill his campaign promise. Mr. Spicer stated:

26   "President Trump yesterday continue [sic] to deliver . . . his . . . campaign promise[]:

1    protecting the country against radical Islamic terrorism." *See* ECF 118-2 at 412 (*Press Briefing*

2    *by Press Secretary Sean Spicer, 3/7/2017, #18,* The White House at 2 (Mar. 7, 2017)).

3        186.    On March 10, 2017, more than 130 foreign policy experts addressed President

4    Trump in an open letter, concluding that the EO2 was just as "damaging" to the United States'

5    interests as EO1. Representing foreign policy experts under both Republican and Democratic

6    administrations, they observed that, even though Iraq was left off EO2, Iraqis would remain in

7    harm's way due to the 120-day suspension of refugees. *See* ECF 118-2 at 452 (*Letter from*

8    *Foreign Policy Experts on Travel Ban*, N.Y. Times (Mar. 10, 2017)).

9        187.    In filing a notice with this Court about the issuance of EO2, Defendants

10   declared: "This Court's injunctive order does not limit the Government's ability to

11   immediately begin enforcing the [second] Executive Order." Further, Defendants stated:

12   "[T]he Government intends to begin enforcing the [second] Executive Order on its effective

13   date of March 16, 2017." *See* ECF 108 at 13.

14       188.    Soon after Defendants' announcement, impacted states, organizations, and

15   individuals nationwide sought to enjoin provisions of EO2. On March 15, 2017, the U.S.

16   District Court for the District of Hawaiʻi issued a nationwide temporary restraining order

17   enjoining enforcement of Sections 2 and 6, i.e., the provisions restricting entry of nationals

18   from the six-targeted countries and the refugee provision. *Hawaiʻi v. Trump*, 241 F. Supp. 3d

19   1119, 1140 (D. Haw. 2017). The next day, the U.S. District Court for the District of Maryland

20   issued a preliminary injunction against enforcement of Section 2(c) of EO2. *Int'l Refugee*

21   *Assistance Project ("IRAP") v. Trump*, 241 F. Supp. 3d 539, 565-566 (D. Md. 2017).

22       189.    Shortly thereafter, President Trump attended a rally in Nashville, where he

23   admitted, "[t]he order he blocked was a watered down version of the first order. . . And let me

24   tell you something. I think we ought to go back to the first one and go all the way, which is

25   what I wanted to do in the first place." *See* Ex. A (Katie Reilly, *Read President Trump's*

26   *Response to the Travel Ban Ruling: It 'Makes Us Look Weak'*, Time (Mar. 16, 2017)).

1    190.    After the *Hawaiʻi* and *IRAP* injunctions issued, this Court stayed Plaintiff

2    States' own motion for a temporary restraining order. ECF 164. In May 2017, this Court

3    further stayed proceedings on the merits pending resolution of the *Hawaiʻi* appeal. ECF 189.

4    191.    On May 25, 2017, an *en banc* panel of the U.S. Court of Appeals for the Fourth

5    Circuit largely upheld the nationwide injunction issued by the District Court of Maryland. *See*

6    *IRAP v. Trump*, 857 F.3d 554, 606 (4th Cir. 2017) (en banc). The Fourth Circuit reasoned that

7    EO2 likely violated both the Constitution and the Immigration and Nationality Act.

8    192.    On June 1, 2017, Defendants filed a petition for a writ of certiorari in the United

9    States Supreme Court. *See Trump v. IRAP*, No. 16-1463 (U.S. June 1, 2017). On the same day,

10   Defendants filed an application for a stay of the injunctions with the Supreme Court.

11   193.    Two days later, President Trump tweeted: "We need to be smart, vigilant and

12   tough. We need the courts to give us back our rights. We need the Travel Ban as an extra level

13   of safety!" *See* Ex. F  (Donald J. Trump (@realDonaldTrump), Twitter (June 3, 2017, 4:17pm

14   ET)

15   194.    On June 5, 2017, President Trump issued a series of tweets criticizing EO2 and

16   calling for a return to EO1. President Trump stated, "The Justice Dept. should have stayed with

17   the original Travel Ban, not the watered down, politically correct version they submitted to

18   S.C." Ex. G (Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017 3:29 a.m. ET).

19   President Trump also tweeted: "People, the lawyers and the courts can call it whatever they

20   want, but I am calling it what we need and what it is a TRAVEL BAN!" Ex. H (Donald J.

21   Trump (@realDonaldTrump), Twitter (June 5, 2017 6:20 p.m.).

22   195.    On June 12, 2017, the U.S. Court of Appeals for the Ninth Circuit largely—and

23   unanimously—upheld the District of Hawaiʻi's injunction on the grounds that EO2 violated the

24   Immigration and Nationality Act. *See Hawaiʻi v. Trump*, 859 F.3d 741, 741 (9th Cir. 2017).

25   196.    Although the plain terms of EO2 directed that its provisions ended on June 14,

26   2017, President Trump issued a Presidential Memorandum that day delaying the start date of

each of the provisions enjoined by the courts until seventy-two hours after the injunctions were lifted or stayed. Ex. I (Presidential Memorandum for the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, *Effective Date in Executive Order 13780* (June 14, 2017)).

197.    On June 26, 2017, the Supreme Court granted Defendants' petitions for certiorari in both *Hawai'i* and *IRAP* and stayed the preliminary injunctions "to the extent the injunctions prevent enforcement of § 2(c) with respect to foreign nationals who lack any bona fide relationship with a person or entity in the United States." *Trump v. IRAP*, 137 S. Ct. at 2087 (2017). By partially lifting the injunction, the Supreme Court's order triggered the 90-day and 120-day expiration dates of EO2.

198.    On June 28, 2017, the State Department issued a cable implementing EO2, which interpreted the Supreme Court's definition of "bona fide relationship" to exclude "grandparents, grandchildren, aunts, uncles, nieces, nephews, cousins, brothers-in-law and sisters-in-law, fiancés and any other 'extended' family members." Ex. J (U.S. lays out criteria for visa applicants from six Muslim nations, Reuters (June 28, 2017)).

199.    After plaintiffs in the Hawai'i litigation successfully challenged Defendants' interpretation of "bona fide relationship," the Ninth Circuit upheld the District of Hawai'i's modification of the injunction applicable to EO2. Under the modified injunction, Defendants were enjoined from enforcing EO2 against grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews and cousins of persons in the United States and refugees who have formal assurances from resettlement agencies or are in the U.S. Refugee Admissions Program. *Hawai'i v. Trump*, --- F.3d ----, No. 17-16426, 2017 WL 3911055, at *14 (9th Cir. Sep. 7, 2017).

**President Trump Issues EO3**

1      200.    Pursuant to the June 14, 2017, Presidential Memorandum and the Supreme

2  Court's June 26, 2017, decision partially lifting the injunction, EO2 expired on September 24,

3  2017.

4      201.    That same day, President Trump issued a Presidential Proclamation titled

5  "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United

6  States by Terrorists or Other Public-Safety Threats." 82 Fed. Reg. 45,161 (Sept. 27, 2017). Ex.

7  B (EO3).

8      202.    EO3 entirely suspends immigration by persons from six Muslim-majority

9  countries: Chad, Iran, Libya, Syria, Yemen, and Somalia. The order also applies "additional

10  scrutiny" to Iraq, another Muslim-majority country.

11      203.    EO3 also suspends classes of non-immigrants like students, businesspeople, and

12  tourists. The non-immigrant restrictions vary by country and by type of visa.

13      204.    Although nominal restrictions also apply to nationals of two non-Muslim

14  majority countries, North Korea and Venezuela, EO3's restrictions only apply to Venezuelans

15  connected to specific, named government agencies, and the number of visas issued each year to

16  North Korea is historically less than 100 people per year. *See* Ex. K (U.S. Dep't of Homeland

17  Security, *Table 3: Persons Obtaining Lawful Permanent Resident Status By Region and*

18  *Country of Birth: Fiscal Years 2013 to 2015* (last published Dec. 15, 2016) (indicating 55

19  North Koreans received green cards in 2015, compared with 13,114 Iranians who did); Ex. L

20  (U.S. Dep't of Homeland Security, *Table 26: Nonimmigrant Admissions (I-94 Only) By Region*

21  *and Country of Citizenship: Fiscal Years 2013 to 2015* (last published Dec. 15, 2016)

22  (indicating 99 non-immigrants from North Korea were admitted in 2015, compared with

23  35,266 non-immigrants from Iran).

24      205.    EO3's restrictions are not temporary and contain no sunset date—they apply

25  indefinitely.

26

206.    EO3 does not treat all countries similarly with respect to its findings regarding security and information sharing. For example, EO3 states that Somalia "generally satisfies the information-sharing requirements" required by DHS, but imposes an indefinite ban on nationals from Somalia. As another example, EO3 finds that Iraq did not meet DHS's requirements, but imposes no ban on Iraqis—and instead recommends "additional scrutiny."

207.    EO3 does not address or explain why countries that refused to share their identity protocols with the United States, such as Belgium, are not included in the travel and visa restrictions. Ex. 1 (Joint Declaration of 49 National Security Officials) ¶ 12.

208.    EO3 does not explain the absence of countries that participate in the Visa Waiver Program despite a May 2016 Government Accountability Office report suggesting more than a third of the 38 mostly European, Western, and non-Muslim majority countries fail to meet their obligation of sharing terrorist identity or criminal history information with the United States. Ex. M (Government Accountability Office, *DHS Should Take Steps to Ensure Timeliness of Information Needed to Protect U.S. National Security* (May 5, 2016)).

209.    EO3 applies to nationals of the banned countries regardless of where they currently reside, and regardless if they have ever resided in their country of origin.

210.    EO3 allows for waivers of its restrictions on a discretionary case-by-case basis. For example, EO3 states that waivers "may be appropriate" where "the foreign national is an infant, a young child or adoptee" or "an individual need[s] urgent medical care."

211.    All of the listed examples of situations where waivers "may be appropriate" reflect specific examples of individuals whose denial of entry resulted in legal challenges and public outcry following EO1.

212.    Like the first two Executive Orders, EO3 ignores DHS's February 2017 report indicating that citizenship was "unlikely to be an indicator" of terrorism threats against the United States and that many foreign-born, U.S.-based violent extremists are radicalized after entering the United States. *See* ECF 118-2 at 255; ECF 118-2 at 259-267.

213. For nationals from Iran, Libya, Somalia, Yemen, and Syria who do not have a credible claim of a bona fide relationship with a person or entity in the United States, EO3 ban went into effect on September 24, 2017. For all others subject to EO3, including those with bona fide relationships with a person or entity in the United States, the order goes into effect on October 18, 2017.

214. Following the issuance of EO3, the Supreme Court removed the *Hawai'i* and *IRAP* cases from the oral argument calendar and directed the parties to file letter briefs addressing whether, or to what extent, EO3 rendered the cases moot. *Trump v. Hawai'i*, --- S. Ct. ----, No. 16-1540, 2017 WL 2734554, at *1 (U.S. Sept. 25, 2017). On October 10, the Supreme Court dismissed *IRAP* as moot and directed the Fourth Circuit to vacate its opinion, finding that there was no longer a live controversy because the only section of EO2 enjoined in *IRAP* had "expired by its own terms on September 24, 2017." *Trump v. IRAP*, --- S. Ct. ----, No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017). The Court "express[ed] no view on the merits." *Id.*

## V. FIRST CAUSE OF ACTION
### (Fifth Amendment – Equal Protection)

215. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Third Amended Complaint.

216. The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

217. Sections 3 and 5 of the EO1, Sections 2 and 6 of the EO2, and Section 2 of EO3, together with statements made by Defendants concerning their intent and application, target individuals for discriminatory treatment based on their country of origin and/or religion, without lawful justification.

218. All three Executive Orders were motivated by animus and a desire to harm a particular group.

219.    The discriminatory terms and application of the Executive Orders are arbitrary and cannot be sufficiently justified by federal interests.

220.    Through their actions above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

221.    Defendants' violation causes ongoing harm to the States and their residents.

## VI.    SECOND CAUSE OF ACTION
### (First Amendment – Establishment Clause)

222.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Third Amended Complaint.

223.    The Establishment Clause of the First Amendment prohibits the federal government from officially preferring one religion over another.

224.    Sections 3 and 5 of the EO1, Sections 2 and 6 of EO2, and Section 2 of EO3, together with statements made by Defendants concerning their intent and application, are intended to disfavor Islam.

225.    Through their actions above, Defendants have violated the Establishment Clause of the First Amendment.

226.    Defendants' violation causes ongoing harm to the States and their residents.

## VII.    THIRD CAUSE OF ACTION
### (Fifth Amendment – Procedural Due Process)

227.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Third Amended Complaint.

228.    The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their liberty interests without due process of law.

229.    Where Congress has granted statutory rights and authorized procedures applicable to arriving and present non-citizens, minimum due process rights attach to those statutory rights.

230.    Because federal agencies have created regulatory rights related to the petitioning for and issuance of visas and other immigration benefits, due process must be given prior to any deprivation of these statutory and regulatory rights.

231.    Sections 3 and 5 of EO1, Sections 2 and 6 of EO2, and Section 2 of EO3 conflict with the statutory rights and procedures directed by Congress. In issuing and implementing the Executive Orders, Defendants have violated the procedural due process guarantees of the Fifth Amendment.

232.    Defendants' violation causes ongoing harm to the States and their residents.

## VIII.   FOURTH CAUSE OF ACTION
### (Immigration and Nationality Act)

233.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Third Amended Complaint.

234.    Section 8 of Article I of the U.S. constitution bestows Congress with exclusive authority over our immigration laws. Congress has laid down the country's immigration laws in the Immigration and Nationality Act ("INA"), as codified under Title 8 of the United States Code

235.    The INA is a multi-faceted and complex immigration structure. It sets forth specific prohibitions, as well as explicit requirements and detailed processes, related to the country's issuance of visas and refugee programs.

236.    For example, 8 U.S.C. § 1152(a)(1)(A), prohibits discrimination in the issuance of immigrant visas on the basis of race, nationality, place of birth, or place of residence.

237.    8 U.S.C. § 1101(a)(15)(U) creates a category of visas for noncitizens who are victims of specified crimes and assist U.S. law enforcement in the prosecution of criminal cases  ("U-visa"). The same provision also creates a category of visas for the noncitizen victim's family members, even if the family member is living abroad ("U-visa derivative"). 8

1  C.F.R. 214.14(f)(6)(ii) sets forth the process for petitioning for a U-visa derivative for a family

2  member outside the United States.

3      238.   8 U.S.C. § 1101(a)(15)(T) creates a category of visas for noncitizens who are

4  victims of severe forms of human trafficking and their family members ("T-visa"). The same

5  provision also creates a category of visas for the noncitizen victim's family members, even if

6  the family member is living abroad ("T-visa derivative"). 8 C.F.R. 214.11(k)(9)(ii) sets forth

7  the process for petitioning for a T-visa derivative for a family member outside the United

8  States.

9      239.   8 U.S.C. § 1157 sets forth the admission procedures for refugees, specifically.

10  Section 1157(a) requires the numerical limitation on refugees be set by the President only after

11  "appropriate consultation" with Congress.

12     240.   8 U.S.C. § 1182(f) permits the President to suspend the entry of immigrants and

13  non-immigrants into the United States only if he first "finds that the entry of any aliens or of

14  any class of aliens into the United States would be detrimental to the interests of the United

15  States."

16     241.   Sections 3 and 5 of EO1, Sections 2 and 6 of EO2, and Section 2 of EO3,

17  together with statements made by Defendants concerning their intent and application, violate

18  the INA.

19     242.   Together, the provisions discriminate on the basis of race, nationality, place of

20  birth, and/or place of residence in the issuance of visas, suspend or impede the refugee

21  program without appropriate consultation with Congress, override the visa and admissibility

22  provisions established by Congress, lack sufficient findings to suspend the entry of aliens, and

23  otherwise contravene the INA's complex immigration structure and violate the statute.

24     243.   Defendants' violation causes ongoing harm to the States and their residents.

25              IX.    FIFTH CAUSE OF ACTION
                    (Religious Freedom Restoration Act)

26

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

244.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Third Amended Complaint.

245.    The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(a), prohibits the federal government from substantially burdening the exercise of religion, even if the burden results from a rule of general applicability.

246.    Section 3 of EO1, Section 2 of EO2, and Section 2 of EO3, if implemented, will result in substantial burdens on Muslims' exercise of religion in a way that is not the least restrictive means of furthering a compelling governmental interest.

247.    The Executive Orders will have the effect of imposing a special disability on the basis of religion, by denying or impeding Muslim residents from accessing benefits relating to their own or their family members' immigration status.

248.    Defendants' violation causes ongoing harm to the States and their residents.

## X.    SIXTH CAUSE OF ACTION
### (Procedural Violation of the Administrative Procedure Act)

249.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Third Amended Complaint.

250.    The Administrative Procedure Act, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct formal rule making before engaging in action that impacts substantive rights.

251.    In implementing Sections 3 and 5 of the EO1, Sections 2 and 6 of EO2, and Section 2 of EO3, federal agencies changed the substantive criteria by which individuals from affected countries may enter the United States. Federal agencies did not follow the procedures required by the Administrative Procedure Act before taking action impacting these substantive rights.

252.    Through their actions above, Defendants have violated the Administrative Procedure Act.

253.    Defendants' violation causes ongoing harm to the States and their residents.

## XI.    SEVENTH CAUSE OF ACTION
### (Substantive Violation of the Administrative Procedure Act)

254.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Third Amended Complaint.

255.    The Administrative Procedure Act, 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary, unconstitutional, and contrary to statute.

256.    None of the three Executive Orders is authorized by the INA. As alleged herein, all three Executive Orders discriminate on the basis of race, nationality, place of birth, and/or place of residence in the issuance of visas, suspend or impede the refugee program without appropriate consultation with Congress, override the visa and admissibility provisions established by Congress, lack sufficient findings to suspend the entry of aliens, and otherwise contravene the INA's complex immigration structure and violate the statute.

257.    In implementing Sections 3 and 5 of EO1, Sections 2 and 6 of EO2, and Section 2 of the Third Executive Order, federal agencies have taken or will take unconstitutional and unlawful action, as alleged herein, in violation of the Administrative Procedure Act.

258.    In implementing Sections 3 and 5 of EO1, Sections 2 and 6 of EO2, and Section 2 of EO3, federal agencies have applied or will apply provisions arbitrarily, in violation of the Administrative Procedure Act.

259.    Defendants' violation causes ongoing harm to the States and their residents.

## XII.    EIGHTH CAUSE OF ACTION
### (Tenth Amendment)

260.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Third Amended Complaint.

261.    The Tenth Amendment reserves all powers not enumerated in the Constitution to the states and prohibits the federal government from commandeering state legislative processes.

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

262.   The Tenth Amendment prohibits the federal government from directly compelling states to enact and enforce federal law.

263.   Sections 3 and 5 of EO1, Sections 2 and 6 of EO2, and Section 2 of EO3, together with statements made by Defendants concerning their intent and application, target individuals for discriminatory treatment based on their country of origin and/or religion, without lawful justification.

264.   The States and their employers, housing providers, and businesses have long been prohibited by their States' laws from discriminating against people based on national origin and religion in employment, housing, and in places of public accommodation.

265.   All three Executive Orders effectively mandate that the States engage in discrimination based on national origin and/or religion, thereby rescinding the States' historic protection of civil rights and religious freedom.

266.   Through their actions above, Defendants have violated the Tenth Amendment.

267.   Defendants' violations cause ongoing harm to the States.

### XIII.   PRAYER FOR RELIEF

Wherefore, the States pray that the Court:

a.   Declare that Sections 3(c), 5(a)–(c), and 5(e) of EO1 are unauthorized by and contrary to the Constitution and laws of the United States;

b.   Enjoin Defendants from implementing or enforcing Sections 3(c), 5(a)–(c), and 5(e) of EO1, including at all United States borders, ports of entry, and in the issuance of visas, pending further orders from this Court;

c.   Declare that Sections 2(c) and 6(a) of EO2 are unauthorized by and contrary to the Constitution and laws of the United States;

      d.     Enjoin Defendants from implementing or enforcing Sections 2(c) and 6(a) of EO2, including at all United States borders, ports of entry, and in the issuance of visas, pending further orders from this Court;

      e.     Declare that Section 2 of EO3 is unauthorized by and contrary to the Constitution and laws of the United States;

      f.     Enjoin Defendants from implementing or enforcing Section 2 of EO3, including at all United States borders, ports of entry, and in the issuance of visas, pending further orders from this Court; and

      g.     Award such additional relief as the interests of justice may require.

DATED this 11th day of October, 2017.

Respectfully submitted,


BOB FERGUSON, WSBA #26004
Attorney General of Washington

*/s/ Noah G. Purcell*
NOAH G. PURCELL, WSBA #43492
Solicitor General
COLLEEN M. MELODY, WSBA #42275
Civil Rights Unit Chief
ANNE E. EGELER, WSBA #20258
Deputy Solicitor General
MARSHA CHIEN, WSBA #47020
PATRICIO A. MARQUEZ, WSBA #47693
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
Noahp@atg.wa.gov
Colleenm1@atg.wa.gov

XAVIER BECERRA
Attorney General of California

ANGELA SIERRA
Senior Assistant Attorney General
THOMAS S. PATTERSON
Senior Assistant Attorney General
TAMAR PACHTER
Supervising Deputy Attorney General
ENRIQUE A. MONAGAS
Deputy Attorney General

*/s/ Alexandra Robert Gordon*
ALEXANDRA ROBERT GORDON
Deputy Attorney General
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5509
E-mail:
Alexandra.RobertGordon@doj.ca.gov

1  | BRIAN E. FROSH
   | Attorney General of Maryland

2

   | /s/ Steven M. Sullivan
3  | STEVEN M. SULLIVAN, Federal Bar #24930
   | Solicitor General
4  | ROBERT A. SCOTT, Federal Bar #24613
   | Assistant Attorney General
5  | MEGHAN K. CASEY, Federal Bar #28958
   | Assistant Attorney General
6  | Office of the Attorney General of Maryland
   | 200 St. Paul Place, 20th Floor
7  | Baltimore, Maryland 21202
   | Telephone: (410) 576-6325
8  | Fax: (410) 576-6955
   | ssullivan@oag.state.md.us
9  | rscott@oag.state.md.us
   | mcasey@oag.state.md.us

10

MAURA HEALEY
Attorney General of Massachusetts

*/s/ Jesse M. Boodoo*
JESSE M. BOODOO
*Assistant Attorney General*
GENEVIEVE C. NADEAU
*Chief, Civil Rights Division*
ELIZABETH N. DEWAR
State Solicitor
One Ashburton Place
Boston, MA 02108
617-963-2204
Bessie.Dewar@state.ma.us
Genevieve.Nadeau@state.ma.us
Jesse.Boodoo@state.ma.us

11 | ERIC T. SCHNEIDERMAN
   | Attorney General of the State of New York

12

   | */s/ Lourdes M. Rosado*
13 | LOURDES M. ROSADO
   | Bureau Chief, Civil Rights Bureau
14 | ANISHA DASGUPTA
   | Deputy Solicitor General
15 | Office of the New York State Attorney General
   | 120 Broadway
16 | New York, New York 10271
   | (212) 416-8252
17 | lourdes.rosado@ag.ny.gov

ELLEN F. ROSENBLUM
Attorney General of Oregon

*/s/ Scott J. Kaplan*
SCOTT J. KAPLAN, WSBA #49377
Senior Assistant Attorney General
Oregon Department of Justice
100 Market Street
Portland, OR  97201
971-673-1880
scott.kaplan@doj.state.or.us

18

19

20

21

22

23

24

25

26