The Honorable James L. Robart

1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

8

9

10

11

STATE OF WASHINGTON; STATE OF
CALIFORNIA; STATE OF MARYLAND;
COMMONWEALTH OF
MASSACHUSETTS; STATE OF NEW
YORK; and STATE OF OREGON,

Plaintiffs,

12

v.

13

14

15

16

17

DONALD TRUMP, in his official capacity as
President of the United States; U.S.
DEPARTMENT OF HOMELAND
SECURITY; ELAINE C. DUKE, in her
official capacity as Acting Secretary of
Homeland Security; REX W. TILLERSON, in
his official capacity as Secretary of State; and
the UNITED STATES OF AMERICA,

18

Defendants.

No. 2:17-cv-00141 (JLR)

**DEFENDANTS' OPPOSITION**
**TO PLAINTIFFS' MOTION**
**FOR TEMPORARY RESTRAINING**
**ORDER**

Noted For Consideration:
October 26, 2017

19

20

21

22

23

24

25

26

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.     Legal Framework .................................................................................................. 3

II.    Executive Order No. 13,780 ................................................................................. 4

III.   The President's Proclamation ............................................................................... 4

       A.     DHS's Worldwide Review and Recommendations ................................. 4

       B.     The President's Findings and Suspensions of Entry ............................... 6

STANDARD OF REVIEW ................................................................................................. 7

ARGUMENT ...................................................................................................................... 7

I.     Plaintiffs' Challenges Are Not Justiciable ........................................................... 7

       A.     Plaintiffs' Statutory Challenges Are Not Reviewable ........................... 7

       B.     Plaintiffs' Constitutional Claims Are Not Reviewable .......................... 9

II.    Plaintiffs' Statutory Claims Are Not Likely To Succeed ................................... 10

       A.     The Proclamation Fits Well Within the President's Broad Constitutional
            and Statutory Authority to Suspend Entry of Aliens Abroad .......................... 10

            1.     The President Has Extremely Broad Discretion to Suspend Entry
                of Aliens Abroad ........................................................................... 10

            2.     Under Any Standard, the Proclamation Is Adequately Justified
                By the President's National Security and Foreign Affairs
                Judgments ..................................................................................... 12

       B.     The Proclamation Does Not Violate Section 1152(a)(1) ...................... 15

            1.     There Is No Conflict Between the Non-Discrimination Provision
                and the President's Suspension Authorities ................................... 15

            2.     In the Event of a Conflict, the President's Suspension Authorities
                Would Prevail ............................................................................... 17

       C.     The Proclamation Does Not Conflict With Other INA Provisions ................... 18

III.   The Proclamation Does Not Violate the Constitution ......................................... 19

       A.     The Proclamation Is Constitutional Under *Mandel* .......................... 19

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - i

*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

B.      The Proclamation Is Valid Even Apart From *Mandel* ....................................... 21

IV.     The Remaining Factors Weigh Against Relief ................................................... 23

V.      A Global Injunction Would Be Inappropriate ................................................. 24

CONCLUSION ............................................................................................................ 24

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - ii
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

# INTRODUCTION

Over the past several months, the Department of Homeland Security (DHS), in consultation with the Department of State and Director of National Intelligence, conducted a worldwide review of foreign governments' information-sharing practices and risk factors, evaluated each country according to a set of religion-neutral criteria, and identified countries with inadequate information-sharing practices. The Secretary of State then engaged countries diplomatically to encourage them to improve their performance. The Acting Secretary of Homeland Security reported the results of this review to the President, recommending that the President impose entry restrictions on nationals from eight countries whose information-sharing practices continued to be inadequate or that otherwise presented special risk factors. After reviewing the recommendations and consulting within the Executive Branch, the President crafted "country-specific restrictions" that, in his judgment, "would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur." Pursuant to his broad authority to suspend or restrict the entry of aliens abroad when he deems it in the Nation's interest, the President issued a Proclamation describing those restrictions and the particular country-conditions justifying them. *See* Proclamation No. 9645, *Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats*, 82 Fed. Reg. 45,161 (Sept. 27, 2017).

Plaintiffs have now shown that, no matter how thorough the Government's process, they will continue to allege that the President's actions are motivated by animus. Plaintiffs ask the Court to enjoin the Proclamation worldwide, nullifying a formal national-security and foreign-policy directive of the President based on extensive investigations and recommendations of several Cabinet Secretaries. Their request threatens the ability of this or any future President to take necessary steps to protect the Nation.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 1
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1   The Court need not even address these issues, however, because Plaintiffs' motion fails at

2   the outset.  The relevant provisions of the Proclamation have already been enjoined nationwide.

3   *See Hawaii v. Trump*, 2017 WL 4639560 (D. Haw. Oct. 17, 2017); *IRAP v. Trump*, 2017 WL

4   4674314 (D. Md. Oct. 17, 2017), appeal docketed, No. 17-2231 (4th Cir. Oct. 20, 2017).  These

5   existing injunctions preclude Plaintiffs from demonstrating actual, imminent irreparable harm

6   justifying a temporary restraining order (TRO).    Indeed, this Court previously stayed

7   consideration of Plaintiffs' motion for a TRO against Executive Order No. 13,780, 82 Fed. Reg.

8   13,209 (Mar. 9, 2017) ("EO-2") in light of injunctions entered in other cases.  *See* ECF No. 164.

9   Plaintiffs' motion should be denied—or at least stayed—on this basis alone.

10      To the extent the Court is nonetheless inclined to consider the merits of Plaintiffs'

11  arguments, their motion should be denied.  The Proclamation is amply justified by the President's

12  constitutional powers and the authority conferred on him by 8 U.S.C. §§ 1182(f) and 1185(a)(1).

13  The President determined that, for countries with inadequate information-sharing practices or

14  other special circumstances, it would be detrimental to the Nation's interests to allow certain

15  foreign nationals of those countries to enter the United States, because "the United States

16  Government lacks sufficient information to assess the risks they pose," and because the entry

17  restrictions "are also needed to elicit improved identity-management and information-sharing

18  protocols . . . from foreign governments[.]"   Procl. § 1(h)(i).    Nor does the President's

19  determination run afoul of § 1152(a)(1), which does not affect the President's pre-existing

20  suspension authorities.

21      Likewise, Plaintiffs' Establishment Clause and equal protection claims are governed by,

22  and fail under, *Kleindienst v. Mandel*, 408 U.S. 753 (1972), which requires upholding the

23  Executive's decision to exclude aliens abroad so long as it rests on a "facially legitimate and bona

24  fide reason."  *Id.* at 770.  The Proclamation's entry restrictions rest squarely on national-security

25  and foreign-policy determinations by the President that are legitimate on their face and supported

26  by extensive findings, and thus, *Mandel* precludes "look[ing] behind" the President's rationale.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 2
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

*Id.* Even without regard to *Mandel*, the Proclamation has nothing to do with religion on its face or in its operation, and Plaintiffs have not demonstrated that the Proclamation—the product of a review by multiple agencies—was motivated by religious animus.

Before reaching the merits, though, Plaintiffs' claims are not justiciable at all. Congress has not authorized review of Plaintiffs' statutory claims and the plaintiff States have no constitutional rights of their own to assert. Plaintiffs' motion should therefore be denied.

## BACKGROUND

## I.    LEGAL FRAMEWORK

"The exclusion of aliens is a fundamental act of sovereignty" that is both an aspect of the "legislative power" and "inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

Under the Immigration and Nationality Act (INA), admission to the United States normally requires a valid visa or other valid travel document. 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203. Applying for a visa typically requires an in-person interview and results in a decision by a Department of State consular officer. 8 U.S.C. §§ 1201(a)(1), 1202(h), 1204; 22 C.F.R. §§ 41.102, 42.62. Although a visa generally is necessary for admission, it does not guarantee admission; the alien still must be found admissible upon arriving at a port of entry. 8 U.S.C. §§ 1201(h), 1225(a). Congress has enabled certain nationals of certain countries to seek temporary admission without a visa under the Visa Waiver Program. 8 U.S.C. §§ 1182, 1187.

Building upon the President's inherent authority to exclude aliens, *see Knauff*, 338 U.S. at 542, Congress has likewise accorded the President broad discretion to restrict the entry of aliens. Section 1182(f) of Title 8 authorizes the President to "suspend the entry of all aliens or any class of aliens" "for such period as he shall deem necessary" whenever he finds that such entry "would be detrimental to the interests of the United States." Section 1185(a)(1) further empowers the President to adopt "reasonable rules, regulations," "orders," and "limitations and exceptions" on the entry of aliens. Pursuant to these authorities, President Reagan suspended

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 3
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1    entry of all Cuban nationals in 1986, and President Carter denied and revoked visas to Iranian

2    nationals in 1979.

3    **II.    EXECUTIVE ORDER NO. 13,780**

4          On March 6, 2017, the President issued Executive Order No. 13,780.  EO-2 directed the

5    Secretary of Homeland Security to conduct a global review to determine whether foreign

6    governments provide adequate information about their nationals seeking U.S. visas, EO-2 § 2(a),

7    and to report his findings to the President.

8          During that review, EO-2 imposed a 90-day entry suspension on certain foreign nationals

9    from six countries—Iran, Libya, Somalia, Sudan, Syria, and Yemen—all of which had been

10   identified by Congress or DHS as presenting heighted terrorism-related concerns.  *Id*. § 2(c).  That

11   90-day suspension was preliminarily enjoined by two district courts.  *See Hawaii v. Trump*, 245

12   F. Supp. 3d 1227 (D. Haw. 2017); *IRAP v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017).  Those

13   injunctions were affirmed in relevant part.  *See Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017)

14   (per curiam); *IRAP v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc).

15         The Supreme Court granted certiorari in both cases and partially stayed the injunctions

16   pending its review.  *Trump v. IRAP*, 137 S. Ct. 2080 (2017).  After EO-2's entry suspension

17   expired, the Supreme Court vacated the *IRAP* injunction as moot.  *See Trump v. IRAP*, 2017 WL

18   4518553 (U.S. Oct. 10, 2017).  The Ninth Circuit's decision also affirmed the injunction of

19   Section 6(a) of EO-2, concerning refugees, which is set to expire on October 24, 2017.

20   **III.   THE PRESIDENT'S PROCLAMATION**

21         On September 24, 2017, following completion of the Government's review and

22   engagement processes, the President signed Proclamation No. 9645.

23         **A.      DHS's Worldwide Review and Recommendations**

24         The Proclamation describes the extensive, worldwide review of the nation's vetting

25   procedures that preceded it.  First, DHS, in consultation with the Department of State and the

26   Director of National Intelligence, established categories of information needed from foreign

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 4
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

governments to enable the United States to assess its ability to make informed decisions about

foreign nationals applying for visas.  That information "baseline" has three components:

> (1) identity-management information, to assess "whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports";
>
> (2) national-security and public-safety information, to determine "whether the country makes available . . . known or suspected terrorist and criminal-history information upon request, whether the country provides passport and national-identity document exemplars, and whether the country impedes the United States Government's receipt of information"; and
>
> (3) a national-security and public-safety risk assessment, including such factors as "whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program . . . that meets all of [the program's] requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States."

Procl. § 1(c).

DHS, in coordination with the Department of State, then collected data on, and evaluated, every foreign country according to these criteria.  Out of nearly 200 countries evaluated, the Acting Secretary of DHS identified the information-sharing practices and risk factors of 16 countries as "inadequate."  *Id*. § 1(e).  Another 31 countries were found "at risk" of becoming "inadequate."  *Id.*  These preliminary results were submitted to the President.  *Id*. § 1(c).  The Department of State then conducted a 50-day engagement period to encourage all foreign governments to improve, which yielded significant gains—29 countries provided travel-document exemplars to combat fraud, and 11 countries agreed to share information on known or suspected terrorists.  *Id*. § 1(f).

The Acting Secretary of DHS then submitted a report to the President recommending tailored entry restrictions on certain nationals from seven countries (Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen) that continue to be "inadequate" with respect to information-sharing and risk factors.  *Id*. § 1(h)(ii).  She also recommended entry restrictions on nationals of Somalia.  *Id.* § 1(i).  Although Somalia generally satisfies the information-sharing

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 5
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

baseline, it not only "has significant identity-management deficiencies" but "stands apart from other countries in the degree to which its government lacks command and control of its territory." *Id*. § 2(h).   The Acting Secretary determined that an eighth country (Iraq) did not meet information-sharing requirements, but in lieu of entry restrictions, recommended additional scrutiny of Iraqi nationals seeking entry because of the United States' close cooperative relationship with Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combatting ISIS. *Id.* § 1(g).

### B.  The President's Findings and Suspensions of Entry

After considering the Acting Secretary's recommendations and consulting with members of his Cabinet, the President issued the Proclamation pursuant to his inherent and statutory authorities, including 8 U.S.C. §§ 1182(f) and 1185(a)(1).   The President considered "several factors, including each country's capacity, ability, and willingness to cooperate with our identity-management and information-sharing policies and each country's risk factors," as well as "foreign policy, national security, and counterterrorism goals."  Procl. § 1(h)(i).  The President sought to "craft[] those country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur." *Id.*

For countries that refuse to cooperate regularly with the United States (Iran, North Korea, and Syria), the Proclamation suspends all classes of visas with the exception, for nationals of Iran only, of student (F and M) and exchange visitor (J) nonimmigrant visas.  *Id.* §§ 2(b)(ii), (d)(ii), (e)(ii).   For countries that are valuable counter-terrorism partners but nonetheless have information-sharing deficiencies (Chad, Libya, and Yemen), the Proclamation suspends entry only of persons seeking immigrant visas and business, tourist, and business/tourist nonimmigrant (B-1, B-2, B-1/B-2) visas. *Id.* §§ 2(a)(ii), (c)(ii), (g)(ii).  For Somalia, the Proclamation suspends entry of persons seeking immigrant visas and requires additional scrutiny of nationals seeking nonimmigrant visas.  *Id.* § 2(h)(ii).  And for Venezuela, the Proclamation suspends entry of

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 6
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

"officials of government agencies of Venezuela involved in screening and vetting procedures" and "their immediate family members" on nonimmigrant business and tourist visas. *Id.* § 2(f)(ii). For each country, the Proclamation summarizes some of the country conditions and inadequacies warranting the restrictions. *Id.* § 2. The Proclamation also provides for case-by-case waivers to the entry restrictions, *id.* § 3(c), along with ongoing review to determine whether the restrictions should remain in place, *id.* § 4.

The entry suspensions were effective immediately for foreign nationals previously restricted under EO-2 and the Supreme Court's stay, but for all other covered persons they were to be effective at 12:01 a.m. EDT on October 18, 2017. *Id.* § 7.

## STANDARD OF REVIEW

Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that [the relief] is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.   PLAINTIFFS' CHALLENGES ARE NOT JUSTICIABLE

### A.   PLAINTIFFS' STATUTORY CHALLENGES ARE NOT REVIEWABLE

**1.** The Supreme Court "ha[s] long recognized the power to . . . exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). "[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *Knauff*, 338 U.S. at 543.

Courts have distilled from these longstanding principles that the denial or revocation of a visa for an alien abroad "is not subject to judicial review . . . unless Congress says otherwise." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999). Courts refer to that rule as "the doctrine of consular nonreviewability," *id.*, but the short-hand label merely reflects the

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 7
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

context in which the principle most often arises—challenges to decisions by consular officers adjudicating visa applications.  The principle underlying that doctrine applies regardless of the manner in which the Executive denies entry to an alien abroad.  It would make no sense to bar review of consular officers' case-specific determinations while permitting review of decisions by the President that are grounded in sensitive foreign-affairs and national-security determinations.

Here, far from authorizing review, Congress has affirmatively precluded it.  Congress has not provided for judicial review of decisions to exclude aliens abroad, *e.g.*, 6 U.S.C. § 236(f), and has forbidden "judicial review" of visa revocations (subject to a narrow exception inapplicable to aliens abroad), 8 U.S.C. § 1201(i).  Furthermore, the conclusion is "unmistakable" from history that "the immigration laws 'preclude judicial review' of []consular visa decisions." *Saavedra Bruno*, 197 F.3d at 1160.  The lone time the Supreme Court held that certain aliens present in the United States could seek review of their exclusion orders under the Administrative Procedure Act (APA), Congress abrogated that ruling and limited those aliens to the habeas remedy (which is not available to aliens abroad).  *See id*. at 1157-62 (recounting history).  Because even an alien present in the United States cannot invoke the APA to obtain review, then *a fortiori* neither can aliens abroad, nor States or U.S. citizens acting at their behest.  *See* 5 U.S.C. §§ 701(a)(1), 702(1).[1]

**2.**  Review is unavailable for three additional reasons.  First, the APA provides for judicial review only of "final agency action."  5 U.S.C. § 704.  The President's Proclamation is not "agency action" at all.  *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).  And Plaintiffs identify no students or faculty who have been admitted or offered employment, but who have applied for and been denied a visa, and a waiver, under the Proclamation.  Second, Plaintiffs lack a statutory right to enforce.  Nothing in the INA gives Plaintiffs a direct right to judicial review, and none of the statutes Plaintiffs invoke confers any rights on third parties like Plaintiffs.  Finally, the APA does not apply "to the extent that . . . agency action is committed to agency discretion

---

[1] The D.C. Circuit's decision in *Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986), does not support reviewability of Plaintiffs' statutory claims.  As the D.C. Circuit subsequently recognized, *Abourezk*'s reviewability holding critically relied on a statute that has since been amended to eliminate such review.  *See Saavedra Bruno*, 197 F.3d at 1162, 1164.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 8
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1    by law." 5 U.S.C. § 701(a)(2).  Here, the relevant statutes commit these matters to the President's

2    unreviewable discretion.  *See* Part II.A.1, *infra*.[2]

3       **B.    PLAINTIFFS' CONSTITUTIONAL CLAIMS ARE NOT REVIEWABLE**

4       Although Congress has not expressly authorized judicial review of Executive decisions to

5    exclude aliens abroad, it has not "clear[ly]" "preclude[d] judicial review" for persons asserting

6    violations of their own constitutional rights.  *Webster v. Doe*, 486 U.S. 592, 603 (1988).  Thus,

7    the Supreme Court has twice engaged in limited judicial review when a U.S. citizen contended

8    that the exclusion of an alien abroad violated the citizen's *own* constitutional rights.  *Mandel*, 408

9    U.S. 753; *Kerry v. Din*, 135 S. Ct. 2128 (2015).

10      Here, Plaintiffs cannot assert that the Proclamation violates their *own* constitutional rights

11   because States do not have rights under the Establishment or Equal Protection Clauses.  *See, e.g.*,

12   *Zelman v. Simmons-Harris*, 536 U.S. 639, 679 n.4 (2002) (Thomas, J., concurring); *South*

13   *Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966).  Plaintiffs allege injuries to their state

14   universities, and tax and tourism revenue.  *See* Pls.' Br. 5-6, ECF No. 195.  But those purported

15   injuries—which are speculative, not actual or imminent—do not stem from the violation of their

16   own constitutional rights.  Indeed, they do not even result from application of the Proclamation

17   to the States themselves, but are instead merely *indirect* effects from the Proclamation's

18   application to third parties.  *See McGowan v. Maryland*, 366 U.S. 420, 429-30 (1961).

19      Although Plaintiffs also claim quasi-sovereign interests in protecting persons in their

20   States (Pls.' Br. 7), Plaintiffs have no sovereign or other cognizable interest in regulating or

21   compelling the entry of aliens from abroad in the first instance.  States "do[] not have standing as

22   *parens patriae* to bring an action against the Federal Government" to protect its residents from

23   alleged discrimination.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592,

24   610 n.16 (1982).  Moreover, "[t]he authority to control immigration—to admit or exclude aliens—

25

26      [2] The Ninth Circuit's preliminary decision in *Hawaii* is not binding here, *see* Part II, *infra*, and, in any event, did not address these fundamental principles of non-reviewability or the existence of a statutory cause of action, *see Hawaii*, 859 F.3d at 768-69.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 9
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1  is vested solely in the Federal Government." *Arizona v. United States*, 567 U.S. 387, 409-10

2  (2012) (citation omitted).  Plaintiffs have no "legally and judicially cognizable" interest, *Raines*

3  *v. Byrd*, 521 U.S. 811, 819 (1997), in the federal government's determination whether to allow an

4  alien abroad to enter.  *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).[3]

5  **II.     PLAINTIFFS' STATUTORY CLAIMS ARE NOT LIKELY TO SUCCEED**

6         Plaintiffs assert that the Ninth Circuit's *Hawaii* decision "controls review" of the

7  Proclamation.  Pls.' Br. 8.  But that decision was issued in the context of a preliminary injunction,

8  and such decisions generally are not binding "given the haste that is often necessary," *see Univ.*

9  *of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), including with respect to "mixed question[s] of

10  law and fact." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 n.5 (9th Cir. 2015).  The Ninth

11  Circuit's statutory analysis in *Hawaii* was expressly tied to the facts of EO-2:  *i.e.*, the particular

12  findings set forth in EO-2, *see Hawaii*, 859 F.3d at 770-74; and the particular purpose of EO-2

13  and the circumstances that led to its issuance, *see id.* at 772 n.13.  Given that the Proclamation

14  contains different findings and has broader purposes, the Ninth Circuit's prior decision regarding

15  EO-2 does not control the statutory analysis here.

16     **A.   THE PROCLAMATION FITS WELL WITHIN THE PRESIDENT'S BROAD
          AUTHORITY TO SUSPEND ENTRY OF ALIENS ABROAD**

17

18         **1.     The President Has Extremely Broad Discretion to Suspend Entry of
                 Aliens Abroad**

19  **a.**  As relevant here, 8 U.S.C. § 1182(f) provides the following:

20  Whenever the President finds that the entry of any aliens or of any class of aliens
    into the United States would be detrimental to the interests of the United States, he

21  may by proclamation, and for such period as he shall deem necessary, suspend the
    entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose

22  on the entry of aliens any restrictions he may deem to be appropriate.

23

24

25         ───────────────────────
              [3] Nor may Plaintiffs assert third-party standing on behalf of aliens who would seek admission as students,

26  faculty, or tourists.  Aliens abroad have no Establishment Clause rights, *see United States v. Verdugo-Urquidez*,
    494 U.S. 259, 265 (1990), and no constitutional rights at all regarding entry into the country, *see Knauff*, 338 U.S.
    at 542.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 10
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

This provision grants the President broad authority and confirms his discretion at every turn. Several courts of appeals have recognized that § 1182(f) provides the President with broad power to suspend the entry of aliens. *See, e.g., Abourezk*, 785 F.2d at 1049 n.2; *Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980); *see also Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 187 (1993).

In addition, 8 U.S.C. § 1185(a)(1) further provides:

> Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe[.]

This statutory text likewise confirms the breadth of the President's authority.  This section does not require any predicate findings whatsoever, but simply gives the President authority to restrict entry to the United States according to "such limitations and exceptions as the President may prescribe."  *Id.*; *see Haig v. Agee*, 453 U.S. 280, 297 (1981) (construing similar language in §1185(b) as "le[aving] the power to make exceptions exclusively in the hands of the Executive").

**b.**   The plain text of these statutes provides no basis for judicial second-guessing of the President's determinations about what restrictions to "prescribe" or what restrictions are necessary to avoid "detriment[] to the interests of the United States," because they commit those matters to his discretion.  *See Webster v. Doe*, 486 U.S. 592, 600 (1988); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) [hereafter "*AAADC*"] (court are "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's reasons for excluding particular foreign nationals).

**c.**   Historical practice confirms the breadth of and deference owed to the President's authority.  For decades Presidents have restricted entry pursuant to §§ 1182(f) and 1185(a)(1) without detailed public justifications or findings; some have discussed the President's rationale in one or two sentences that broadly declare the Nation's interests.[4]  Executive Order No. 12,807—

---

[4] *E.g.*, Proclamation No. 8693 (July 27, 2011); Proclamation No. 8342 (Jan. 22, 2009); Proclamation No. 6958 (Nov. 26, 1996); Proclamation No. 5887 (Oct. 26, 1988); Proclamation No. 5829 (June 14, 1988).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 11
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

at issue in *Sale*—contained only a single sentence articulating its justification. *See* Exec. Order No. 12,807, pmbl. pt. 4 (May 24, 1992) ("There continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally."). But the Supreme Court expressed no concerns about the adequacy of that finding, instead stating that "[w]hether the President's chosen method" made sense from a policy perspective was "irrelevant to the scope of his authority" under the statute. *Sale*, 509 U.S. at 187-88. Similarly, in 1979 when President Carter invoked § 1185(a)(1) to restrict Iranian nationals, the Executive Order contained no express findings and delegated the authority to prescribe restrictions to lower Executive Branch officials. *See* Exec. Order No. 12,172, § 1-101 (Nov. 26, 1979). Yet courts refused to invalidate those restrictions. *See Nademi v. INS*, 679 F.2d 811, 813-14 (10th Cir. 1982); *Yassini v. Crosland*, 618 F.2d 1356, 1362 (9th Cir. 1980).

### 2. Under Any Standard, the Proclamation is Adequately Justified By the President's National Security and Foreign Affairs Judgments

**a.** The President provided far more detail and explanation for his findings than exist in other suspensions under §§ 1182(f) or 1185(a). The President imposed the entry restrictions after reviewing the recommendations of the Acting Secretary of DHS, and her recommendations were created following a global review that evaluated every country according to neutral criteria.

The President's entry restrictions serve two purposes. First, the restrictions are "necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States." Procl. § 1(h)(i); *id.* § 1(a)-(b) (discussing the importance of foreign countries' information-sharing to the overall security-vetting process). Plaintiffs have no basis to contest the Executive Branch's national-security judgments, and it would be inappropriate for this Court to second-guess them. *See Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs").

Second, the restrictions place pressure on foreign governments "to work with the United States to address those inadequacies and risks so that the restrictions and limitations imposed . . .

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 12
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

may be relaxed or removed as soon as possible." Procl. § 1(h).  The utility of entry restrictions as a foreign-policy tool is confirmed by the results of the diplomatic engagement period described in the Proclamation—the prospect of entry restrictions yielded significant improvements in foreign countries' information-sharing practices.  *Id.* § 1(e)-(g).  Like President Carter's Iranian Order and President Reagan's Cuban proclamation, these foreign-relations efforts independently justify the Proclamation and yet they are almost wholly ignored by Plaintiffs.  *See also Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013) (noting "the danger of unwarranted judicial interference in the conduct of foreign policy").

**b.**  The Proclamation satisfies the standards the Ninth Circuit applied to EO-2 as well.

*First*, the Ninth Circuit held that EO-2 made "no finding that nationality alone renders entry of this broad class of individuals a heightened security risk to the United States." *Hawaii*, 859 F.3d at 772.  But the Proclamation explains that the entry restrictions have the purpose and effect of "elicit[ing] improved identity-management and information-sharing protocols and practices from foreign governments" going forward.  Procl. § 1(h)(i); *see id.* § 1(b), (e)-(g).  The Ninth Circuit itself acknowledged the rationality of distinguishing among "classes of aliens on the basis of nationality" when necessary "as retaliatory diplomatic measures." *Hawaii*, 859 F.3d at 772 n.13 (discussing the Iranian and Cuban Presidential actions).

In addition, the Proclamation explains that "[s]creening and vetting protocols" play "a critical role" in protecting United States citizens "from terrorist attacks and other public-safety threats," Procl. § 1(a); that "[i]nformation-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of th[os]e screening and vetting protocols," *id.* § 1(b); that each of the eight countries was determined to have "inadequate" practices under DHS's baseline criteria or to present other special circumstances, *id.* § 1(g); and therefore the Proclamation's restrictions are "necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States," *id.* § 1(h)(i).  These findings necessarily turn on nationality,

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 13
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1    because it is the inadequacy of the foreign governments' practices concerning their nationals that

2    creates the risk inherent in those persons' entry. *Id.* § 1(b).[5]

3        *Second*, the Ninth Circuit faulted EO-2's use of nationality as over-inclusive because it

4    suspended entry even for "nationals without significant ties to the six designated countries[.]"

5    *Hawaii*, 859 F.3d at 773.  As the Proclamation explains, however, the "practices of foreign

6    governments are important for the effectiveness of the screening and vetting protocols and

7    procedures of the United States," because these governments "manage the identity and travel

8    documents of their nationals," and "also control the circumstances under which they provide

9    information about their nationals to other governments."  Procl. § 1(b).  Such practices apply to

10   all of a foreign government's nationals traveling on that country's passports, regardless of the

11   degree of a foreign national's connection to his or her country of citizenship.  The Proclamation

12   is thus well tailored to its identity-management concerns, as demonstrated by its exclusion of dual

13   nationals of a covered country if they travel on a non-covered country's passport.  *Id.* § 3(b)(iv).

14       *Third*, the Ninth Circuit noted that EO-2 did not "make[] any finding that the current

15   screening processes are inadequate."  *Hawaii*, 859 F.3d at 773.  But the Proclamation expressly

16   contains such a finding; the Acting Secretary conducted the worldwide review "to identify

17   whether, and if so what, additional information will be needed from each foreign country to

18   adjudicate an application by a national of that country . . . in order to determine that the individual

19   is not a security or public-safety threat," Procl. § 1(c), and after being evaluated under that

20   standard, the eight countries here were found to have *inadequate* information-sharing practices or

21   to present other risks, *id.* § 1(g), (i).  Furthermore, the President found that the status quo was

22   inadequate to encourage greater cooperation from the eight nations.  *See id.* § 1(h)(i).

23       **c.**  Plaintiffs' motion advocates a degree of scrutiny over the Proclamation even *more*

24   rigorous than the Ninth Circuit's—for example, by questioning the logic of removing Iraq "for

25
26   _____
        [5] The Ninth Circuit also faulted EO-2 for not identifying a "link between an individual's nationality and
     their propensity to commit terrorism."  *Hawaii*, 859 F.3d at 772.  To the extent the Ninth Circuit implied that the
     President must make an individualized risk determination as to each particular national excluded, that would plainly
     conflict with the statutes here, which permit the President to make categorical determinations.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 14
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1  policy reasons," and accusing the Proclamation of failing to explain why each category of visitors

2  from each country is restricted.  Pls.' Br. 12.

3    As an initial matter, the features that Plaintiffs focus on are *virtues* of the Proclamation

4  because they demonstrate its tailored nature.  For instance, it is no surprise that the President

5  considered countervailing "policy reasons"—*i.e.*, foreign policy, national security, and

6  counterterrorism goals—before deciding to impose entry restrictions on a country.  *See* Procl.

7  § 1(h)(i).  The fact that Iraq, a Muslim-majority country, did not receive entry restrictions for such

8  reasons *confirms* (rather than undermines) that the Proclamation is based on the national interest.

9  *See id.* § 1(g).  Similarly, the fact that greater restrictions were imposed on countries that refuse

10  to cooperate regularly with the United States (Iran, North Korea, and Syria) than countries that

11  are valuable terrorism partners but nonetheless have information-sharing deficiencies (Chad,

12  Libya, Yemen) again shows the careful, tailored nature of the Proclamation.  In short, these

13  differences are not "inconsistencies," Pls.' Br. 12, but rather nuanced distinctions—reflecting the

14  obvious reality that different countries present different considerations.

15    Moreover, there is no basis even in the *Hawaii* decision, much less in 8 U.S.C. §§ 1182(f)

16  and 1185(a), for the type of exacting scrutiny proposed by plaintiffs.  Even assuming that some

17  type of review is appropriate, the level of explanation and tailoring Plaintiffs demand cannot be

18  justified.  *See IRAP*, 2017 WL 4674314, at *23.  Indeed, Plaintiffs' challenge to even these

19  narrowest of details within the Proclamation underscores the degree to which they are asking this

20  Court to second-guess the President's conduct of foreign affairs, contrary to the principle that

21  such matters are "to be largely immune from judicial inquiry or interference."  *Regan v. Wald*,

22  468 U.S. 222, 242 (1984).

23    **B.**  **THE PROCLAMATION DOES NOT VIOLATE SECTION 1152(a)(1)**

24      **1.**  **There Is No Conflict Between the Non-Discrimination Provision and the President's Suspension Authorities**

25  Plaintiffs' argument—that § 1152(a)(1)(A) precludes the President from using §§ 1182(f)

26  or 1185 to impose nationality-based restrictions—creates a conflict between those statutes,

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 15
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

because nationality-based restrictions would otherwise fall within the plain terms of §§ 1182(f) and 1185.  This argument is contrary to the well-settled canon that "when two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976).  Here, there is an easy way to harmonize the statutes because they operate in two different spheres: §§ 1182(f) and 1185(a)(1), along with other grounds in § 1182(a), limit the universe of individuals eligible to receive visas, and then § 1152(a)(1)(A) prohibits discrimination on the basis of nationality *within* that universe of eligible individuals.

The legislative history shows that Congress understood the INA to operate in this manner.  The 1965 amendments were designed to eliminate the country-quota system previously in effect, not to limit any of the pre-existing provisions like §§ 1182(f) or 1185(a)(1) addressing entry or protecting security.  *See* H. Rep. No. 745, 89th Cong., 1st Sess., at 13 (1965); S. Rep. No. 89-748 at 11 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 3328, 3329-30.  The history expressly states that the new immigrant-selection system (now codified in §§ 1151-53) was intended to operate only as to those *otherwise eligible for visas*.  *See* H. Rep. No. 745, 89th Cong., 1st Sess., at 12 (1965); S. Rep. No. 89-748, at 13.

Historical practice also confirms this interpretation.  President Carter in 1979 directed the Secretary of State and the Attorney General to adopt "limitations and exceptions" regarding "entry" of "Iranians holding nonimmigrant visas," Exec. Order No. 12,172 (Nov. 26, 1979), and subsequently amended that directive to make it applicable to all Iranians.  Exec. Order No. 12,206 (Apr. 7, 1980).  Although President Carter's Order itself did not deny or revoke visas to Iranian nationals, he simultaneously explained how the new measures would operate:  the State Department would "invalidate all visas issued to Iranian citizens for future entry into the United States, effective today," and "w[ould] not reissue visas, nor w[ould] [it] issue new visas, except for compelling and proven humanitarian reasons or where the national interest of our own country requires."[6]  And that is how the State Department implemented it.  *See* 45 Fed. Reg. 24,436 (Apr.

---

[6] The American Presidency Project, Jimmy Carter, *Sanctions Against Iran:  Remarks Announcing U.S. Actions* (Apr. 7, 1980), https://goo.gl/4iX168.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 16
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

9, 1980).  Similarly, President Reagan invoked § 1182(f) to suspend immigrant entry of "all Cuban nationals," subject to exceptions.  Proclamation No. 5517.  And the Supreme Court in *Sale* deemed it "perfectly clear" that § 1182(f) would authorize a "naval blockade" against illegal migrants from a particular country.  509 U.S. at 187.

The Proclamation is not materially distinguishable from these historical examples.  Just as the Iranian and Cuban entry restrictions were "retaliatory diplomatic measures responsive to government conduct directed at the United States," *Hawaii*, 859 F.3d at 772 n.13, the Proclamation here responds to foreign governments' failure to provide requested information to the United States and imposes entry restrictions as leverage to encourage those governments to do so.  *See* Procl. § 1(h)(i).  This core foreign-relations purpose also demonstrates that the Proclamation is justified under the President's "inherent powers." *Hawaii*, 859 F.3d at 782 n.21.  Thus, there is no conflict with § 1152(a)(1)(A).

> **2.  In the Event of a Conflict, the President's Suspension Authorities Would Prevail**

Interpreting § 1152(a)(1)(A) as limiting §§ 1182(f) or 1185(a)(1) would require concluding that § 1152(a)(1)(A) impliedly repealed those provisions.  But implied repeals are disfavored, and in the event of a conflict, the suspension authorities would prevail.

While § 1152(a)(1)(A) was later-enacted with respect to § 1182(f), that is not true for § 1185(a)(1), which was modified to its current form in 1978.  *See* Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. No. 95-426, § 707(a), 92 Stat. 963, 992-93 (1978).  Even under Plaintiffs' approach, then, § 1185(a)(1) would prevail over § 1152(a)(1)(A).  Moreover, § 1182(f) is more specific within the statutory scheme, because § 1152(a)(1)(A) establishes only a default rule governing non-discrimination in the issuance of visas by consular officers.  In contrast, §§ 1182(f) and 1185(a)(1) confer special power on the *President* to restrict

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 17
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1    entry of aliens.  That unique grant of authority to the President himself is more specific and

2    supersedes § 1152(a)(1)(A)'s general rule governing visa issuance.[7]

3    ### C.    THE PROCLAMATION DOES NOT CONFLICT WITH OTHER INA PROVISIONS

4        Finally, Plaintiffs criticize the Proclamation as "essentially a new piece of immigration

5    legislation" given its "detailed line-drawing" and "'extensive and complex' provisions."  Pls.' Br.

6    13.  But again, those narrowly tailored country-specific restrictions are a *virtue* of the

7    Proclamation, not a basis for criticism.  And unlike the plaintiffs in *Hawaii* who alleged that EO-

8    2 conflicted with a specific statutory provision, *see* 859 F.3d at 782, Plaintiffs' challenge here is

9    a broadside attack on the Proclamation as a whole, untethered to any specific statutory provision.

10   Plaintiffs cite no authority justifying such a free-form challenge to the Proclamation.

11       In any event, even if the claim were cognizable, Plaintiffs' underlying theory is wrong.

12   Although Congress (through the INA) has set the *minimum* requirements for an alien to gain entry,

13   it has also recognized the President's authority to impose *additional* restrictions when he deems

14   appropriate.  There is nothing improper about the President supplementing the INA's minimum

15   requirements, even on issues that Congress has already addressed in some fashion.[8]

16       Plaintiffs' contrary theory—that the President is *precluded* from acting whenever an INA

17   provision addresses the same topic—is particularly ill-suited to the arena of national security and

18   foreign affairs, which involve delicate balancing in the face of ever-changing circumstances, such

19   that the Executive must be permitted to act quickly and flexibly.  *See Zemel v. Rusk*, 381 U.S. 1,

20   17 (1965); *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 348 (2005).  For that reason,

21   courts typically assume that, unless specifically expressed, Congress did not intend to foreclose

22

23       [7] Even if Plaintiffs were correct that the Government violates § 1152(a)(1)(A) by denying immigrant visas
     on the basis of nationality, the remedy would be to enjoin the Government from refusing to issue visas on the basis
24   of the Proclamation.  In no event would it be proper for the remedy to extend to an injunction compelling the
     Government to grant individuals *entry* into the United States.
25       [8] *See Knauff*, 338 U.S. at 541-42, 545-47 (holding that, although alien would normally have been entitled
     to a statutory hearing on her exclusion, she could be excluded without a hearing based on President's Proclamation
26   under the predecessor to § 1185(a)(1)); *Abourezk*, 785 F.2d at 1049 n.2 (even if Congress chose to exclude only
     aliens whose activities in the United States would be prejudicial, the President could still use § 1182(f) to suspend
     aliens whose mere entry would be prejudicial).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 18
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 305-8902

1    the President's authority over national-security and foreign-affairs.  *See, e.g.*, *Jama*, 543 U.S.

2    at 348; *Egan*, 484 U.S. at 530.  Given the breadth of subjects addressed in various INA provisions,

3    Plaintiffs' argument would severely circumscribe the President's authority, effectively reading

4    §§ 1182(f) and 1185(a)(1) out of the INA entirely.[9]

5    **III.   THE PROCLAMATION DOES NOT VIOLATE THE CONSTITUTION**

6         **A.    THE PROCLAMATION IS CONSTITUTIONAL UNDER *MANDEL***

7         **1.**  The Supreme Court in *Mandel* held that when the Executive gives "a facially legitimate

8    and bona fide reason" for excluding an alien, "courts will neither look behind the exercise of that

9    discretion, nor test it by balancing its justification against the" asserted constitutional rights of

10   U.S. citizens.  408 U.S. at 770.  *Mandel* involved a First Amendment claim, but courts have

11   applied its test to other constitutional claims as well.  *See, e.g.*, *Fiallo*, 430 U.S. at 792-96 (equal

12   protection); *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (claims alleging discrimination

13   based on "religion, ethnicity, gender, and race"); *Washington v. Trump*, 858 F.3d 1168, 1179-82

14   (9th Cir. 2017) (Bybee, J., dissenting from denial of reconsideration en banc) (collecting cases).

15   *Mandel*'s rule reflects that the Constitution "exclusively" allocates power over the entry of aliens

16   to the "political branches," 408 U.S. at 765 (citation omitted), and that aliens abroad have no

17   constitutional rights at all regarding entry into the country.  *See Fiallo*, 430 U.S. at 792-96.[10]

18       *Mandel* compels rejecting Plaintiffs' Establishment Clause and equal protection claims.

19   The Proclamation's entry restrictions rest on facially legitimate reasons:  both protecting national

20   security and enhancing the government's leverage in persuading foreign governments to share

21   information needed to screen their nationals.  Procl. § 1.  The Proclamation also sets forth a bona

22   fide basis for these reasons:  after the worldwide review and diplomatic engagement required by

---

23       [9] If the Court accepted Plaintiffs' interpretation of §§ 1182(f) and 1152(a)(1)(A) as constraints on the
24   President's constitutional powers, even in response to an urgent crisis (*e.g.*, the brink of war with a particular
     country), then the statutes would raise grave constitutional questions.  The Court should reject Plaintiffs'
25   interpretation for that reason alone.
         [10] Contrary to Plaintiffs' assertion (Pls.' Br. 18), the Ninth Circuit has not rejected *Mandel*'s application to
26   Plaintiffs' Establishment Clause claim.  *See Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (expressly
     "reserv[ing] consideration" of Establishment Clause challenge).  And in *IRAP*, the Fourth Circuit agreed that
     *Mandel*'s test applies, although the court applied it incorrectly.  *See* 857 F.3d at 588.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 19
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1    EO-2, several nations continued to have inadequate information-sharing practices or otherwise

2    heightened risk factors that warranted entry restrictions.   It further explains that, based on the

3    Acting Secretary's recommendations and after consulting with members of the Cabinet, the

4    President "craft[ed] . . . country-specific restrictions that would be most likely to encourage

5    cooperation given each country's distinct circumstances, and that would, at the same time, protect

6    the United States until such time as improvements occur." *Id*. § 1(h)(i).  These facially legitimate

7    and bona fide reasons for the Proclamation's entry restrictions readily satisfy *Mandel*'s test.

8         **2.**  In its now-vacated decision in *IRAP*, the Fourth Circuit erroneously determined that

9    *Mandel*'s "bona fide" requirement permits courts to examine whether the Government's stated

10   reasons were given in good faith.  *See* 857 F.3d at 590-91.  But that understanding of *Mandel*

11   cannot be squared with subsequent Supreme Court authority, which equates *Mandel*'s standard

12   with rational-basis review.  *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017).

13   Rational-basis review is objective and does not permit probing government officials' subjective

14   intentions or second-guessing national-security and foreign-policy determinations.  *See W. & S.*

15   *Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 671-72 (1981).  That standard has

16   particular force here, as courts are generally "ill equipped to determine the[] authenticity and

17   utterly unable to assess the[] adequacy" of the Executive's "reasons for deeming nationals of a

18   particular country a special threat." *AAADC*, 525 U.S. at 491.[11]

19        In any event, Plaintiffs do not and cannot show that the Proclamation's stated national-

20   security and foreign-policy rationales were given in bad faith.  Plaintiffs cannot plausibly maintain

21   that the many government officials involved in the multi-agency review and diplomatic

22

23        [11] The Fourth Circuit based its approach in *IRAP* on a reference to "bad faith" in the concurrence in *Din*.
     *IRAP*, 857 F.3d at 590-91. But the concurrence did not propose an enormous loophole in *Mandel*, especially with

24   respect to a formal national-security and foreign-policy determination of the President.  It merely hypothesized that,
     if the government had not identified a factual basis for the consular officers' decision at issue, the plaintiff might

25   have been able to seek "additional factual details" about the basis of the consular officer's decision (provided the
     information is not classified).  *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in judgment).  In contrast, when the
     government does identify a factual basis—as it did in *Mandel* and *Din* by citing a statutory provision that itself

26   included sufficient factual predicates, and also has done here through the Proclamation's text—that is the end of the
     analysis.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 20
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1   engagement processes preceding the Proclamation were acting in bad faith or harbored anti-

2   Muslim animus.  *See United States v. Chemical Found., Inc.*, 272 U.S. 1, 14 (1926) (describing

3   the "presumption of regularity" that attaches to all federal officials' actions).

4         **B.**     **THE PROCLAMATION IS VALID EVEN APART FROM *MANDEL***

5        The Establishment and Equal Protection Clauses both require the government to "pursue

6   a course of neutrality toward religion."  *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512

7   U.S. 687, 696 (1994).  The Proclamation fully comports with that principle.  It does not draw

8   "explicit and deliberate distinctions" based on religion.  *Larson v. Valente*, 456 U.S. 228, 246 n.23

9   (1982).  To the contrary, it is entirely neutral in terms of religion.

10        The Proclamation also was not motivated by a religious purpose.  Even in the domestic

11   context, a court deciding whether official action violates the Establishment Clause because of an

12   improper religious purpose looks only to "the 'text, legislative history, and implementation of the

13   statute,' or comparable official act."  *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 862 (2005).

14   The court is not to engage in "judicial psychoanalysis of a drafter's heart of hearts."  *Id*.  Rather,

15   it is only an "official objective" of favoring or disfavoring religion that implicates the Clause.  *Id*.

16        There is no basis for invalidating the Proclamation under that standard either.  The

17   Proclamation's text does not refer to or draw any distinction based on religion.  And the

18   Proclamation's operation confirms that it is religion-neutral:  it applies tailored restrictions to

19   eight countries based on detailed findings, and the entry restrictions apply only to certain nationals

20   of those countries without regard to their religion.

21        Plaintiffs assert that an anti-Muslim purpose can be inferred from the Proclamation's

22   inclusion of six majority-Muslim countries.  Pls.' Br. 15.  But the Proclamation omits the

23   overwhelming number of majority-Muslim countries, including Sudan and Iraq, both of which

24   were included in prior entry suspensions.  It is neither surprising nor pernicious that those six

25   majority-Muslim countries are included, as five of them were previously identified by Congress

26   or DHS as countries presenting heightened terrorism-related concerns.  *See* 8 U.S.C.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 21
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

§ 1187(a)(12).  In addition, the Proclamation applies entry restrictions to two countries that do not have majority Muslim populations (North Korea and Venezuela), and a third country that has a substantial (approximately 48 percent) non-Muslim population (Chad).[12]  Plaintiffs' assertion also ignores that the Proclamation's entry restrictions are customized for each nation, specifically allowing entry of, for example, Iranian student and exchange visitors and all Libyan nonimmigrants besides those traveling on tourist or business visas.  *See* Procl. §§ 1(h), 2.

Plaintiffs rely almost exclusively on the Fourth Circuit's now-vacated conclusion that EO-2 was motivated by religious animus to argue that the Proclamation was similarly motivated.  Thus, Plaintiffs' purported evidence of improper purpose is largely a rehashing of campaign-trail statements and of informal remarks of the President's aides about EO-2 and Executive Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017) ("EO-1).  Even if those statements could be considered in the search for *official* purpose at all (and they cannot, as the Government previously argued), they do not show that the Proclamation's purpose is religious.

"[P]ast actions" cannot "forever taint" future government efforts.  *McCreary*, 545 U.S. at 874.  Nearly all of the statements on which Plaintiffs rely were made more than a year before the President issued the Proclamation.  And none of them address the Proclamation; rather, they are about campaign-trail suggestions that were never adopted, EO-1, or EO-2.  Finally, the "specific sequence of events" leading to the issuance of the Proclamation—especially the recommendations of the Acting Secretary after an extensive, multi-agency process—severs any connection between EO-2's supposed religious purpose and the Proclamation.  *Id.* at 866.

Unlike the third Ten Commandments display at issue in *McCreary*, which "quoted more of the purely religious language of the Commandments than the first two," 545 U.S. at 872, the Proclamation materially differs from EO-2 in ways that eliminate—rather than add to—any supposed religious message.  First, as to process, the Proclamation resulted from a multi-agency review that applied religion-neutral criteria to assess the risks posed by all nations, followed by a

---

[12] *See* CIA, The World Factbook: Africa: Chad, https://www.cia.gov/library/publications/the-world-factbook/geos/cd.html.

period of diplomatic engagement.  Second, as to substance, the Proclamation applies more tailored entry restrictions to a different set of countries than EO-1 or EO-2; among other things, majority Muslim countries like Sudan and Iraq have been removed, while non-majority Muslim countries like North Korea and Venezuela have been added.  The President's decision to require a neutral, worldwide review itself demonstrates that any supposed prior taint has been neutralized, as do the significant substantive differences between the Proclamation and EO-1 or EO-2.

Indeed, the Proclamation is more like the Maryland Sunday closing laws at issue in *McGowan*.  Despite acknowledging that the laws were originally enacted for a religious purpose, the Supreme Court determined they no longer retained their religious character because they had "undergone extensive changes from the[ir] earliest form."  366 U.S. at 431.  The Court noted the newer Sunday closing laws were "not simply verbatim re-enactments of their religiously oriented antecedents."  *Id*. at 448.  Moreover, although the new laws retained references to the "Sabbath" and the "Lord's day," *id*. at 445, the Court found it compelling that the laws' more recent exemptions, which allowed for some activities on Sunday, suggested their purpose was providing a day for rest rather than religion, *id*. at 448.  The transformations in the Proclamation are even more extensive.  Not only does it omit any reference to religion whatsoever, but it provides for tailored, country-specific restrictions that, like the exemptions in *McGowan*, evidence its national-security and foreign-policy origins and justifications.  The Proclamation thus represents a "genuine change[] in constitutionally significant conditions."  *McCreary*, 545 U.S. at 874.

## IV.   THE REMAINING FACTORS WEIGH AGAINST RELIEF

Plaintiffs cannot possibly demonstrate irreparable harm because they are already protected by the two nationwide injunctions currently in place.  *See supra* p. 2.  Even absent those injunctions, however, delay in entry alone does not amount to irreparable harm.  Until aliens abroad meet the otherwise-applicable visa requirements and seek and are denied a waiver, they have not received final agency action and their claimed harms are too remote and speculative to merit injunctive relief.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 23
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

On the other side of the scales, an injunction would cause direct, irreparable injury to the government and public interest. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). *A fortiori*, the same principle applies to a national-security and foreign-policy judgment of the President. *Agee*, 453 U.S. at 307; *Sale*, 509 U.S. at 188. The Court should not interfere with, or second-guess, such judgments.

## V.   A GLOBAL INJUNCTION WOULD BE INAPPROPRIATE

Constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). The Proclamation's severability clause compels the same approach. Procl. § 8(a). Thus, any injunction the Court enters should be limited to those aliens whose denial of entry the Court determines will impose on Plaintiffs a cognizable and irreparable harm.[13]

In *IRAP*, the Supreme Court stayed the injunctions against EO-2 as to aliens who lack a credible claim of a bona fide relationship with a U.S. person or entity. *See* 137 S. Ct. at 2088-89. The Court did not conclude that similar relief was required in all circumstances, and carefully tailored its stay to the equities in that case. This case is very different for the reasons described above, and the equitable balancing requires following the ordinary rule of plaintiff-specific relief.

## CONCLUSION

The Court should deny Plaintiffs' motion for a temporary restraining order.

---

[13] Although Plaintiffs request an injunction as to Section 1(g) of the Proclamation, their motion does not address that section specifically—either as to standing or the merits. Indeed, additional screening is not a suspension of entry under 8 U.S.C. § 1182(f). Moreover, Iraqi nationals have been subject to additional screening since EO-2's issuance, but Plaintiffs have never before sought to challenge it.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 24
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

1

DATED: October 23, 2017                    Respectfully submitted,

2

CHAD A. READLER
Acting Assistant Attorney General

3

JENNIFER D. RICKETTS
Director, Federal Programs Branch

4

JOHN R. TYLER
Assistant Director, Federal Programs Branch

5

6

*/s/ Michelle R. Bennett*
MICHELLE R. BENNETT

7

DANIEL SCHWEI

8

Senior Trial Counsel
U.S. Department of Justice

9

Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW

10

Washington, DC 20530
Tel: (202) 305-8902

11

Fax: (202) 616-8470
Email: michelle.bennett@usdoj.gov

12

13

*Attorneys for Defendants*

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 25
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**

## <u>CERTIFICATE OF SERVICE</u>

1

2        I hereby certify that, on October 23, 2017, a copy of the foregoing document was

3    electronically filed with the Clerk of the Court using the CM/ECF system which will send

4    notification of such filing to all counsel of record.

5    DATED this 23rd day of October, 2017.

6                                                  /s/ Michelle R. Bennett
                                                   MICHELLE R. BENNETT
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' OPPOSITION TO PLAINTIFFS' TRO MOTION - 26
*State of Washington, et al. v. Trump, et al.*, No. 2:17-cv-00141 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 305-8902**